UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| OHIO DEPARTMENT OF MEDICAID, et al., | : : : | |
| Plaintiffs, | : : | Case No. 21-cv-1502 |
| v. | : : | Judge Michael H. Watson |
| CENTENE CORPORATION, et al. | : : | Magistrate Judge Vascura |
| Defendants. | : : | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION TO FILE AND RETAIN COMPLAINT UNDER SEAL FOR THIRTY DAYS**

There are no secrets here; there is nothing that needs to be hidden or, in fact, that even justifies the filing of this lawsuit.[1] The Complaint in this case reflects a misunderstanding of the admittedly complex world of Medicaid accounting and billing in which Managed Care Organizations ("MCO") and Pharmacy Benefit Managers ("PBM") such as Defendants operate. Regrettably, the Complaint's filing ignored the contractual requirements to provide Defendants "timely written notification" of any alleged violation and "to make every reasonable effort to resolve the dispute." Instead, this lawsuit and the adjoining motion to seal the Complaint were filed without consulting -- or even notifying -- Defendants Centene Corporation ("Centene"), Buckeye Health Plan Community Solutions, Inc.,[2] ("Buckeye"), or Envolve Pharmacy

---

[1] The Sealing Order of March 11, 2021 applies only to the Complaint and not other filings in the case: "The Complaint shall be retained under seal with the Clerk of Courts for thirty (30) days. . . ." Upon entry of the Sealing Order, Plaintiffs simultaneously issued a press release describing the allegations of the "sealed" Complaint in detail. This media release stated "[t]he lawsuit was filed under seal due to a confidentiality and nondisclosure agreement," explaining why Plaintiffs concluded the Sealing Order did not preclude statewide dissemination of the "sealed" allegations. Nothing herein discloses the confidentiality and nondisclosure agreement or deals with issues Plaintiffs have not already made subject to media coverage.

[2] Defendant Buckeye Health Plan Community Solutions, Inc. is not a managed-care organization, has not entered a Provider Agreement with ODM, and has nothing to do with the conduct alleged in the Complaint. As such, all claims against Buckeye Health Plan Community Solutions should be dismissed. Buckeye Community

Solutions, Inc. ("Envolve"). Each of Plaintiffs' claims is easily explained away once the facts about Buckeyes' reporting and billings to the Ohio Department of Medicaid ("ODM") are understood.

Here, the State of Ohio is represented by outside, contingent-fee counsel from Jackson, Mississippi and Washington DC, alongside local counsel from Akron. Their remuneration is premised on initiating litigation; consequently, these outside counsel failed to recognize the regulatory history and precedents of Ohio's Medicaid system and violated the State's contractual requirements to first provide "timely written notification" of any alleged violation and "to make every reasonable effort to resolve the dispute." Instead, they sued Buckeye, a MCO which has a "provider contract" with ODM. They also sued Centene. Buckeye is a wholly-owned subsidiary of Centene, the nation's largest Medicaid service provider. And they sued Envolve, a second wholly-owned subsidiary of Centene that operates as a "PBM," providing pharmaceutical services, both directly and by subdelegation of certain functions, to Medicaid enrollees under Buckeye's provider contract.

Defendants view themselves as partners with ODM in striving to provide to Medicaid recipients the best possible medical care. Defendants believe this lawsuit could have been completely avoided had Plaintiffs chosen to work cooperatively, if the contractual and statutory obligations to engage each other when concerns arise had been followed, and Defendants had been provided an opportunity to address the issues in the Complaint. In fact, notwithstanding the filing of this lawsuit, Defendants are confident that if ODM would agree to engage in full dialogue with Defendants regarding these issues, an appropriate understanding of the facts would be reached.

---

Health Plan is a managed-care organization that contracted with ODM. Claims against Buckeye Community Health Plan, even if alleged properly, would fail. For ease of reference, references to "Buckeye" in this memorandum refer to the Buckeye Community Health Plan.

2

In the interim, because outside counsel chose to proceed in violation of the contract by filing this lawsuit, Defendants submit the Complaint should not be kept under seal, and Plaintiffs' counsel's basic misunderstanding of Medicaid accounting and billing practices for MCOs and PBMs under the ODM's contracts should be reviewed in the light of day.

The Complaint (or "Compl.") rests upon seven factual errors or misstatements on which the Complaint's three counts are based.  As the Court will see, each error is rooted in outside counsel's failure to engage in basic due diligence and/or their misunderstanding of the reporting requirements of Medicaid's laws and regulations.  Because the truth negates the underpinnings of Plaintiff's Complaint, lifting of the seal is necessary to avoid any implication that Defendants are hiding anything related to these issues.

> A. **Plaintiffs' Assertion No. 1:** Plaintiffs Allege Defendants Constructed a "Three-tiered PBM Structure" To Hide Information From ODM. [Compl. ¶¶ 25-35.]
>
> **Defendants' Response:**  Defendants Disclosed In Writing Envolve's PBM Structure Utilizing Caremark —Nothing Was Hidden.

It is undisputed that Buckeye contracts for pharmacy benefit services from Envolve, and it is undisputed that Envolve subdelegates a portion of its PBM work stream to Caremark.  The Complaint, failing to demonstrate an understanding of the responsibilities of each of these three companies, alleges "impropriety" in what it mislabels as a "Three-tiered PBM Structure," opaquely built to hide information from ODM.  [Compl. ¶¶ 25-35.]

If Defendants had been notified of this concern, or had Plaintiffs' outside counsel reviewed their clients' files, the Complaint would never have made this allegation.  ODM's files document that Buckeye disclosed Envolve's intent to subdelegate to Caremark nearly six months before its contract with Caremark was implemented.

3

A series of emails, portions of which are quoted in the following paragraphs, make this point perfectly clear.[3]

In March 2016, prior to Caremark coming on board, Buckeye sent an e-mail to an ODM official with the Subject line "Subdelegation for Pharmacy Claims."  The email stated, "I wanted to give you a heads up that Buckeye may be sub-delegating claims from US Script[4] [now Envolve] to Care Mark [sic] after the Centene acquisition of Health Net closes."  Two days later Buckeye sent another e-mail to ODM:  "I want to also highlight this acquisition will allow us to access improved pricing to pharmacies under Caremark contracts, and we intend to utilize that option as well."  The ODM contract administrator wrote back asking, "Can you explain what you mean by sub-delegating claims. Also, exactly what will Caremark be doing that currently US Scripts does (e.g., claims processing, PA decisions)?  Would the contract be between US Scripts and Caremark for this to happen?"  Buckeye responded, "We are only sub-delegating claims payment processing – Caremark will not be doing any PA or UM functions for our members. Yes, the contract will be between US Script and Caremark. Please let me know if you have any additional questions."

In May 2016, Buckeye again informed ODM of the involvement of Caremark, writing to its contract administrator:  "[a]s we've discussed, Buckeye will be moving from the US Script [now Envolve] claims processing system to Caremark's system, through a sub-delegated agreement between US Script and Caremark.  US Script remains the first line delegated entity with Buckeye."

---

[3]  To the extent Plaintiffs' counsel does not have the emails from this timeframe readily available, Defendants are ready to provide copies upon request.

[4]  US Script became Envolve several months after this e-mail.

4

Far from the undisclosed "opaque" structure alleged in the Complaint, these e-mails, and the follow-up discussions that occurred, informed ODM of Buckeye's PBM plan, answered the questions ODM presented and offered to answer more. Outside counsel's false accusation that Buckeye concealed the PBM structure from ODM is simply the result of counsel's failure to look at its own client's e-mails.

Moreover, ODM e-mails show that Envolve's PBM structure was widely discussed within ODM. The last e-mail in the chain, with the Subject line "Subdelegation for Pharmacy Claims," reflects involvement of four separate ODM officials. An April 2016 e-mail chain with the Subject line, "Buckeye's PBM (US Script/Caremark)" begins with an e-mail from ODM asking for details of the structure so "we can distribute among ourselves." Thus, ODM was not only aware of Buckeye's proposed PBM structure, but the Department also had multiple employees reviewing the proposal in the months preceding implementation.

While it was unnecessary for ODM to approve the subdelegation itself, ODM had to, and did, approve multiple follow-on consequences resulting from Envolve's subdelegation decision, including among others, notice to Buckeye's members regarding the termination of Walgreens, the distribution of new ID cards for members, and a Rx Network Disrupted member letter.

Not only did Buckeye answer ODM's questions, but at every step in the process ODM had the right to request copies of the Envolve contracts as well as any other documentation relating to the subdelegation arrangement. *See*, Article VII A of Provider Agreement and O.A.C. 5160-26-05.

B.    **Plaintiffs' Assertion No. 2:**  Plaintiffs Suggest that Defendants' Utilization Of Spread Pricing Was Improper.  [Compl. ¶ 34.]

**Defendants' Response:**  Spread Pricing Was The Traditional Pricing Model Permitted Under ODM's Contracts With Buckeye And All Other Ohio MCOs Prior To 2019—As ODM Acknowledged in Writing.

Having inaccurately claimed ODM did not know of Envolve's subdelegation to CareMark, the Complaint doubles down with a second, related factual mistake.  Paragraph 34 of the Complaint alleges that "Envolve always billed Buckeye significantly more than it paid Caremark for the claims processed in a given week," alleging Buckeye overcharged ODM.  The Complaint reflects no understanding that spread pricing contracts were the "traditional" and sole contractual model utilized by Ohio's five MCOs.

"The ODM Provider Agreements are uniform for all MCOs working at a given time for ODM."  [Compl. ¶ 14.]  Consequently, ODM's description of its contracts must be given credence.  In an August 14, 2018 letter, requesting that all PBMs move to a "pass-through pricing model," ODM acknowledged the established precedence of spread pricing, stating "Ohio Medicaid should move to a pass-through pricing model for Medicaid in place of *the traditional PBM contract with spread pricing*."  (Emphasis added.)

Indeed, the then-Auditor of the State also acknowledged the appropriateness of "the current practice of spread pricing contracts." (2018 Ohio's Medicaid Managed Care Pharmacy Services Auditor of State Report, p. 20.)  There, the very practice Plaintiffs' Complaint challenges is acknowledged as accepted by ODM:  "[a] type of contracting in which the amount paid by the managed care plan to the PBM for a specific prescription is different than the amount paid by the PBM to the pharmacy for the same prescription." *Id.*, at 7.

Furthermore, the report specifically notes that ODM contracts with Ohio's MCOs permitted a pricing spread between what the pharmacies were paid and what the PBMs are paid

6

for the same transaction. The then-Auditor stated, "the amount reimbursed to a pharmacy by a PBM does not correlate to the amount paid to the PBM by the managed care plan for the same transaction" and "has no impact on the overall Medicaid program's cost." (*Id.*, at 2.)

Yes, Envolve billed Buckeye more than it paid Caremark for the claims Caremark processed, as was appropriate under ODM's traditional spread pricing model. Because ODM permitted spread pricing, the allegations of Paragraph 34 of the Complaint, implying impropriety or fraud in the arrangement, fall away.

   **C.**   **Plaintiffs' Assertion No. 3:**   **Envolve Did Not Provide Substantive PBM Services. [Compl. ¶ 35.]**

    **Defendants' Response:**   **Envolve Provided Significant PMB Services Requiring Many Employees And Costing Millions of Dollars.**

In attacking Buckeye's PBM structure, the Complaint claims, "[t]he net effect of the Envolve-HNPS Contract was that by mid-2016, Caremark was handling most of the pharmacy benefit management responsibilities for Buckeye and was doing so for significantly less than Envolve was billing Buckeye for the work." [Compl. ¶ 35.]

Again, this allegation is simply untrue. As the e-mails cited above reflect, under Envolve's subdelegation agreement, Caremark would handle a limited, albeit important, set of PBM duties. Envolve retained responsibility to provide Clinical Programs, some Medication Therapy Management services, Vendor Oversight, Member Helpdesk, and Coordination of Member Engagement Solutions responsibilities. Envolve also retained the leading role for Formulary Management, Utilization Management, Specialty Benefit Management/Dispensing, Benefit Design, and Data Warehouse/Analytics/Reporting. Envolve also handled the necessary client billing services, member and provider portals for the Website and apps, coordination of

7

file transfers including encounters, compliance and audit support and systems access management responsibilities.

For Envolve to provide these services to Buckeye and other health plans across the country, Envolve employs more than 2,000 professionals and annually incurs hundreds of millions of dollars of related expenses. The claim that Envolve did not significantly contribute to the pharmacy services provided to Buckeye members simply elevates advocacy over accuracy.

> **D.** **Plaintiffs' Assertion No. 4:** Envolve Obtained A $1.25 Credit That It Failed To Pass Along To Buckeye. [Compl. ¶¶ 41-46.]
>
> **Defendants' Response:** Envolve Did Pass Through 100% of The $1.25 to Buckeye And Buckeye Submitted Those Cost Savings To ODM, As Noted In Multiple Cost Reports.

In paragraphs 41-46 of the Complaint, the Complaint alleges Envolve failed to disclose to ODM a $1.25 per claim credit it received from Caremark. Again, the allegation is based on a fundamental misunderstanding of Medicaid accounting.

For part of 2016 and all of 2018 (though not 2017), Envolve's contract with Caremark entitled Envolve to a $1.25 credit for certain retail pharmacy transactions Caremark handled. These $1.25 per claim credits were properly included on the Caremark invoices as a reduction in the amount due CareMark from Envolve.

While Envolve's invoices to Buckeye did not show the Caremark credit, Envolve nonetheless passed through 100% of these credits to Buckeye as a reduction to pharmacy claim costs. Had Defendants merely been asked, they would have identified that 100% of claims credits at issue are recorded in the Buckeye general ledger statements and were subsequently reported as a reduction to pharmacy claim costs in Buckeye's quarterly cost reports to ODM. These credits were handled separately, through the general ledger instead of being reported on

Envolve's invoices to Buckeye, because they are not considered to be part of the adjudicated claim cost.

In 2018 alone, Envolve passed through to Buckeye $5.9M in Caremark credits. Buckeye then treated these credits as it does other credits and rebates which are not part of claims adjudication: they are applied as adjustments to the pharmacy expense amount, creating a reduction of the total pharmacy expense reported to ODM.

The Complaint also incorrectly asserts these credits were hidden from ODM and were not considered in ODM's overall capitation rate calculations. In fact, the "Medicaid Managed Care Capitation Rate Certification" prepared in Ohio each year by Milliman, Inc., ODM's outside actuarial and consulting service, specifically identifies "annual cost report data submitted by the MCPs" as part of the "data used to develop the capitation rates." (*See,* Exh. 1 to the Complaint, at 70.)

    E.    **Plaintiffs' Assertion No. 5:  Plaintiffs Allege Buckeye Improperly Kept Savings It Generated Through The PBM.  [Compl. ¶ 28.]**

          **Defendants' Response:  Not Only Did The ODM Contract Permit Buckeye To Retain Savings It Generated Through Cost Efficiencies, But Buckeye Communicated Those Savings To ODM Thus Contributing To Subsequent Lower Capitation Rates For ODM.**

Paragraph 28 of the Complaint alleges that Buckeye, after successfully generating savings in performing its MCO responsibilities, improperly kept "the resulting savings as profits." But this claim ignores an important contractual reality of Ohio's Medicaid system: ODM paid Buckeye – and all other Ohio MCOs – on a "capitated basis" incentivizing them to generate, and entitling them to keep, cost savings they obtained.

9

To provide predictability to the State's Medicaid budgetary needs, and to put the risk of excessive costs on the MCOs and not the State, Buckeye and each of the other MCOs is paid a capitation rate—that is, a set per member per month payment.

The capitation rate is set at the start of each year. Under the ODM contract, if Buckeye experiences cost overruns, it must bear the entirety of the loss. On the other hand, if Buckeye can develop cost savings as part of the Medicaid coverage it offers, it is entitled to realize the savings. This concept is at the center of the contract between the State of Ohio and its five MCOs. To suggest that Buckeye's successful performance of its duties under the State's Medicaid contract is "improper" exhibits a fundamental misunderstanding of the MCO's role in providing quality healthcare and controlling costs for Ohio taxpayers.

It must be noted, any resulting cost savings also benefit ODM through the calculation of the next year capitation rate. One of the factors in setting the capitation rate is the cost of medical care, including pharmacy, experienced by the MCOs. Each year cost data is provided to ODM by Buckeye and the other MCOs so that ODM's actuaries can re-calibrate capitation rates common for all five plans. As discussed below, Buckeye provided ODM accurate cost data as part of the cost reporting process.

>    F.    **Plaintiffs' Assertion No. 6:**  **Plaintiffs Allege Envolve Paid A Lower Dispensing Fee Than It Charged To Buckeye. [Compl. ¶¶ 48-54.]**
>
>    **Defendants' Response:** **The Traditional Spread Pricing Contracts Entered By ODM Permitted A Pricing Spread For Dispensing Fees, And Buckeye Communicated To ODM The Dispensing Fee Charged By Envolve.**

Paragraphs 48-54 of the Complaint allege that "[t]he claims data provided by Caremark and Envolve show that Caremark was, in fact, charging an agreed-upon fifty cent dispensing fee to Envolve. The same claims data, however, show that Envolve was charging Buckeye a dispensing fee of $1.95 per claim. . . ." While the Complaint has these facts correct, it again

10

demonstrates a misunderstanding of ODM's own business methodology: the challenged conduct is entirely appropriate under ODM's spread pricing contracts.

In 2019, ODM engaged HealthPlan Data Solutions ("HDS") to analyze its shift from its historical "spread pricing" methodology to a "pass-through" approach. HDS issued a report entitled "Ohio Department of Medicaid (ODM) Analysis of Pass-Through Pricing Implementation, September 10, 2019." That report defined ODM's historical spread pricing approach:

> **Traditional (Spread) Pricing:** PBM charges a plan sponsor a contracted price with specified discounts and dispensing fees for prescription claims, while paying the pharmacy provider a different price with higher discounts and lower dispensing fees. The difference between the amount billed to the plan sponsor and paid to the pharmacy provider is known as spread and is retained by the PBM as revenue in lieu of charging the plan sponsor claim administration fee.

(*Id*., at 5.)

Exactly what the Complaint challenges was explicitly contemplated under ODM's then-existing contracts: the "PBM charges a plan sponsor a contracted price with specified discounts and **dispensing fees** for prescription claims, while paying the pharmacy provider a different price with higher discounts and **lower dispensing fees**." (*Id*.) (emphasis added).

The dispensing fees paid by Buckeye are and has been part of the encounter data reported to ODM for years, including the $1.95 dispensing fee. To suggest now this has been hidden from the state is wrong.

      **G.**      <u>**Plaintiffs' Assertion No. 7:**</u>  **Plaintiffs Allege That Envolve Billed Buckeye For Amounts Paid By Third Parties.  [Compl. ¶¶ 36-40.]**

      <u>**Defendants' Response:**</u>  **Plaintiffs' Assertion Relies On Irrelevant Documents And The Actual Billing Data Demonstrates That Payments By Third Parties Were Properly Deducted From Charges To Buckeye.**

Complaint paragraphs 36-40 assert that "Envolve billed Buckeye for amounts paid by third parties."  Again, these allegations are false.  They arise from a lack of understanding of Envolve's billing processes and a failure of outside counsel to appropriately inquire when outside counsel perceived an issue.

Because Medicaid is a "payor of last resort," payments made by others are not included in the costs of the Medicaid claim.  For instance, if the Buckeye member is covered by health insurance from a primary insurer, Ohio Medicaid does not cover the amount paid by the primary insurer.  If a claim is only partially covered by the primary insurer, Medicaid covers only the remaining portion.  In such circumstances, Envolve, as the PBM, accounts for the primary insurance by reducing the expense to Buckeye by the amount of the primary insurance paid.

To accomplish this, Envolve utilizes an additional data field known as "Other Payor Amount." Any values placed in the "Other Payor Amount" data field are deducted from the Ingredient Cost eventually presented to ODM, thus presumably lowering the cost to the Medicaid program.  Had there been an effort to resolve what the Complaint wrongly labeled incorrect billing, Defendants could easily have shown counsel where these "Other Payor Amounts" are appropriately and accurately deducted within the electronic invoices submitted weekly to Buckeye.

Admittedly, there was an inaccuracy within the IT logic used to create a portion of the .pdf invoices.  However, it is absolutely false that this inaccuracy affected the amount billed to Buckeye or the accuracy of the data submitted to ODM.  The inaccurate calculation only related

to a small section of the .pdf invoices generated by Envolve labeled "Billing Summary" – a supplemental table for informational purposes which had no impact on the amount billed or paid by the plan. The flawed IT logic was neither replicated nor utilized in the generation of the electronic data provided to Buckeye for billing and payment purposes. Indeed, the .pdf in which the flawed logic existed was not submitted to ODM.

To be clear, the data within electronic data invoices submitted and paid by Buckeye, and subsequently submitted to ODM for cost-reporting purposes, correctly captured and properly deducted the amounts paid by third parties.

Because of the importance of this issue, Defendant's next five paragraphs admittedly delve into granularity, but hopefully this explanation will assist in resolving a misunderstanding that could have been resolved with a mere telephone call by Plaintiffs' outside counsel.

As set out in the Complaint, the allegation of improperly billing for amounts paid by third parties is all based on .pdf invoices prepared and sent weekly by Envolve to Buckeye. However, the .pdf invoices were never utilized for billing and payment purposes. Rather, for each billing cycle, Envolve submitted to Buckeye billing data through an electronic invoice payment system. The electronic data is what was/is utilized to accomplish the billing/payment transactions. The electronic data has never been challenged as inaccurate. In today's computerized world, tens-of-thousands of claims totaling millions of dollars are transacted on a weekly basis without utilizing .pdf documents.

To be clear, there was a flaw in the IT logic used to create a section of the .pdf document, titled "Billing Summary." Specifically, when a claim involved an "Other Payor Amount," the IT logic first deducted the dollar amount paid by a member's primary insurer from the encounter's Ingredient Cost, as is appropriate. However, the flawed logic then also deducted

13

the amount paid by the member's primary insurer *a second time* from a cell titled "Adjustment Cost." This *second* deduction of the amount paid by a member's primary insurer caused the Adjustment Cost number within the Billing Summary to be incorrect by the value of the primary insurance payment, and the error resulted in an incorrect value in the Billing Summary section of the .pdf invoice. However, this IT logic flaw was not connected to any formula effecting the ultimate "payable" amount of Envolve's weekly .pdf summary, nor was this inaccuracy contained in the weekly electronic transmission upon which payment by Buckeye was transmitted.

While Ingredient Cost and Adjustment Cost were generated by the flawed IT logic contained within the .pdf document, the two data fields in the Billing Summary section of the .pdf document which would be the most critical -- those being "Total" and "Billed Amount" – were not generated by the IT logic, but instead were pulled from hard-coded numbers found elsewhere in the document.

The miscalculation is remedied by adding back one of the two "Other Payor Amounts" which were deducted from Ingredient Cost.

The above paragraphs demonstrate that this IT logic flaw can easily cause confusion, and Defendants continually strive toward process improvement. Here, outside counsel cannot be blamed for their confusion. But they should have complied with the statutory and contractual requirements to raise, and attempt to resolve, any concerns. Defendants would have provided a fulsome and understandable explanation if requested. Most importantly, a review of the electronic data (which Plaintiff's counsel did, in fact, possess) would have eliminated any concern that third party payments were not being handled correctly. Good faith review of the

electronic claims data would have shown that third party payments were being correctly deducted before any payment was made by Buckeye to Envolve.

## CONCLUSION

As these facts reflect, the factual misunderstandings upon which the Complaint is based could have been avoided had Plaintiffs' outside counsel simply followed the contractual and statutory requirements which obligated plaintiffs to ask for explanations of their concerns. Although Plaintiffs had a contractual duty to do so, as well as a duty to attempt to resolve any real issues, their outside counsel ignored those obligations and pursued the litigation route instead.

The Sealing Order should be vacated now: the disclosure of Plaintiffs' allegations in their March 11 media release, resulting in false allegations being disseminated statewide against Defendants, destroyed any value the Court's original sealing order had. (*See* Footnote 1). Having eviscerated the protections ordered by the Court, Plaintiffs can have no objection to unsealing the Complaint.[5] Defendants therefore request the Court to vacate the March 11 Sealing Order immediately.

Dated: April 2, 2021

Respectfully submitted,

/s/ John W. Zeiger
John W. Zeiger (0010707)
Marion H. Little, Jr. (0042679)
ZEIGER, TIGGES & LITTLE LLP
3500 Huntington Center
41 South High Street
Columbus, Ohio 43215
(614) 365-9900
(Fax) (614) 365-7900
zeiger@litohio.com
little@litohio.com

---

[5] Defendants have no objection to a continuing agreement or order not to file materials publicly that are, or should be, subject to a "confidentiality and non-disclosure agreement."

*Attorneys for Defendants Centene Corporation, Buckeye Health Plan Community Solutions, Inc. and Envolve Pharmacy Solutions*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on April 2, 2021, the foregoing was filed with the Court using the Clerk of Court's electronic filing system, which will serve copies of the foregoing on counsel of record. An additional copy is being delivered by email transmission.

/s/ Marion H. Little, Jr
Marion H. Little, Jr.  (0042679)

898439