S0215 - K4

# EXHIBIT 1

**S0215 – K5**

Medicaid Managed Care
Baseline

### THE OHIO DEPARTMENT OF MEDICAID
### OHIO MEDICAL ASSISTANCE PROVIDER AGREEMENT
### FOR MANAGED CARE PLAN

This Provider Agreement (hereinafter "Agreement") is entered into this first day of July, 2017, at Columbus, Franklin County, Ohio, between the State of Ohio, The Ohio Department of Medicaid, (hereinafter referred to as ODM) whose principal offices are located in the City of Columbus, County of Franklin, State of Ohio, and _____, Managed Care Plan (hereinafter referred to as the MCP), an Ohio corporation, whose principal office is located in the city of _____, County of _____, State of Ohio.

The MCP is licensed as a Health Insuring Corporation by the State of Ohio, Department of Insurance (hereinafter referred to as ODI), pursuant to Chapter 1751 of the Ohio Revised Code (ORC) and is organized and agrees to operate as prescribed by Chapter 5160-26 of the Ohio Administrative Code (OAC), and other applicable portions of the OAC as amended from time to time.

The MCP is an entity eligible to enter into a provider agreement in accordance with 42 CFR (Code of Federal Regulations) 438.3 and is engaged in the business of providing comprehensive health care services as defined in 42 CFR 438.2 through the managed care program for the Medicaid eligible population described in OAC rule 5160-26-02 and any other Medicaid eligible populations authorized by the Centers for Medicare and Medicaid Services (CMS) and described in Ohio's Medicaid State Plan.

ODM, as the single state agency designated to administer the Medicaid program under Section 5162.03 of the ORC and Title XIX of the Social Security Act, desires to obtain MCP services for the benefit of certain Medicaid recipients. In so doing, the MCP has provided and will continue to provide proof of the MCP's capability to provide quality services, efficiently, effectively and economically during the term of this Agreement.

This Agreement is a contract between ODM and the undersigned MCP, provider of medical assistance, pursuant to the federal contracting provisions of 42 CFR 434.6 and 438.6 in which the MCP agrees to provide comprehensive Medicaid services through the managed care program as provided in OAC Chapter 5160-26, assuming the risk of loss, and at all times complying with federal and state laws and regulations, federal and state Medicaid program requirements, and other requirements as specified by ODM. This includes without limitation Title VI of the Civil Rights Act of 1964; Title IX of the Education Amendments of 1972 (regarding education programs and activities); the Age Discrimination Act of 1975; the Rehabilitation Act of 1973; the Americans with Disabilities Act; and Section 1557 of the Affordable Care Act.

#### ARTICLE I - GENERAL

A. ODM enters into this Agreement in reliance upon the MCP's representations that it has the necessary expertise and experience to perform its obligations hereunder, and the MCP represents and warrants that it does possess such necessary expertise and experience.

B. The MCP agrees to communicate with the Director of the Office of Managed Care (OMC) (hereinafter referred to as OMC) or his or her designee as necessary in order for the MCP to ensure its understanding of the responsibilities and satisfactory compliance with this Agreement.

S0215 – K6

Medicaid Managed Care
Baseline

C. The MCP agrees to furnish its staff and services as necessary for the satisfactory performance of the services as enumerated in this Agreement.

D. ODM may, from time to time as it deems appropriate, communicate specific instructions and requests to the MCP concerning the performance of the services described in this Agreement. Upon such notice and within the designated time frame after receipt of instructions, the MCP shall comply with such instructions and fulfill such requests to the satisfaction of the department. It is expressly understood by the parties that these instructions and requests are for the sole purpose of performing the specific tasks requested to ensure satisfactory completion of the services described in this Agreement, and are not intended to amend or alter this Agreement or any part thereof.

ARTICLE II - TIME OF PERFORMANCE

A. Upon approval by the Director of ODM, this Agreement shall be in effect from the date executed through June 30, 2018, unless this Agreement is suspended or terminated pursuant to Article VIII prior to the termination date, or otherwise amended pursuant to Article IX.

ARTICLE III - REIMBURSEMENT

A. ODM will reimburse the MCP in accordance with the terms of this Agreement or OAC, as applicable.

ARTICLE IV - RELATIONSHIP OF PARTIES

A. ODM and the MCP agree that, during the term of this Agreement, the MCP shall be engaged with ODM solely on an independent contractor basis, and neither the MCP nor its personnel shall, at any time or for any purpose, be considered as agents, servants or employees of ODM or the state of Ohio. The MCP shall therefore be responsible for all the MCP's business expenses, including, but not limited to, employee's wages and salaries, insurance of every type and description, and all business and personal taxes, including income and Social Security taxes and contributions for Workers' Compensation and Unemployment Compensation coverage, if any. Pursuant to ORC 145.038, ODM is required to provide individuals and business entities with fewer than five employees the Independent Contractor Acknowledgment (Form PEDACKN). This form requires the MCP to acknowledge that ODM has notified the MCP that it has not been classified as a public employee and no Ohio Public Employees Retirement System (OPERS) contributions will be made on behalf of the MCP, its employees, or its subcontractors for these services. If the MCP is a business entity with fewer than five employees, each employee shall complete the PEDACKN form.

B. The MCP agrees to comply with all applicable federal, state, and local laws in the conduct of the work hereunder.

C. ODM retains the right to ensure that the MCP's work is in conformity with the terms and conditions of this Agreement.

D. Except as expressly provided herein, neither party shall have the right to bind or obligate the other party in any manner without the other party's prior written consent.

S0215 — K7

Medicaid Managed Care
Baseline

**ARTICLE V - CONFLICT OF INTEREST; ETHICS LAWS**

A. In accordance with the safeguards specified in Section 27 of the Office of Federal Procurement Policy Act (41 U.S.C. 423) and other applicable federal requirements, no officer, member or employee of the MCP, the Director of OMC, or other ODM employee who exercises any functions or responsibilities in connection with the review or approval of this Agreement or provision of services under this Agreement shall, prior to the completion of such services or reimbursement, acquire any interest, personal or otherwise, direct or indirect, which is incompatible or in conflict with, or would compromise in any manner or degree the discharge and fulfillment of his or her functions and responsibilities with respect to the carrying out of such services. For purposes of this article, "members" does not include individuals whose sole connection with the MCP is the receipt of services through a health care program offered by the MCP.

B. The MCP represents, warrants, and certifies that it and its employees engaged in the administration or performance of this Agreement are knowledgeable of and understand the Ohio Ethics and Conflicts of Interest laws and Executive Order 2011-03K. The MCP further represents, warrants, and certifies that neither the MCP nor any of its employees will do or cause any act or omit any action that is inconsistent with such laws and Executive Order. The Governor's Executive Orders may be found by accessing the following website:
http://www.governor.ohio.gov/MediaRoom/ExecutiveOrders.aspx

C. The MCP hereby covenants that the MCP, its officers, members and employees of the MCP, shall not, prior to the completion of the work under this Agreement, voluntarily acquire any interest, personal or otherwise, direct or indirect, which is incompatible or in conflict with or would compromise in any manner of degree the discharge and fulfillment of his or her functions and responsibilities under this Agreement. The MCP shall periodically inquire of its officers, members and employees concerning such interests.

D. Any such person who acquires an incompatible, compromising or conflicting personal or business interest, on or after the effective date of this Agreement, or who involuntarily acquires any such incompatible or conflicting personal interest, shall immediately disclose his or her interest to ODM in writing. Thereafter, he or she shall not participate in any action affecting the services under this Agreement, unless ODM shall determine in its sole discretion that, in the light of the personal interest disclosed, his or her participation in any such action would not be contrary to the public interest. The written disclosure of such interest shall be made to: Director, OMC, ODM.

E. No officer, member or employee of the MCP shall promise or give to any ODM employee anything of value that is of such a character as to manifest a substantial and improper influence upon the employee with respect to his or her duties. The MCP, along with its officers, members and employees, understand and agree to take no action, or cause ODM or its employees to take any action, which is inconsistent with the applicable Ohio ethics and conflict of interest laws including without limitation those provisions found in Chapter 102 and Chapter 2921 of the ORC.

F. The MCP hereby covenants that the MCP, its officers, members and employees are in compliance with Section 102.04 of the ORC and that if MCP is required to file a statement pursuant to 102.04(D)(2) of the ORC, such statement has been filed with the ODM in addition to any other required filings.

S0215 – K8

Medicaid Managed Care
Baseline

**ARTICLE VI - NONDISCRIMINATION OF EMPLOYMENT**

A. The MCP agrees that in the performance of this Agreement or in the hiring of any employees for the performance of services under this Agreement, the MCP shall not by reason of race, color, religion, gender, gender identity, sexual orientation, age, disability, national origin, military status, health status, genetic information or ancestry, discriminate against any individual in the employment of an individual who is qualified and available to perform the services to which the Agreement relates.

B. The MCP agrees that it shall not, in any manner, discriminate against, intimidate, or retaliate against any employee hired for the performance or services under the Agreement on account of race, color, religion, gender, sexual orientation, age, disability, national origin, military status, health status, genetic information or ancestry.

C. In addition to requirements imposed upon subcontractors in accordance with OAC Chapter 5160-26, the MCP agrees to hold all subcontractors and persons acting on behalf of the MCP in the performance of services under this Agreement responsible for adhering to the requirements of paragraphs (A) and (B) above and shall include the requirements of paragraphs (A) and (B) above in all subcontracts for services performed under this Agreement, in accordance with OAC rule 5160-26-05.

**ARTICLE VII - RECORDS, DOCUMENTS AND INFORMATION**

A. The MCP agrees that all records, documents, writings or other information produced by the MCP under this Agreement and all records, documents, writings or other information used by the MCP in the performance of this Agreement shall be treated in accordance with OAC rule 5160-26-06 and shall be provided to ODM, or its designee, if requested. The MCP shall maintain an appropriate record system for services provided to members. The MCP shall retain all records in accordance with 42 CFR 438.3(u).

B. All information provided by the MCP to ODM that is proprietary shall be held to be strictly confidential by ODM. Proprietary information is information which, if made public, would put the MCP at a disadvantage in the market place and trade of which the MCP is a part [see ORC Section 1333.61(D)]. The MCP agrees to expressly indicate by marking the top or bottom of each individual record containing information the MCP deems proprietary or trade secret, regardless of media type (CD-ROM, Excel file etc.) prior to its release to ODM. Upon request from ODM, the MCP agrees to promptly notify ODM in writing of the nature of the proprietary information including all reasonable evidence regarding the nature of the proprietary information in records submitted to ODM. The MCP also agrees to provide for the legal defense of all proprietary information submitted to ODM. ODM shall promptly notify the MCP in writing or via email of the need to legally defend the proprietary information such that the MCP is afforded the opportunity to adequately defend such information. Failure to provide such prior notification or failure to legally defend the proprietary nature of such information is deemed to be a waiver of the proprietary nature of the information, and a waiver of any right of the MCP to proceed against ODM for violation of this Agreement or of any proprietary or trade secret laws. Such failure shall also be deemed a waiver of trade secret protection in that the MCP will have failed to make efforts that are reasonable under the circumstances to maintain the information's secrecy. The provisions of this Article are not self-executing.

**S0215 – K9**

Medicaid Managed Care
Baseline

C. The MCP shall not use any information, systems, or records made available to it for any purpose other than to fulfill the duties specified in this Agreement. The MCP agrees to be bound by the same standards of confidentiality that apply to the employees of ODM and the State of Ohio, including without limitation the confidentiality requirements found in 42 CFR Part 431 Subpart F and ORC 5160.45, as well as 42 CFR Part 2 and ORC 5119.27, as applicable. The terms of this section shall be included in any subcontracts executed by the MCP for services under this Agreement. The MCP shall implement procedures to ensure that in the process of coordinating care, each enrollee's privacy is protected consistent with the confidentiality requirements in 45 CFR parts 160 and 164.

D. The MCP agrees, certifies and affirms that HHS, US Comptroller General or representatives of either entity will have access to books, documents, and other business records of the MCP.

E. All records relating to performance, under or pertaining to this Agreement will be retained by the MCP in accordance to the appropriate records retention schedule. Pursuant to 42 CFR 438.3(u) and 42 CFR 438.3(h), the appropriate records retention schedule for this Agreement is for a total period of 10 years as are the audit and inspection rights for those records. For the initial three (3) years of the retention period, the records shall be stored in a manner and place that provides readily available access. If any records are destroyed prior to the date as determined by the appropriate records retention schedule, the MCP agrees to pay to ODM all damages, costs, and expenses incurred by ODM associated with any cause, action or litigation arising from such destruction.

F. The MCP agrees to retain all records in accordance with any litigation holds that are provided to them by ODM, and actively participate in the discovery process if required to do so, at no additional charge. Litigation holds may require the MCP to keep the records longer then the approved records retention schedule. The MCP will be notified by ODM when the litigation hold ends and retention can resume based on the approved records retention schedule. If the MCP fails to retain the pertinent records after receiving a litigation hold from ODM, the MCP agrees to pay to ODM all damages, costs and expenses incurred by ODM associated with any cause, action or litigation arising from such destruction.

G. The MCP shall promptly notify ODM of any legal matters and administrative proceedings including, but not limited to, litigation and arbitration, which involve or otherwise pertain to the activities performed pursuant to this Agreement and any third party. In the event that the MCP possesses or has access to information and/or documentation needed by ODM with regard to the above, the MCP agrees to cooperate with ODM in gathering and providing such information and/or documentation to the extent permissible under applicable law.

ARTICLE VIII - NONRENEWAL AND TERMINATION

A. This Agreement may be terminated, by the ODM or the MCP upon written notice in accordance with the applicable rule(s) of the OAC, with termination to occur at the end of the last day of the termination month.

B. Subsequent to receiving a notice of termination from ODM, the MCP beginning on the effective date of the termination, shall cease provision of services on the terminated activities under this Agreement; terminate all subcontracts relating to such terminated activities, take all necessary or

S0215 – K10

Medicaid Managed Care
Baseline

appropriate steps to limit disbursements and minimize costs, and comply with the requirements specified in this Agreement, as of the date of receipt of notice of termination describing the status of all services under this Agreement.

C.  In the event of termination under this Article, the MCP shall be entitled to request reconciliation of reimbursements through the final month for which services were provided under this Agreement, in accordance with the reimbursement provisions of this Agreement. The MCP agrees to waive any right to, and shall make no claim for, additional compensation against ODM by reason of such suspension or termination.

D.  In the event of termination under this Article, the MCP shall return all records in their native format relating to cost, work performed, supporting documentation for invoices submitted to ODM, and copies of all materials produced under or pertaining to this Agreement.

E.  ODM may, in its sole discretion, terminate or fail to renew this Agreement if the MCP or MCP's subcontractors violate or fail to comply with the provisions of this Agreement or other provisions of law or regulation governing the Medicaid program. Where ODM proposes to terminate or refuse to enter into a provider agreement, the provisions of applicable sections of the OAC with respect to ODM's suspension, termination or refusal to enter into a provider agreement shall apply, including the MCP's right to request an adjudication hearing under Chapter 119 of the ORC. The MCP does not have the right to request an adjudication hearing under Chapter 119 of the ORC to challenge any action taken or decision made by ODM with respect to entering into or refusing to enter into a provider agreement with the MCP pursuant to Section 5167.10 of the Revised Code.

F.  When initiated by the MCP, termination of or failure to renew the Agreement requires written notice to be received by ODM at least 240 days in advance of the termination or renewal date, provided, however, that termination or non-renewal shall be effective at the end of the last day of a calendar month. In the event of non-renewal of the Agreement with ODM, if the MCP is unable to provide the required number of days of notice to ODM prior to the date when the Agreement expires, then the Agreement shall be deemed extended to the last day of the month that meets the required number of days from the date of the termination notice, and both parties shall, for that time, continue to fulfill their duties and obligations as set forth herein. If the MCP wishes to terminate or not renew their Agreement for a specific region(s), ODM reserves the right to initiate a procurement process to select additional MCPs to serve Medicaid consumers in that region(s). ODM, at its discretion, may use the MCP's termination or non-renewal of this Agreement as a factor in any future procurement process.

G.  The MCP understands that availability of funds to fulfill the terms of this Agreement is contingent on appropriations made by the Ohio General Assembly and the United States government for funding the Medicaid program. If sufficient funds are not available from the Ohio General Assembly or the United States government to make payments on behalf of a specific population (Aged, Blind, Disabled, Modified Adjusted Gross Income, or Adult Extension) to fulfill the terms of this Agreement, the obligations, duties and responsibilities of the parties with respect to that population will be terminated except as specified in Appendix P as of the date funding expires. If the Ohio General Assembly or the United States government fails at any time to provide sufficient funding for ODM or the State of Ohio to make payments due under this Agreement, this Agreement will terminate as of the date funding expires without further obligation of ODM or the State of Ohio.

S0215 – K11

Medicaid Managed Care
Baseline

## ARTICLE IX - AMENDMENT AND RENEWAL

A. This writing constitutes the entire Agreement between the parties with respect to all matters herein. This Agreement may be amended only by a writing signed by both parties. Any written amendments to this Agreement shall be prospective in nature.

B. In the event that changes in state or federal law, regulations, an applicable waiver or state plan amendment, or the terms and conditions of any applicable federal waiver or state plan amendment, require ODM to modify this Agreement, ODM shall notify the MCP regarding such changes and this Agreement shall be automatically amended to conform to such changes without the necessity for executing written amendments pursuant to this Article of this Agreement.

C. This Agreement supersedes any and all previous Agreements, whether written or oral, between the parties.

D. A waiver by any party of any breach or default by the other party under this Agreement shall not constitute a continuing waiver by such party of any subsequent act in breach of or in default hereunder.

E. If the MCP was not selected as a contractor as a result of a procurement process, the expiration of this Agreement shall not be considered a termination or failure to renew. The MCP will have the ability to protest the award of the contract in accordance with the process that will be described in the Request for Applications.

## ARTICLE X - LIMITATION OF LIABILITY

A. The MCP agrees to indemnify and to hold ODM and the state of Ohio harmless and immune from any and all claims for injury or damages resulting from the actions or omissions of the MCP in the fulfillment of this Agreement or arising from this Agreement which are attributable to the MCP's own actions or omissions, or of those of its trustees, officers, employees, agents, subcontractors, suppliers, third parties utilized by the MCP, or joint ventures. Such claims shall include but are not limited to: any claims made under the Fair Labor Standards Act or under any other federal or state law involving wages, overtime, or employment matters and any claims involving patents, copyrights, trademarks and applicable public records laws. The MCP shall bear all costs associated with defending ODM and the state of Ohio against these claims.

B. The MCP hereby agrees to be liable for any loss of federal funds suffered by ODM for enrollees resulting from specific, negligent acts or omissions of the MCP or its subcontractors during the term of this Agreement, including but not limited to the nonperformance of the duties and obligations to which the MCP has agreed under this Agreement.

C. In the event that, due to circumstances not reasonably within the control of the MCP or ODM, a major disaster, epidemic, complete or substantial destruction of facilities, war, riot or civil insurrection occurs, neither ODM nor the MCP will have any liability or obligation on account of reasonable delay in the provision or the arrangement of covered services; provided that so long as

# S0215 - K12

Medicaid Managed Care
Baseline

the MCP's Certificate of Authority remains in full force and effect, the MCP shall be liable for the covered services required to be provided or arranged for in accordance with this Agreement.

D. In no event shall either party be liable to the other party for indirect, consequential, incidental, special or punitive damages, or lost profits.

## ARTICLE XI - ASSIGNMENT

A. Medicaid members may not be transferred by one MCP to another entity without the express prior written approval of ODM. Even with ODM's prior written approval, ODM reserves the right to offer such members the choice of MCPs outside the normal open enrollment process and implement an assignment process as ODM determines is appropriate. Any member transfer shall be submitted for ODM's review 120 days prior to the desired effective date. ODM shall use reasonable efforts to respond to any such request for approval within the 120 day period. Failure of ODM to act on a request for approval within the 120 day period does not act as an approval of the request. ODM may require a receiving MCP to successfully complete a readiness review process before the transfer of members under this Agreement.

B. MCPs shall not assign any interest in this Agreement and shall not transfer any interest in the same (whether by assignment or novation) without the prior written approval of ODM and subject to such conditions and provisions as ODM may deem necessary. No such approval by ODM of any assignment shall be deemed in any event or in any manner to provide for the incurrence of any obligation by ODM in addition to the total agreed-upon reimbursement in accordance with this Agreement. Any assignments of interest shall be submitted for ODM's review 120 days prior to the desired effective date. ODM shall use reasonable efforts to respond to any such request for approval within the 120 day period. Failure of ODM to act on a request for approval within the 120 day period does not act as an approval of the request. ODM may require a receiving MCP to successfully complete a readiness review process before the transfer of obligations under this Agreement.

C. The MCP shall not assign any interest in subcontracts of this Agreement and shall not transfer any interest in the same (whether by assignment or novation) without the prior written approval of ODM and subject to such conditions and provisions as ODM may deem necessary. Any such assignments of subcontracts shall be submitted for ODM's review 30 days prior to the desired effective date. No such approval by ODM of any assignment shall be deemed in any event or in any manner to provide for the incurrence of any obligation by ODM in addition to the total agreed-upon reimbursement in accordance with this Agreement.

## ARTICLE XII - CERTIFICATION MADE BY THE MCP

A. This Agreement is conditioned upon the full disclosure by the MCP to ODM of all information required for compliance with state and federal regulations.

B. The MCP certifies that no federal funds paid to the MCP through this or any other Agreement with ODM shall be or have been used to lobby Congress or any federal agency in connection with a particular contract, grant, cooperative agreement or loan. The MCP further certifies its continuing compliance with applicable lobbying restrictions contained in 31 U.S.C. 1352 and 45 CFR Part 93. If this Agreement exceeds $100,000, the MCP has executed the Disclosure of Lobbying Activities,

S0215 - K13

Medicaid Managed Care
Baseline

Standard Form LLL, if required by federal regulations. This certification is material representation of fact upon which reliance was placed when this Agreement was entered into.

C. The MCP certifies that neither the MCP nor any principals of the MCP (i.e., a director, officer, partner, or person with beneficial ownership of more than 5% of the MCP's equity) is presently debarred, suspended, proposed for debarment, declared ineligible, or otherwise excluded from participation in transactions by any Federal agency. The MCP also certifies that it is not debarred from consideration for contract awards by the Director of the Department of Administrative Services, pursuant to either ORC Section 153.02 or ORC Section 125.25. The MCP also certifies that the MCP has no employment, consulting or any other arrangement with any such debarred or suspended person for the provision of items or services or services that are significant and material to the MCP's contractual obligation with ODM. This certification is a material representation of fact upon which reliance was placed when this Agreement was entered into. Federal financial participation (FFP) is not available for amounts expended for providers excluded by Medicare, Medicaid, or SCHIP, except for emergency services. If it is ever determined that the MCP knowingly executed this certification erroneously, then in addition to any other remedies, this Agreement shall be terminated pursuant to Article VIII, and ODM shall advise the Secretary of the appropriate federal agency of the knowingly erroneous certification.

D. The MCP certifies that the MCP is not on the most recent list established by the Secretary of State, pursuant to Section 121.23 of the ORC, which identifies the MCP as having more than one unfair labor practice contempt of court finding. This certification is a material representation of fact upon which reliance was placed when this Agreement was entered into.

E. The MCP agrees not to discriminate against individuals who have or are participating in any work program administered by a County Department of Job and Family Services (CDJFS) under Chapters 5101 or 5107 of the ORC.

F. The MCP certifies and affirms that, as applicable to the MCP, that no party listed or described in Division (I) or (J) of Section 3517.13 of the ORC who was in a listed position at the time of the contribution, has made as an individual, within the two previous calendar years, one or more contributions in excess of one thousand dollars ($1,000.00) to the present Governor or to the Governor's campaign committees during any time he/she was a candidate for office. This certification is a material representation of fact upon which reliance was placed when this Agreement was entered into. If it is ever determined that the MCP's certification of this requirement is false or misleading, and not withstanding any criminal or civil liabilities imposed by law, the MCP shall return to ODM all monies paid to the MCP under this Agreement. The provisions of this section shall survive the expiration or termination of this Agreement.

G. The MCP agrees to refrain from promising or giving to any ODM employee anything of value that is of such a character as to manifest a substantial and improper influence upon the employee with respect to his or her duties.

H. The MCP agrees to comply with the false claims recovery requirements of 42 U.S.C 1396a(a)(68) and to also comply with ORC 5162.15.

**S0215 – K14**

Medicaid Managed Care
Baseline

I.   The MCP, its officers, employees, members, any subcontractors, and/or any independent contractors (including all field staff) associated with this Agreement agree to comply with all applicable state and federal laws regarding a smoke-free and drug-free workplace. The MCP will make a good faith effort to ensure that all MCP officers, employees, members, and subcontractors will not purchase, transfer, use or possess illegal drugs or alcohol, or abuse prescribed drugs in any way while performing their duties under this Agreement.

J.   The MCP certifies and confirms that any performance of experimental, developmental, or research work shall provide for the rights of the Federal Government and the recipient in any resulting invention.

K.   The MCP certifies and confirms that it agrees to comply with all applicable standards orders or regulations of the Clean Air Act and Federal Water Pollution Control Act.

L.   The MCP agrees that it is in compliance with the Federal Acquisition Regulation (FAR) for Combatting Trafficking in Persons, 48 CFR Subpart 22.17, in which "the United States Government has adopted a zero tolerance policy regarding trafficking in persons." The provisions found in 48 CFR Subpart 52.2, specifically Subpart 52.222-50 are hereby incorporated into this Agreement by reference. ODM reserves the right to immediately and unilaterally terminate this Agreement if any provision in this section is violated and ODM may implement Section 106(g) of the Trafficking Victims Protection Act of 2000, as amended (22 USC 7104), *see* 2 CFR Part 175.

**ARTICLE XIII - CONSTRUCTION**

A.   This Agreement shall be governed, construed and enforced in accordance with the laws and regulations of the state of Ohio and appropriate federal statutes and regulations. The provisions of this Agreement are severable and independent, and if any such provision shall be determined to be unenforceable, in whole or in part, the remaining provisions and any partially enforceable provision shall, to the extent enforceable in any jurisdiction, nevertheless be binding and enforceable.

**ARTICLE XIV - INCORPORATION BY REFERENCE**

A.   OAC Chapter 5160-26 is hereby incorporated by reference as part of this Agreement having the full force and effect as if specifically restated herein.

B.   Appendices A through Q and any additional appendices are hereby incorporated by reference as part of this Agreement having the full force and effect as if specifically restated herein. Appendix P and any other applicable obligations set forth in this Agreement will survive the termination or non-renewal of this Agreement.

C.   In the event of inconsistence or ambiguity between the provisions of OAC Chapter 5160-26 and this Agreement, the provisions of OAC Chapter 5160-26 shall be determinative of the obligations of the parties unless such inconsistency or ambiguity is the result of changes in federal or state law, as provided in Article IX of this Agreement, in which case such federal or state law shall be determinative of the obligations of the parties. In the event OAC 5160-26 is silent with respect to any ambiguity or inconsistency, the Agreement (including Appendices B through Q and any additional appendices), shall be determinative of the obligations of the parties. In the event that a

## S0215 – K15

Medicaid Managed Care
Baseline

dispute arises which is not addressed in any of the aforementioned documents, the parties agree to make every reasonable effort to resolve the dispute, in keeping with the objectives of the Agreement and the budgetary and statutory constraints of ODM.

**ARTICLE XV – NOTICES**

All notices, consents, and communications hereunder shall be given in writing, shall be deemed to be given upon receipt thereof, and shall be sent to the addresses first set forth below.

**ARTICLE XVI – HEADINGS**

The headings in this Agreement have been inserted for convenient reference only and shall not be considered in any questions of interpretation or construction of this Agreement.

The parties have executed this Agreement the date first written above. The Agreement is hereby accepted and considered binding in accordance with the terms and conditions set forth in the preceding statements.


Intentionally blank.

**MCP NAME:**

BY: _____          DATE: _____
   PRESIDENT & CEO
   ADDRESS: _____



**THE OHIO DEPARTMENT OF MEDICAID:**

BY: _____          DATE: _____
   BARBARA R. SEARS , DIRECTOR
   50 West Town Street, Columbus, Suite 400, Columbus, Ohio 43215

**S0215 – K16**

Medicaid Managed Care
Table of Contents

**Ohio Department of Medicaid (ODM)**
**Medicaid Managed Care Provider Agreement**
**Table of Contents**

| **APPENDIX** | **TITLE** |
|---|---|
| APPENDIX A | OAC RULES |
| APPENDIX B | SERVICE AREA SPECIFICATIONS |
| APPENDIX C | PLAN RESPONSIBILITIES |
| APPENDIX D | ODM RESPONSIBILITIES |
| APPENDIX E | RATE METHODOLOGY |
| APPENDIX F | MARKETING AND MEMBER COMMUNICATIONS |
| APPENDIX G | COVERAGE AND SERVICES |
| APPENDIX H | PROVIDER PANEL SPECIFICATIONS |
| APPENDIX I | PROGRAM INTEGRITY |
| APPENDIX J | FINANCIAL PERFORMANCE |
| APPENDIX K | QUALITY CARE |
| APPENDIX L | DATA QUALITY |
| APPENDIX M | QUALITY MEASURES AND STANDARDS |
| APPENDIX N | COMPLIANCE ASSESSMENT SYSTEM |
| APPENDIX O | PAY-FOR-PERFORMANCE (P4P) AND QUALITY WITHOLD |
| APPENDIX P | PLAN TERMINATIONS/NONRENEWALS |
| APPENDIX Q | PAYMENT REFORM |

**S0215 - K17**

Medicaid Managed Care
Appendix A
OAC Rules

**APPENDIX A**

**OAC RULES**

The managed care program rules are located in Ohio Administrative Code (OAC) chapter 5160-26 and can be accessed electronically through the Ohio Department of Medicaid's Managed Care webpage.

S0215 – K18

Medicaid Managed Care
Appendix B
Service Area Specifications

**APPENDIX B**

**SERVICE AREA SPECIFICATIONS**

1.  **Service Areas.** The MCP agrees to provide services to Aged, Blind or Disabled (ABD) members, Modified Adjusted Gross Income (MAGI) members, and Adult Extension members residing in the following service area(s):

    | | |
    |---|---|
    | Central/Southeast Region | ☒ |
    | Northeast Region | ☒ |
    | West Region | ☒ |

    The ABD and MAGI categories of assistance are described in OAC rule 5160-26-02. The Adult Extension category is defined in Ohio's Medicaid State Plan as authorized by the Centers for Medicare and Medicaid Services (CMS).

    The MCP shall serve all counties in any region they agree to serve. Section 2 of this appendix lists all of the counties in each region.

2.  **Ohio MCP Regions.**

    Counties in the Central/Southeast Region

    | | | | | |
    |---|---|---|---|---|
    | Athens | Franklin | Jefferson | Morrow | Pickaway |
    | Belmont | Gallia | Knox | Meigs | Pike |
    | Coshocton | Guernsey | Lawrence | Monroe | Ross |
    | Crawford | Harrison | Licking | Morgan | Scioto |
    | Delaware | Hocking | Logan | Muskingum | Union |
    | Fairfield | Jackson | Madison | Noble | Vinton |
    | Fayette | | Marion | Perry | Washington |

    Counties in the Northeast Region

    | | | | | |
    |---|---|---|---|---|
    | Ashland | Cuyahoga | Huron | Medina | Summit |
    | Ashtabula | Erie | Lake | Mahoning | Trumbull |
    | Carroll | Holmes | Lorain | Richland | Tuscarawas |
    | Columbiana | Geauga | Portage | Stark | Wayne |

    Counties in the West Region

    | | | | | |
    |---|---|---|---|---|
    | Adams | Clermont | Hancock | Miami | Seneca |
    | Allen | Clinton | Hardin | Montgomery | Shelby |
    | Auglaize | Darke | Henry | Ottawa | Van Wert |
    | Brown | Defiance | Highland | Paulding | Williams |
    | Butler | Fulton | Lucas | Preble | Wood |
    | Champaign | Greene | Mercer | Putnam | Wyandot |
    | Clark | Hamilton | | Sandusky | Warren |

S0215 – K19

Medicaid Managed Care
Appendix C
Plan Responsibilities

## APPENDIX C

## PLAN RESPONSIBILITIES

The following are Managed Care Plan (MCP) responsibilities not otherwise specifically stated in Ohio Administrative Code (OAC) rule or elsewhere in this Agreement.

1. The MCP shall implement program modifications as soon as reasonably possible or no later than the required effective date, in response to changes in applicable state and federal laws and regulations.

2. The MCP shall submit a current copy of its Certificate of Authority (COA) to the Ohio Department of Medicaid (ODM) within 30 days of issuance by the Ohio Department of Insurance (ODI).

3. The MCP shall designate the following:

   a. A primary contact person (the Contract Compliance Officer) who will dedicate a majority of his or her time to the Medicaid product line and coordinate overall communication between ODM and the MCP. ODM may also require the MCP to designate contact staff for specific program areas. The Medicaid Contract Compliance Officer will be responsible for ensuring the timeliness, accuracy, completeness and responsiveness of all MCP submissions to ODM.

   b. A provider relations representative for each service area included in this Agreement. This provider relations representative can serve in this capacity for only one service area.

4. **Communications.** The MCP shall take all necessary and appropriate steps to ensure all MCP staff are aware of, and follow, the following communication process:

   a. All MCP employees are to direct all day-to-day submissions and communications to their ODM-designated Contract Administrator within the Office of Managed Care (OMC) unless otherwise notified by ODM. If the MCP needs to contact another area of ODM in any other circumstance, the Contract Administrator within the OMC shall also be copied or otherwise included in the communication.

   b. Entities that contract with ODM should never be contacted by the MCP unless ODM has specifically instructed the MCP to contact these entities directly.

   c. Because the MCP is ultimately responsible for meeting program requirements, ODM will only discuss MCP issues with the MCP's subcontractor when the MCP is also participating in the discussion or when the MCP grants ODM permission to do so. MCP subcontractors should communicate with ODM when the MCP is participating, or when the MCP grants authorization to communicate directly with ODM.

5. The MCP shall be represented at all meetings and events designated by ODM that require mandatory attendance.

S0215 — K20

Medicaid Managed Care
Appendix C
Plan Responsibilities

6. The MCP shall have an administrative office located in Ohio.

7. The MCP shall have its Ohio Medicaid Managed Care program member call center(s) located in the state of Ohio.

8. **Required MCP Staff.** The MCP shall have the key Ohio Medicaid Managed Care program staff identified below based and working in the state of Ohio. Key management and supervisory staff for positions associated with new products and services shall be in place at least 60 days prior to the effective date of the new products and services. Each key staff person identified below may occupy no more than one of the positions listed below, unless the MCP receives prior written approval from ODM stating otherwise. These key staff are:

   a. **Administrator/CEO/COO** or their designee shall serve in a full time (40 hours weekly) position available during ODM business hours to fulfill the responsibilities of the position and to oversee the entire operation of the MCP. The Administrator shall devote sufficient time to the MCP's operations to ensure adherence to program requirements and timely responses to ODM.

   b. **Medical Director/CMO** who is a physician with a current, unencumbered license through the Ohio State Medical Board. The Medical Director shall have at least three years of training in a medical specialty. The Medical Director shall devote full time (minimum 32 hours weekly) to the MCP's operations to ensure timely medical decisions, including after-hours consultation as needed. The Medical Director shall be actively involved in all major clinical and quality management components of the MCP. At a minimum, the Medical Director shall be responsible for:

      i. Development, implementation and medical interpretation of medical policies and procedures including, but not limited to, service authorization, claims review, discharge planning, credentialing and referral management, and medical review included in the MCP grievance system;

      ii. Administration of all medical management activities of the MCP; and

      iii. Serve as director of the Utilization Management committee and chairman or co-chairman of the Quality Assessment and Performance Improvement committee.

   c. **Behavioral Health (BH) Administrative Director.** With the BH carve-in to managed care expected to occur on July 1, 2018, the MCP shall employ a BH Administrative Director who possesses an independent, current and unrestricted Ohio license to provide BH services in the State of Ohio (MD, DO, RN with Advanced Practice Certification, Psychologist, LISW, PCC, IMFT) and has a minimum of five years of experience in the provision and supervision of treatment service for mental illness and substance use disorders. The BH Administrative Director shall demonstrate knowledge and understanding of Ohio's overall BH system which includes mental health, alcohol and drug addiction, and developmental disabilities services. He or she shall be responsible for the daily operational activities of BH services across the full spectrum of care to members, inclusive of mental health and substance abuse services. The primary functions of the BH Administrative Director are:

**S0215 – K21**

Medicaid Managed Care
Appendix C
Plan Responsibilities

  i. Ensuring access to BH services including mental health and substance abuse services;

  ii. Ensuring systematic screening for BH related disorders by utilizing standardized and/or evidence-based approaches;

  iii. Promoting preventive BH strategies;

  iv. Identifying and coordinating assistance for identified Beneficiary needs specific to BH;

  v. Participating in management and program improvement activities with other key staff (including the BH Clinical Director) for enhanced integration with primary care and coordination of BH services and achievement of outcomes; and

  vi. Working with the BH Clinical Director, as needed, in the development and maintenance of programs and systems.

d. **Behavioral Health (BH) Clinical Director.** With the BH carve-in to managed care expected to occur on July 1, 2018, the MCP shall employ dedicated part-time staff, at a minimum, with continuous engagement to perform the functions of a BH Clinical Director. These personnel must be practicing within the scope of his or her license, and must hold a current unrestricted Ohio license as either a Clinical Psychologist, or a Board Certified Psychiatrist, with a minimum of three years professional experience in a clinical setting.

  i. The MCP must include at least one Board Certified Psychiatrist, who shall be a prescriber, to perform the following BH Clinical Director functions:

   1. Play a lead role in monitoring the overall safety of patients with a BH diagnosis, with a special focus on safe prescribing;

   2. Serving as a key clinical lead in developing and implementing evidenced based clinical policies and practices;

   3. Participating in regulatory/accreditation reviews;

   4. Assuming key role in quality improvement initiatives, case management activities and member safety activities (i.e. incident management);

  ii. All other duties and responsibilities of the BH Clinical Director staff shall include:

   1. BH coverage determination for utilization management to ensure members receive appropriate and medically necessary care in the most cost-effective setting;

   2. Oversight and quality improvement activities associated with case management activities;

S0215 — K22

Medicaid Managed Care
Appendix C
Plan Responsibilities

    3. Providing guidance to BH orientation and network development/ recruitment in conjunction with provider relations, value-based contracting, support of episodes of care and full integration of BH services;

    4. Assisting in the review of utilization data to identify variances in patterns, and providing feedback and education to MCP staff and providers as appropriate; and

    5. Representing the MCP as the primary clinical liaison to members, providers and ODM.

e. **Contract Compliance Officer** who will serve as the primary point-of-contact for all MCP operational issues. The primary functions of the Contract Compliance Officer may include but are not limited to coordinating the tracking and submission of all contract deliverables; fielding and coordinating responses to ODM inquiries, coordinating the preparation and execution of contract requirements, random and periodic audits and site visits.

f. **Provider Services Representatives** who will resolve provider issues, including, but not limited to, problems with claims payment, prior authorizations (PA) and referrals.

g. **Care Management (CM) Director** who is an Ohio-licensed registered nurse or an Ohio-licensed independent social worker preferably with a designation as a Certified Case Manager (CCM) from the Commission for Case Manager Certification (CCMC). The CM Director is responsible for overseeing the day-to-day operational activities of the Care Management Program in accordance with state guidelines. The CM Director is responsible for ensuring the functioning of care management activities across the continuum of care (assessing, planning, implementing, coordinating, monitoring, and evaluating). The CM Director shall have experience in the activities of care management as specified in 42 CFR §438.208. Primary functions of the CM Director position are to ensure:

    i. The implementation of mechanisms for identifying, assessing, and developing a treatment plan for an individual with special health care needs;

    ii. Access to primary care, behavioral health, and coordination of health care services for all members; and

    iii. The coordination of services furnished to the enrollee with the services the enrollee receives from any other health care entity.

h. **Utilization Management (UM) Director** who is an Ohio-licensed registered nurse or a physician with a current unencumbered license through the Ohio State Medical Board. This person may have a certification as a Certified Professional in Health Care Quality (CPHQ) by the National Association for Health Care Quality (NAHQ) and/or Certified in Health Care Quality and Management (CHCQM) by the American Board of Quality Assurance and Utilization Review Providers. The UM Director is responsible for overseeing the day-to-day operational activities of the Utilization Management Program

S0215 – K23

Medicaid Managed Care
Appendix C
Plan Responsibilities

in accordance with state guidelines. The UM Director shall have experience in the activities of utilization management as specified in 42 CFR 438.210. Primary functions of the Director of Utilization Management position are to ensure:

    i. There are written policies and procedures regarding authorization of services and that these are followed;

    ii. Consistent application of review criteria for authorization decisions;

    iii. Decisions to deny or reduce the amount of services are made by a health care professional who has appropriate clinical expertise in treating the enrollee's condition or disease;

    iv. Notices of adverse action meet the requirements of 42 CFR 438.404; and

    v. All decisions are made within the specified allowable time frames.

i. **Early and Periodic Screening, Diagnosis and Treatment (EPSDT)/Maternal Child Health Manager** who is an Ohio licensed registered nurse, physician, or physician's assistant; or has a Master's degree in health services, public health, or health care administration and other related field and/or a CPHQ or CHCQM. Staffing under this position should be sufficient to meet quality and performance measure goals. The primary functions of the EPSDT/MCH Manager are:

    i. Ensuring receipt of EPSDT services;

    ii. Ensuring receipt of maternal and postpartum care;

    iii. Promoting family planning services;

    iv. Promoting preventive health strategies;

    v. Identifying and coordinating assistance for identified member needs specific to maternal/child health and EPSDT;

    vi. Interfacing with community partners; and

    vii. Pregnancy Related Services Coordinator

j. **Quality Improvement (QI) Director** is a member of the MCP QI leadership team who is either an Ohio-licensed registered nurse, physician or physician's assistant, or who is certified as a CPHQ by the National Association for Healthcare Quality, CQIA by the American Society for Quality (ASQ), and/or a CHCQM by the American Board of Quality Assurance and Utilization Review Providers (ABQAURP) within six months of employment. The Quality Improvement Director shall have experience in quality management and quality improvement as specified in 42 CFR §438.200 – 438.424. The primary functions of the Quality Improvement Director position are:

    i. Developing and managing the MCP's portfolio of improvement projects;

S0215 – K24

Medicaid Managed Care
Appendix C
Plan Responsibilities

  ii. Ensuring individual and systemic quality of care and services through modeling and encouraging systems thinking;

  iii. Assisting the MCP leadership team in integrating quality throughout the organization's culture through working with staff from different program areas to identify and address improvement opportunities;

  iv. Assisting the MCP's leadership team (defined in Appendix K) in communicating the cross-cutting nature of improvement efforts and the relationship of improvement efforts to the MCP and ODM quality strategies and improved state health outcomes;

  v. Assisting the MCP's leadership team in identifying and prioritizing initiatives within the MCP quality improvement strategy;

  vi. Supporting MCP improvement teams, including elevating resource, IT, analytic, and staffing needs by bringing to the attention of the leadership team;

  vii. Increasing MCP staff effectiveness through providing training opportunities in quality improvement and reinforcing effective implementation;

  viii. Incorporating the results of quality improvement assessments and evaluations into the MCP's quality strategy;

  ix. Monitoring, reporting, and presentation of quality improvement initiative status and results over time to both internal and external audiences; and

  x. Working with all MCPs and ODM to improve population health outcomes.

 k. **Community Engagement Coordinator**, a position that formalizes current MCP engagement activities in priority communities. Depending on the size of the population being served, at least one FTE will be devoted to Community Engagement Coordinator responsibilities. These responsibilities may be filled by multiple individuals. Community Engagement Coordinator responsibilities will include:

  i. Serving as the MCP's primary point(s) of contact for ODM-sanctioned improvement efforts involving community-based organizations and requiring community outreach and active involvement in priority communities (e.g., community-based infant mortality reduction);

  ii. Attending or overseeing MCP attendance at community events in priority communities (e.g., trainings, racism dialogues, infant mortality awareness events);

  iii. In-person communication with funded community-based organizations in order to bolster the presence of the MCP itself as a collaborative and trusted partner of the CBO and as a supporter of the ODM initiative;

## S0215 – K25

Medicaid Managed Care
Appendix C
Plan Responsibilities

    iv.  Collaborating with other MCPs' coordinators to communicate and address community concerns;

    v.  Coordinating the tracking and submission of process measures, as needed, related to MCP improvement efforts in communities (e.g. infant mortality reduction efforts in high priority areas);

    vi.  Identifying additional community engagement opportunities and developing a plan to participate in or support those opportunities; and

    vii.  Responding to ODM inquiries related to MCP community engagement activities.

9. Upon request by ODM, the MCP shall submit information on the current status of their company's operations not specifically covered under this Agreement unless otherwise excluded by law.

10. The MCP shall ensure employees, including subcontractor staff, receive training on applicable program requirements, and represent, warrant and certify to ODM that such training occurs, or has occurred. Training will be commensurate with provider function and will include at a minimum an introduction to: behavioral health benefits, evidence-based practices for both behavioral health and medical conditions, person-centered care delivery approaches and other subjects as specified by ODM. Individuals who oversee training shall have demonstrable experience and expertise in the topic for which they are providing training.

11. All employees of the MCP and the MCP's subcontractors who have in-person contact with a member in the member's home shall comply with criminal record check requirements as specified by ODM.

12. If the MCP determines that it does not wish to provide, reimburse, or cover a counseling service or referral service due to an objection to the service on moral or religious grounds, it shall immediately notify ODM to coordinate the implementation of this change. The MCP is required to notify their members of this change at least 30 days prior to the effective date. The MCP's member handbook and provider directory, as well as all marketing materials, will need to include information specifying any such services that the MCP will not provide.

13. For any data and/or documentation that the MCP is required to maintain, ODM may request that the MCP provide analysis of this data and/or documentation to ODM in an aggregate format, such format to be solely determined by ODM.

14. The MCP is responsible for determining medical necessity for services and supplies requested for its members as specified in OAC rule 5160-26-03. Notwithstanding such responsibility, ODM retains the right to make the final determination on medical necessity in specific member situations. In accordance with OAC rule 5160-26-03.1, the MCP shall make its medical necessity review policies and procedures available to ODM, contracting and non-contracting providers.

15. The MCP shall submit medical records at no cost to ODM and/or its designee upon request.

S0215 - K26

Medicaid Managed Care
Appendix C
Plan Responsibilities

16. **Provider Panel Changes.** In addition to the provisions in OAC 5160-26-05, the MCP shall notify the OMC:

   a. Within·one business day of becoming aware that an MCP panel provider that served 500 or more of the MCP's members failed to notify the MCP that they are·no longer available·to serve as an MCP panel provider;

   b. At least 4 months before the effective date of a systemic change in panel. ODM defines a systemic change in panel as an MCP-initiated termination or change in availability of any single provider or combination of providers, which are included in the provider contract termination in question, serving 500 or more of the MCP's members. For example, the MCP terminates ten providers each serving 450 members. This termination shall be reported, even though the providers individually do not meet the 500 member requirement. Overall, the group termination impacts 4,500 members and shall be reported. ODM reserves the right to require that the MCP align an MCP initiated systemic change in panel to the annual open enrollment month; or

   c. Within one business day of becoming aware of a provider-initiated hospital unit closure.

17. **Additional Benefits.** The MCP may elect to provide services in addition to those covered under the Ohio Medicaid fee-for-service (FFS) program. Before the MCP notifies potential or current members of the availability of those services, the MCP shall first notify ODM of its plans to make such services available. If the MCP elects to provide additional services, the MCP shall ensure to the satisfaction of ODM that the services are readily available and accessible to members who are eligible to receive them. Additional benefits shall be made available to members for at least six calendar months from the date approved by ODM. Additional benefits may not vary by county within a region except out of necessity for transportation arrangements (e.g., bus versus cab). MCPs approved to serve members in more than one region may vary additional benefits between regions.

   a. The MCP is required to make transportation available to any member requesting transportation when the member shall travel 30 miles or·more from his or her home to receive a medically-necessary Medicaid-covered service provided by the MCP pursuant to OAC rule 5160-26-03 and Appendix G of this Agreement. If the MCP offers transportation to their members as an additional benefit and this transportation benefit only covers a limited number of trips, the required transportation listed above may not .. be counted toward this trip limit.

   b. The MCP shall give ODM and members 90 days prior notice when decreasing or ceasing any additional benefits. When the MCP finds that it is impossible to provide 90 days prior notice for reasons beyond its control, as demonstrated to ODM's satisfaction, ODM shall be notified within at least one business day.

18. **Behavioral Health Crisis Services.** Beginning July 1, 2018, the MCP shall ensure protocols, policies and processes are in place for MCP and/or delegated staff to appropriately address member contacts related to behavioral health crisis needs. Protocols shall include, at a minimum, the involvement of qualified health professionals whose scope of practice and

S0215 – K27

Medicaid Managed Care
Appendix C
Plan Responsibilities

licensure permits them to perform the required functions associated with the services. Staff shall have: experience with behavioral health crisis assessment and intervention as applicable, a mechanism to validate that the individual received the needed services (e.g. connection to crisis counseling services), and the ability to activate the MCP's process 24/7.

19. **Provision of Transportation Services.** The MCP shall ensure transportation pick-up is completed not more than 15 minutes before or 15 minutes after the pre-scheduled pick-up time, ensuring the member is on time for their appointment. Following a scheduled appointment, transportation pick-up shall be completed no more than 30 minutes after a request for pick-up following a scheduled appointment. The vendor shall attempt to contact the member if he/she does not respond at pick-up.

   a. The vendor shall not leave the pick-up location prior to the pre-scheduled pick-up time.

   b. The MCP shall identify and accommodate the special transportation assistance needs of their members (e.g., door-to-door assistance, attendant support, member-specific timeliness requirements). Member-specific needs shall be communicated to the transportation vendor and updated as frequently as is needed to support the member's needs. Where applicable, these needs shall be documented in the member's care plan.

   c. The MCP shall submit a plan for the provision of transportation services during winter snow and other weather emergencies, specifying identification, triage, transportation of consumers requiring critical services, notification to consumers of canceled transportation and rescheduling. The plan shall specify the snow emergency level and any other weather-related criteria that require a change to scheduled transportation. The MCP shall notify the Contract Administrator immediately when transportation is canceled in accordance with the plan.

20. **Member Rights.** The MCP shall comply with 42 CFR 438.100, OAC rule 5160-26-08.3 and any applicable federal and state laws that pertain to member rights and ensure its staff adhere to such laws when furnishing services to its members. The MCP shall include a requirement in its contracts with affiliated providers that such providers also adhere to applicable Federal and State laws when providing services to members.

21. **Cultural Competency and Communication Needs.** The MCP is responsible for promoting the delivery of services in a culturally competent manner, as defined by the National Standards for Culturally and Linguistically Appropriate Services (CLAS) in Health and Health Care (https://www.thinkculturalhealth.hhs.gov/clas), to all members, including those with limited English proficiency (LEP) and diverse cultural and ethnic backgrounds. The MCP shall make oral interpreter services for all languages available free of charge to all members and eligible individuals pursuant to 42 CFR Section 438.10(c)(4). The MCP shall comply with the requirements specified in OAC rules 5160-26-03.1, 5160-26-05, and 5160-26-05.1 for providing assistance to LEP members and eligible individuals. In addition, the MCP shall provide written translations of certain MCP materials in the prevalent non-English languages of members and eligible individuals in accordance with the following:

S0215 – K28

Medicaid Managed Care
Appendix C
Plan Responsibilities

a. If ODM identifies prevalent non-English languages in the MCP's service area, the MCP, as specified by ODM, shall translate marketing and member materials, including but not limited to HIPAA privacy notices, into the primary languages of those groups. The MCP shall make these marketing and member materials available to eligible individuals free of charge.

b. The MCP shall utilize a centralized database which records the special communication needs of all MCP members (i.e., those with LEP, limited reading proficiency [LRP], visual impairment, and hearing impairment) and the provision of related services (i.e., MCP materials in alternate format, oral interpretation, oral translation services, written translations of MCP materials, and sign language services). This database shall include all MCP member primary language information (PLI) as well as all other special communication needs information for MCP members, as indicated above, when identified by any source including but not limited to ODM, the Hotline, MCP staff, providers, and members. This centralized database shall be readily available to MCP staff and be used in coordinating communication and services to members, including the selection of a primary care provider (PCP) who speaks the primary language of an LEP member, when such a provider is available.

c. The MCP shall share specific communication needs information with its providers [e.g., PCPs, Pharmacy Benefit Managers (PBMs), and Third Party Administrators (TPAs)], as applicable.

d. The MCP shall submit to ODM, upon request, information regarding the MCP's members with special communication needs, which could include individual member names, their specific communication need, and any provision of special services to members (i.e., those special services arranged by the MCP as well as those services reported to the MCP which were arranged by the provider).

e. The MCP is responsible for ensuring that all member materials use easily understood language and format. The determination of whether materials comply with this requirement is in the sole discretion of ODM.

f. The MCP shall participate in ODM's cultural competency initiatives.

g. The MCP will use person-centered language in all communication with eligible individuals and members. Person-first language resources are available from national organization, including The Centers for Disease Control and Prevention, The Arc, and the National Inclusion Project.

22. **Healthchek and Pregnancy Related Services.** Healthchek, Ohio's early and periodic screening, diagnostic and treatment (EPSDT) and Pregnancy Related Services programs are outlined in OAC rules 5160:1-2-15, 5160:1-2-16, and 5160-1-14.

a. Informing members about Healthchek, the MCP shall:

S0215 – K29

Medicaid Managed Care
Appendix C
Plan Responsibilities

    i. Inform each member under the age of 21 about Healthchek services as prescribed by ODM and as specified by 42 CFR. Section 441.56 within 7 calendar days of their effective date of enrollment in the MCP. The MCP may meet this requirement by including information with the new member materials as specified in Appendix F. In addition, the MCP may be required to communicate with the member's local County Department of Job and Family Services (CDJFS) agency any requests made by the member for County coordinated services and/or supports (e.g. social services).

    ii. Provide members with accurate information in the member handbook regarding Healthchek. The MCP's member handbooks shall be provided to members within the time frames specified in this appendix, and shall include verbatim the model language developed by ODM. The model language at a minimum will include:

        1. A description of the types of screening and treatment services covered by Healthchek;

        2. A list of the intervals at which individuals under age 21 should receive screening examinations, as indicated by the most recent version of the document entitled "Recommendations for Preventive Pediatric Health Care," published by Bright Futures/American Academy of Pediatrics;

        3. Information that Healthchek services are provided at no additional cost to the member; and

        4. Information that providers may request prior authorization for:

            a. Coverage of services that have limitations; and/or

            b. Services not covered for members age 21 and older if the services are medically necessary EPSDT services.

    iii. Provide the above Healthchek information in 25.a.ii on the MCP's member website specified in this Appendix.

    iv. Deliver Healthchek information as provided, or as approved, by ODM to its members at the following intervals:

        1. When the member is 9 months old;

        2. When the member is 18 months old;

        3. When the member is 30 months old;

        4. January of each calendar year to all members under the age of 21; and

S0215 — K30

Medicaid Managed Care
Appendix C
Plan Responsibilities

        5.  At the beginning of each school year in the month of July for members from age 4 to under 21.

        6.  When the member is identified as pregnant.

    v.  Use the mailing templates provided by ODM not to exceed two 8x11 pages for each mailing with most mailings being one page or less in length. The MCP shall populate the materials with appropriate Healthchek information as required (e. g. type of service, rendering provider, date of service and age of member on the date of service).

b.  Informing Members about Pregnancy Related Services (PRS):

    i.  Upon the identification of a member as pregnant, the MCP shall deliver to the member within 14 calendar days a PRS form as designated by ODM.

    ii.  The MCP may be required to communicate with the member's local CDJFS agency any requests made by the member for County coordinated services and supports (e.g. social services).

c.  Informing providers about Healthchek, the MCP shall:

    i.  Provide Healthchek education to all contracted providers on an annual basis which shall include, at a minimum:

        1.  The required components of a Healthchek exam as specified in OAC rule 5160-01-14;

        2.  A list of the intervals at which individuals under age 21 should receive screening examinations, as indicated by the most recent version of the document "Recommendations for Preventive Pediatric Health Care" published by Bright Futures/American Academy of Pediatrics;

        3.  A statement that Healthchek includes a range of medically necessary screening, diagnostic and treatment services; and

        4.  A list of common billing codes and procedures related to the Healthchek services (e.g., immunizations, well child exams, laboratory tests, and screenings).

    ii.  Provide the above information on the MCP's provider website as specified in this Appendix.

d.  The MCP shall maintain documentation to verify members and providers were informed of Healthchek and PRS as specified by ODM.

Medicaid Managed Care
Appendix C
Plan Responsibilities

23. **Advance Directives.** The MCP shall comply with the advance directives requirements specified in 42 CFR 422.128. At a minimum, the MCP shall:

   a. Maintain written policies and procedures that meet the requirements for advance directives, as set forth in 42 CFR Subpart I of part 489 (42 CFR 489.100—489.104).

   b. Maintain written policies and procedures concerning advance directives with respect to all adult individuals receiving medical and/or behavioral health care by or through the MCP to ensure the MCP:

      i. Provides written ODM-approved information to all adult members concerning:

         1. The member's rights under state law to make decisions concerning his or her medical and/or behavioral health care, including the right to accept or refuse medical or surgical treatment and the right to formulate advance directives.

         2. The MCP's policies concerning the implementation of those rights including a clear and precise statement of any limitation regarding the implementation of advance directives as a matter of conscience;

         3. Any changes in state law regarding advance directives as soon as possible, but no later than 90 days after the proposed effective date of the change; and

         4. The right to file complaints concerning noncompliance with the advance directive requirements with the Ohio Department of Health.

      ii. Provides for education of staff concerning the MCP's policies and procedures on advance directives;

      iii. Provides for community education regarding advance directives directly or in concert with other providers or entities;

      iv. Requires that the member's medical record document whether or not the member has executed an advance directive; and

      v. Does not condition the provision of care, or otherwise discriminate against a member, based on whether the member has executed an advance directive.

24. **Call Center Standards.** The MCP shall provide assistance to members and providers through a toll-free call-in system.

   a. Provider call center standards

      i. 85% of calls answered within 120 seconds.

S0215 – K32

Medicaid Managed Care
Appendix C
Plan Responsibilities

    ii. Maintain a capture rate of 95%.

    iii. At least semi-annually, the MCP shall self-report its monthly and semi-annual performance in the following three areas for their Provider Call Center, as specified: capture rate, average call time and average speed of answer. If the MCP has separate telephone lines for different Medicaid populations, the MCP shall report performance for each individual line separately. The MCP shall report their July through December performance to ODM by January 10th and their January through June performance by July 10th. ODM reserves the right to require more frequent reporting by the MCP if ODM becomes aware of what is perceives to be an access issue or consecutive months of non-compliance.

b. The Member telephone system shall have services available to assist:

    i. Hearing-impaired members; and

    ii. Limited English Proficiency (LEP) members in the primary language of the member.

c. The member services program shall assist MCP members, and as applicable, eligible individuals seeking information about MCP membership with the following:

    i. Accessing Medicaid-covered services;

    ii. Obtaining or understanding information on the MCP's policies and procedures;

    iii. Understanding the requirements and benefits of the plan;

    iv. Resolution of concerns, questions, and problems;

    v. Filing of grievances and appeals as specified in OAC rule 5160-26-08.4;

    vi. Obtaining information on state hearing rights;

    vii. Appealing to or filing directly with the U.S. Department of Health and Human Services Office of Civil Rights any complaints of discrimination on the basis of race, color, national origin, age, or disability in the receipt of health services;

    viii. Appealing to or filing directly with the ODM Office of Civil Rights any complaints of discrimination on the basis of race, color, religion, gender, gender identity, sexual orientation, age, disability, national origin, military status, genetic information, ancestry, health status, or need for health services in the receipt of health services; and

    ix. Accessing sign language, oral interpretation, and oral translation services. The MCP shall ensure these services are provided at no cost to the eligible individual or member. The MCP shall designate a staff person to coordinate and document

S0215 - K33

Medicaid Managed Care
Appendix C
Plan Responsibilities

the provision of these services.

d. In the event the consumer contact record (CCR) does not identify a member-selected primary care provider (PCP) for each assistance group member, or if the member-selected PCP is not available, the MCP shall:

   i. Select a PCP for each member based on the PCP assignment methodology prior-approved by ODM;

   ii. Simultaneously notify each member with an MCP-selected PCP of the ability within the first month of initial MCP membership to change the MCP-selected PCP effective on the date of contact with the MCP; and

   iii. Explain that PCP change requests after the initial month of MCP membership shall be processed according to the procedures outlined in the MCP member handbook.

e. MCP member services staff shall be available nationwide to provide assistance to members through the toll-free call-in system every Monday through Friday, at all times during the hours of 7:00 am to 7:00 pm Eastern Time, except for the following major holidays:

   • New Year's Day
   • Martin Luther King Day
   • Memorial Day
   • Independence Day
   • Labor Day
   • Thanksgiving Day
   • Christmas Day

f. Two optional closure days can be used independently or in combination with any of the major holiday closures, but cannot both be used within the same closure period. Before announcing any optional closure dates to members and/or staff, the MCP shall receive ODM prior approval which verifies that the optional closure days meet the specified criteria.

g. If a major holiday falls on a Saturday, the MCP member services line may be closed on the preceding Friday. If a major holiday falls on a Sunday, the member services line may be closed on the following Monday. MCP member services closure days shall be specified in the MCP's member handbook, member newsletter, or other some general issuance to the MCP's members at least 30 days in advance of the closure. The MCP shall request prior approval from ODM of any extended hours of operation of the member services line outside the required days and time specified above.

h. The MCP shall also provide access to medical advice and direction through a centralized twenty-four-hour, seven day (24/7), toll-free call-in system, available nationwide. The

# S0215 – K34

Medicaid Managed Care
Appendix C
Plan Responsibilities

24/7 call-in system shall be staffed by appropriately trained medical personnel. For the purposes of meeting this requirement, trained medical professionals are defined as physicians, physician assistants, licensed practical nurses (LPNs), and registered nurses (RNs).

i. The MCP shall meet the current American Accreditation HealthCare Commission/URAC-designed Health.

j. Standards (HCC) for call center abandonment rate, blockage rate and average speed of answer. At least semi-annually, the MCP shall self-report its monthly and semi-annual performance in these three areas for their member services and 24/7 hour toll-free call-in systems to ODM as specified. If the MCP has separate telephone lines for different Medicaid populations, the MCP shall report performance for each individual line separately. The MCP shall report their July through December performance to ODM by January 10 and their January through June performance by July 10. ODM reserves the right to require more frequent reporting by the MCP if it becomes aware of an egregious access issue or consecutive months of non-compliance with URAC standards. ODM will inform the MCP of any changes/updates to these URAC call center standards.

k. The member services call center requirement may not be delegated through a sub-contractual relationship as specified in this Appendix, without prior approval by ODM. With the exception of transportation vendors, the MCP is prohibited from publishing a delegated entity's general call center number.

25. **Notification of Voluntary MCP Membership.** In order to comply with the terms of the ODM State Plan Amendment for the managed care program (i.e., 42 CFR 438.50), the MCP shall inform new members that MCP membership is voluntary for Indians who are members of federally-recognized tribes. Except as permitted under 42 CFR 438.50(d)(2) this population is not required to select an MCP in order to receive their Medicaid healthcare benefit. The MCP shall inform these members what steps they need to take if they do not wish to be a member of an MCP. Pursuant to 42 CFR 438.14, the MCP shall provide to any enrolled Indian, access to an Indian healthcare provider.

26. **Privacy Compliance Requirements.** The Health Insurance Portability and Accountability Act (HIPAA) Privacy Regulations at 45 CFR.164.502(e) and 164.504(e) require ODM to enter into agreements with MCPs as a means of obtaining satisfactory assurance that the MCPs will appropriately safeguard all "protected health information" (PHI), which means information received from or on behalf of ODM that meets the definition of PHI as defined by HIPAA and the regulations promulgated by the United States Department of Health and Human Services, specifically 45 CFR 160.103, 45 CFR 164.501 and any amendments thereto.

In addition to the HIPAA requirements, the MCP shall comply with any other applicable Federal and State laws regarding privacy and confidentiality, including Title VI of the Civil Rights Act of 1964, ORC 5101.26, 5101.27, and 5160.45 through 5160.481, as applicable.

The MCP acknowledges that ODM is a Covered Entity under HIPAA. A Covered Entity means a health plan, a health care clearinghouse, or health care provider under 45 CFR 160.103. The

S0215 — K35

Medicaid Managed Care
Appendix C
Plan Responsibilities

MCP further acknowledges that it is a Business Associate of ODM. A Business Associate means a person or entity that, on behalf of the Covered Entity, maintains, performs, or assists in the performance of a function or activity that involves the use or disclosure of "Protected Health Information" under 45 CFR 160.103. The MCP, as a Business Associate agrees to comply with all of the following provisions:

a. **Permitted Uses and Disclosures.** The MCP will not use or disclose PHI except as provided in this Agreement or as otherwise required under HIPAA regulations or other applicable law.

b. **Safeguards.** The MCP shall implement sufficient safeguards, and comply with Subpart C of 45 CFR Part 164 pertaining to electronic PHI to prevent the use or disclosure of PHI other than as provided for under this Agreement. Safeguards will be implemented for all paper and electronic PHI created, received, maintained, or transmitted on behalf of ODM.

c. **Reporting of Disclosures.** The MCP agrees to promptly report to ODM any inappropriate use or disclosure of PHI not in accordance with this Agreement or applicable law, including a breach of unsecured PHI as required at 45 CFR 164.410 and any security incident the MCP has knowledge of or reasonably should have knowledge of under the circumstances.

d. **Mitigation Procedures.** The MCP agrees to coordinate with ODM to determine specific actions that will be required of the Business Associates for mitigation, to the extent practical, of the breach. These actions will include notification to the appropriate individuals, entities, or other authorities. Notification or communication to any media outlet shall be approved, in writing, by ODM prior to any such communication being released. The MCP shall report all of its mitigation activity to ODM and shall preserve all relevant records and evidence.

e. **Incidental Costs.** The MCP shall bear the sole expense of all costs to mitigate any harmful effect, of any breaches or security incidents which were caused by the MCP, or its subcontractors, in violation of the terms of this Agreement. These costs will include, but are not limited to, the cost of investigation, remediation and assistance to the affected individuals, entities or other authorities.

f. **Agents and Subcontractors.** The MCP, in compliance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2) as applicable, shall ensure all its agents and subcontractors that create, receive, maintain, or transmit PHI from or on behalf of the MCP and/or ODM agree to have, in a written agreement, the same restrictions, conditions, and requirements that apply to the MCP with respect to the use or disclosure of PHI.

g. **Accessibility of Information.** The MCP shall make available to ODM such information as ODM may require to fulfill its obligations to provide access to, provide a copy of any information or documents with respect to PHI pursuant to HIPAA and regulations promulgated by the United States Department of Health and Human Services, including, but not limited to, 45 CFR 164.524 and 164.528 and any amendments thereto.

**S0215 - K36**

Medicaid Managed Care
Appendix C
Plan Responsibilities

h.  **Amendment of Information.** The MCP shall make any amendment(s) to PHI as directed by, or agreed to, by ODM pursuant to 45 CFR 164.526, or take other steps as necessary to satisfy ODM's obligations under 45 CFR 164.526. In the event that the MCP receives a request for amendment directly from an individual, agent, or subcontractor, the MCP shall notify ODM prior to making any such amendment(s). The MCP's authority to amend information is explicitly limited to information created by the MCP.

i.  **Accounting for Disclosure.** The MCP shall maintain and make available to ODM or individuals requesting the information as appropriate, records of all disclosures of PHI in a Designated Record Set as necessary to satisfy ODM's obligations under 45 CFR 164.528. For every disclosure, the record shall include, at a minimum, the name of the individual who is the subject of the disclosure, the date of the disclosure, reason for the disclosure if any, and the name and address of the recipient to which the PHI was disclosed.

j.  **Obligations of ODM.** When the MCP is required to carry out an obligation of ODM under Subpart E of 45 CFR Part 164, the MCP agrees to comply with all applicable requirements of Subpart E that would apply to ODM in the performance of such obligation.

k.  **Access to Books and Records.** The MCP shall make available to ODM and to the Secretary of the U.S. Department of Health and Human Services any and all internal practices, documentation, books, and records related to the use and disclosure of PHI received from ODM, or created or received on behalf of ODM. Such access is for the purposes of determining compliance with the HIPAA Rules.

l.  **Material Breach.** In the event of material breach of the MCP's obligations under this Article, ODM may immediately terminate this Agreement as set forth in ARTICLE VI, Section B. Termination of this Agreement will not affect any provision of this Agreement, which, by its wording or its nature, is intended to remain effective and to continue to operate after termination.

m.  **Return or Destruction of Information.** Upon termination of this Agreement and at the request of ODM, the MCP will return to ODM or destroy all PHI in MCP's possession stemming from this Agreement as soon as possible but no later than 90 days, and will not keep copies of the PHI except as may be requested by ODM or required by law, or as otherwise allowed for under this Agreement. If the MCP, its agent(s), or subcontractor(s) destroy any PHI, then the MCP will provide to ODM documentation evidencing such destruction. Any PHI retained by the MCP will continue to be extended the same protections set forth in this section, HIPAA regulations and this Agreement for as long as it is maintained.

n.  **Survival.** These provisions shall survive the termination of this Agreement.

27. **Electronic Communications.** The MCP is required to purchase and utilize Transport Layer Security (TLS) for all e-mail communication between ODM and the MCP. The MCP's e-mail gateway shall be able to support the sending and receiving of e-mail using TLS and the MCP's

S0215 – K37

Medicaid Managed Care
Appendix C
Plan Responsibilities

gateway shall be able to enforce the sending and receiving of email via TLS.

28. **Managed Care Day One.** Beginning January 1, 2018, individuals will enroll in managed care beginning the first day of the month in which Medicaid eligibility is determined. There will be no fee-for-service time period for most services. For members identified on the 834C as being determined Medicaid eligible, during their first month of managed care enrollment the MCP shall pay for all medically-necessary covered services provided during the first month.

29. **MCP Membership Acceptance, Documentation, and Reconciliation.**

   a. **Medicaid Consumer Hotline Contractor.** The MCP shall provide to the Medicaid Consumer Hotline contractor ODM prior-approved MCP materials and directories for distribution to eligible individuals who request additional information about the MCP.

   b. **Plan PBM Contractor.** Eligibility additions for the current month received in the 834C file must be sent to the MCP's PBM within 24 hours of the MCP's receipt of the file, except during state cutoff when plans have the option to follow the 834 file loading process as stated in the 834 companion guide.

   c. **Enrollment and Capitation Reconciliation.** The MCP shall maintain the integrity of its membership data through processing and loading of the daily HIPAA 834C (Daily Benefit Enrollment and Maintenance File) and reconciling the daily changes with the monthly HIPAA 834F (Monthly Benefit Enrollment and Maintenance File) transactions. Discrepancies between the HIPAA 834C and 834F that have a negative impact on a member's access to care shall be reported to ODM within one business day.

   d. **Monthly Remittance Advice.** The HIPAA 820 (Monthly Remittance Advice) will contain the following: a capitation payment for each member listed on the HIPAA 834F, a capitation payment/recoupment for changes listed in the daily HIPAA 834C, any other capitation payment/recoupment, and delivery payment/recoupment from the previous calendar month. Reconciliation for any discrepancies between the HIPAA 834 and HIPAA 820 is due and shall be submitted, as instructed by ODM, no later than 60 days after the issuance of the HIPAA 834F. Please reference the Processing Dates for Calendar Year memo issued annually. In the event of changes in the processing dates, the due date will be adjusted accordingly.

   e. **Change in Member Circumstance.** In accordance with CFR 438.608, the MCP shall promptly notify ODM when it becomes aware that a member is deceased. The notification must be made following the submission guidelines and in the format prescribed by ODM.

   f. **Institution for Mental Disease (IMD) Stays.** If a member age 21 through 64 has an IMD stay exceeding 15 days per calendar month, ODM will recover a percentage of the MCP's monthly capitation payment based on the total number of days the member was in the IMD; *e.g.,* if the member is in the community for 10 days and admitted to an IMD for the remainder of the month, ODM will reconcile 20 days.

S0215 – K38

Medicaid Managed Care
Appendix C
Plan Responsibilities

g. **Format.** All reconciliation requests shall be submitted in the format specified by ODM. ODM may reject reconciliation requests submitted after the due date. Reconciliation requests submitted after the due date will be processed at the discretion of ODM. Recoupments, date of death, duplicative payments made to the same plan due to multiple IDs will always be processed.

h. **MCP-Initiated Nursing Facility (NF) disenrollment requests.** Excluding Adult Extension, pursuant to OAC rule 5160-26-02.1, MCP-initiated nursing facility (NF) disenrollment requests for MAGI and ABD shall be submitted to ODM on an ODM designated form. See disenrollment table below:

| Month of Nursing Facility Admission | Next Two Consecutive Months | Earliest Disenrollment Date |
|---|---|---|
| January | February & March | March 31 |
| February | March & April | April 30 |
| March | April & May | May 31 |
| April | May & June | June 30 |
| May | June & July | July 31 |
| June | July & August | August 31 |
| July | August & September | September 30 |
| August | September & October | October 31 |
| September | October & November | November 30 |
| October | November & December | December 31 |
| November | December & January (next CY) | January 31 (next CY) |
| December | January & February (next CY) | Last Day of February (next CY) |

If a member is admitted to a NF while enrolled with the MCP and the MCP disenrollment request is submitted after the Earliest Disenrollment Date, the member will be disenrolled as of the last day of the submission month.

When a member is admitted to a NF while enrolled with one MCP, then changes to a different MCP, either:

i. The admission date is three months or less prior to the initial enrollment month, and the MCP disenrollment request shall align with the Disenrollment Table dates; or

ii. The admission date is more than three months prior to the initial enrollment month, and the MCP disenrollment request shall be submitted during the initial enrollment month to disenroll the member the last day of the month prior to the initial enrollment.

If a member is admitted to a NF prior to being enrolled with the MCP and was admitted under fee-for-service Medicaid, the MCP disenrollment request shall be submitted during the initial enrollment month to disenroll the member the last day of the month prior to the initial enrollment. Otherwise, the member will be disenrolled as of the last day of the submission month.

**S0215 – K39**

Medicaid Managed Care
Appendix C
Plan Responsibilities

In all cases, MCPs are responsible for coverage through the disenrollment date.

i. **Change in Enrollment During Hospital/Inpatient Facility Stay.** When the MCP learns of a currently hospitalized member's intent to disenroll through the CCR or the HIPAA 834, the disenrolling MCP shall notify the hospital/inpatient facility and treating providers as well as the enrolling MCP, if applicable, of the change in enrollment. The disenrolling MCP shall notify the inpatient facility that it will remain responsible for the inpatient facility charges through the date of discharge; and shall notify the treating providers that it will remain responsible for provider charges through the date of disenrollment. The disenrolling MCP shall not request and/or require that a disenrolled member be discharged from the inpatient facility for transfer to another inpatient facility. Should a discharge and transfer to another inpatient facility be medically necessary, the disenrolling MCP shall notify the treating providers to work with the enrolling MCP or ODM as applicable to facilitate the discharge, transfer and authorization of services as needed.

When the enrolling MCP learns through the disenrolling MCP, through ODM or other means, that a new member who was previously enrolled with another MCP was admitted prior to the effective date of enrollment and remains an inpatient on the effective date of enrollment, the enrolling MCP shall contact the hospital/ inpatient facility. The enrolling MCP shall verify that it is responsible for all medically necessary Medicaid covered services from the effective date of MCP membership, including professional charges related to the inpatient stay; the enrolling MCP shall inform the hospital/inpatient facility that the admitting/disenrolling MCP remains responsible for the hospital/inpatient facility charges through the date of discharge. The enrolling MCP shall work with the hospital/inpatient facility to facilitate discharge planning and authorize services as needed.

When the MCP learns that a new member who was previously on Medicaid fee-for-service was admitted prior to the effective date of enrollment and remains an inpatient on the effective date of enrollment, the MCP shall notify the hospital/inpatient facility and treating providers that the MCP is responsible for the professional charges effective on the date of enrollment, and shall work to ensure discharge planning provides continuity using MCP-contracted or authorized providers.

j. **Just Cause Requests.** As specified by ODM in OAC rule 5160-26-02.1, the MCP shall assist in resolving member-initiated Just Cause requests affecting membership.

k. **Newborn Notifications.** MCP membership for newborns will be in accordance with rule OAC 5160-26-02. In order to encourage the timely addition of newborns, authorization for Medicaid and enrollment in the MCP, the MCP shall provide notification of the birth to the CDJFS within five business days of birth or immediately upon learning of the birth. The MCP shall provide, at a minimum, the mother's name, social security number, eligibility system case number, 12 digit recipient ID, county and the newborn's name, gender, and date of birth, unless the CDJFS and MCP have agreed to a different minimum set of information to be transmitted for the CDJFS newborn notification. The

S0215 – K40

Medicaid Managed Care
Appendix C
Plan Responsibilities

information shall be sent again at sixty days from the date of birth if the MCP has not received confirmation by ODM of a newborn's MCP membership via the membership roster.

l. **Eligible Individuals.** If an eligible individual, as defined in OAC rule 5160-26-01, contacts the MCP, the MCP shall provide any MCP-specific managed care program information requested. The MCP shall not attempt to assess the eligible individual's health care needs. However, if the eligible individual inquires about continuing/transitioning health care services, the MCP shall provide an assurance that all MCPs shall cover all medically necessary Medicaid-covered health care services and assist members with transitioning their health care services.

m. **Pending Member.** If a pending member (i.e., an eligible individual subsequent to MCP selection or assignment to an MCP, but prior to their membership effective date) contacts the selected MCP, the MCP shall provide any membership information requested, including but not limited to explaining how to access services as an MCP member and assistance in determining whether current services require prior authorization. The MCP shall also ensure any care coordination (e.g., PCP selection, prescheduled services and transition of services) information provided by the pending member is logged in the MCP's system and forwarded to the appropriate MCP staff for processing as required. When a member does not select a PCP, the MCP's second rank for assignment shall be based on the member's prior PCP claims utilization. The PCP assignment algorithm shall integrate FFS and MCP historical files.

The MCP may confirm any information provided on the CCR at this time. Such communication does not constitute confirmation of membership. Upon receipt of the CCR or the HIPAA 834, the MCP may contact a pending member to confirm information provided on the CCR or the HIPAA 834, assist with care coordination and transition of care, and inquire if the pending member has any membership questions.

30. The MCP shall use ODM-provided utilization and prior authorization data files for care coordination/management activities and to adhere to transition of care requirements.

31. **Transition of Care for Members Moving from Medicaid Fee for Service (FFS) to Managed Care.**

a. **Retroactive Coverage Requirements.** The MCP shall pay for claims for covered services provided to members during retroactive enrollment periods. For services provided during retroactive enrollment periods that require FFS prior authorization as documented in Appendix DD of OAC 5160-1-60, OAC 5160-9-03 (regarding pharmacy claims), and all other FFS regulations that set forth prior authorization policy, the MCP may conduct a medical necessity review for payment. However, if the service was already reviewed and approved by FFS, the MCP shall also approve the service.

b. **New Populations Enrolling in Managed Care** (i.e., after July 1, 2016: Adult Extension members who can access waiver services and January 1, 2017: Breast and Cervical Cancer Project, Foster Care, Adoption Assistance, Bureau for Children with Medical Handicaps, 1915(i), and the DD waiver). Providing care coordination for prescheduled

S0215 — K41

Medicaid Managed Care
Appendix C
Plan Responsibilities

health services, access to preventive and specialized care, care management, member services, and education with minimal disruption to members' established relationship with providers and existing care plans, is critical for members transitioning from FFS to managed care. The MCP shall develop and implement processes that include the following provisions:

i. **Pre-enrollment planning**. The MCP shall implement a comprehensive transition of care process prior to the effective enrollment date that will:

   1. Utilize information and data provided by ODM (prior authorizations, FFS claims, MCP encounters, consumer contact records, etc.) and/or collected by the MCP through assessments, new member outreach in advance of the member's enrollment effective date, communication with other state agencies, etc;

   2. Create a new member profile based on the information and data referenced in the section above to identify existing health care needs including:

      a. Existing sources of care (i.e., primary physicians, specialists, case managers, behavioral health providers, ancillary, and other providers);

      b. Current provision of services for all aspects of health care services, including scheduled health care appointments, planned and/or approved (inpatient or outpatient);

      c. Ancillary or medical therapies, prescribed drugs, home health care services, private duty nursing;

      d. Scheduled lab/radiology tests, necessary durable medical equipment, supplies;

      e. Needed/approved transportation arrangements; and

      f. Services received through other state agencies (e.g., Ohio Department of Mental Health and Addiction Services (Ohio MHAS), the Ohio Department of Developmental Disabilities (DODD) and the Ohio Department of Aging (ODA); and

   3. Ensure each new member will obtain needed services, at a minimum, specified in this appendix.

ii. **Provision of Care Management**. In accordance with Appendix K, the MCP shall assess new members using the standardized health risk assessment within 90 days of enrollment for the purpose of risk stratification and to identify potential needs for care management.

S0215 – K42

Medicaid Managed Care
Appendix C
Plan Responsibilities

iii. **Continuation of Services.** The MCP shall allow a new member who is transitioning from FFS to the MCP to continue to receive services from network and out-of-network providers per the following:

| Transition Requirements | Members who are 21 years of age and older | Members who are under 21 years of age |
|---|---|---|
| **Physician Services** | Shall allow the member to continue with out-of-network physician or specialist for the first month of enrollment. | Shall allow the member to continue with out-of-network physician or specialist for the first three months of enrollment. |
| **Durable Medical Equipment** | Honor Medicaid FFS prior authorizations (PAs) for no less than 90 days from the enrollment effective date. After the 90 days has expired, the MCP can conduct a medical necessity review pursuant to OAC rule 5160-26-03.1. | Unless noted as an exception below, the MCP shall honor Medicaid FFS PAs for no less than 90 days from the enrollment effective date. After the 90 days has expired, the MCP can conduct a medical necessity review pursuant to OAC rule 5160-26-03.1.<br><br>The MCP shall honor the Medicaid FFS PA for 90 days or the duration of the PA, whichever is longer, for the following items: enteral feeding supply kits, hearing aids, synthesized speech generating devices, and parenteral nutritional supply kits. |
| **Home Care and Private Duty Nursing (PDN) Services** | Maintain current service level with current provider until the MCP conducts a medical necessity review and renders an authorization decision pursuant to OAC rule 5160-26-03.1 | Maintain current service level with current provider pursuant to OAC rules 5160-12-01 and 5160-12-02 for 90 days after initial MCP enrollment. After 90 days of enrollment and prior to transitioning to a participating provider or proposing a change in the service amount, the MCP shall make a home visit, and observe the home care or PDN service being provided, to assess the current need for continued services. |
| **Medicaid Community Behavioral Health Services** | Make referral and linkage to, and follow up with, the Community Behavioral Health Centers for requested/needed services. | |
| **Prescribed Drugs** | Shall cover prescription refills during the first three months of membership for prescriptions covered by Ohio Medicaid during the prior FFS enrollment period. Thereafter, the MCP may not require PA of these prescriptions until the MCP has educated the member that further dispensation will require the prescribing provider to request PA. If applicable, the MCP shall offer the member the option of using an alternative medication that may be available without PA. Written member education notices shall use ODM-specified model language. | |

S0215 – K43

Medicaid Managed Care
Appendix C
Plan Responsibilities

| | |
|---|---|
| | Verbal member education may be done in place of written education but shall contain the same information as a written notice. MCP member notices and, if applicable, call scripts used for verbal education, shall be prior approved by ODM. |
| | For antidepressant and antipsychotic medications, the MCP shall abide by the restrictions on PA described in Appendix G. of this Agreement. |
| Scheduled Surgeries | Shall allow the member to receive scheduled inpatient or outpatient surgery if it has been prior approved and/or pre-certified pursuant to OAC rule 5160-2-40 (surgical procedures would also include follow up care as appropriate). |
| Chemotherapy or Radiation | Shall allow the member to continue to receive the entire course of treatment if initiated prior to enrollment with the MCP. |
| Organ, Bone Marrow, Hematopoietic Stem Cell Transplants | Shall honor current FFS prior authorizations for organ, bone marrow, or hematopoietic stem cell transplant pursuant to OAC rule 5160-2-07.1 and 2.b.vii of Appendix G. The MCP shall receive prior approval from ODM prior to transferring services to a network provider. |
| Vision and Dental | Shall honor current FFS prior authorizations for any vision and dental services that have not yet been received. |
| Hospital Discharge | Shall continue with treatment if the member was discharged 30 days prior to the MCP enrollment effective date. |
| Pregnancy Care | Shall allow a member who is in her third trimester of pregnancy to continue a relationship with her out of network obstetrician and/or delivery hospital. |

c. **Continuation of Services for Members**. The MCP shall allow a member not identified in this Appendix who is transitioning from FFS to the MCP to receive services from network and out-of-network providers, if any of the following applies:

   i. If the MCP confirms that the Adult Extension member is currently receiving care in a nursing facility (NF) on the effective date of enrollment with the MCP, the MCP shall cover NF care at the same facility until a medical necessity review has been completed and if applicable, a transition to an alternative location has been documented in the member's care plan.

   ii. Upon learning, or receiving notification, of a pregnant woman's enrollment with the MCP, the MCP shall identify the member's maternal risk and shall facilitate connection to services and supports in accordance with ODM's *Guidance for Managed Care Plans for the Provision of Enhanced Maternal Care Services*. These services and supports include delivery at an appropriate facility and continuation of progesterone therapy covered by Medicaid FFS for the duration of the pregnancy. In addition, the MCP shall allow the pregnant member to continue with an out-of-network provider if she is in her third trimester of pregnancy and/or has an established relationship with an obstetrician and/or delivery hospital.

   iii. For all members, the MCP shall honor any current FFS prior authorizations and/or to allow its new members to continue to receive the following services as provided by Medicaid FFS, regardless of whether the authorized/treating provider is in or out-of-network with the MCP:

Medicaid Managed Care
Appendix C
Plan Responsibilities

1. The member has been scheduled for an inpatient or outpatient surgery and has been prior-approved and/or pre-certified pursuant to OAC rule 5160-2-40 (surgical procedures would also include follow-up care as appropriate);

2. The member is receiving ongoing chemotherapy or radiation treatment;

3. The member has been released from the hospital within 30 days prior to MCP enrollment and is following a treatment plan.

4. An organ, bone marrow, or hematopoietic stem cell transplant pursuant to OAC rule 5160-2-07.1 and 2.b.vii of Appendix G;

5. Dental services, as previously authorized, that have not yet been received;

6. Vision services, as previously authorized, that have not yet been received;

7. Durable medical equipment (DME), as previously authorized, that has not yet been received. Ongoing DME services and supplies are to be covered by the MCP as previously authorized until the MCP conducts a medical necessity review and renders an authorization decision pursuant to OAC rule 5160-26-03.1.

8. Private duty nursing and home care services shall be covered at the same level with the same provider as approved and/or covered by Medicaid FFS until the MCP conducts a medical necessity review and renders an authorization decision pursuant to OAC rule 5160-26-03.1.

9. Prescribed drugs shall be covered without PA for at least one refill for the first 30 days of membership. The MCP may not require PA, for these prescribed drugs filled without PA during the first 30 days of membership, until the MCP has educated the member that further dispensation will require the prescribing provider to request PA. If applicable, the MCP shall offer the member the option of using an alternative medication that may be available without PA. Written member education notices shall use ODM-specified model language. Verbal member education may be done in place of written education but shall contain the same information as a written notice. MCP member notices and, if applicable, call scripts used for verbal education, shall be prior approved by ODM.

10. For antidepressant and antipsychotic medications, the MCP shall abide by the restrictions on PA described in Appendix G of this Agreement.

S0215 – K45

Medicaid Managed Care
Appendix C
Plan Responsibilities

    d. **Out-of-Panel Provider Reimbursement**. The MCP shall reimburse out-of-panel providers that agree to provide the transition services at 100% of the current Medicaid FFS provider rate for the services identified in this Appendix.

    e. **Documentation of services**. The MCP shall document the provision of transition of services identified in this Appendix as follows:

        i. The MCP shall seek confirmation from a non-panel provider that the provider agrees to provide the service and accept 100% of the current Medicaid FFS rate as payment. If the provider agrees, the MCP shall distribute its materials to the non-panel provider as outlined in Appendix G of this Agreement.

        ii. If the non-panel provider does not agree to provide the service and accept 100% of the Medicaid FFS rate, the MCP shall notify the member of the MCP's availability to assist with locating a provider as expeditiously as the member's health condition warrants.

        iii. If the service will be provided by a panel provider, the MCP shall notify the panel provider and the member to confirm the MCP's responsibility to cover the service.

        iv. The MCP shall use the ODM-specified model language for the provider and member notices and maintain documentation of all member and/or provider contacts relating to such services.

32. **Transition of Care Requirements for Managed Care Members Receiving Behavioral Health Services**. Beginning July 1, 2018, the MCP is required to cover behavioral health services provided to its members as directed by ODM. The MCP shall allow a member who is receiving behavioral health services prior to July 1, 2018 to continue to receive services as follows:

    a. The MCP shall follow the Medicaid fee-for service (FFS) behavioral health coverage policies through June 30, 2019. The MCP may implement less restrictive policies than FFS. After one year, the MCP may conduct a medical necessity review pursuant to OAC rule 5160-26-03.1.

    b. The MCP shall honor any prior authorizations approved by Medicaid FFS prior to July 1, 2018 through the expiration of the authorization.

    c. The MCP shall allow the member to continue with out-of-network providers until September 30, 2018. For continuity of care purposes, the MCP will make the following efforts:

        i. Work with the service provider to add the provider to their network; or

        ii. Implement a single case agreement with the provider; or

        iii. Assist the member in finding a provider currently in the MCP's network.

S0215 — K46

Medicaid Managed Care
Appendix C
Plan Responsibilities

    d. The MCP shall maintain Medicaid FFS payment rates as a floor for behavioral health services through June 30, 2019 when the MCP's provider contracts are based on FFS rates. This does not apply to Community Behavioral Health Center (CBHC) Laboratories.

33. **Transition of Care Requirements for Existing Members of an Exiting MCP.** When the enrolling MCP is informed by ODM, or its designee, of a member transitioning from an MCP that no longer has a provider agreement in the member's service area, the enrolling MCP shall follow the transition of care requirements as set forth in this appendix.

34. **Transition of Care Requirements for Members Changing MCPs.** Upon notification from a member and/or provider of a need to continue services, the MCP shall allow a member transitioning from another MCP to continue to receive services from network and out-of-network providers when the member could suffer detriment to their health or be at risk for hospitalization or institutionalization in the absence of continued services. Upon request from the enrolling MCP, the disenrolling MCP shall provide historical utilization and prior authorization data for the disenrolled member as expeditiously as the situation warrants. The MCP may prior authorize these services or assist the member to access services through an in-network provider when any of the following occur:

    a. The member's condition stabilizes and the MCP can ensure no interruption to services;

    b. The member chooses to change to a network provider;

    c. The member's needs change to warrant a change in service; or

    d. Quality concerns are identified with the provider.

Effective July 1, 2018, the enrolling MCP shall honor the disenrolling MCP's prior authorization for all new members until the enrolling MCP is able to conduct a medical necessity review.

35. **Health Information System Requirements.** The ability to develop and maintain information management systems capacity is crucial to successful plan performance. ODM therefore requires the MCP to demonstrate their ongoing capacity in this area by meeting several related specifications.

    a. **Health Information System.**

        i. As required by 42 CFR 438.242(a), the MCP shall maintain a health information system that collects, analyzes, integrates, and reports data. The system shall provide information on areas including, but not limited to, utilization, grievances and appeals, and MCP membership terminations for other than loss of Medicaid eligibility.

        ii. As required by 42 CFR 438.242(b)(1), the MCP shall collect data on member and provider characteristics and on services furnished to its members.

S0215 – K47

Medicaid Managed Care
Appendix C
Plan Responsibilities

    iii.  As required by 42 CFR 438.242(b)(2), the MCP shall ensure data received from providers is accurate and complete by verifying the accuracy and timeliness of reported data, screening the data for completeness, logic, and consistency, and collecting service information in standardized formats to the extent feasible and appropriate.

    iv.  As required by 42 CFR 438.242(b)(3), the MCP shall make all collected data available upon request by ODM or CMS.

    v.  Acceptance testing of any data electronically submitted to ODM is required:

        1.  Before the MCP may submit production files;

        2.  Whenever the MCP changes the method or preparer of the electronic media; and/or

        3.  When ODM determines that the MCP's data submissions have an unacceptably high error rate.

    vi.  When the MCP changes or modifies information systems involved in producing any type of electronically submitted files, either internally or by changing vendors, it is required to submit to ODM for review and approval a transition plan that includes the submission of test files in the ODM-specified formats. Once an acceptable test file is submitted to ODM, as determined solely by ODM, the MCP can return to submitting production files. ODM will inform the MCP in writing when a test file is acceptable. Once the MCP's new or modified information system is operational, the MCP will have up to 90 days to submit an acceptable test file and an acceptable production file.

    vii.  Submission of test files can start before the new or modified information system is in production. ODM reserves the right to verify the MCP's capability to report elements in the minimum data set prior to executing the provider agreement for the next contract period. Penalties for noncompliance with this requirement are specified in Appendix N of this Agreement, Compliance Assessment System.

b.  **Electronic Data Interchange (EDI), Claims Adjudication and Payment Processing Requirements.**

    i.  **Timely Filing for Behavioral Health (BH) Claims.** The MCP shall accept claims for BH services described in OAC Chapter 5160-27 for at least 180 days and no longer than 365 days from the date of service when the service date is prior to July 1, 2019. An MCP may negotiate timely filing requirements within these limitations through their contract with the BH provider.

    ii.  **Claims Adjudication.** The MCP shall have the capacity to electronically accept and adjudicate all claims to final status (payment or denial). Information on claims submission procedures shall be provided to non-contracting providers

S0215 – K48

Medicaid Managed Care
Appendix C
Plan Responsibilities

within 30 days of a request. The MCP shall inform providers of its ability to electronically process and adjudicate claims and the process for submission. Such information shall be initiated by the MCP and not only in response to provider requests.

iii.   The MCP shall notify providers who have submitted claims of claims status [paid, denied, pended (suspended)] within one month of receipt by the MCP or its designee. Such notification may be in the form of a claim payment/ remittance advice produced on a routine monthly, or more frequent, basis.

iv.   **Inpatient and Outpatient Grouper.** When the MCP uses a grouper to pay inpatient and/or outpatient claims, they are expected to utilize the same grouper software and version as ODM uses to process fee for service claims.

v.   **Electronic Visit Verification (EVV).** The MCP shall implement the ODM-established EVV system no later than January 1, 2019 for the following services: Private Duty Nursing; State Plan Home Health Aide; State Plan Home Health Nursing; RN Assessment. The MCP shall use data collected from the EVV data collection system data to validate all claims against EVV data (100% review) during or after the claim adjudication process. Prior to implementation, the MCP shall inform providers of the use of the EVV data collection system and how the data will be utilized by the MCP. The MCP shall also provide assistance on utilization of the data collection system, as appropriate, to individuals receiving services, direct care workers and providers.

vi.   The MCP is prohibited from recovering back or adjusting any payments beyond two years from the date of payment of the claim due to the MCP member's retroactive termination of coverage from the MCP, unless the MCP is directed to do so by CMS, ODM, or applicable state or federal law and regulation. However, this does not prohibit the MCP or ODM from initiating a recovery or adjustment more than two years after the payment of a claim in the event of fraud, abuse, or as otherwise provided by applicable state or federal law and regulation.

vii.   The MCP shall have policies providing that, upon discovery of claims payment systemic errors that resulted in incorrectly underpaying or denying claims, the MCP is required to reprocess and correctly pay such claims, from the date of identification of the error retroactively through the period specified in the contract between the MCP and the provider for claims payment corrective activity. A claims payment systemic error is defined as involving more than five providers, or involving a significant number of payment errors if five or fewer providers are affected. If a claims payment systemic error occurs, the MCP shall notify ODM of the error and shall specify its process and timeline for corrective action. The MCP's policies shall include how corrective action will be taken on behalf of all affected providers, regardless of whether the claims payment systemic error is identified by the MCP or by any provider. If the error is not a claims payment systemic error, the MCP shall correct the payments within 60

## S0215 — K49

Medicaid Managed Care
Appendix C
Plan Responsibilities

days from the date of identification of the error.

viii. The MCP shall load rate changes into applicable systems within 30 days of being notified by ODM of the change.

ix. The MCP is prohibited from engaging in practices that unfairly or unnecessarily delay the processing or payment of any claim for MCP members.

x. The MCP is required to give a 30 calendar day advance notice to providers of any new edits or system changes related to claims adjudication or payments processing.

c. **Electronic Data Interchange (EDI).**

i. The MCP shall comply with all applicable provisions of HIPAA including EDI standards for code sets and the following electronic transactions:

1. Health care claims;

2. Health care claim status request and response;

3. Health care payment and remittance status;

4. National Standard code sets; and

5. National Provider Identifier (NPI).

ii. Each EDI transaction processed by the MCP shall be implemented in conformance with the appropriate version of the transaction implementation guide, as specified by applicable federal rule or regulation.

iii. The MCP shall have the capacity to accept the following transactions from ODM consistent with EDI processing specifications in the transaction implementation guides and in conformance with the 820 and 834 Transaction Companion Guides issued by ODM:

1. ASC X12.820 - Payroll Deducted and Other Group Premium Payment for Insurance Products; and

2. ASC X12 834 - Benefit Enrollment and Maintenance.

iv. The MCP shall comply with the HIPAA-mandated EDI transaction standards and code sets no later than the required compliance dates as set forth in the federal regulations.

v. **Documentation of Compliance with Mandated EDI Standards.** The capacity of the MCP and/or applicable trading partners and business associates to

S0215 – K50

Medicaid Managed Care
Appendix C
Plan Responsibilities

electronically conduct claims processing and related transactions in compliance with standards and effective dates mandated by HIPAA shall be demonstrated, to the satisfaction of ODM, as outlined below.

vi. **Verification of Compliance with HIPAA** (Health Insurance Portability and Accountability Act of 1996). The MCP shall comply with the transaction standards and code sets for sending and receiving applicable transactions as specified in 45 CFR Part 162 (HIPAA regulations). In addition the MCP shall enter into the appropriate trading partner agreement and implemented standard code sets. If the MCP has obtained third-party certification of HIPAA compliance for any of the items listed below, that certification may be submitted in lieu of the MCP's written verification for the applicable items.

    1. Trading Partner Agreements

    2. Code Sets

    3. Transactions

        a. Health Care Claims or Equivalent Encounter Information (ASC X12N 837 & NCPDP 5)

        b. Eligibility for a Health Plan (ASC X12N 270/271)

        c. Referral Certification and Authorization (ASC X12N 278)

        d. Health Care Claim Status (ASC X12N 276/277)

        e. Enrollment and Disenrollment in a Health Plan (ASCX12N 834)

        f. Health Care Payment and Remittance Advice (ASC X12N 835)

        g. Health Plan Premium Payments (ASC X12N 820)

        h. Coordination of Benefits

vii. **Trading Partner Agreement with ODM**. The MCP shall complete and submit an EDI trading partner agreement in a format specified by ODM. Submission of the copy of the trading partner agreement prior to entering into this Agreement may be waived at the discretion of ODM; if submission prior to entering into this Agreement is waived, the trading partner agreement shall be submitted at a subsequent date determined by ODM.

viii. Noncompliance with the EDI and claims adjudication requirements will result in the imposition of penalties, as outlined in Appendix N of this Agreement, Compliance Assessment System.

S0215 - K51

Medicaid Managed Care
Appendix C
Plan Responsibilities

    d. **Encounter Data Submission Requirements.**

        i. **General Requirements.** The MCP shall collect data on services furnished to members through a claims system and shall report encounter data to the ODM. The MCP is required to submit this data electronically to ODM as specified in Appendix L.

        ii. Effective July 1, 2018, for sub-contracted payment arrangements in which a vendor directly pays particular claims (i.e. delegated arrangements in which the delegate is responsible for paying claims on behalf of the MCP to providers), the MCP shall submit encounters that include the amounts paid by the vendor to the provider at the claim-level.

        iii. **Acceptance Testing.** The MCP shall have the capability to report all elements in the Minimum Data Set as set forth in the ODM Encounter Data Specifications and shall submit a test file in the ODM-specified medium in the required formats prior to contracting or prior to an information systems replacement or update. Acceptance testing of encounter data is required as specified in 35.a.v. of this Appendix.

        iv. **Encounter Data File Submission Procedures.** A certification letter shall accompany the submission of an encounter data file in the ODM-specified medium. The certification letter shall be signed by the MCP's Chief Executive Officer (CEO), Chief Financial Officer (CFO), or an individual who has delegated authority to sign for, and who reports directly to, the MCP's CEO or CFO. Pursuant to 42 CFR 438.606, the CEO or CFO remains responsible for certification regardless of delegated signee.

    e. **IDSS Data Submission and Audit Report Requirements.** In accordance with 42 CFR 438.606, the MCP shall submit a signed data certification letter to ODM attesting to the accuracy and completeness of its audited HEDIS IDSS data submitted to ODM. The MCP shall also submit to ODM a signed data certification letter attesting to the accuracy and completeness of its final HEDIS audit report (FAR) submitted to ODM. Each data certification letter is due to ODM on the same day the respective HEDIS IDSS data/FAR is to be submitted. For complete instructions on submitting the data certification letters, see ODM Methodology for MCP Self-Reported, Audited HEDIS Results.

    f. **Information Systems Review.** ODM or its designee may review the information system capabilities of the MCP at the following times: before ODM enters into a provider agreement with a new MCP, when a participating MCP undergoes a major information system upgrade or change, when there is identification of significant information system problems, or any time at ODM' discretion. The MCP shall participate in the review. The review will assess the extent to which the MCP is capable of maintaining a health information system including producing valid encounter data, performance measures, and other data necessary to support quality assessment and improvement, as well as managing the care delivered to its members. The following activities, at a minimum, will

S0215 - K52

Medicaid Managed Care
Appendix C
Plan Responsibilities

be carried out during the review. ODM or its designee will:

    i. Review the Information Systems Capabilities Assessment (ISCA) forms, as developed by CMS, which the MCP will be required to complete;

    ii. Review the completed ISCA and accompanying documents;

    iii. Conduct interviews with MCP staff responsible for completing the ISCA, as well as staff responsible for aspects of the MCP's information systems function;

    iv. Analyze the information obtained through the ISCA, conduct follow-up interviews with MCP staff, and write a statement of findings about the MCP's information system;

    v. Assess the ability of the MCP to link data from multiple sources;

    vi. Examine MCP processes for data transfers;

    vii. If the MCP has a data warehouse, evaluate its structure and reporting capabilities;

    viii. Review MCP processes, documentation, and data files to ensure they comply with state specifications for encounter data submissions; and

    ix. Assess the claims adjudication process and capabilities of the MCP.

36. **Delivery (Childbirth) Payments for MAGI and Adult Extension Members**. The MCP will be reimbursed for MAGI and Adult Extension member childbirth deliveries identified in the submitted encounters, using the methodology outlined in the Modified Adjusted Gross Income (MAGI) and MAGI Adult Extension Delivery Payment Reporting Procedures and Specifications for ODM Managed Care Plans - MITS (ICD-10) document. The delivery payment represents: the facility and professional service costs associated with the delivery event, postpartum care rendered in the hospital immediately following the delivery event, and the additional costs associated with multiple birth events; no prenatal or neonatal experience is included in the delivery payment.

    a. If a delivery occurred, but the MCP did not reimburse providers for any costs associated with the delivery, then the MCP shall not submit the delivery encounter to ODM and is not entitled to receive payment for the delivery. Delivery encounters submitted by the MCP shall be received by ODM no later than 460 days after the last date of service (pending ODM IT capacity). Delivery encounters which are received by ODM after this time will be denied payment. Prior to the implementation of the 460 day criteria, delivery encounters which are submitted later than 365 days after the last date of service will be denied payment. The MCP will receive notice of the payment denial on the remittance advice.

S0215 – K53

Medicaid Managed Care
Appendix C
Plan Responsibilities

b. To capture deliveries outside of institutions (e.g., hospitals) and deliveries in hospitals without an accompanying physician encounter, both the institutional encounters (UB-92) and the non-institutional encounters (NSF) are searched for deliveries.

c. If a physician and a hospital encounter are found for the same delivery, only one payment will be made. The same is true for multiple births; if multiple delivery encounters are submitted, only one payment will be made.

d. **Rejections**. If a delivery encounter is not submitted according to ODM specifications, it will be rejected and the MCP will receive this information on the exception report (or error report) that accompanies every file in the ODM-specified format. Tracking, correcting and resubmitting all rejected encounters is the responsibility of the MCP and is required by ODM.

e. **Timing of Delivery Payments**. The MCP will be paid monthly for deliveries. For example, payment for a delivery encounter submitted with the required encounter data submission in March, will be reimbursed in May. This payment will be a part of the weekly update (adjustment payment) in place currently. The third weekly update of the month will include the delivery payment. The remittance advice is in the same format as the capitation remittance advice which is sent once each month.

f. **Updating and Deleting Delivery Encounters**. The process for updating and deleting delivery encounters can be found in the Modified Adjusted Gross Income (MAGI) and MAGI Adult Extension Delivery Payment Reporting Procedures and Specifications for ODM Managed Care Plans - MITS (ICD-10) document.

g. **Auditing of Delivery Payments**. A delivery payment audit will be conducted periodically. If medical records do not substantiate that a delivery (at least 22 weeks gestation) occurred related to the payment that was made, then ODM will recoup the delivery payment from the MCP. Also, if it is determined that the encounter which triggered the delivery payment was not a paid encounter, then ODM will recoup the delivery payment.

37. If the MCP will be using the Internet functions that will allow approved users to access member information (e.g., eligibility verification), the MCP shall ensure the proper safeguards, firewalls, etc., are in place to protect member data.

38. Pursuant to 42 CFR 438.106(b), the MCP acknowledges that it is prohibited from holding a member liable for the cost of services provided to the member in the event that ODM fails to make payment to the MCP.

39. In the event of an insolvency of the MCP, the MCP, as directed by ODM, shall cover the continued provision of services to members until the end of the month in which insolvency has occurred, as well as the continued provision of inpatient services until the date of discharge for a member who is institutionalized when insolvency occurs.

S0215 — K54

Medicaid Managed Care
Appendix C
Plan Responsibilities

40. **Information Required for MCP Websites.**

    a. The MCP shall have a secure internet-based website for contracting providers through which providers can confirm a consumer's enrollment and through which providers can submit and receive responses to prior authorization requests (an e-mail process is an acceptable substitute if the website includes the MCP's e-mail address for such submissions).

    b. The MCP provider website shall also include, at a minimum, the following information which shall be accessible to providers and the general public without any log-in restrictions:

        i. MCP contact information, including the MCP's designated contact for provider issues;

        ii. A listing of the counties the MCP serves unless the MCP serves the entire state in which case the MCP may indicate it services the entire state;

        iii. The MCP's provider manual including the MCP's claims submission process, as well as a list of services requiring PA, recent newsletters and announcements;

        iv. The MCP's policies and procedures for out-of-network providers to seek payment of claims for emergency, post-stabilization and any other services authorized by the MCP;

        v. The MCP's internet provider directory as referenced in this Appendix and Appendix H; and

        vi. The MCP's PDL, including an explanation of the list and identification of any preferred drugs that require PA, the MCP's list of drugs that require PA, including an explanation of the list, identification of first line drugs for drugs that require PA for step therapy, how to initiate a PA, and the MCP's policy for coverage of generic versus brand name drugs. The MCP shall publish 30 days in advance a notice of changes to the MCP's PDL.

        vii. The MCP shall publish 30 days in advance a notice of changes to the MCP's list of drugs requiring PA or any other service or device requiring prior authorization via their website. In addition, 30 days prior to all PA requirement changes, the MCP shall notify providers, via email or standard mail, the specific location of prior authorization change information on the website, pursuant to ORC 5160.34(B)(9-10).

        viii. The MCP shall provide documentation specifics for PA completion and details about Medicaid programs and their services requiring PA (e.g., drugs, devices) pursuant to ORC 5160.34(B)(11).

Medicaid Managed Care
Appendix C
Plan Responsibilities

ix. The MCP shall provide prescribers with in-office access to their preferred drug and PA lists via the availability of at least one hand-held software application.

x. The MCP shall provide all Healthchek information as specified in this Appendix.

xi. ODM may require the MCP to include additional information on the provider website as needed.

xii. The MCP shall publish the requirements and process for submitting an appeal related to Maximum Allowable Costs (MAC) for pharmacy providers on their website. Prior to implementation, the MCP shall submit its MAC appeal auditing process to ODM for approval to ensure a reasonable process is established for pharmacy providers.

41. **Provider Feedback.** The MCP shall have the administrative capacity to offer feedback to individual providers on their adherence to evidence-based practice guidelines; and positive and negative care variances from standard clinical pathways that may impact outcomes or costs. In addition, the feedback information may be used by the MCP for activities such as provider performance improvement projects that include incentive programs or the development of quality improvement programs.

42. **Third Party Liability (TPL).**

a. **Coordination of Benefits.** When a claim is denied due to TPL, the MCP shall timely share appropriate and available information regarding the third party to the provider for the purposes of coordination of benefits, including, but not limited to TPL information received from ODM.

b. **Recovery.** ODM reserves the right to identify, pursue, and retain any recovery of third party resources assigned to the MCP that remains uncollected 18 months from the payment date, with the exception of Tricare, where ODM retains the sole right of recovery.

43. Unless otherwise indicated, MCP submissions with due dates that fall on a weekend or holiday are due the next business day.

44. **Trial Member Level Incentive Programs.** The MCP shall submit a description of a proposed trial member-level incentive program to ODM for review and approval prior to implementation. A trial member level incentive program is defined as a time limited monetary or non-monetary reward offered to a member who complies with the intended goals of the program as outlined by the MCP (e.g., recommended health screenings) in the submission. The incentive shall not be considered a medically-necessary Medicaid-covered service or an additional benefit as offered in the MCP's Member Handbook. The MCP should refer to the *Guidance Document for Managed Care Plan Submission for Trial Member Level Incentive Programs* for additional clarification.

45. **Distribution List Subscriptions.** The MCP shall subscribe to the appropriate distribution lists for notification of all OAC rule clearances, and final rules published with medical assistance letters

Medicaid Managed Care
Appendix C
Plan Responsibilities

(MALs), Medicaid handbook transmittal letters (MHTLs), and other transmittal letters affecting managed care program requirements. The MCP is solely responsible for submitting its names and email addresses to the appropriate distribution lists and is also responsible for ensuring the validity of any e-mail addresses maintained on those distribution lists.

46. Pursuant to ORC 5167.14, the MCP shall enter into a data security agreement with the State of Ohio's Board of Pharmacy that governs the MCP's use of the Board's drug database established and maintained under ORC 4729.75.

47. Upon request by ODM, the MCP shall share data with ODM's actuary. ODM and the MCP are covered entities under the Health Insurance Portability and Accountability Act of 1996 (HIPAA). ODM represents and warrants that separate from this Agreement, a Business Associate agreement that complies fully with HIPAA and the Health Information Technology for Economic and Clinical Health Act ("HITECH") and the implementing federal regulations under both Acts, has been executed by ODM's actuary, is currently in effect, and will remain in effect for the term of this Agreement.

48. As outlined in OAC rule 5160-26-05, MCP subcontractors and referral providers may not bill enrollees any amount greater than would be owed if the entity provided the services directly (i.e., no balance billing by providers).

49. **Conducting Business Outside the United States.**

    a. The MCP shall comply with Executive Order 2011-12K. A copy of Executive Order 2011-12K can be found at http://governor.ohio.gov/MediaRoom/ExecutiveOrders.aspx. This Executive Order prohibits the use of public funds to purchase services that will be provided outside of the United States except under certain circumstances. Such services include the use of offshore programming or call centers. Additionally, the MCP shall not transfer PHI to any location outside the United States or its territories.

    b. Pursuant to 42 CFR 438.602(i), no MCP claim paid to any provider, out-of-network provider, subcontractor, or financial institution located outside of the United States is considered in capitation rates. In addition, no contracting ODM MCP shall be located outside the United States or its territories.

50. **National Committee for Quality Assurance (NCQA) Accreditation.** The MCP shall hold and maintain, or shall be actively seeking and working towards, accreditation by the NCQA for the Ohio Medicaid line of business. The MCP shall achieve and/or maintain an Excellent, Commendable or Accredited status. If the MCP receives a Provisional or Denied status from NCQA, the MCP will be subject to sanctions as noted in Appendix N. Compliance will be assessed annually based on the MCP's accreditation status as of September 15th of each year. For the purposes of meeting this accreditation requirement, ODM will only accept the use of the NCQA Corporate Survey Process to the extent deemed allowable by NCQA.

Upon completion of the accreditation survey, the MCP shall submit to ODM a copy of the "Final Decision Letter" no later than 10 calendar days upon receipt from NCQA. Thereafter and on an annual basis between accreditation surveys, the MCP shall submit a copy of the "Accreditation

S0215 - K57

Medicaid Managed Care
Appendix C
Plan Responsibilities

Summary Report" issued as a result of the Annual HEDIS Update no later than 10 calendar days upon receipt from NCQA. Upon ODM's request, the MCP shall provide any and all documents related to achieving accreditation.

51. **MCP Family Advisory Council.** The MCP shall convene an MCP Family Advisory Council at least quarterly in each region that the MCP serves consisting of the MCP's current members. The purpose of the Council is to engage members in such a way as to elicit meaningful input related to the MCP's strengths and challenges with respect to serving members. The composition of the group shall be diverse and representative of the MCP's current membership throughout the region with respect to the members' race, ethnic background, primary language, age, Medicaid eligibility category (Adult Extension, MAGI and ABD), and health status. As new populations are enrolled in managed care, the MCP shall actively pursue ensuring the Council's membership reflects the diversity of its enrolled population.

The MCP shall report the following to ODM on or before the 15th of July, October, January and April of each calendar year:

   a. A list of attending members during the prior quarter for each regional Advisory Council; Meeting dates,
   b. Agenda and the minutes from each regional meeting that occurred during the prior quarter; and

   c. Improvement recommendations developed by each Council.

52. **MCP Pharmacy & Therapeutics (P&T) Committee.** The MCP shall convene a P&T Committee that is in substantial compliance with CMS's Medicare requirements set forth in 42 CFR 423.120(b)(1), Development and Revision by a Pharmacy and Therapeutics Committee. In order to comply with CMS's Medicare requirements in the Medicaid program, the plans shall substitute the terms, Medicaid Covered Outpatient Drug and MCP, for the terms, part D drug and plan sponsor, respectively, and are not required to include members who are experts regarding the care of elderly or disabled individuals. The P&T Committee shall submit to ODM upon request:

   a. The P&T Committee membership list for ODM review and approval.

   b. The minutes pertaining to the Medicaid program from each the MCP P&T committee meeting within 10 days of the date of the meeting at which the minutes are approved. Minutes shall include all voting results.

53. The MCP shall participate in the development, implementation, and operation of initiatives for early managed care enrollment and care coordination for inmates to be released from state prisons or state psychiatric hospitals and youths in Department of Youth Services custody.

54. If the MCP uses a Diagnosis Related Grouper (DRG) to pay for inpatient hospital claims, then the MCP shall use the All-Patient Refined (APR) DRG that is the same version that ODM uses.

S0215 — K58

Medicaid Managed Care
Appendix C
Plan Responsibilities

55. **Nursing Facility Services.** For Medicaid covered nursing facility stays, the MCP shall evaluate the member's need for the level of services provided by a nursing facility. To make this decision, the MCP shall use the criteria for nursing facility-based level of care pursuant to OAC rules 5160-3-08, 5160-3-09 and 5160-1-01. The MCP shall provide documentation of the member's level of care determination to the nursing facility. The MCP shall maintain a written record that the criteria were met, or if not met, the MCP shall maintain documentation that a Notice of Action was issued in accordance with OAC 5160-26-08.4.

The MCP shall ensure accurate claims payment to nursing facility providers by appropriately modifying payment when a member has patient liability obligations or lump sum amounts pursuant to 5160-3-39.1. The MCP is prohibited from paying for nursing facility services during restricted Medicaid coverage periods (RMCP). The MCP shall utilize HIPPA compliant enrollment files for patient liability obligations and RMCPs.

56. **Payment and Adjustment to Capitation in Consideration of the ACA Section 9010 Health Insurance Providers Fee.** The following payment and adjustment to capitation information applies only to MCPs that are covered entities under Section 9010 of the Patient Protection and Affordable Care Act, as amended by Section 10905 of the same Act, and as further amended by Section 1406 of the Health Care and Education Reconciliation Act of 2010 (collectively, the "ACA"), and thus required to pay an annual fee ("Annual Fee") for United States health risks.

   a. The ACA requires the MCP to pay the Annual Fee no later than September 30th (as applicable to each relevant year, the "Fee Year") with respect to premiums paid to the MCP in the preceding calendar year (as applicable to each relevant year, the "Data Year"), and continuing similarly in each successive year.

   b. In order to satisfy the requirement for actuarial soundness set forth in 42 CFR 438.6(c) with respect to amounts paid by ODM under this Agreement, the parties agree that ODM shall make a payment or an adjustment to capitation to the MCP for the full amount of the Annual Fee allocable to this Agreement, as follows:

      i. **Amount and Method of Payment.** For each Fee Year, ODM shall make a payment or an adjustment to capitation to the MCP for that portion of the Annual Fee attributable to the premiums paid by ODM to the MCP (the "Ohio Medicaid-specific Premiums") for risks in the applicable Data Year under the Agreement, less any applicable exclusions and appropriate credit offsets. These payments or adjustments to be made by ODM will include the following:

         1. The amount of the Annual Fee attributable to this Agreement;

         2. The corporate income tax liability, if any, that the MCP incurs as a result of receiving ODM's payment for the amount of the Annual Fee attributable to this Agreement; and

         3. Any Ohio state and local Sales and Use taxes and Health Insuring Corporation taxes.

Medicaid Managed Care
Appendix C
Plan Responsibilities

Because the amount of the Annual Fee will not be determinable until after ODM makes the regular capitation payment to the MCP, ODM shall annually make this payment or adjustment to capitation separately from the regular capitation rate paid to the MCP.

ii. Documentation Requirements. ODM shall pay the MCP after it receives sufficient documentation, as determined by ODM, detailing the MCP's Ohio Medicaid-specific liability for the Annual Fee. The MCP shall provide documentation that includes the following:

1. Total premiums reported on IRS Form 8963;

2. Ohio Medicaid-specific premiums included in the premiums reported on Form 8963;

3. The amount of the Annual Fee as determined by the IRS; and

4. The corporate income tax rate applicable to the year of such payments.

Payment by ODM is intended to put the MCP in the same position as the MCP would have been in had no Annual Fee been imposed upon the MCP. This provision shall survive the termination of the Agreement.

57. **Hepatitis C Risk Pool Arrangement.** Pursuant to the Hepatitis C Risk Pool Arrangement described in Appendix E, Rate Methodology, the MCP shall participate in a Hepatitis C risk pool arrangement on a calendar year (CY) basis. The amount of the risk pool is determined by the projected Hepatitis C costs incorporated into the CY rates. ODM will redistribute funds among MCPs based on the actual Hepatitis C costs. This risk pool will be used to account for any MCP getting a disproportionate share of members using Hepatitis C drugs by giving plans that experience adverse selection or relatively adverse claims experience a greater proportion of the risk pool funds. The MCP shall follow FFS clinical criteria for Hepatitis C direct acting antivirals.

58. **Comprehensive Disaster/Emergency Response Planning.** The MCP shall develop and implement an ODM-approved Comprehensive Disaster/Emergency Response Plan for natural, man-made, or technological disasters and other public emergencies (e.g., floods, extreme heat, and extreme cold). The MCP shall notify its Contract Administrator immediately when the Comprehensive Disaster/Emergency Response Plan has been activated. The MCP shall make a current version of the approved Comprehensive Disaster/Emergency Response Plan available to all staff.

a. The MCP shall designate both a primary and alternate point of contact who will perform the following functions: be available 24 hours a day, 7 days a week during the time of an emergency; be responsible for monitoring news, alerts and warnings about disaster/emergency events; have decision-making authority on behalf of the MCP; respond to directives issued by ODM; and cooperate with the local- and state-level Emergency Management Agencies. The MCP shall communicate any changes to the primary and alternate point of contact to the Contract Administrator at least one

**S0215 – K60**

Medicaid Managed Care
Appendix C
Plan Responsibilities

business day prior to the effective date of the change.

b. The MCP shall participate in ODM sanctioned workgroups and processes to establish a state-level emergency response plan which will include a provision for Medicaid recipients, and will comply with the resulting procedures.

c. During the time of an emergency or a natural, technological, or man-made disaster, the MCP shall be able to generate a current list of members for whom an individual disaster plan, according to the specifications below, has been developed, including the risk and the individual-level plan, and distribute to local and state emergency management authorities according to the protocol established by ODM.

d. The MCP shall identify members who are at risk for harm, loss, or injury during any potential natural, technological, or manmade disaster. The MCP shall ensure every member who is technology and/or service dependent, with no known reasonable means to access services, is known and documented as part of the plan's Comprehensive Disaster/Emergency Response Plan. For these members, the MCP shall develop an individual-level plan with the member when appropriate. The MCP shall ensure staff, including care managers, are prepared to respond to and implement the plans in the event of an emergency or disaster. The member-level plan shall:

   i. Include a provision for the continuation of critical services appropriate for the member's needs in the event of a disaster including, but not limited to access to medication/prescriptions;

   ii. Identify how and when the plan will be activated;

   iii. Be documented in the member record maintained by the MCP; and

   iv. Be provided to the member.

59. **MCP Portfolio Expansion.** The MCP shall immediately report to ODM all arrangements wherein services or contracts may overlap with Medicaid plans when plans are seeking to expand their portfolios through contracts with other entities.

60. **Subcontractual Relationships and Delegation.** If the MCP delegates to any first tier, downstream and related entity (FDR), they shall ensure it has an arrangement with the FDR to perform administrative services as defined below on the MCP's behalf.

   a. Unless otherwise specified by ODM, administrative services include: care management, marketing, utilization management, quality improvement, enrollment, disenrollment, membership functions, claims administration, licensing and credentialing, provider network management, and coordination of benefits.

   b. Parties to administrative services arrangements are defined as:

S0215 – K61

Medicaid Managed Care
Appendix C
Plan Responsibilities

    i.   First tier entity: any party that enters into a written arrangement, acceptable to ODM, with the MCP to provide administrative services for Ohio Medicaid eligible individuals.

    ii.   Downstream entity: any party that enters into a written arrangement, acceptable to ODM, with a first tier or related entity or below the level of a first tier or related entity to provide administrative services for Ohio Medicaid eligible individuals. These arrangements continue down to the level of the ultimate provider of the administrative services.

    iii.   Related entity: any party related to the MCP by common ownership or control, and under an oral or written arrangement performs some of the administrative services under the MCP's contract with ODM.

c.   Before the MCP enters into an arrangement with an FDR to perform an administrative function not listed above that could impact a member's health, safety, welfare or access to Medicaid covered services, the MCP shall contact ODM to request a determination of whether or not the function should be included as an administrative service that complies with the provisions listed herein.

d.   Upon request, the MCP shall disclose to ODM all financial terms and arrangements for payment of any kind that apply between the MCP, or the MCP's first tier, downstream and related entity (FDR), and any provider of a Medicaid service. ODM acknowledges that such information may be considered confidential and proprietary and thus shall be held strictly confidential by ODM as specified in Article VII of this Agreement.

e.   The MCP that enters into a written arrangement with an FDR shall include the following enforceable provisions:

    i.   A description of the administrative services to be provided by the FDR and any requirements for the FDR to report information to the MCP.

    ii.   The beginning date and expiration date or automatic renewal clause for the arrangement, as well as applicable methods of extension, renegotiation and termination.

    iii.   Identification of the service area and Medicaid population, either "non-dual" or "non-dual and dual" the FDR will serve.

    iv.   A provision stating that the FDR shall release to the MCP and ODM any information necessary for the MCP to perform any of its obligations under the MCP's provider agreement with ODM, including but not limited to compliance with reporting and quality assurance requirements.

    v.   A provision that the FDR's applicable facilities and records will be open to inspection by the MCP, ODM, its designee or other entities as specified in OAC rule.

S0215 – K62

Medicaid Managed Care
Appendix C
Plan Responsibilities

    vi.  A provision that the arrangement is governed by, and construed in accordance with all applicable state or federal laws, regulations and contractual obligations of the MCP. The arrangement shall be automatically amended to conform to any changes in laws, regulations and contractual obligations without the necessity for written amendment.

    vii.  A provision that Medicaid eligible individuals and ODM are not liable for any cost, payment, copayment, cost-sharing, down payment, or similar charge, refundable or otherwise for services performed, including in the event the FDR or the MCP cannot or will not pay for the administrative services. This provision does not prohibit waiver entities from collecting patient liability payments from MCP members as specified in OAC rule 5160:1-6-05.1.

    viii.  The procedures to be employed upon the ending, nonrenewal or termination of the arrangement including at a minimum to promptly supply any documentation necessary for the settlement of any outstanding claims or services.

    ix.  A provision that the FDR will abide by the MCP's written policies regarding the False Claims Act and the detection and prevention of fraud, waste and abuse.

    x.  A provision that the FDR, and all employees of the FDR, are subject to the applicable provider qualifications in OAC rule 5160-26-05.

    xi.  For an FDR providing administrative services that result in direct contact with a Medicaid eligible individual, a provision that the FDR will identify, and where indicated, arrange pursuant to the mutually agreed upon policies and procedures between the MCP and FDR for the following at no cost to the individual or ODM:

        1.  Sign language services; and

        2.  Oral interpretation and oral translation services.

    xii.  For an FDR providing licensing and credentialing services of medical providers, a provision that:

        3.  The credentials of medical professionals affiliated with the party or parties will be reviewed by the MCP; or

        4.  The credentialing process will be reviewed and approved by the MCP and the MCP will audit the credentialing process on an ongoing basis.

    xiii.  For an FDR providing administrative services that result in the selection of providers, a provision that the MCP retains the right to approve, suspend, or

Medicaid Managed Care
Appendix C
Plan Responsibilities

terminate any such selection.

xiv. A provision that permits ODM or the MCP to seek revocation or other remedies, as applicable, if ODM or the MCP determines that the FDR has not performed satisfactorily or the arrangement is not in the best interest of the MCP's members.

f. The MCP is ultimately responsible for meeting all contractual obligations under the MCP's provider agreement with ODM. The MCP shall:

i. Ensure the performance of the FDR is monitored on an ongoing basis to identify any deficiencies or areas for improvement;

ii. Impose corrective action on the FDR as necessary; and

iii. Maintain policies and procedures that ensure there is no disruption in meeting its contractual obligations to ODM, if the FDR or the MCP terminates the arrangement between the FDR and the MCP.

g. Unless otherwise specified by ODM, all information required to be submitted to ODM shall be submitted directly by the MCP.

h. Information regarding new, changes to, or termination of FDR arrangements shall be reported to ODM no less than 15 days prior to it taking effect.

i. Delegation requirements do not apply to care management arrangements between the MCP and a Comprehensive Primary Care Practice or Patient Centered Medical Home as cited in Appendix K.

61. **Appeals and Grievances.** The MCP shall have written policies and procedures for an appeal and grievance system for members, in compliance with the requirements of OAC rule 5160-26-08.4 and 42 C.F.R. 438 Subpart F, and shall include the participation of individuals authorized by the MCP to require corrective action. The MCP is prohibited from delegating the appeal or grievance process to another entity unless approved by ODM. These policies and procedures shall include a process by which members may file grievances and appeals with the MCP, and a process by which members may access the state's fair hearing system through the Ohio Department of Job and Family Services (ODJFS) Bureau of State Hearings (BSH).

a. **State Hearing Process.** The MCP shall develop and implement written policies and procedures that ensure the MCP's compliance with the state hearing provisions specified in division 5101:6 of the Administrative Code. Upon request, the MCP's state hearing policies and procedures shall be made available for review by ODM. When the MCP is notified by BSH that a member has requested a state hearing, the MCP shall review the state hearing request and within two business days of receipt of the BSH notice, confirm via email to State_Hearings_Scheduling@jfs.ohio.gov one of the following:

S0215 - K64

Medicaid Managed Care
Appendix C
Plan Responsibilities

  i. The MCP has no record that the member has requested a plan appeal pertaining to the state hearing request;

  ii. The MCP made an adverse appeal resolution pertaining to the state hearing request, whether or not the appeal was expedited, and attach a copy of the State Hearing Notice issued to the member;

  iii. The MCP made a decision to authorize the services pertaining to the state hearing request and identify the date the member and provider were notified of the authorization; or

  iv. The MCP has not yet made a decision on the appeal request pertaining to the state hearing request and identify the date the MCP received the appeal request and the date the MCP is currently required to decide an appeal resolution.

  Unless the timeframe for a member to file an appeal with the MCP is exhausted in accordance with OAC 5160-26-08.4, if the MCP confirms to BSH that there is no record of the member requesting a plan appeal, the MCP shall attempt to contact the member to initiate the plan appeal process.

b. **Logging and Reporting of Appeals and Grievances.** The MCP shall maintain records of all appeals and grievances, including resolutions, for a period of ten years. Upon request, the records shall be made available to ODM and the Medicaid Fraud Control Unit.

  i. The record of each grievance or appeal shall contain, at a minimum:

   1. The name of the member for whom the appeal or grievance was filed;

   2. The date the appeal or grievance was received;

   3. A general description of the reason for the appeal or grievance;

   4. The date of each review or, if applicable, review of meeting;

   5. If applicable, the resolution of the appeal or grievance; and

   6. If applicable, the date of the resolution.

  ii. The MCP shall identify a key staff person responsible for the logging and reporting of appeals and grievances and ensuring the grievance and appeals system is in accordance with this rule.

The MCP shall submit information regarding appeal and grievance activity as directed by ODM.

S0215 – K65

Medicaid Managed Care
Appendix C
Plan Responsibilities

62. Behavioral Health (BH) Carve-in Testing Standards. In preparation for BH Carve-in implementation, the MCP shall demonstrate to ODM bi-weekly, using a standardized reporting template, the following testing standards are met. These standards are only related to test claims submitted by contracted BH providers who demonstrate a willingness to participate in testing during these timeframes. Failure to meet the testing standards will result in the assessment of a noncompliance penalty. See Appendix N of this Agreement for financial sanctions for noncompliance with the performance standards.

    a. 50% of test claims submitted correctly by contracted BH providers must adjudicate correctly through the system by April 15, 2018.

    b. 75% of test claims submitted correctly by contracted BH providers must adjudicate correctly through the system by May 31, 2018.

Correctly adjudicated claim means a claim that has been processed to payment or denial by the MCP parent company or any subcontractor and includes both original and adjustment claims.

63. Ohio Equity Institute Data. The MCP shall submit data files for ODM-sanctioned improvement efforts involving infant mortality in priority communities as specified by ODM. See Appendix N of the Agreement for the penalty for noncompliance with this requirement.

S0215 – K66

Medicaid Managed Care
Appendix D
ODM Responsibilities

**APPENDIX D**

**ODM RESPONSIBILITIES**

The following are the Ohio Department of Medicaid (ODM) responsibilities or clarifications not otherwise specifically stated in Ohio Administrative Code (OAC) chapter 5160-26 or elsewhere in this Agreement.

1. ODM will provide the MCP with an opportunity to review and comment on the rate-setting time line and proposed rates, and proposed changes to the OAC program rules and the provider agreement.

2. ODM will notify the MCP of managed care program policy and procedural changes and, whenever possible, offer sufficient time for comment and implementation.

3. ODM will provide regular opportunities for the MCP to receive program updates and discuss program issues with ODM staff.

4. ODM will provide technical assistance sessions where·MCP attendance and participation is required. ODM will also provide optional technical assistance sessions to the MCP, individually or as a group.

5. ODM will provide the MCP linkages to organization that can provide guidance on the development of effective strategies to eliminate health disparities.

6. ODM will conduct an annual analysis of Medicaid eligible individuals to identify whether there are any prevalent common primary languages, other than English, in the MCP service areas. ODM will notify the MCP of any languages identified as prevalent for the purpose of translating marketing and member materials outlined.in Appendix F.

7. ODM will provide the MCP with an annual MCP Calendar of Submissions outlining major submissions and due dates.

8. ODM will identify contact staff, including the Contract Administrator (CA), selected for the MCP.

9. ODM will provide the MCP with an electronic Provider Master File containing all the Ohio Medicaid fee-for-service (FFS) providers, which includes their Medicaid Provider Number, as well as all providers who have been assigned a provider reporting number for current encounter data purposes. This file also includes·NPI information when available.

10. **Service Area Designation.** ODM will implement a mandatory managed care program in service areas wherever choice and capacity allow and the criteria in 42 CFR 438.50(a) are met.

11. **Member Information.**

    a. ODM, or its designee, will provide membership notices, informational materials, and instructional materials to members and eligible individuals in a manner and format that

S0215 – K67

Medicaid Managed Care
Appendix D
ODM Responsibilities

may be easily understood. At least annually, ODM or its designee will provide current MCP members with an open enrollment notice which describes the managed care program and includes information on the MCP options in the service area and other information regarding the managed care program as specified in 42 CFR 438.10.

b. ODM will notify members or ask the MCP to notify members about significant changes affecting contractual requirements, member services or access to providers. If the MCP elects not to provide, reimburse, or cover a counseling service or referral service due to an objection to the service on moral or religious grounds, ODM will provide coverage and reimbursement for these services for the MCP's members.

c. As applicable, ODM will provide information to MCP members on what services the MCP will not cover and how and where the MCP's members may obtain these services.

12. **Membership Selection.**

a. The Ohio Medicaid Consumer Hotline (henceforth referred to as the "Hotline") is responsible for providing unbiased education and selection services for the Medicaid managed care program. The Hotline operates a statewide toll-free telephone center to assist eligible individuals in selecting an MCP or choosing a health care delivery option.

b. Eligible individuals will be auto-assigned to an MCP at the discretion of ODM in accordance with 42 CFR 438.54.

c. ODM or their designated entity shall provide Consumer Contact Records (CCRs) to the MCP on no less than a weekly basis. The CCRs are a record of each consumer initiated MCP enrollment, change, or termination, and each Hotline initiated MCP assignment processed through the Hotline.

d. ODM verifies MCP enrollment via a membership roster. ODM or its designated entity provides HIPAA compliant 834 daily and monthly transactions.

13. **Monthly Premium Payment.** ODM will remit payment to the MCP via an electronic funds transfer (EFT), or at the discretion of ODM, by paper warrant.

a. ODM will confirm all premium payments paid to the MCP during the month via a monthly remittance advice (RA). ODM or its designated entity will provide a record of each recipient detail level payment via HIPAA 820 compliant transactions. ODM or its designee will keep a record of the MCP's Accounts Payable (i.e. Pay 4 Performance, Primary Care Rate Increase, and Health Insurance Provider Fee) and Accounts Receivable (i.e. Penalty, Credit Balance) transaction on the MITS Provider Portal Report Tab.

b. ODM will make available a website which includes current program information.

c. ODM will regularly provide information to the MCP regarding different aspects of the MCP's performance including, but not limited to, information on MCP-specific and

S0215 – K68

Medicaid Managed Care
Appendix D
ODM Responsibilities

statewide external quality review organization surveys, focused clinical quality of care studies, consumer satisfaction surveys and provider profiles.

14. The Office of Managed Care (OMC) is responsible for the oversight of the MCPs' provider agreements with ODM. Within the OMC, a specific Contract Administrator (CA) has been assigned to the MCP. Unless expressly directed otherwise, the MCP shall first contact their designated CA for questions/assistance related to Medicaid and/or the MCP's program requirements /responsibilities. If their CA is not available and the MCP needs immediate assistance, MCP staff should request to speak to a supervisor within the Managed Care Contract Administration Section.

S0215 — K69

Medicaid Managed Care
Appendix E
Rate Methodology

**APPENDIX E**

**RATE METHODOLOGY**

S0215 – K70

**Milliman Client Report**



---

# Calendar Year 2018 Medicaid Managed Care Provider Agreement Rate Certification Summary

## January 1, 2018 through December 31, 2018

### Ohio Department of Medicaid

Prepared for:
Al Dickerson
Deputy Director Rate Setting
Ohio Department of Medicaid

Prepared by:
Jeremy D. Palmer
FSA, MAAA
Principal and Consulting Actuary

Jason A. Clarkson
FSA, MAAA
Consulting Actuary

Market Tower
10 West Market Street
Suite 1600
Indianapolis, IN 46204 USA

Tel  +1 317 639 1000
Fax  +1 317 639 1001

milliman.com

---

December 8, 2017

S0215 - K71
Milliman Client Report

## Table of Contents

INTRODUCTION & EXECUTIVE SUMMARY ......................................................................................... 1

SECTION I. MEDICAID MANAGED CARE RATES ............................................................................... 1

   1.  GENERAL INFORMATION ............................................................................................................ 1

   2.  DATA ............................................................................................................................................. 2

   3.  PROJECTED BENEFIT COST AND TRENDS ........................................................................... 12

   4.  SPECIAL CONTRACT PROVISIONS RELATED TO PAYMENT ............................................... 18

   5.  PROJECTED NON-BENEFIT COSTS ....................................................................................... 21

   6.  RISK ADJUSTMENT AND ACUITY ADJUSTMENTS ................................................................ 24

SECTION II. NEW ADULT GROUP CAPITATION RATES ................................................................... 25

   1.  DATA ........................................................................................................................................... 25

   2.  PROJECTED BENEFIT COSTS ................................................................................................ 25

   3.  PROJECTED NON-BENEFIT COSTS ....................................................................................... 26

   4.  FINAL CERTIFIED RATES OR RATE RANGES ....................................................................... 26

   5.  RISK MITIGATION STRATEGIES .............................................................................................. 26

LIMITATIONS ...................................................................................................................................... 27

APPENDIX 1: 2018 RATE CHANGE SUMMARIES

S0215 – K72
Milliman Client Report

# INTRODUCTION & EXECUTIVE SUMMARY

*This document is an abridged version of the file titled "CY 2018 Medicaid Managed Care Certification" dated December 1, 2017. Please refer to the certification report for a complete version of the calendar year 2018 Medicaid Managed Care capitation rate development documentation.*

## BACKGROUND

Milliman, Inc. (Milliman) has been retained by the Ohio Department of Medicaid (ODM) to provide actuarial and consulting services related to the development of capitation rates for its Medicaid Managed Care Program (MMC) effective January 1, 2018.

This letter provides documentation for the development of the actuarially sound capitation rates. The certified capitation rates for the MMC program are effective from January 1, 2018 through December 31, 2018.

## SECTION I. MEDICAID MANAGED CARE RATES

## 1. GENERAL INFORMATION

The capitation rates provided under this certification are "actuarially sound" for purposes of 42 CFR 438.4(a), according to the following criteria:

- The capitation rates provide for all reasonable, appropriate, and attainable costs that are required under terms of the contract and for the operation of the managed care plan for the time period and population covered under the terms of the contract, and such capitation rates were developed in accordance with the requirements under 42 CFR 438.4(b).

To ensure compliance with generally accepted actuarial practices and regulatory requirements, we referred to published guidance from the American Academy of Actuaries (AAA), the Actuarial Standards Board (ASB), the Centers for Medicare and Medicaid Services (CMS), and federal regulations. Specifically, the following were referenced during the rate development:

- Actuarial standards of practice applicable to Medicaid managed care rate setting which have been enacted as of the capitation rate certification date, including: ASOP 1 (Introductory Actuarial Standard of Practice); ASOP 5 (Incurred Health and Disability Claims); ASOP 23 (Data Quality); ASOP 25 (Credibility Procedures); ASOP 41 (Actuarial Communications); ASOP 45 (The Use of Health Status Based Risk Adjustment Methodologies); and ASOP 49 (Medicaid Managed Care Capitation Rate Development and Certification).
- Actuarial soundness and rate development requirements in the Medicaid and CHIP Managed Care Final Rule (CMS 2390-F) for the provisions effective for the CY 2018 managed care program rating period.
- The most recent *Medicaid Managed Care Rate Development Guide* published by CMS.
- Throughout this document and consistent with the requirements under 42 CFR 438.4(a), the term "actuarially sound" will be defined as in ASOP 49:

*"Medicaid capitation rates are "actuarially sound" if, for business for which the certification is being prepared and for the period covered by the certification, projected capitation rates and other revenue sources provide for all reasonable, appropriate, and attainable costs. For purposes of this definition, other revenue sources include, but are not limited to, expected reinsurance and governmental stop-loss cash flows, governmental risk-adjustment cash flows, and investment income. For purposes of this definition, costs include, but are not limited to, expected health benefits; health benefit settlement expenses; administrative expenses; the cost of capital, and government-mandated assessments, fees, and taxes."[1]*

---

[1] http://www.actuarialstandardsboard.org/asops/medicaid-managed-care-capitation-rate-development-and-certification/

S0215 – K73
**Milliman Client Report**

## A. RATE DEVELOPMENT STANDARDS

### i. Annual basis

The capitation rates are for the one year rate period from January 1, 2018 through December 31, 2018.

### ii. Differences among capitation rates

Any proposed differences among capitation rates according to covered populations are based on valid rate development standards and are not based on the rate of federal financial participation associated with the covered populations.

### iii. Cross-subsidization of rate cell payment

The capitation rates were developed at the rate cell level and neither cross-subsidize nor are cross-subsidized by payments from any other rate cell.

## B. APPROPRIATE DOCUMENTATION

### i. Documentation of required elements

This report contains appropriate documentation of key elements, including data used, assumptions made, and methods for analyzing data and developing assumptions and adjustments.

# 2. DATA

This section provides information on the base data used to develop the capitation rates.

## A. APPROPRIATE DOCUMENTATION

### i. Requested data

As the actuary contracted by ODM to provide consulting services and associated financial analyses for many aspects of the MMC program (and not limited to capitation rate development), Milliman intakes and summarizes eligibility and expenditure data on a monthly basis using vendor files provided by ODM. As such, there is no separate data request from Milliman to the state specifically related to the base data for the capitation rate development. The remainder of this section details the base data and validation processes utilized in the CY 2018 capitation rate development.

### ii. Data used to develop the capitation rates

(a)     **Description of the data**

(i)     **Types of data**

The primary data sources used in the development of the MMC rates are the following:

- Historical enrollment and eligibility files provided by ODM;
- Encounter data submitted by the MCPs;
- Annual cost report data submitted by the MCPs;
- Re-priced inpatient and outpatient hospital claims experience provided by ODM;
- Historical FFS data for the AFK population provided by ODM;
- Historical FFS data provided by ODM for the Breast and Cervical Cancer Project (BCCP), Bureau of Children with Medical Handicaps Program (BCMH), and Developmental Disabilities (DD) populations;
- CY 2016 Managed Care Survey completed by each MCP; and,
- Statutory financial statement data.

S0215 – K74
Milliman Client Report

### (ii) Age of the data

The data serving as the base experience in the capitation rate development process was incurred during CY 2016. The annual cost report data reflects claims paid through March 31, 2017. The encounter data used in our rate development process reflected encounters adjudicated through March 31, 2017, consistent with the basis of the annual cost report data. For the purposes of trend development and analyzing emerging population enrollment patterns and claims experience, we also reviewed encounter and cost report experience from CY 2014 through the first half of CY 2017. Cost report and encounter data was provided by ODM.

For the purpose of analyzing inpatient and outpatient hospital reimbursement changes, we received hospital encounter data (re-priced to ODM's fee schedule) for inpatient and outpatient hospital services incurred during CY 2016 from ODM. We also summarized statutory financial statement data from calendar years 2015 and 2016, and the second quarter of CY 2017. Financial statement data was developed using MCP annual cost report data and subsequently reconciled using SNL Financial.

### (iii) Data sources

The historical encounter data experience used for this certification is submitted by the five MCPs on an ongoing basis. This data is stored in ODM's Medicaid Information Technology System (MITS). Medicaid enrollment and encounter data stored in MITS was provided to us for the purposes of developing the CY 2018 capitation rates. CY 2016 annual cost report data was also provided to us. The cost report data is contained in Microsoft Excel files that the MCPs submit to ODM.

### (iv) Sub-capitation

Sub-capitated data is identified separately in both the encounter and cost report experience.

*Encounter Data*: MCPs indicated whether an encounter is sub-capitated and "shadow priced" at the detail and header level, depending on how the encounter was paid. In the payment arrangement field ('CDE_PAY_ARR'), code '05' indicates sub-capitated arrangements. This field was used to separate sub-capitated claims from the non-sub-capitated encounter data.

*Cost Report*: We relied on the separate reporting of non-sub-capitated and sub-capitated experience by the MCPs in the medical cube worksheets of the CY 2016 cost reports. In the MCP cost reports, sub-capitated expenditures represent the amounts paid by MCPs for sub-capitated services, rather than "shadow priced" claims as illustrated in the CY 2016 encounter data.

### (b)      Availability and quality of the data

### (i)      Steps taken to validate the data

The base experience used in the capitation rates relies on cost report and encounter data submitted to ODM by participating MCPs. Managed care eligibility is maintained in MITS by ODM. The actuary, the MCPs, and ODM all play a role in validating the quality of encounter and cost report data used in the development of the capitation rates. The MCPs play the initial role, collecting and summarizing data sent to the state. ODM's Bureau of Health Research and Quality Improvement, Data Analytics section focuses on encounter data quality and MCP performance measurement, with measures focused on completeness, accuracy, and comparison between data sources. Appendix L of ODM's contract with the MCPs stipulates encounter data specific submission and quality standards. Additionally, we perform independent analysis of encounter data and cost report data to evaluate the quality of the data being used in the rate development process. Below is a summary of measures specific to each quality area that are applied by either Milliman or ODM.

*Completeness*

*Encounter Data*

ODM applies several measures to the MCP-submitted encounter data to evaluate the completeness of the data. A sample of measures focused on the completeness of the data include:
- Encounter data volume measures by population and service category;
- Incomplete rendering provider data;
- NPI provider number usage without Medicaid / reporting provider numbers;
- Percentage of encounters in an MCP's fully adjudicated claims file not present in the ODM encounter data files; and,
- Percentage of encounters in the ODM encounter data files not present in the MCP's fully adjudicated claims file.

S0215 – K75
Milliman Client Report

We also summarize the encounter data to assess month to month completeness of the encounter data. These measures include:
- Encounter per member per month (PMPM) by MCP and high level service categories;
- MCP distribution of members by annual encounter-reported expenditures; and,
- MCP distribution of members by monthly encounter-reported expenditures.

These measures are applied to identify any months where encounter data volume is unusually large or small, indicating a potential issue with the submitted encounter data.

The CY 2016 encounter data used in the development of the rates was adjudicated through March 31, 2017. As noted in this report, claims completion is applied to the encounter data for estimated CY 2016 claims adjudicated after March 31, 2017.

*Cost Report Data*

MCPs submit quarterly and year-end annual cost report data to ODM. We reviewed each MCP's quarterly and annual cost reports to identify large data variances, incomplete data, and other reporting issues. These issues are provided to each MCP by ODM and the cost reports are re-submitted to ODM as necessary.

The year-end cost report data must be certified by two officers of each MCP and externally audited. The year-end annual cost report is completed by the MCPs using claims incurred and paid through March 31st of the following calendar year. The three months of claims run-out limits the impact of the IBNP estimate on the incurred expenditure estimates used in the development of the rates.

## Accuracy

*Encounter Data*

We also review the accuracy of the encounter data by reviewing the percentage of matched encounters between the ODM encounter data files and outside data sources illustrating an MCP's fully adjudicated claims files where a payment amount discrepancy is identified.

Outside data sources include MCP Cost Report submissions along with NAIC financial statement information. We also review the encounter data to ensure each claim is related to a covered individual and a covered service. We summarize the encounter data into an actuarial cost model format. Annual base period data summaries are created to ensure that the data for each service is consistent across the health plans and with prior historical periods. Stratification by rate cell facilitates this review, as it minimizes the impact of changes in population mix. This process identifies MCP and service category combinations that may have unreasonable reported data.

*Cost Report Data*

As stated in the *Completeness* section, MCPs submit quarterly and annual cost report data to ODM. In terms of accuracy measures, the process of submitting both quarterly and annual reports identifies unreasonable or inconsistent values in the data among cost report submissions. In addition to utilization and cost metrics, financial measures such as medical loss ratio, underwriting margin, and administrative loss ratio are tracked across plans and rate cells. These metrics enable us to quickly identify potential cost allocation issues. We also evaluated the cost report expenditures in relation to statutory financial statements for each MCP to ensure expenditure differences were reasonable.

## Consistency of data across data sources

We performed a detailed review of the encounter data used in the development of capitation rates effective January 1, 2018. Assessing the encounter data for consistency with the MCP cost reports was a vital part of the rate development process. We reviewed utilization and cost metrics by rate cell and region for CY 2016 encounter data and cost reports. Experience was reviewed for non-sub-capitated services, sub-capitated services, and in aggregate. Aggregate expenditures in the encounter data were approximately 2% less than aggregate expenditures in the cost report data (prior to any data quality adjustment). Differences between the encounter data and cost report expenditures were generally greater in rate cells where a large portion of the expenditures were sub-capitated, due to differences in the reporting of sub-capitated expenditures between the two data sources (shadow-priced versus ceded premium).

S0215 – K76

**Milliman Client Report**

We also reviewed the consistency of other data sources that have been used to inform assumptions in the rate setting process:

- Eligibility – Monthly enrollment in eligibility files received by ODM was reconciled with publicly available values on ODM's website.
- Re-priced inpatient claims experience – To support our analysis of the impact of the APR-DRG changes during the historical experience period and rate period, we received re-priced inpatient encounter records from ODM. The claims experience included the actual MCP paid amount, along with claims re-priced to ODM's fee schedule. We confirmed the MCP paid amount was consistent with the encounter experience we had previously received, and confirmed the re-priced amounts were consistent with ODM's published inpatient hospital fee schedule.
- Re-priced outpatient claims experience – To support our analysis of the impact of EAPG implementation, we received re-priced outpatient encounter records from ODM. The claims experience included the actual MCP paid amount, along with claims re-priced to ODM's fee schedule. We confirmed the MCP paid amount was consistent with the encounter experience we had previously received, and confirmed the re-priced amounts were consistent with ODM's published outpatient hospital fee schedule.

**(ii) Actuary's assessment**

As required by Actuarial Standard of Practice (ASOP) No. 23, Data Quality, we disclose that Milliman has relied upon certain data and information provided by the Ohio Department of Medicaid and their vendors, primarily the MCPs. The values presented in this letter are dependent upon this reliance.

While there are areas for data improvement, we found the encounter data to be of appropriate quality for developing the CY 2018 capitation rates. After applying a series of data quality adjustments to both the encounter and cost report data, aggregate claims in the encounter data were within 0.1% of aggregate claims in the cost report data on a PMPM basis.

**(iii) Data concerns**

Through discussions with ODM and various data analyses, we were made aware of and confirmed encounter data quality concerns.

**(c) Appropriate data**

**(i) Use of encounter and fee-for-service data**

Fee-for-service (FFS) data was used as the base experience to develop the capitation rates for the Adoption and Foster Kids (AFK) rate cell. We reviewed and shared data summaries of the AFK FFS data with ODM to validate that it was appropriate for use. FFS experience was also used to estimate the potential impact of ODM's policy decision to move certain periods of retro-active FFS eligibility into the managed care delivery system. Additionally, FFS data was used to estimate the impact of moving the BCCP, BCMH, and DD populations into managed care where necessary. Managed care encounter data was used in the development of the capitation rates for all other populations. The base data reflects the historical experience and covered services used by the covered populations.

**(ii) Use of managed care encounter data**

Managed care encounter data was the primary data source used in the development of the capitation rates.

**(d) Reliance on a data book**

Development of the capitation rates did not rely on a data book or other summarized data source. We were provided with detailed claims data for all covered services and populations. We created data books summarizing CY 2016 encounter data, which were shared with ODM and participating MCPs.

## iii. Data adjustments

Capitation rates were developed primarily from CY 2016 encounter data. Adjustments were made to the base experience for data quality, completion, reimbursement changes, managed care efficiencies, and other program adjustments.

S0215 – K77

Milliman Client Report

**(a)    Credibility adjustment**

The MMC program, as represented in the base experience, was fully credible. No adjustments were made for credibility.

**(b)    Completion adjustment**

The capitation rates are based on CY 2016 experience. Encounter data is paid through March 31, 2017. Completion factors were developed by summarizing encounter data and applying traditional actuarial techniques to develop estimates of incurred but not paid (IBNP) liability.

First, we stratified the data by category of service and population groupings. Claims for each of these population-service category stratifications were analyzed and formed into lag triangles by paid and incurred month. Claim completion factors were developed for each month of the base experience period, based on historical completion patterns. Completion factors developed through the use of encounter data were compared to MCP reported IBNP liability estimates in the CY 2016 MCP Cost Reports. The completion factors selected were developed by blending MCP reported IBNP with our IBNP estimates.

The monthly completion factors were applied to CY 2016 non-sub-capitated experience to estimate the remaining claims liability for the calendar year. Results were aggregated into annual completion factors for each calendar year. For the AFK population, completion factors were developed through a review of historical fee-for-service claims experience.

**(c)    Errors found in the data**

Through discussions with ODM and our independent review of the data, we were made aware of and confirmed data quality concerns. After applying a series of data quality adjustments, composite encounter claims were reconciled within approximately 0.1% of composite MCP cost report claims on a PMPM basis.

**(d)    Program change adjustments**

The subsections below include details related to the program and reimbursement changes that have occurred in the MMC program since January 1, 2016, the beginning of the base experience period used in the capitation rate development.

**Calendar Year 2016**

**Hydroxyprogesterone Prior Authorization Modifications.**

Based on conversations with ODM, we understand that prior authorization for doses of Makena have been loosened. Makena is a form of progesterone that is used to reduce the risk of premature births. We reviewed the historical experience of Makena along with the lower cost alternative, compounded 17-hydroxyprogesterone (17P). We applied an adjustment for increased dispensing of Makena to the pharmacy-retail, professional immunizations & injections, and outpatient-other categories of service (COS) for female rate cells.

**James Cancer Center Reimbursement Adjustment.**

For James Cancer Center, reimbursement for hospital services was set at 97% of the calculated cost-to-charge ratio for services incurred from October 1, 2014 through June 30, 2015, 94% of the calculated cost-to-charge ratio for services incurred from July 1, 2015 through June 30, 2016, and 91.7% of the calculated cost-to-charge ratio for services incurred after July 1, 2016[2]. CY 2016 hospital experience from James Cancer Center was re-priced to reflect reimbursement rates effective January 1, 2018. This was calculated simultaneously with other inpatient reimbursement changes.

**Nursing Facility Policy Changes.**

For the CFC and ABD populations, nursing facility stays were required to be covered by MCPs for the month of admission and the next consecutive month during January through June 2016. After this point in time, a member is transitioned out of the MMC program and receives Medicaid services on a fee-for-service basis. Effective July 1, 2016, nursing facility stays in the ABD and CFC populations were required to be covered by the MCPs for the month of admission and two consecutive months.

We estimated the increase in nursing facility utilization associated with this policy change. We developed this estimate by adding up to one month of nursing facility utilization for every CFC and ABD nursing facility stay with a duration of three or

---

[2] http://codes.ohio.gov/oac/5160-2-22

**S0215 – K78**

Milliman Client Report

more months in January through June 2016, where the third month of the stay was covered under fee-for-service after the recipient exited managed care. For the Extension population, MCPs will continue to cover nursing facility stays as long as medically necessary and therefore no rate adjustment was required.

**Nursing Facility Program Changes.**

Nursing Facility (NF) per diems were rebased effective July 1, 2016. Along with the rebasing, ODM updated the resource utilization group (RUGs) methodology used to measure resident acuity. The methodology was updated from RUGs III to RUGs IV to coincide with the calculation of new rate components during the rebasing process. Along with the per diem update, Trumbull County was reassigned from Peer Group 3 to Peer Group 2. Lastly, as of July 1, 2016 the gross daily rate paid for the lowest acuity individuals in Ohio NFs was reduced from $130 per resident day to $115 per resident day to more closely correspond with the expected cost of serving these individuals. We applied adjustments to the nursing facility category of service to account for this program change.

**Calendar Year 2017**

**Hepatitis C Fibrosis Level Protocol.**

Effective July 1, 2017, MCPs were required to modify prior authorization criteria for hepatitis C medications to allow for individuals with an F2 fibrosis score. We analyzed MCPs' prior authorization criteria for hepatitis C medications in the state of Ohio and observed significant variation among the plans. Additionally, we observed a delayed utilization increase associated with modifying hepatitis C prior authorization criteria in other states. Hepatitis C utilization was increased by approximately 50% to account for the change in fibrosis level protocol.

**Multiple Birth Payment Changes.**

Effective January 1, 2017, ODM pays for secondary and third deliveries of a multiple birth. The delivery of twins and triplets receive an additional payment at a reduced rate. A single delivery, or the first delivery of a multiple birth, is reimbursed at 100% of the amount specified in appendix DD to rule 5160-1-60[3]. Secondary births are reimbursed at 50%, while third deliveries are reimbursed at 25%. No additional payment is made for deliveries after the third of a multiple birth.

It should be noted that the total payment made is the lesser of the provider's submitted charge and the total payment calculated under the methodology outlined above. We evaluated the impact of this program adjustment to the CFC and Extension delivery kick payment (DKP). Note that separate DKPs will not be provided for multiple births. We adjusted the DKP based on the prevalence of multiple birth deliveries in the MMC population.

**Potentially Preventable Readmissions (PPR).**

Effective January 1, 2017, hospitals with excessive preventable readmissions are penalized in the form of hospital-specific base rate reductions. For hospitals with actual-to-expected readmission ratios greater than 1.0, a base rate reduction of 1% is applied. This program change was calculated simultaneously with other inpatient reimbursement changes.

**Respite Service Expansion.**

Effective January 1, 2017, eligibility for respite services was expanded so that more children may access the benefit. This service expansion included both SSI and non-SSI children. Eligibility is based on severe emotional disturbance (SED) and substance-use disorder (SUD) diagnosis criteria established by ODM. We reviewed historical experience for respite services, and adjusted our assumed take-up rates based on the low utilization observed as of June 2017. In aggregate, the CY 2018 capitation rates include approximately $2 million for respite services.

**Calendar Year 2018**

**Inpatient Hospital Facility Reimbursement Changes.**

Effective January 1, 2018, ODM will rebase its inpatient hospital base rates through the continued use of All Patients Refined Diagnosis Related Groups (APR DRG). This includes revised APR DRG relative weights along with updated hospital base rates. In addition, ODM updated inpatient APR DRG relative weights effective July 4, 2017 to account for budgetary items and a legislative mandate. This included a 3.7% relative weight reduction for a budgetary item, along with an additional decrease to delivery DRGs due to a legislative mandate. This legislative mandate requires ODM to provide separate

---

[3] http://codes.ohio.gov/oac/5160-1-60

S0215 – K79

Milliman Client Report

reimbursement for long-acting reversible contraceptives (LARCs). ODM estimates that the decrease to delivery DRGs will be budget neutral to the separate LARC payments.

To estimate the impact of this reimbursement change, we received re-priced CY 2016 inpatient hospital encounter experience to reflect reimbursement rates that will be effective on January 1, 2018 from ODM. The aggregate percentage change in ODM reimbursement was calculated by rate cell. This percentage change was applied to the inpatient paid claims experience, weighted by the proportion of total inpatient encounter data expenditures subject to reimbursement based on APR DRG pricing. The adjustment does not reflect hospital charge inflation impacting outlier payments. The impact of outlier payments is addressed in the development of prospective unit cost trends. Separate adjustments were developed for maternity delivery and non-maternity delivery inpatient services. We did not apply adjustments to nursing facility utilization.

**Outpatient EAPG Rebasing.**

Effective January 1, 2018, ODM will rebase its outpatient hospital payments through the continued use of the Enhanced Ambulatory Patient Grouping System (EAPG). This includes EAPG relative weights and base rates by hospital. We evaluated the estimated impact to outpatient expenditures associated with EAPG implementation. The impact of outpatient reimbursement changes was calculated by region and rate cell. Adjustments were calculated through the use of data provided by ODM, which we reviewed for reasonableness.

**Nursing Facility Reimbursement Changes.**

ODM updates nursing facility payment rates and acuity scores on a semi-annual basis. We applied adjustments to reflect the impact of the semi-annual per diem update. Adjustments were applied to the nursing facility category of service, and vary based on differences in base nursing facility experience by rate cell and region.

**Other Fee Schedule Changes.**

We reviewed other known fee schedule changes. Included in known fee schedule changes is compliance with the most recent budget bill (MCDCD50 and MCDCD77). Effective January 1, 2018, ODM will set professional rates for certain neonatal and newborn services at 75% of the Medicare rates for these services. Because of this increase, clinical laboratory, molecular pathology, and pathology services will be reduced to prevent an increase in aggregate Medicaid expenditures. Additionally, MCDC77 in the budget bill reduced the maximum Medicaid payment for radiology, clinical laboratory, molecular pathology, and pathology services by five percent, effective January 1, 2018. Through the use of 5160-1-60 Appendix DD and 5160-11-09, we estimated the impact of these fee schedule changes and applied rating adjustments to impacted categories of service.

**Full Coverage of Institutions for Mental Disease (IMD) Under Age 21 and Over Age 64.**

Effective January 1, 2018, MCPs will be required to cover both the professional and facility component of IMD stays for members under 21 and over 64 years of age. Currently, MCPs are responsible for professional services only for the under 21 and over 64 populations. We estimated the impact of this program change through the use of fee-for-service IMD experience during CY 2016.

**Population Morbidity Changes.**

We applied adjustments to account for estimated population morbidity differences between calendar year 2016 and calendar year 2018. Adjustments were applied to account for known population changes based on data provided by ODM. Items considered when developing these adjustments are outlined below.

- **Deceased Members.** We received a list of the date of death for Medicaid members in the state of Ohio. Using this information, we removed CY 2016 member months associated with deceased members. This adjustment resulted in a minor increase to PMPM costs, as member months were removed with minimal corresponding claims cost.
- **Disenrolled Members.** We received a list of member IDs that were involuntarily disenrolled during the summer of 2017. In developing the CY 2018 capitation rates, we removed historical claims and member months for these members.
- **Duplicate Member IDs.** We were informed of the potential for duplicate member IDs in the vendor file eligibility information we received. Additionally, ODM provided us with a listing of potential duplicate member IDs. We removed member months associated with these member IDs. We also applied adjustments for other duplicate member IDs based on our observations in using the vendor eligibility files.

**S0215 – K80**

Milliman Client Report

- **Mandatory Enrollment of BCCP and BCMH.** Effective January 1, 2017, the Bureau of Children with Medical Handicaps (BCMH) and Breast and Cervical Cancer Project (BCCP) populations began enrolling in mandatory managed care. The BCCP population was assigned to ABD rate cells, while the BCMH population is subject to the standard eligibility process. Effective January 1, 2018 the Department of Health will increase screening for the BCCP eligibility group based on the following criteria:
  - o Cervical cancer screening and diagnostic services for women ages 21 through 64.
  - o Breast cancer screening if a physician determines it is warranted based on a clinical breast examination, family history, or other factors for women ages 25 through 39.
  - o Breast cancer screening and diagnostic services for women ages 40 through 65.

  Women determined to be pre-cancer or have cancer may be eligible for Medicaid through an existing pathway or the BCCP eligibility group. The income limit for the BCCP eligibility group will be increase from 200% FPL to 250% FPL. We estimated the morbidity impact associated with these population based on enrollment information through July 2017. Based on information provided by ODM, actual BCCP enrollment was increased by 10% to account for eligibility changes.

- **Voluntary Enrollment of DD Waiver Population.** Effective January 1, 2017, the Developmental Disabilities (DD) waiver population was eligible for voluntary enrollment in managed care. Waiver services continue to be provided on a FFS basis. We estimated the morbidity impact associated with this population based on enrollment information through July 2017.

**Targeted Reimbursement.**

We reviewed MCP provider reimbursement levels in CY 2016 in relation to ODM's FFS reimbursement methodologies. The 2016 MCP Survey required each participating MCP to report its provider reimbursement methodologies by population (CFC, ABD, and Extension), region, and service category. Additionally, reimbursement levels in relation to Ohio Medicaid's fee-for-service reimbursement schedule were required to be reported at the same level of granularity. This information was provided for the following service categories:

- Inpatient Hospital;
- Outpatient Hospital Emergency Room;
- Outpatient Hospital Other;
- Professional;
- Radiology / Pathology / Laboratory;
- Pharmacy; and,
- Other.

Additionally, we received inpatient encounter data from ODM that was re-priced to the FFS fee schedule. We reviewed the ratio of MCP paid to FFS reimbursement for inpatient admissions where the ratio between MCP paid and FFS re-priced amounts was within a 0.9 to 1.2 corridor. In discussion with ODM, we adjusted the base experience to reflect a targeted reimbursement ratio between the composite base experience MCP reimbursement and fee-for-service reimbursement. The targeted reimbursement ratios are inclusive of 2018 fee-for-service reimbursement changes.

### Program changes deemed immaterial to benefit expenses in the rate period

Adjustment factors were developed for policy and program changes estimated to *materially* affect the managed care program during CY 2018 that are not fully reflected in the CY 2016 base experience. Program adjustments were made in the rate development process to the extent a policy or reimbursement change is deemed to have a material cost impact to the MCPs. We defined a program adjustment to be 'material' if the total benefit expense for any individual rate cell is impacted by more than 0.1%. In addition, program adjustments that were determined to be material in prior rate setting activities, or are material to the MyCare Ohio program, are considered material. The following is a list of program adjustments deemed immaterial based on our review of the experience data and policy change.

- **Acupuncture Coverage.** Effective January 1, 2017, acupuncture services for low back pain and migraines became a covered service. On January 1, 2018, acupuncture services will be expanded to include new provider types along with electrical stimulation. Projected acupuncture expenditures are estimated to be immaterial.

- **APRN Prescribing.** Effective with the passage of the most recent budget bill, there was a provision (MCDMD49) allowing an Advanced Practice Registered Nurse (APRN) who is certified in psychiatric mental health by a national certifying organization to prescribe atypical antipsychotics and antidepressant drugs without going through prior

S0215 – K81

**Milliman Client Report**

authorization. This provision already exists for psychiatrists. Based on the existing high rate of prescribing for preferred agents, we do not anticipate a material shift in volume to more expensive agents.

- **Advanced Imaging Reimbursement Changes.** Effective January 1, 2017, ODM modified its reimbursement policy for radiology services that occur when more than one radiology procedure is performed by the same provider or provider group for an individual patient on the same date. Payment for the primary procedure is made at 100% of the Medicaid fee schedule amount. Each additional professional component of the procedure is reduced to 95% of the Medicaid fee schedule amount, compared to the prior policy of paying each additional professional procedure at 75% of the Medicaid fee schedule amount.

- **Dental Program Changes.** Effective April 1, 2018, Silver Diamine Fluoride (SDF) will be included as a covered dental benefit in the MMC program for all ages. It is anticipated that utilization of SDF will be low in the near-term. In addition, effective January 1, 2018, coverage for tobacco cessation and counseling services will be a covered dental benefit. Based on information provided by ODM, coverage of SDF and tobacco cessation is estimated to be budget neutral.

- **ESRD Reimbursement Changes.** Effective July 1, 2017, reimbursement for End-Stage Renal Disease (ESRD) clinics are based on the calendar year 2016 prospective payment system (PPS) base rate published by the Centers for Medicare and Medicaid Services (CMS). Reimbursement for services were established as follows:
  o Chronic maintenance dialysis performed in an ESRD dialysis clinic: 58.75% of PPS base rate;
  o Chronic maintenance dialysis performed in a home setting: 25.18% of PPS base rate;
  o Dialysis support services: 33.75% of PPS base rate; and,
  o Dialysis with self-care training: 67.75% of PPS base rate.

  We reviewed CY 2016 experience data for applicable services and believe that this program change is not material to the CY 2018 rate development process.

- **Insect Repellant Coverage.** Effective June 6, 2016, ODM began requiring the coverage of insect repellent for enrolled members. Based on a review of the coverage requirements, estimated expenditures for this service coverage are immaterial.

- **IMD as an "In Lieu of" Service.** Effective July 1, 2017, ODM began permitting the use of IMDs as an "in lieu of" service for the 21 to 64-year-old population for up to 15 days per month. This "in lieu of" service setting was implemented in compliance with the conditions outlined in the final Medicaid managed care regulations. Authorization of this setting of care is optional to the managed care plan and member as an "in lieu of" service. Consistent with the rate-setting guidance published by CMS, we did not assume the unit cost of the IMD, and instead assumed the unit cost for that of existing state plan providers. This change will introduce a new setting of care for existing covered services. Based on feedback from ODM, we have no evidence of suppressed utilization for services that could be performed in an IMD. As a result, we do not anticipate additional expenditures associated with inpatient psychiatric and substance use utilization during CY 2018.

- **Managed Care Day One.** Effective January 1, 2018, MMC members will be enrolled in a MCP the first of the month *coinciding* with the date of Medicaid eligibility approval. Prior to this program adjustment, MMC members are enrolled in a MCP the first of the month *following* the date of approval. Managed Care Day One is estimated to result in one additional month of MCP enrollment for many new MMC members. While member months are estimated to increase by 1.5% to 2.0%, our analysis produced an immaterial change in PMPM expenditures in the MMC program. Projected member months for calendar year 2018 reflect an assumed increase in managed care enrollment associated with this program change.

- **Occupational Therapy Provided in FQHCs.** Federally Qualified Health Centers (FQHC) did not historically receive payment for providing occupational therapy (OT) services; however, physical therapy (PT) was provided in FQHCs. Effective October 1, 2016, OT was added to this list of services provided by FQHCs. We anticipate little utilization of OT by FQHCs during CY 2018.

- **Comprehensive Primary Care (CPC).** In CY 2018, a portion of the MMC population will be enrolled in the Ohio CPC program. The care management payments made to these providers will not be funded by the MCPs; however, providers will be eligible for gain sharing payments funded by the MCPs if predetermined performance metrics are achieved. It is our understanding that to receive a gain sharing payment, a provider would need to

S0215 – K82

Milliman Client Report

achieve a cost of care level lower than historical levels. For this reason, an adjustment was not applied in the CY 2018 rate setting process for CPC, as gain sharing payments are assumed to be offset by the cost of care savings achieved by the CPC providers. It should also be noted that we did not reflect a cost of care reduction associated with CPC providers achieving savings.

- **Podiatry Program Change.** Under Ohio Medicaid Rule 5160-7-03, changes were proposed to covered podiatric services to remove the program limit of one LTCF visit per month by a podiatrist. Based on feedback from ODM, projected expenditures are assumed to be immaterial.

- **Third Party Liability (TPL) Collections.** ODM will contract with HMS for the purpose of pursuing third party liability (TPL) recoveries for MMC claims experience. This collection will occur 12 months after claim payment, at which point the MCP will be unable to obtain these recoveries. We believe this program change will be immaterial to the capitation rate development process.

- **Wheelchair Benefit Changes.** Effective January 1, 2017, new coverage and payment policies for wheelchairs and associated accessories were adopted. Analyses completed by ODM suggest that the payment policy changes will result in increases to base payments for wheelchairs, which will be offset by decreases to wheelchair accessory payments.

Each of the program adjustments listed above were determined to be immaterial on a stand-alone basis (i.e., impacted the rates by less than 0.1%). We evaluated the composite impact of all of the immaterial items listed above to assess whether an aggregate impact should be applied in the CY 2018 rate development process. Based on this analysis, the impact of immaterial program adjustments is immaterial on a composite basis (i.e., impacted the rates by less than 0.1%), so no further adjustments were applied.

**(e)      Exclusion of payments or services from the data**

The following adjustments were made to the base experience data to reflect non-state plan services, uncollected co-pays, pharmacy rebates, third party liability recoveries, and non-encounter claims payments.

*A. Services excluded from initial base data summaries*

*A.1. Non-State Plan Services*

We excluded all services included in the encounter data that do not reflect approved state plan services (nor are an approved in-lieu-of service).

*B. Adjustments made to base data*

*B.1. Uncollected Co-pays*

Adjustments were made to reflect fee-for-service co-pay amounts that were not collected by the MCPs in 2016. Co-pay amounts were estimated by applying ODM's co-pay policies to the MCP encounter data. Separate adjustments were made for emergency room, dental, vision, and pharmacy categories of service based on the uncollected co-pay amounts as a percentage of CY 2016 expenditures. Co-pay adjustments were not applied to children or pregnant women populations, with the exception of co-pays for vision services for pregnant women. Adjustments to account for uncollected co-pays reduced the base experience data by approximately 0.3%.

*B.2. Pharmacy Rebates*

Based on an analysis of CY 2016 annual cost report data, retail pharmacy expenditures were reduced by supplemental rebates. We reviewed CY 2016 historical experience period to assess a reasonably attainable level of supplemental pharmacy rebates. For the AFK population, we assumed an amount of Pharmacy Rebates consistent with the CFC and ABD child populations. In aggregate, supplemental rebates are assumed to be approximately 5.0% to 5.5% of total pharmacy expenditures.

*B.3. Third Party Liability/Fraud and Abuse*

In addition to actual cost avoidance reflected in the encounter data, we estimated additional third party liability (TPL) and fraud recoveries based on data available in CY 2016 cost report and MCP surveys. These data sources indicated that

S0215 – K83

**Milliman Client Report**

approximately 0.3% of total claims were recovered and not reflected in the baseline experience data. We adjusted encounter baseline data by region to reflect an estimated amount of TPL and fraud recoveries using data reported by the MCPs. For the AFK population, we assumed an amount of TPL/Fraud and Abuse recoveries consistent with reported values for the CFC and ABD child populations.

### B.4. Non-encounter Claims Payment

We made an adjustment to the encounter data base experience period to reflect non-claim payments made to providers for items such as shared savings payments, quality incentives, and other similar provider incentive payments that are not reflected in the base data or in other components of the capitation rate. We have reviewed the information provided by the MCPs and included approximately $8.5 million in payments in the benefit cost component of the capitation rate development.

### B.5. Net Reinsurance

Ohio Administrative Code requires MCPs contracted with ODM for the MMC program to carry reinsurance for high cost inpatient claims. We have adjusted inpatient expenses in the historical period by the net cost of reinsurance (reinsurance premiums less reinsurance recoveries) as reported in the CY 2016 annual cost report data. The aggregate statewide reinsurance loss ratio for MCPs in CY 2016 was approximately 83% (reinsurance recoveries / reinsurance premiums). A statewide estimated reinsurance premium by rate cell was developed by taking statewide reinsurance recoveries for each rate cell and dividing by the 83% loss ratio. The statewide rate cell reinsurance premium estimates were further adjusted based on estimated regional reinsurance loss ratios. Reinsurance recoveries were based on amounts reported in MCP cost report data. While we have not changed the aggregate amount of MMC reinsurance premiums reported, we believe these adjustments allocate the reinsurance premium on a more actuarially sound basis at the rate cell level. In aggregate, net reinsurance increased projected benefit expenses by approximately 0.1%.

### B.6. Sub-capitated Arrangements

Based on discussions with ODM, we understand that sub-capitated medical claims expenditures reported in the CY 2016 annual cost reports are understated for region and rate cell cohorts included in the MCPs' arrangement with Partners for Kids (PFK). The PFK arrangement includes CFC and ABD child rate cells in the South Central and Southeast regions. Upon reviewing shadow priced claims provided in the encounter data, we developed a missing claims adjustment to apply to PFK regions and rate cells. The adjustment increased the medical benefit cost component of the capitation rate development by a combined amount of approximately $46 million for the affected CFC Children and ABD <21 rate cells.

## 3. PROJECTED BENEFIT COST AND TRENDS

This section provides information on the development of projected benefit costs in the capitation rates.

## A. RATE DEVELOPMENT STANDARDS

### i. Final Capitation Rate Compliance

The final capitation rates are in compliance with 42 CFR 438.4(b)(6) and are only based on services outlined in 42 CFR 438.3(c)(1)(ii) and 438.3(e). Non-state plan services provided by the MCPs have been excluded from the capitation rate development process. During CY 2016, the MCPs did not provide any in-lieu-of services. Effective July 1, 2017, ODM began permitting the use of IMDs as an in-lieu-of service for the 21 to 64-year-old population for up to 15 days per month. We do not anticipate a material amount of additional expenditures due to this change, and have not projected any additional benefit costs.

### ii. Basis for Variation in Assumptions

Any assumption variation between covered populations is the result of program differences and is in no way based on the rate of Federal financial participation associated with the population.

**S0215 – K84**

Milliman Client Report

### iii. Benefit Cost Trend Assumptions

Projected benefit cost trend assumptions are developed in accordance with generally accepted actuarial principles and practices. The primary data used to develop benefit cost trends is historical claims and enrollment from the covered populations.

### iv. In-Lieu-Of Services

The projected benefit costs do not include costs for in-lieu-of services.

### v. Benefit expenses associated with members residing in an IMD

We reviewed benefit costs for enrollees aged 21 to 64 during the base experience period to identify costs associated with an Institution for Mental Diseases (IMD) stay of more than 15 days in a month and any other MCP costs for services delivered in a month when an enrollee had an IMD stay of more than 15 days. These claims were excluded from the base experience data.

### vi. IMDs as an in-lieu-of service provider

Not applicable. The projected benefit costs do not include costs for in-lieu-of services.

## B. APPROPRIATE DOCUMENTATION

### i. Projected Benefit Costs

This section provides the documentation of the methodology utilized to develop the benefit cost component of the capitation rates at the rate cell level.

### ii. Development of Projected Benefit Costs

#### (a)    Description of the data, assumptions, and methodologies

This section of the report outlines the data, assumptions, and methodology used to project the benefit costs to the rating period. The baseline benefit costs were developed using the following steps:

**Step 1: Create per member per month (PMPM) cost summaries**

The capitation rates were developed from historical claims and enrollment data from the MMC enrolled populations. This data consisted of CY 2016 incurred encounter data that has been submitted by the MCPs. Additionally, we utilized CY 2016 Fee-for-Service (FFS) claims data to develop capitation rates for the Adoption and Foster Kids population.

**Step 2: Apply data quality adjustments**

We applied data quality adjustments to the CY 2016 incurred encounter data submitted by the MCPs. This process included adjustments for known missing claims reported in CY 2016 MCP Survey submissions. In situations where there are known discrepancies with MCP encounter data, we applied adjustments using CY 2016 annual cost reports.

**Step 3: 1634 conversion rate cell reassignment**

Effective August 1, 2016, Ohio converted from the status of a 209(b) to a 1634 state for disability determination. As a 209(b) state, Ohio's eligibility determination standard was more restrictive than the criteria used by the Social Security Administration (SSA). Under the 1634 conversion, Ohio has adopted the SSA definition of disability and extended Medicaid eligibility to all individuals who receive Supplemental Security Income (SSI). Individuals with SSI are automatically enrolled in Medicaid. Additionally, on July 31, 2016, ODM eliminated the Medicaid spend down program. A 1915(i) state plan option created a special benefit program for adults with serious and persistent mental illness (SPMI) with income up to 225% of the federal poverty level. To ensure that impacted members have sufficient time to transition to other coverage sources, ODM requested a waiver of ABD redeterminations. This pause in redetermination resulted in existing ABD members not

S0215 – K85
**Milliman Client Report**

being subject to the 1634 eligibility criteria until after eligibility redetermination resumed on January 1, 2017. As of June 2017, it is our understanding that all members have been assigned rate cells based on 1634 eligibility criteria.

In developing the adjusted base data for the CY 2018 capitation rates, rate cells were reassigned based on each member's rate cell as of July 1, 2017. For members included in the CY 2016 encounter data but not enrolled as of July 1, 2017, we reassigned member rate cells based on state data exchange (SDX) files for the state of Ohio. The SDX files contain information related to which MMC enrollees receive SSI. This process produced total benefit expense equal to the CY 2016 incurred encounter data, while reflecting post-1634 member rate cell assignment.

**Step 4: Apply historical and other adjustments to cost summaries**

As documented in the previous section, utilization and cost per service rates from the base experience period were adjusted for a number of items, including but not limited to: incomplete data adjustments, uncollected co-pays, pharmacy rebates, TPL, and policy and program changes that occurred during CY 2016.

**Step 5: Adjust for prospective program and policy changes and trend to calendar year 2018**

We adjusted the CY 2016 base experience for known policy and program changes that have occurred or are expected to be implemented between the base period and the end of the CY 2018 rate period. In the previous section, we documented these items and the adjustment factors for each covered population. Assumed trend factors were applied for 24 months to the adjusted utilization and unit cost values, or per member per month (PMPM) values, as appropriate, from the midpoint of the base experience period (July 1, 2016) to the midpoint of the rate period (July 1, 2018).

As described later in this section, further adjustments were applied to the CY 2016 base experience to reflect targeted improvements in managed care efficiency for specific rate cells and service categories that are estimated to impact projected 2018 benefit expense. The PMPMs resulting from the application of these adjustments established the adjusted benefit expense by population rate cell for the rating period.

**Other material adjustments - managed care efficiency**

We calculated percentage adjustments to the experience data to reflect the utilization and cost per unit differential between the base experience and the levels targeted for the projection period managed care environment. We developed the targeted managed care efficiency adjustments through a review and analysis of CY 2016 utilization levels achieved by each MCP, the NYU Center for Health and Public Service Research (CHPSR) Emergency Department Algorithm, and the AHRQ prevention quality indicators (PQI).

**Emergency Room**

For the outpatient hospital emergency room service category and the corresponding physician emergency room visits category, we reviewed the following: (1) CY 2016 managed care utilization levels for each MCP and (2) the resulting classification of claims using the NYU Center for Health and Public Service Research (CHPSR) Emergency Department Algorithm. The NYU CHPSR tool classifies emergency room utilization into four (4) primary categories as well as categories that are excluded from the grouping. The four categories include: Non-emergency, Emergency/Primary Care Treatable, Emergency–Preventable/Avoidable, and Emergency–Not Preventable/Avoidable. Subsequent to the review of the experience into these defined categories, we developed specific adjustments for the first three categories to reflect the target utilization levels for the managed care plans. The following illustrates the adjustments by emergency room classification:
- Non-emergency – 20% Reduction
- Emergency/Primary Care Treatable – 10% Reduction
- Emergency – Preventable/Avoidable – 5% Reduction

When applying the adjustments listed above, reductions were taken from level 1 emergency room claims first, followed by level 2 and level 3 claims if applicable. No adjustments were made to level 4 or level 5 emergency room claims. In coordination with determination of the managed care adjustments for hospital outpatient emergency room services, we assumed that most emergency room visits reduced would be replaced with an office visit. The utilization of professional office visits and consults was increased proportionately.

**Inpatient Hospital**

We applied managed care adjustments to base year utilization to reflect higher levels of care management relative to the CY 2016 experience period. We identified potentially avoidable admissions using the AHRQ prevention quality indicators

S0215 – K86

**Milliman Client Report**

(PQI). We also analyzed the frequency of re-admissions for the same DRG. Inpatient hospital managed care adjustments were developed by applying assumed reductions to potentially avoidable inpatient admissions and same-DRG readmissions. This analysis was completed at the population and regional level.

Our analysis was completed at the regional level by first reducing readmissions within 30 days, and then reducing non-readmissions for select PQIs. Inpatient hospital managed care adjustments were developed by applying a 10% reduction to same-DRG readmissions and a 5% reduction to potentially avoidable inpatient admissions. In completing our analysis, we estimated inpatient hospital unit cost changes based on the utilization reductions outlined above. No adjustments were made to corresponding inpatient physician charges to account for the potential shift of these services to an ambulatory setting. Additionally, nursing facility claims were excluded from this analysis.

**Pharmacy Services**

We reviewed historical pharmacy experience by therapeutic class for each MCP to estimate achievable generic drug dispensing rates (GDR), generic drug cost per script, and brand drug cost per script. For each therapeutic class, we estimated the impact of improvements in GDR and cost per script amounts by repricing MCP historical experience to levels achieved by other MCPs during the same time period. We developed pharmacy managed care efficiency adjustments by rate cell to reflect mix differences by therapeutic class due to the age, gender, and morbidity of the applicable rate cell.

**Maternity Delivery Kick Payment**

We reviewed the mix of vaginal and cesarean section deliveries by MCP and region to determine appropriate efficiency adjustments for the maternity delivery kick payment. Delivery managed care efficiency adjustments were developed by analyzing the percent of cesarean and vaginal deliveries by MCP and region. Vaginal delivery percentages were adjusted to levels achieved by MCPs with at least 1,000 deliveries in a region, with a minimum assumed percentage of 70%. This analysis resulted in shifting approximately 0.8% of CY 2016 deliveries from cesarean to vaginal. Managed care savings were estimated by evaluating the cost per delivery difference between cesarean and vaginal deliveries. No adjustments were made to the total number of deliveries.

**Adoption and Foster Kids**

For the AFK population, managed care adjustment factors were developed independently from the process outlined above. The FFS data for the AFK population was adjusted to reflect anticipated managed care efficiencies that are reasonably achievable. These estimates were developed by reviewing efficiencies that were gained in other state Medicaid programs for similar populations that were transitioned from FFS to managed care. Additionally, we reviewed the historical experience for the ABD <21 population that was transitioned to managed care on July 1, 2013. It should be noted that for AFK members that were previously enrolled in the MMC program, managed care efficiencies were set equal to their originating population.

**(b)      Material changes to the data, assumptions, and methodologies**

Material changes to the rate development methodology include:
- Base Encounter Data – The 2017 rate setting process placed 75% credibility on cost report data expenditures, with 25% credibility on encounter data expenditures. The CY 2018 rate development process assumes full credibility of MCP encounter data, after applying data quality adjustments.

All material assumptions are documented in this rate certification report and the overall methodology utilized to develop the capitation rates is consistent with the prior rate-setting analysis.

## iii.   Projected Benefit Cost Trends

This section discusses the data, assumptions, and methodologies used to develop the benefit cost trends, i.e., the annualized projected change in benefit costs from the historical base period (CY 2016) to the CY 2018 rating period of this certification. We evaluated prospective trend rates using ODM data, as well as external data sources.

S0215 – K87

Milliman Client Report

### (a) Required elements

### (i) Data

CY 2014 through 2016 MCP encounter was used to develop estimated prospective trend rates. The Extension population was introduced in January 2014, and as a result, there is limited data credibility during the first half of CY 2014. In developing prescription drug utilization and unit cost trends, data through the first half of CY 2017 was also reviewed.

External data sources that were referenced include:

- *National Health Expenditure (NHE) projections* developed by the CMS office of the actuary, specifically those related to Medicaid. Please note that as these are expenditure projections, projected growth reflects not only unit cost and utilization, but also aggregate enrollment growth and enrollment mix changes such as aging. For trends used in this certification, we are interested only in unit cost and utilization trends, so in general, our combinations of unit cost and utilization trends should be lower than NHE trends. NHE tables and documentation may be found in the location listed below:
  https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/nationalhealthexpenddata/nationalhealthaccountsprojected.html
- *Express Scripts 2016 Drug Trend Report – Medicaid (February 2017)* found in the location listed below:
  https://lab.express-scripts.com/lab/~/media/29f13dee4e7842d6881b7e034fc0916a.ashx
- *Other sources:* We also reviewed internal sources that are not publicly available, such as historical experience from other programs and trends used by other Milliman actuaries.

### (ii) Methodology

For internal ODM data, historical utilization and per member per month cost data was stratified by month, rate cell, and category of service. The data was adjusted for completion and normalized for historical population morbidity changes. We used linear regression to project experience during the contract period. Contract period projections were compared to base period experience to determine an appropriate annualized trend. Additional details related to key aspects of the trend development process are outlined below.

*Inpatient Unit Cost Trends*

As previously mentioned, an explicit adjustment has been made for changes in ODM's inpatient APR-DRG fee schedule from the CY 2016 base experience period to the fee schedule that will be in place during CY 2018. This adjustment did not include the impact of outlier payment inflation.

For inpatient unit cost trends, we used CY 2016 inpatient encounter data experience adjusted to the fee schedule that will be in place during CY 2018 to evaluate the impact of cost inflation due to outlier payments. We trended reported costs from the admission date to the midpoint of the rate period (July 1, 2018) at an annualized trend rate of six percent. The 6% annualized trend was applied to project the billed charges component of inpatient outlier payments to the midpoint of the rate period. This annualized trend rate was not utilized for any other purposes. We developed this assumption based on information from the Milliman Health Cost Guidelines™. The estimated change in inpatient cost as a result of outlier inflation was used in the development of inpatient unit cost trend assumptions.

*Pharmacy trends*

We developed a Medicaid Pharmacy model (trend model) for the purposes of studying and projecting detailed pharmacy trend information. The trend model summarizes pharmacy claims data by month, drug type (brand, generic, specialty brand, and specialty generic), covered population, and therapeutic class (according to GPI-4 assignments). Projected values were estimated using the base period data as a starting point and applying anticipated shifts and trends. There are several areas for consideration.

### Brand patent loss

When a brand drug loses patent, the utilization often shifts from the brand drug to the new generic alternatives. Our model incorporates effective dates of patent expirations and estimated shifts in utilization as a result of patent loss.

**S0215 – K88**
Milliman Client Report

·Cost per script trends

Projected costs per script in the first month of the projection period are based on the average costs per script in the most recent three months of the experience period, adjusted for any anomalies in the data. These costs are trended forward using separate cost trend assumptions by therapeutic class for brand, generic, and specialty products.

In developing cost trends, we relied on a combination of Milliman research, publicly available industry trend reports, and the historical average wholesale price (AWP) trends using MMC encounter data. Generic drugs, which historically had modest price increases, have experienced more significant price increases in recent years, due to ingredient shortages, changes to legislation, and consolidation of generic manufacturers resulting in reduced competition. However, this pattern has begun to slow, and generic trends are expected by the industry to return to more typical levels over the next few years. As a result, generic cost trends were dampened·for therapeutic classes that experienced significant price increases in recent years.

**Changes in utilization**

To develop utilization trend assumptions, we relied on a combination of Milliman research, publicly available industry trend reports, and the historical utilization trends developed using MMC encounter data. Monthly seasonality is accounted for in our trend development.

***Hepatitis C Virus (HCV) Trends***

We examined detailed HCV claims data separately from our typical·trend work. We summarized HCV claims by drug name, drug type (interferon, ribavirin, and all other), month, and population to understand historical utilization and price patterns for these drugs. As discussed previously, we also considered the impact of changes to the Hepatitis C Fibrosis Level Protocol.

### (iii) Comparisons

Historical trends should not be used in a simple formulaic manner to determine future trends; a great deal of actuarial judgment is also needed. We did not explicitly rely on the historical MCP encounter data trend experience due to anomalies observed in the historical trend data. We referred to the sources listed in the prior section as well as considered changing practice patterns, the impact of reimbursement changes on utilization in the MMC population, and shifting population mix.

Explicit adjustments were made outside of trend to reflect all recent or planned changes in reimbursement from the base period to the rating period.

## iv. Mental Health Parity and Addiction Equity Act Service Adjustment

ODM is assessing the State's compliance with the parity standards of the Mental Health Parity and Addiction Equity Act (MHPAEA) as required by 42 CFR 438.3(c)(1)(ii). This assessment is not complete. Preliminary results of the analysis indicate compliance with MHPAEA·for both quantitative and non-quantitative treatment limits. Based on the preliminary results, we have not made any rating adjustments to accommodate parity compliance.

## v. In-Lieu-of Services

The projected benefit costs do not include costs for in-lieu-of services. While ODM began permitting the use of IMDs as an in-lieu-of service for the 21 to 64-year-old population for up to 15 days per month, we do not anticipate a material amount of additional expenditures due·to this change and have not projected any additional benefit costs.

## vi. Retrospective Eligibility Periods

**(a)     MCP responsibility**

Under the ODM contract, beginning April 1, 2016, the MCPs became responsible for retrospective eligibility periods when the beneficiary was previously enrolled with an MCP in the·MMC program less than 90 days prior to re-enrolling with an MCP. ODM will provide capitation payments to the MCPs for beneficiaries meeting this criteria. We reviewed historical eligibility meeting the MCP retro-active eligibility criteria, as well as associated FFS expenses, and did not observe material or consistent cost differences between retro-active eligibility member months (meeting the specific 90 day criteria) and managed care member months. We have not adjusted the estimated benefit expense included in the rates for the

retrospective eligibility policy change. FFS claims incurred during retrospective eligibility periods have been excluded from the base data.

**(b)      Claims treatment**

As noted earlier, claims for retrospective eligibility periods are not reflected in the base data.

**(c)      Enrollment treatment**

Enrollment is treated consistently with claims. We have not included retrospective eligibility in the base experience period.

**(d)      Adjustments**

As previously mentioned, no explicit adjustment was applied to the CY 2018 rate setting as a result of the April 1, 2016 policy change, as we did not observe material or consistent cost differences between retro-active eligibility member months. In developing projected member months, we utilized enrollment data as of July 2017, and applied adjustments for population changes occurring after that point in time. This included population movements associated with the 1634 conversion, along with AFK, BCCP, and BCMH mandatory managed care enrollment.

# 4. SPECIAL CONTRACT PROVISIONS RELATED TO PAYMENT

## A. INCENTIVE ARRANGEMENTS

### i.  Rate Development Standards

This section provides documentation of the incentive payment structure in the MMC program.

### ii.  Appropriate Documentation

Incentive payments under this plan are below 105% of the certified capitation rates paid under the contract. Effective April 1, 2018, an incentive pool will be determined by the portion of withhold that is not returned to the MCPs after a first pass review. By design, the incentive amount represented by the bonus pool is significantly less than 5% of the certified rates.

## B. WITHHOLD ARRANGEMENTS

### i.  Rate Development Standards

This section provides documentation of the withhold arrangement in the MMC program.

### ii.  Appropriate Documentation

**(a)  Description of the Withhold Arrangement**

**(i)   Time period and purpose**

Effective April 1, 2018, ODM will implement a quality withhold arrangement for the MMC program.  The withhold arrangement is measured on a calendar year basis. The withhold measures are primarily based on HEDIS metric benchmarks.

**(ii)  Description of total percentage withheld**

Effective April 1, 2018, ODM will establish a quality withhold of 2.0% of the capitation rate, and will determine the return of the withhold based on review of each MCP's data relative to the applicable HEDIS benchmarks.  The capitation rates shown in this letter are illustrated before offset for the withhold amount; however, the CY 2018 capitation rates documented in this report are actuarially sound while considering the amount of the withhold not expected to be earned.

S0215 – K90

**Milliman Client Report**

**(iii) Estimate of percent to be returned**

Based on our review of MCPs' historical performance relative to the applicable HEDIS metric benchmarks, along with information provided by ODM, we believe that a full withhold return is attainable by the MCPs.

**(iv) Reasonableness of withhold arrangement**

Our review of the total withhold percentage of 2.0% of capitation revenue indicates that it is reasonable within the context of the capitation rate development and the magnitude of the withhold does not have a detrimental impact on the MCP's financial operating needs and capital reserves. Our interpretation of financial operating needs relates to cash flow needs for the MCP to pay claims and administer benefits for its covered population. We evaluated the reasonableness of the withhold within this context by reviewing the MCP's cash available to cover operating expenses, as well as the capitation rate payment mechanism utilized by ODM.

**(v) Effect on the capitation rates**

The rate is certified as actuarially sound after adjustment for the amount of the withhold not expected to be earned back.

## C. RISK SHARING MECHANISMS

### i. Rate Development Standards

This section provides documentation of the risk-sharing mechanisms in the MMC program.

### ii. Appropriate Documentation

#### (a) Description of Risk-sharing Mechanism

ODM maintains a cost-neutral risk pool for high cost Hepatitis C drugs. The risk pool was introduced for the CY 2015 MMC rates to address the high cost nature of Hepatitis C treatment and the potential for the prevalence of treated Hepatitis C beneficiaries to vary between MCPs. To the extent an MCP receives a higher proportion of Hepatitis C drug expenditures in relation to other MCPs, the MCP will receive additional reimbursement from the risk sharing pool. Conversely, an MCP receiving a lower portion of Hepatitis C drug expenditures will be required to pay into the risk sharing pool. The development of the risk pool does not impact the capitation rate development process.

**Hepatitis C Risk Pool: Methodology**

The CY 2018 Hepatitis C drug risk pool aggregate amounts will be developed using the estimated CY 2018 Hepatitis C drug benefit expense PMPM included in the CY 2018 capitation rates, multiplied by the actual CY 2018 membership on a region and rate cell basis. The estimated CY 2018 Hepatitis C drug PMPM is developed on a prospective basis and is based on a review of historical Hepatitis C drug expenditures through June 2017. Program and policy changes developed for the CY 2018 MMC rates impacting Hepatitis C expenditures were applied to the base experience.

Please note that consistent with the prior capitation rates, the estimated CY 2018 Hepatitis C drug PMPM is based on the historical Hepatitis C drug expenditures, with no smoothing adjustment across region or rate cell. Therefore, certain region and rate cell combinations may have estimated CY 2018 Hepatitis C drug expenditures while other similar region and rate cell combinations may have zero or significantly lower estimated CY 2018 Hepatitis C drug expenditures. Please note that the estimated CY 2018 Hepatitis C drug PMPM will not be updated with actual CY 2018 Hepatitis C drug experience, but the actual CY 2018 membership will be used to develop the aggregate expenditures in the Hepatitis C drug risk pool development.

**Hepatitis C Risk Pool: Schedule of Risk Pool Submissions**

The following table illustrates the expected timeline for implementation of the CY 2018 Hepatitis C drug risk pools:

S0215 – K91

Milliman Client Report

| Ohio Department of Medicaid<br>Medicaid Managed Care Program<br>Capitation Rates Effective January 1, 2018<br>Timeline for Hepatitis C Drug Risk Pools | | |
|---|---|---|
| Function | Interim | Final |
| Prescription Dates of Service | January – June 2018 | January – December 2018 |
| Prescription Paid Date | September 30, 2018 | March 31, 2019 |
| Prescription Submission Date | October 2018 cut-off | April 2019 cut-off |
| MCP Distribution Calculation | December 15, 2018 | June 15, 2019 |
| MCP Payment and Recoupment | December 30, 2018 | June 30, 2019 |

**Hepatitis C Risk Pool: Attestation**

The CY 2018 Hepatitis C risk pools were developed in accordance with generally accepted actuarial principles and practices.

**(b) Medical Loss Ratio**

**Description**

ODM's provider agreement indicates that ODM will perform medical loss ratio (MLR) calculations for the MMC program. This includes the ABD, CFC, AFK, and Extension populations.

**Financial consequences**

Effective January 1, 2018, there are no financial consequences associated with MLR requirements.

**(c)  Reinsurance Requirements and Effect on Capitation Rates**

Ohio Administrative Code requires MCPs contracted with ODM for the MMC program to carry reinsurance for high cost inpatient claims.[4] We have adjusted inpatient expenses in the historical period by the net cost of reinsurance (reinsurance premiums less reinsurance recoveries) as reported in the 2016 annual cost report data. Reinsurance recoveries were based on amounts reported in MCP cost report data.

## D.  DELIVERY SYSTEM AND PROVIDER PAYMENT INITIATIVES

### i.  Rate Development Standards

The CY 2018 MMC capitation rates do not reflect delivery system or provider payment initiatives.

## E.  PASS-THROUGH PAYMENTS

*MCP Hospital Incentive Payments*: The MCP Hospital Incentive program was developed to incentivize hospitals to contract with the MCPs, as the State's approved hospital supplemental upper payment limit program appeared to be creating an incentive for hospitals to want their payments delivered under the FFS program. Hospitals that have an active MCP contract are eligible to receive a payment.

### i.  Rate Development Standards

This section provides information on the pass-through payments reflected in the CY 2018 capitation rates.

---

[4] http://codes.ohio.gov/oac/5160-26-09

**S0215 – K92**
Milliman Client Report

### ii. Appropriate Documentation

**(a) Description of Pass-Through Payments**

**(i) Description**

The total computable funding for the program is appropriated by Ohio's General Assembly from the State's General Revenue Fund. The MCP/Hospital Incentive program was developed to incentivize hospitals to contract with the MCPs, as the State's approved hospital supplemental upper limit payment program appeared to be creating an incentive for hospitals to want their payments delivered under the FFS program. Hospitals that have an active MCP contract and provide inpatient services are eligible to receive a payment. The basis for the distribution of the MCP/Hospital Incentive payment in the capitation rates is an allocation based on the non-nursing home inpatient costs associated with each rate group/rating region combination exclusive of Extension, AFK, and maternity delivery kick payment rate cells.

**(ii) Amount**

The total computable funding for the program is appropriated by Ohio's General Assembly from the State's General Revenue Fund. For CY 2018, the amount is assumed to be $162 million, excluding additional taxes and fees that are applied to the appropriation amount.

**(iii) Providers receiving the payment**

Hospitals that have an active MCP contract are eligible to receive a payment.

**(iv) Financing mechanism**

As referenced above, the total computable funding for the program is appropriated by Ohio's General Assembly from the State's General Revenue Fund.

**(v) Pass-through payments for previous rating period**

Appropriated amounts for the MCP/Hospital Incentive program were set at $162 million in aggregate for each of calendar years 2014 through 2017.

**(vi) Pass-through payments for rating period in effect on July 5, 2016**

The rating period in effect on July 5, 2016 is the CY 2016 rating period. Appropriated amounts for the MCP/Hospital Incentive program were set at $162 million in aggregate.

**(b) Base Amount for Hospital Pass-Through Payments**

Based on information provided by ODM, the $162 million associated with the MCP/Hospital Incentive will result in total inpatient hospital expenditures materially below the amount Medicare FFS would have paid for the services. For the purpose of this certification, we did not explicitly calculate the base amount.

## 5. PROJECTED NON-BENEFIT COSTS

## A. RATE DEVELOPMENT STANDARDS

### i. Overview

In accordance with 42 CFR §438.5(e), the non-benefit component of the capitation rate includes reasonable, appropriate and attainable expenses related to MCP operation of the MMC program.

The remainder of Section I, item 5 provides documentation of the data, assumptions and methodology that we utilized to develop the non-benefit cost component of the capitation rate.

### ii. PMPM Versus Percentage

The non-benefit cost was developed as a percentage of the capitation rate.

S0215 – K93

Milliman Client Report

### iii. Basis for Variation in Assumptions

Any assumption variation between covered populations is the result of program differences and is in no way based on the rate of federal financial participation associated with the population.

### iv. Health Insurance Providers Fee

Detail regarding the health insurance providers fee is provided in a later section of this letter.

## B. APPROPRIATE DOCUMENTATION

### i. Development of non-benefit costs

**(a)     Description of the data, assumptions, and methodologies**

*Data*

The primary data sources used in the development of the CY 2018 non-benefit costs are listed below:

- Annual cost report data submitted by the MCPs.
- CY 2016 MCP Survey completed by each MCP.
- Statutory financial statement data for each of the MCPs.
- Average costs from the financial statements of Medicaid health plans nationally, as summarized by Palmer and Pettit. These reports date from 2012 through 2017, analyzing financial results from 2011 through 2016. A link to the 2017 report analyzing administrative costs for 2016 is here: http://www.milliman.com/insight/2017/Medicaid-risk-based-managed-care-Analysis-of-administrative-costs-for-2016/

*Assumptions and methodology*

In developing the administrative costs, we reviewed historical administrative expenses for the MMC program along with national Medicaid health plan administrative expenses. We considered the size of participating health plans and the resulting economies of scale that could be achieved, along with the benefits covered and the demographics of the MMC population.

Historical reported administrative expenses were reconciled between the available data sources for the purpose of evaluating the quality of the data provided. CY 2016 cost report administrative expenses were analyzed by MCP for reasonableness and completeness of the data provided. This data formed the baseline for projected 2018 administrative expense amounts. There is a significant amount of variation in the reporting of administrative expenses between the five MCPs, both in the magnitude of administrative expenses and in the rate cell allocation methodology utilized. We summarized historical reported administrative expenses for each MCP and reallocated these values using a percent of revenue before taxes allocation methodology. Separate administrative expense amounts were developed for CFC Children, ABD <21, ABD 21+, Delivery, AFK, and the adult CFC/EXT populations.

**(b)     Material changes**

There are no material changes to the data, assumptions, or methodology used to develop the projected non-benefit cost.

**(c)     Other material adjustments**

There are no other material adjustments applicable to the non-benefit cost component of the capitation rate.

### ii. Non-Benefit Costs, by Cost Category

Administrative expenses have not been developed from the ground up (based on individual components). However, individual components were reviewed within MCP cost reports and financial statement data. The components may appropriately interact, and the state does not wish to dictate to the plans how these may be allocated. The CY 2018 non-benefit cost allowance is determined as a percentage of the capitation rates before fees and taxes.

S0215 — K94

·Milliman Client Report

In addition, CY.2018·capitation rates include amounts for the following non-benefit expense:

- Enhanced Maternal Program: ODM has implemented an enhanced maternal health program to target geographic areas with high infant mortality rates. ODM will provide guidelines to the MCPs for the.purposes of developing strategies and systems that will provide·enhanced maternal case management and reduce infant mortality rates. Funding to support MCP initiatives for the program is included in the applicable regions and female rate·cells. A total of $13.4 million was added to four female CFC rate cells, before fees and taxes, for the enhanced maternal program. The rate cells assumed to be included in the program are HF/HST 14-18 F, HF 19-44 F, HF 45+ M+F, and HST 19-64 F. The total amount of available funding for the enhanced maternal program was allocated based on the assumed percent of targeted membership in each region and rate cell.
- MCP Hospital Incentive: A total of $162 million was added to CFC and ABD non-delivery rate cells, before fees and taxes, for.the MCP Hospital Incentive payment. This amount was allocated based on total projected inpatient claims by region and rate cell.
- HUB Contracting Requirements: In the July 2017, Medicaid Managed Care Capitation Rate Amendment, we included care management amounts under the DKP in four regions to account for the Pathways Community HUB (HUB) contracting requirements. Care management to account for HUB contracting requirements is 2.5% of the delivery kick payment, consistent with the July 2017 rate amendment.

Fees and Taxes are loaded to the capitation rates after the application of non-benefit expenses. This includes the Health Insuring Corporation (HIC) Franchise Fee along with the HIC tax. The HIC Franchise Fee consists of a PMPM amount that varies based on an entity's Medicaid member months. The development of the actuarially sound capitation rates includes HIC Franchise Fee (collected by ODM) and HIC tax (collected by the Ohio Department of Insurance) components. HIC Franchise Fee amounts were developed by MCP based on projected Medicaid member months for January through June 2018, and then weighted based on regional enrollment by MCP. As the HIC Franchise Fee is.assessed on a state fiscal year.basis, we anticipate amending the CY 2018 capitation rates to reflect HIC Franchise Fee amounts applicable to July through December.2018. The HIC tax will remain at 1% of the total capitation rate.

## iii. Health Insurance Providers Fee

### (a) Whether the fee is incorporated in the rates

Consistent with ODM's payment of the Health Insurer Fee (HIF) in prior years, CY 2018 rates will be amended based on the calculated·HIF attributable to ODM premium revenue. To the extent the actual paid HIF is·less than the calculated HIF, the rates for the MCP will be amended based on actual paid HIF.

### (b) Fee year or data year

The.HIF for each insurer is calculated based on the data year. Amended CY 2018 rates.will be based on the 2019 HIF attributable to the 2018 data year.

### (c) Determination of fee impact to rates

The calculation of the fee for each MCP subject to the HIF will be based on the final Form 8963 premium·amounts reported by the insurer, aggregate HIF premium base, final IRS invoices provided to the MCPs subject to the HIF, Form 8963 premium amounts attributable to ODM, data year HIF tax percentage, and adjustments for premium revenue based on benefits described in 26 CFR 57.2(h)(2)(ix) such as nursing home and home health care. Final fee amounts are adjusted for applicable fees and taxes that are applied to ODM capitation rate revenue (documented in the non-benefit expense section of this report).

### (d) Timing of adjustment for health insurance providers fee

The ·2018 capitation rates will be amended based on the 2019 HIF attributable to the 2018 data year. We anticipate amending the rates in the last quarter of CY 2019.

### (e) Identification of long-term care benefits

An estimated percentage of each capitation rate cell that is attributable to long-term.care services as described in 26 CFR 57.2(h)(2)(ix) will be estimated for the purposes of the HIF payment.

S0215 – K95

Milliman Client Report

# 6. RISK ADJUSTMENT AND ACUITY ADJUSTMENTS

This section provides information on the risk adjustment included in the contract.

## A. RATE DEVELOPMENT STANDARDS

### i. Overview

In accordance with 42 CFR §438.5(g), we will follow the rate development standards related to budget-neutral risk adjustment for the MMC program. The composite rates for the CFC, ABD, Extension, and AFK populations will be prospectively risk adjusted by health plan on a regional basis to reflect estimated prospective morbidity differences in the underlying population enrolling with each MCP.

### ii. Risk adjustment model

Risk adjustment will be performed using CDPS + Rx version 6.2. Risk adjustment will be performed on a budget neutral basis at the region and rate cell level. Newborns, one year olds, and delivery kick payments will be excluded from the risk adjustment process.

### iii. Acuity adjustments

Acuity adjustments are not applicable to the CY 2018 capitation rates.

## B. APPROPRIATE DOCUMENTATION

### i. Prospective Risk Adjustment

#### (a) Data and adjustments

The January 1, 2018 through June 30, 2018 rate period will be risk adjusted based on a diagnosis and prescription drug collection period including incurred (dispensed) dates from January 1, 2016 through December 31, 2016, paid through June 30, 2017. The risk adjustment diagnosis base data will exclude diagnosis codes associated with diagnostic testing and certain medical supply codes.

The risk adjustment process will account for the variation in HIC Franchise Fee payments by MCP. Prospective risk scores will be applied to the CY 2018 capitation rates less the HIC Franchise Fee and tax amounts. We will then apply MCP-specific HIC Franchise Fee and tax amounts to the normalized rates on a budget neutral basis. For rate cells excluded from risk adjustment yet subject to the HIC Franchise fee, we will apply adjustments to account for variation in projected HIC Franchise Fee amounts by MCP. This includes the newborn and one-year-old rate cells.

#### (b) Risk adjustment model

Populations will be risk-adjusted using CDPS+Rx risk scoring models. We will provide full documentation of the results and methodology for the risk adjustment analysis in a separate correspondence.

#### (c) Risk Adjustment methodology

The risk adjustment is designed to be cost neutral for each population. Relative risk scores will be normalized to result in a composite risk score of 1.000 for each population group, across all MCPs. The risk adjustment methodology uses generally accepted actuarial principles and practices.

S0215 – K96

Milliman Client Report

# SECTION II. NEW ADULT GROUP CAPITATION RATES

ODM implemented the Affordable Care Act's Medicaid expansion on January 1, 2014. As of July 2017, approximately 630,000 individuals receive Medicaid benefits through MCPs under ODM's expansion population, known as the 'Extension' population.

## 1. DATA

### A. Data Used in Certification

The source of data used to develop the Extension capitation rates for CY 2018 was identical to the source of data used in the development of rates for the ABD and CFC populations: encounter data submitted by the contracted MCPs.

### B. 2016 Experience vs. Assumptions

ODM has monitored enrollment and costs in the Extension population on an on-going basis. Internal reports are shared with ODM personnel and its vendors, tracking eligibility changes by rate cell and county. Encounter and cost report data is used to track financial experience from the MCPs on a quarterly basis.

## 2. PROJECTED BENEFIT COSTS

### A. Description of Projected Benefit Cost Issues

CY 2016 Extension population experience, in the form of adjusted encounter data, is used as the underlying data source for the development of the CY 2018 capitation rates. The 2017 rate setting process placed 75% credibility on cost report data expenditures, with 25% credibility on encounter data expenditures. The CY 2018 rate development process assumes full credibility of MCP encounter data, after applying data quality adjustments. In developing the adjusted base data for the CY 2018 capitation rates, rate cells were reassigned based on each member's rate cell as of July 1, 2017. For members included in the CY 2016 encounter data but not enrolled as of July 1, 2017, we reassigned member rate cells based on state data exchange (SDX) files for the state of Ohio. The SDX files contain information related to which MMC enrollees receive SSI. This process produced total benefit expense equal to the CY 2016 incurred encounter data, while reflecting post-1634 member rate cell assignment. Other data sources, assumptions, and methodologies are generally consistent with the CY 2017 certification and the July amendment to the CY 2017 certification.

Discussion of other assumption changes is provided in the next section.

### B. Description of Key Assumption

**Adjustments for pent-up demand** – Consistent with the CY 2017 rate setting, it was assumed that the baseline experience data did not require these adjustments.

**Adjustment for adverse selection** – Consistent with the CY 2017 rate setting, it was assumed that the baseline experience data did not require these adjustments.

**Adjustment for demographics of the new adult group** – The current rate cell structure of the Extension population appropriately adjusts capitation payments to the MCPs to the extent the demographic mix of the Extension population changes significantly during the CY 2018 rate period.

**Differences in provider reimbursement rates or provider networks** – MCPs were required to report provider reimbursement relative to ODM's reimbursement schedule by population group (CFC, ABD <21, ABD 21+, and Extension) and major service category in the 2016 MCP Survey. Additionally, we received re-priced inpatient claims experience from ODM that allowed us to evaluate MCP inpatient hospital reimbursement relative to ODM's reimbursement schedule. We are not aware of any provider network differences between the Extension population and other Medicaid populations. Variations in assumptions by covered population were not based on the rate of Federal financial participation associated with the population.

**S0215 – K97**

Milliman Client Report

## C. Changes to Benefit Plan

No benefit changes have been made to the Extension benefit plan, other than items discussed in Section I, 2.

## D. Other Material Changes or Adjustments to Benefit Costs

We did not make any other adjustments in the Extension rate development process other than those previously outlined in the report.

# 3. PROJECTED NON-BENEFIT COSTS

## A. Changes in Data Sources, Assumptions, or Methodologies Since Last Certification

Cost report data, including non-benefit costs, was available for CY 2016. We used this information to evaluate the reasonableness of our non-benefit expense assumptions for the Extension population. As reported non-benefit expenses in the CY 2016 cost reports did not differ significantly between the CFC Adult and Extension populations, the non-benefit expense percentage loads have been set equal for the two populations in the development of the CY 2018 rates. This assumption is consistent with the prior certification.

## B. Assumption Differences Relative to Other Medicaid Populations

As stated previously, non-benefit expense assumptions for the Extension population were set equal to the CFC Adult population.

# 4. FINAL CERTIFIED RATES OR RATE RANGES

## A. Comparison to Previous Certification

On an aggregate basis, the July 2017 Extension rates are estimated to increase by 0.3%.

# 5. RISK MITIGATION STRATEGIES

## A. Description of Risk Mitigation Strategy

ODM's provider agreement indicates that ODM will perform MLR calculations for the MMC program. This includes the ABD, CFC, AFK, and Extension populations. Effective January 1, 2018, there are no financial consequences associated with MLR requirements.

## B. Changes to Risk Mitigation Strategy Relative to Prior Years

Based on information provided by ODM, CY 2015 MLR calculations resulted in two MCPs having MLR below 85%. These MCPs were required to return the difference between 85% of net capitation and actual allowed medical expenses incurred. The MLR calculation for CY 2016 will be performed in January 2018; however, no MLR rebates are anticipated for CY 2016. Effective January 1, 2018, there will be no MLR rebate requirements for the Extension program.

S0215 – K98

Milliman Client Report

# LIMITATIONS

The information contained in this report has been prepared for the Ohio Department of Medicaid (ODM) to provide documentation of the development of the calendar year 2018 actuarially sound capitation rates for the Medicaid Managed Care Program (MMC). The data and information presented may not be appropriate for any other purpose.

The information contained in this letter, including the enclosures, has been prepared for ODM and their consultants and advisors. It is our understanding that the information contained in this letter will be shared with CMS and may be utilized in a public document. Any distribution of the information should be in its entirety. Any user of the data must possess a certain level of expertise in actuarial science and healthcare modeling so as not to misinterpret the information presented.

Milliman makes no representations or warranties regarding the contents of this letter to third parties. Likewise, third parties are instructed that they are to place no reliance upon this letter prepared for ODM by Milliman that would result in the creation of any duty or liability under any theory of law by Milliman or its employees to third parties. Other parties receiving this letter must rely upon their own experts in drawing conclusions about the capitation rates, assumptions, and trends.

Milliman has relied upon certain data and information provided by ODM and the participating Medicaid MCPs in the development of the calendar year 2018 capitation rates. Milliman has relied upon ODM and the MCPs for the accuracy of the data and accept it without audit. To the extent that the data provided is not accurate, the capitation rate development would need to be modified to reflect revised information.

It should be emphasized that capitation rates are a projection of future costs based on a set of assumptions. Results will differ if actual experience is different from the assumptions contained in this report.

The services provided by Milliman to ODM were performed under the signed contract agreement between Milliman and ODM dated June 11, 2015.

Guidelines issued by the American Academy of Actuaries require actuaries to include their professional qualifications in all actuarial communications. The authors of this report are members of the American Academy of Actuaries and meet the qualification standards for performing the analyses contained herein.

S0215 – K99
**Milliman Client Report**

# APPENDIX 1: 2018 RATE CHANGE SUMMARIES

S0215 – L1

12/08/2017

**Ohio Department of Medicaid**
**Medicaid Managed Care Program**
**Capitation Rates Effective January 1, 2018**
**Calendar Year 2018 Rate Change Summary**

Region: North Central

| Rate Cell | Member Months / Deliveries | July 2017 Capitation Rate | Calendar Year 2018 Capitation Rate | % Change |
|---|---|---|---|---|
| **CFC** | | | | |
| HF/HST <1 M+F | 57,972 | $ 760.51 | $ 833.97 | 9.66% |
| HF/HST 1 M+F | 55,860 | 169.33 | 165.62 | (2.19%) |
| HF/HST 2-13 M+F | 578,674 | 147.96 | 133.99 | (9.44%) |
| HF/HST 14-18 M | 90,520 | 192.25 | 177.01 | (7.93%) |
| HF/HST 14-18 F | 91,944 | 228.21 | 232.28 | 1.78% |
| HF 19-44 M | 78,179 | 283.03 | 275.14 | (2.79%) |
| HF 19-44 F | 254,711 | 387.59 | 390.07 | 0.64% |
| HF 45+ M+F | 40,176 | 591.01 | 607.61 | 2.81% |
| HST 19-64 F | 30,756 | 453.50 | 435.80 | (3.90%) |
| Subtotal - CFC | 1,278,799 | $ 262.82 | $ 258.99 | (1.46%) |
| **Extension** | | | | |
| EXT 19-34 M | 118,654 | $ 323.82 | $ 309.55 | (4.41%) |
| EXT 19-34 F | 105,019 | 363.63 | 353.73 | (2.72%) |
| EXT 35-44 M | 56,736 | 544.12 | 492.04 | (9.57%) |
| EXT 35-44 F | 45,756 | 584.09 | 581.19 | (0.50%) |
| EXT 45-54 M | 53,280 | 741.87 | 710.82 | (4.19%) |
| EXT 45-54 F | 55,260 | 804.61 | 775.27 | (3.65%) |
| EXT 55-64 M | 40,008 | 888.17 | 881.49 | (0.75%) |
| EXT 55-64 F | 44,172 | 824.77 | 863.73 | 4.72% |
| Subtotal - Extension | 518,884 | $ 559.20 | $ 544.48 | (2.63%) |
| **ABD** | | | | |
| ABD <21 | 45,449 | $ 708.54 | $ 716.26 | 1.09% |
| ABD 21+ | 122,715 | 1,503.21 | 1,614.35 | 7.39% |
| Subtotal - ABD | 168,164 | $ 1,288.44 | $ 1,371.63 | 6.46% |
| AFK | 30,360 | $ 383.32 | $ 332.52 | (13.25%) |
| CFC & EXT Delivery | 3,546 | $ 5,808.28 | $ 5,626.99 | (3.12%) |
| Total | 1,996,207 | $ 438.41 | $ 438.04 | (0.08%) |

**Ohio Department of Medicaid**
**Medicaid Managed Care Program**
**Capitation Rates Effective January 1, 2018**
**Calendar Year 2018 Rate Change Summary**

Region: Northwest

| Rate Cell | Member Months / Deliveries | July 2017 Capitation Rate | Calendar Year 2018 Capitation Rate | % Change |
|---|---|---|---|---|
| **CFC** | | | | |
| HF/HST <1 M+F | 41,412 | $ 734.43 | $ 821.10 | 11.80% |
| HF/HST 1 M+F | 35,664 | 154.09 | 153.33 | (0.49%) |
| HF/HST 2-13 M+F | 384,364 | 148.03 | 133.28 | (9.96%) |
| HF/HST 14-18 M | 61,318 | 230.68 | 190.99 | (17.21%) |
| HF/HST 14-18 F | 63,936 | 211.51 | 210.95 | (0.26%) |
| HF 19-44 M | 45,590 | 277.99 | 277.11 | (0.32%) |
| HF 19-44 F | 139,631 | 375.29 | 385.41 | 2.70% |
| HF 45+ M+F | 20,628 | 601.49 | 618.02 | 2.75% |
| HST 19-64 F | 23,304 | 426.33 | 416.14 | (2.39%) |
| Subtotal - CFC | 815,846 | $ 254.82 | $ 251.02 | (1.49%) |
| **Extension** | | | | |
| EXT 19-34 M | 53,979 | $ 308.77 | $ 318.00 | 2.99% |
| EXT 19-34 F | 55,596 | 363.29 | 351.63 | (3.21%) |
| EXT 35-44 M | 27,651 | 523.52 | 524.38 | 0.16% |
| EXT 35-44 F | 28,056 | 648.84 | 612.74 | (5.56%) |
| EXT 45-54 M | 26,304 | 777.70 | 813.11 | 4.55% |
| EXT 45-54 F | 31,296 | 824.07 | 856.00 | 3.87% |
| EXT 55-64 M | 21,084 | 817.07 | 891.03 | 9.05% |
| EXT 55-64 F | 26,167 | 838.40 | 852.34 | 1.66% |
| Subtotal - Extension | 270,133 | $ 573.63 | $ 583.68 | 1.75% |
| **ABD** | | | | |
| ABD <21 | 18,916 | $ 650.72 | $ 752.20 | 15.60% |
| ABD 21+ | 51,777 | 1,362.83 | 1,429.60 | 4.90% |
| Subtotal - ABD | 70,693 | $ 1,172.28 | $ 1,248.34 | 6.49% |
| AFK | 12,564 | $ 386.96 | $ 352.66 | (8.86%) |
| CFC & EXT Delivery | 2,269 | $ 5,373.23 | $ 4,839.31 | (9.94%) |
| Total | 1,169,237 | $ 395.79 | $ 398.66 | 0.72% |

S0215 – L2

12/08/2017

**Ohio Department of Medicaid**
**Medicaid Managed Care Program**
**Capitation Rates Effective January 1, 2018**
**Calendar Year 2018 Rate Change Summary**

Region: Southwest

| Rate Cell | Member Months / Deliveries | July 2017 Capitation Rate | Calendar Year 2018 Capitation Rate | % Change |
|---|---|---|---|---|
| **CFC** | | | | |
| HF/HST <1 M+F | 218,148 | $ 912.79 | $ 926.97 | 1.55% |
| HF/HST 1 M+F | 205,319 | 203.45 | 196.31 | (3.51%) |
| HF/HST 2-13 M+F | 2,200,069 | 161.66 | 151.84 | (6.07%) |
| HF/HST 14-18 M | 344,157 | 212.59 | 207.03 | (2.62%) |
| HF/HST 14-18 F | 355,413 | 248.35 | 249.20 | 0.34% |
| HF 19-44 M | 269,230 | 251.21 | 262.89 | 4.65% |
| HF 19-44 F | 867,179 | 353.86 | 370.26 | 4.63% |
| HF 45+ M+F | 148,462 | 552.38 | 605.75 | 9.66% |
| HST 19-64 F | 122,651 | 364.18 | 385.45 | 5.84% |
| **Subtotal - CFC** | 4,730,629 | $ 266.17 | $ 267.51 | 0.50% |
| **Extension** | | | | |
| EXT 19-34 M | 410,531 | $ 314.84 | $ 305.51 | (2.96%) |
| EXT 19-34 F | 359,284 | 361.39 | 358.32 | (0.85%) |
| EXT 35-44 M | 211,908 | 494.04 | 483.15 | (2.20%) |
| EXT 35-44 F | 171,252 | 619.01 | 581.46 | (6.07%) |
| EXT 45-54 M | 200,663 | 716.53 | 712.31 | (0.59%) |
| EXT 45-54 F | 202,763 | 769.27 | 784.85 | 2.03% |
| EXT 55-64 M | 147,335 | 838.06 | 850.15 | 1.44% |
| EXT 55-64 F | 170,831 | 850.55 | 819.99 | (3.59%) |
| **Subtotal - Extension** | 1,874,568 | $ 553.90 | $ 546.01 | (1.43%) |
| **ABD** | | | | |
| ABD <21 | 137,756 | $ 1,063.64 | $ 1,100.74 | 3.49% |
| ABD 21+ | 369,015 | 1,438.83 | 1,498.08 | 4.12% |
| **Subtotal - ABD** | 506,772 | $ 1,336.84 | $ 1,390.07 | 3.98% |
| **AFK** | 117,264 | $ 406.07 | $ 348.25 | (14.24%) |
| **CFC & EXT Delivery** | 12,542 | $ 4,971.70 | $ 5,275.84 | 6.12% |
| **Total** | 7,229,232 | $ 426.73 | $ 428.88 | 0.50% |

**Ohio Department of Medicaid**
**Medicaid Managed Care Program**
**Capitation Rates Effective January 1, 2018**
**Calendar Year 2018 Rate Change Summary**

Region: South Central

| Rate Cell | Member Months / Deliveries | July 2017 Capitation Rate | Calendar Year 2018 Capitation Rate | % Change |
|---|---|---|---|---|
| **CFC** | | | | |
| HF/HST <1 M+F | 190,548 | $ 1,139.78 | $ 1,128.61 | (0.98%) |
| HF/HST 1 M+F | 183,264 | 220.22 | 241.68 | 9.74% |
| HF/HST 2-13 M+F | 1,861,801 | 169.42 | 154.91 | (8.56%) |
| HF/HST 14-18 M | 290,065 | 197.29 | 180.97 | (8.27%) |
| HF/HST 14-18 F | 293,594 | 242.48 | 228.70 | (5.68%) |
| HF 19-44 M | 258,978 | 267.67 | 271.47 | 1.42% |
| HF 19-44 F | 697,698 | 383.36 | 408.98 | 6.68% |
| HF 45+ M+F | 139,664 | 558.52 | 586.28 | 4.97% |
| HST 19-64 F | 100,596 | 384.76 | 422.20 | 9.73% |
| **Subtotal - CFC** | 4,016,208 | $ 287.56 | $ 285.69 | (0.65%) |
| **Extension** | | | | |
| EXT 19-34 M | 309,614 | $ 333.40 | $ 366.77 | 10.01% |
| EXT 19-34 F | 283,940 | 382.06 | 384.74 | 0.70% |
| EXT 35-44 M | 152,832 | 558.03 | 549.88 | (1.46%) |
| EXT 35-44 F | 134,496 | 617.61 | 610.05 | (1.22%) |
| EXT 45-54 M | 142,871 | 786.65 | 815.88 | 3.72% |
| EXT 45-54 F | 154,319 | 783.41 | 802.66 | 2.46% |
| EXT 55-64 M | 103,187 | 900.00 | 952.45 | 5.83% |
| EXT 55-64 F | 122,951 | 829.74 | 874.76 | 5.43% |
| **Subtotal - Extension** | 1,404,210 | $ 575.58 | $ 594.75 | 3.33% |
| **ABD** | | | | |
| ABD <21 | 106,262 | $ 1,237.29 | $ 1,198.36 | (3.15%) |
| ABD 21+ | 354,879 | 1,382.19 | 1,485.12 | 7.45% |
| **Subtotal - ABD** | 461,141 | $ 1,348.80 | $ 1,419.04 | 5.21% |
| **AFK** | 86,113 | $ 370.72 | $ 316.96 | (14.50%) |
| **CFC & EXT Delivery** | 11,034 | $ 4,543.92 | $ 4,737.94 | 4.27% |
| **Total** | 5,967,672 | $ 446.94 | $ 455.20 | 1.85% |

S0215 – L3

12/08/2017

**Ohio Department of Medicaid**
**Medicaid Managed Care Program**
**Capitation Rates Effective January 1, 2018**
**Calendar Year 2018 Rate Change Summary**

Region: Southeast

| Rate Cell | Member Months / Deliveries | July 2017 Capitation Rate | Calendar Year 2018 Capitation Rate | % Change |
|---|---|---|---|---|
| **CFC** | | | | |
| HF/HST <1 M+F | 60,996 | $ 912.39 | $ 1,041.31 | 14.13% |
| HF/HST 1 M+F | 57,924 | 208.18 | 177.86 | (14.56%) |
| HF/HST 2-13 M+F | 632,957 | 168.37 | 145.24 | (13.74%) |
| HF/HST 14-18 M | 111,196 | 213.39 | 189.94 | (10.99%) |
| HF/HST 14-18 F | 110,316 | 243.65 | 233.94 | (3.99%) |
| HF 19-44 M | 108,012 | 277.62 | 283.12 | 1.98% |
| HF 19-44 F | 264,191 | 377.23 | 376.88 | (0.09%) |
| HF 45+ M+F | 47,472 | 550.65 | 569.57 | 3.44% |
| HST 19-64 F | 36,048 | 484.24 | 462.88 | (4.41%) |
| Subtotal - CFC | 1,429,112 | $ 278.59 | $ 270.48 | (2.91%) |
| **Extension** | | | | |
| EXT 19-34 M | 124,527 | $ 292.16 | $ 312.17 | 6.85% |
| EXT 19-34 F | 109,932 | 364.69 | 360.17 | (1.24%) |
| EXT 35-44 M | 60,459 | 537.38 | 501.37 | (6.70%) |
| EXT 35-44 F | 52,140 | 566.30 | 553.85 | (2.20%) |
| EXT 45-54 M | 59,268 | 675.71 | 718.55 | 6.34% |
| EXT 45-54 F | 68,319 | 731.29 | 761.01 | 4.06% |
| EXT 55-64 M | 47,640 | 784.24 | 817.41 | 4.23% |
| EXT 55-64 F | 54,996 | 793.53 | 844.49 | 6.42% |
| Subtotal - Extension | 577,281 | $ 536.13 | $ 550.20 | 2.62% |
| **ABD** | | | | |
| ABD <21 | 35,749 | $ 1,040.69 | $ 966.15 | (7.16%) |
| ABD 21+ | 136,344 | 1,282.59 | 1,313.06 | 2.38% |
| Subtotal - ABD | 172,094 | $ 1,232.34 | $ 1,241.00 | 0.70% |
| AFK | 34,090 | $ 343.65 | $ 299.84 | (12.75%) |
| CFC & EXT Delivery | 3,749 | $ 4,218.61 | $ 4,313.08 | 2.24% |
| Total | 2,212,578 | $ 428.12 | $ 426.71 | (0.33%) |

**Ohio Department of Medicaid**
**Medicaid Managed Care Program**
**Capitation Rates Effective January 1, 2018**
**Calendar Year 2018 Rate Change Summary**

Region: Northeast

| Rate Cell | Member Months / Deliveries | July 2017 Capitation Rate | Calendar Year 2018 Capitation Rate | % Change |
|---|---|---|---|---|
| **CFC** | | | | |
| HF/HST <1 M+F | 250,476 | $ 1,016.10 | $ 1,127.97 | 11.01% |
| HF/HST 1 M+F | 235,662 | 217.53 | 219.14 | 0.74% |
| HF/HST 2-13 M+F | 2,510,274 | 152.51 | 154.64 | 1.40% |
| HF/HST 14-18 M | 427,339 | 189.50 | 191.41 | 1.01% |
| HF/HST 14-18 F | 439,258 | 219.46 | 225.38 | 2.70% |
| HF 19-44 M | 338,926 | 242.73 | 252.81 | 4.15% |
| HF 19-44 F | 1,108,857 | 351.90 | 366.95 | 4.28% |
| HF 45+ M+F | 205,546 | 530.27 | 571.87 | 7.85% |
| HST 19-64 F | 122,760 | 415.22 | 482.21 | 16.13% |
| Subtotal - CFC | 5,639,097 | $ 265.72 | $ 278.85 | 4.94% |
| **Extension** | | | | |
| EXT 19-34 M | 559,569 | $ 297.86 | $ 301.37 | 1.18% |
| EXT 19-34 F | 486,441 | 352.99 | 345.06 | (2.25%) |
| EXT 35-44 M | 271,537 | 459.39 | 454.16 | (1.14%) |
| EXT 35-44 F | 215,127 | 544.00 | 538.61 | (0.99%) |
| EXT 45-54 M | 272,963 | 696.72 | 688.14 | (1.23%) |
| EXT 45-54 F | 279,675 | 718.70 | 725.52 | 0.95% |
| EXT 55-64 M | 226,800 | 834.65 | 818.55 | (1.93%) |
| EXT 55-64 F | 255,878 | 766.80 | 782.47 | 2.04% |
| Subtotal - Extension | 2,567,989 | $ 528.37 | $ 526.59 | (0.34%) |
| **ABD** | | | | |
| ABD <21 | 203,702 | $ 751.54 | $ 856.47 | 13.96% |
| ABD 21+ | 574,514 | 1,419.71 | 1,487.60 | 4.78% |
| Subtotal - ABD | 778,216 | $ 1,244.81 | $ 1,322.40 | 6.23% |
| AFK | 110,774 | $ 392.92 | $ 313.34 | (20.25%) |
| CFC & EXT Delivery | 15,359 | $ 4,852.69 | $ 5,039.55 | 3.85% |
| Total | 9,096,076 | $ 433.38 | $ 447.01 | 3.14% |

S0215 – L4

12/08/2017

**Ohio Department of Medicaid**
**Medicaid Managed Care Program**
**Capitation Rates Effective January 1, 2018**
**Calendar Year 2018 Rate Change Summary**

Region: Northeast Central

| Rate Cell | Member Months / Deliveries | July 2017 Capitation Rate | Calendar Year 2018 Capitation Rate | % Change |
|---|---|---|---|---|
| **CFC** | | | | |
| HF/HST <1 M+F | 62,316 | $ 761.52 | $ 878.07 | 15.30% |
| HF/HST 1 M+F | 57,753 | 191.65 | 159.45 | (16.80%) |
| HF/HST 2-13 M+F | 614,683 | 149.31 | 142.76 | (4.39%) |
| HF/HST 14-18 M | 99,799 | 211.01 | 185.43 | (12.12%) |
| HF/HST 14-18 F | 103,464 | 220.22 | 229.10 | 4.03% |
| HF 19-44 M | 80,950 | 226.17 | 257.86 | 14.01% |
| HF 19-44 F | 248,606 | 340.73 | 361.60 | 6.13% |
| HF 45+ M+F | 40,680 | 537.54 | 507.88 | (5.52%) |
| HST 19-64 F | 36,156 | 423.96 | 425.58 | 0.38% |
| **Subtotal - CFC** | **1,344,407** | **$ 248.70** | **$ 253.42** | **1.90%** |
| **Extension** | | | | |
| EXT 19-34 M | 105,968 | $ 282.55 | 271.99 | (3.74%) |
| EXT 19-34 F | 97,988 | 329.75 | 346.41 | 5.05% |
| EXT 35-44 M | 52,656 | 414.66 | 440.45 | 6.22% |
| EXT 35-44 F | 49,188 | 549.56 | 541.67 | (1.44%) |
| EXT 45-54 M | 52,068 | 647.29 | 639.14 | (1.26%) |
| EXT 45-54 F | 59,460 | 679.99 | 721.43 | 6.09% |
| EXT 55-64 M | 43,356 | 810.76 | 798.19 | (1.55%) |
| EXT 55-64 F | 50,496 | 759.76 | 762.72 | 0.39% |
| **Subtotal - Extension** | **511,180** | **$ 506.22** | **$ 512.34** | **1.21%** |
| **ABD** | | | | |
| ABD <21 | 37,421 | $ 832.16 | $ 925.64 | 11.23% |
| ABD 21+ | 100,685 | 1,291.39 | 1,357.31 | 5.10% |
| **Subtotal - ABD** | **138,106** | **$ 1,166.96** | **$ 1,240.35** | **6.29%** |
| **AFK** | 28,149 | $ 370.08 | $ 342.82 | (7.37%) |
| **CFC & EXT Delivery** | 3,763 | $ 4,508.93 | $ 4,357.97 | (3.35%) |
| **Total** | **2,021,842** | **$ 386.62** | **$ 395.65** | **2.34%** |

**Ohio Department of Medicaid**
**Medicaid Managed Care Program**
**Capitation Rates Effective January 1, 2018**
**Calendar Year 2018 Rate Change Summary**

Region: Statewide

| Rate Cell | Member Months / Deliveries | July 2017 Capitation Rate | Calendar Year 2018 Capitation Rate | % Change |
|---|---|---|---|---|
| **CFC** | | | | |
| HF/HST <1 M+F | 881,868 | $ 962.08 | $ 1,021.00 | 6.12% |
| HF/HST 1 M+F | 831,447 | 206.24 | 205.03 | (0.59%) |
| HF/HST 2-13 M+F | 8,782,823 | 158.81 | 150.19 | (5.43%) |
| HF/HST 14-18 M | 1,424,401 | 201.98 | 191.59 | (5.14%) |
| HF/HST 14-18 F | 1,457,923 | 233.23 | 232.57 | (0.28%) |
| HF 19-44 M | 1,179,864 | 256.23 | 264.75 | 3.33% |
| HF 19-44 F | 3,580,874 | 363.05 | 378.67 | 4.30% |
| HF 45+ M+F | 642,628 | 549.57 | 582.32 | 5.96% |
| HST 19-64 F | 472,270 | 404.46 | 432.20 | 6.86% |
| **Subtotal - CFC** | **19,254,098** | **$ 269.50** | **$ 272.60** | **1.15%** |
| **Extension** | | | | |
| EXT 19-34 M | 1,682,842 | $ 309.34 | $ 314.47 | 1.66% |
| EXT 19-34 F | 1,498,200 | 360.98 | 357.81 | (0.88%) |
| EXT 35-44 M | 833,778 | 497.00 | 486.54 | (2.10%) |
| EXT 35-44 F | 696,014 | 585.61 | 570.11 | (2.65%) |
| EXT 45-54 M | 807,417 | 718.44 | 721.39 | 0.41% |
| EXT 45-54 F | 851,093 | 750.24 | 764.23 | 1.86% |
| EXT 55-64 M | 629,410 | 843.51 | 852.84 | 1.11% |
| EXT 55-64 F | 725,491 | 804.84 | 817.74 | 1.60% |
| **Subtotal - Extension** | **7,724,245** | **$ 545.92** | **$ 547.72** | **0.33%** |
| **ABD** | | | | |
| ABD <21 | 585,256 | $ 929.42 | $ 972.91 | 4.68% |
| ABD 21+ | 1,709,930 | 1,401.83 | 1,475.10 | 5.23% |
| **Subtotal - ABD** | **2,295,186** | **$ 1,281.37** | **$ 1,347.05** | **5.13%** |
| **AFK** | 419,315 | $ 385.63 | $ 327.29 | (15.13%) |
| **CFC & EXT Delivery** | 52,262 | $ 4,833.26 | $ 4,962.55 | 2.68% |
| **Total** | **29,692,843** | **$ 429.77** | **$ 436.72** | **1.62%** |

S0215 – L5

Medicaid Managed Care
Appendix F
Marketing and Member Communications

**APPENDIX F**

**MARKETING AND MEMBER COMMUNICATIONS**

The following are the MCP responsibilities related to communicating with eligible individuals pre-enrollment and MCP members post-enrollment. Upon request, the MCP shall provide both members and eligible individuals with a copy of their practice guidelines.

1. **Marketing Activities.** Marketing means any communication from the MCP to an eligible individual who is not a member of the MCP that can reasonably be interpreted as intended to influence the individual to select membership in the MCP, or to not select membership in or to terminate membership from another MCP. When marketing, the MCP shall follow the following guidelines:

    a. Ensure representatives, as well as materials and plans, represent the MCP in an honest and forthright manner, and do not make statements which are inaccurate, misleading, confusing, or otherwise misrepresentative, or which defraud the eligible individuals or ODM.

    b. Ensure no marketing activity directed specifically toward the Medicaid population begins prior to approval by ODM.

    c. Not engage directly or indirectly with cold-call marketing activities including, but not limited to, door-to-door or telephone contact. Cold-call marketing means any unsolicited personal contact by the MCP with an eligible individual for the purpose of marketing.

    d. Receive prior approval for any event or location where the MCP plans to provide information to eligible individuals.

    e. Not offer material or financial gain, including but not limited to, the offering of any other insurance, to an eligible individual as an inducement to select MCP membership.

    f. Not offer inducements to any county department of job and family services (CDJFS) or Ohio Medicaid Consumer Hotline staff or to others who may influence an individual's decision to select MCP membership.

    g. The MCP may offer nominal gifts prior-approved by ODM to an eligible individual as long as these gifts are offered whether or not the individual selects membership in the MCP.

    h. The MCP may reference member incentive/appreciation items in marketing presentations and materials; however, such member items shall not be made available to non-members.

    i. Not make marketing presentations, defined as a direct interaction between the MCP's marketing representative and an eligible individual, in any setting unless requested by the eligible individual.

S0215 - L6

Medicaid Managed Care
Appendix F
Marketing and Member Communications

     j.  MCP marketing representatives shall offer the ODM-approved solicitation brochure to the eligible individual at the time of the marketing presentation and shall provide:

         i.  An explanation of the importance of reviewing the information in the ODM-approved solicitation brochure, how the individual can receive additional information about the MCP prior to making an MCP membership selection, and the process for contacting ODM to select an MCP.

         ii.  Information that membership in the particular MCP is voluntary and that a decision to select or not select the MCP will not affect eligibility for Medicaid or other public assistance benefits.

         iii.  Information that each member shall choose a PCP and shall access providers and services as directed in the MCP's member handbook and provider directory. Upon request, the MCP shall provide eligible individuals with a provider directory.

         iv.  Information that all medically necessary Medicaid-covered services, as well as any additional services provided by the MCP, will be available to all members.

     k.  MCP marketing representatives and other MCP staff are prohibited from offering eligible individuals the use of a portable device (laptop computer, cellular phone, etc.) to assist with the completion of an online application to select and/or change MCPs, as all enrollment activities shall be completed by the Hotline.

2.  **Marketing Representatives and Training.** An MCP that utilizes marketing representatives for marketing presentations requested by eligible individuals shall comply with the following:

     a.  All marketing representatives shall be employees of the MCP. A copy of the representative's job description shall be submitted to ODM.

     b.  No more than 50% of each marketing representative's total annual compensation, including salary, benefits and bonuses may be paid on a commission basis. For the purpose of this rule, any performance-based compensation would be considered a form of commission. Upon ODM request, the MCP shall make available for inspection, the compensation packages of marketing representatives.

     c.  Marketing representatives shall be trained and duly licensed by the Ohio Department of Insurance to perform such activities.

     d.  The MCP shall develop and submit to ODM for prior approval (at initial development and at the time of revision) a marketing representative training program which shall include:

         i.  A training curriculum including:

S0215 – L7

Medicaid Managed Care
Appendix F
Marketing and Member Communications

1. A full review of the MCP's solicitation brochure, provider directory and all other marketing materials including all video, electronic and print.

2. An overview of the applicable public assistance benefits, designed to familiarize and impart a working knowledge of these programs.

3. The MCP's process for providing sign language, oral interpretation and oral translation services to an eligible individual to whom a marketing presentation is being made, including a review of the MCP's written marketing materials.

4. Instruction on acceptable marketing tactics, including a requirement that the marketing representatives may not discriminate on the basis of age, gender, gender identity, sexual orientation, disability, race, color, religion, national origin, military status, genetic information, ancestry, health status, or the need for health services.

5. An overview of the ramifications to the MCP and the marketing representatives if ODM rules are violated.

6. Review of the MCP's code of conduct or ethics.

ii. Methods that the MCP will utilize to determine initial and ongoing competency with the training curriculum.

e. Any MCP staff person providing MCP information or making marketing presentations to an eligible individual shall:

i. Visibly wear an identification tag and offer a business card when speaking to an eligible individual and provide information which ensures that the staff person is not mistaken for an Ohio Medicaid Consumer Hotline, federal, state or county employee.

ii. Inform eligible individuals that the following MCP information or services are available and how to access the information or services:

1. Sign language, oral interpretation, and oral translation services at no cost to the member.

2. Written information in the prevalent non-English languages of eligible individuals or members residing in the MCP's service area.

3. Written information in alternative formats.

iii. Not discriminate on the basis of age, gender, gender identity, sexual orientation, race, color, religion, national origin, military status, ancestry, disability, genetic information, health status, or the need for health services.

S0215 - L8

Medicaid Managed Care
Appendix F
Marketing and Member Communications

> iv. Not ask eligible individuals questions related to health status or the need for health services.

f. Only ODM approved MCP marketing representatives may make a marketing presentation upon request by the eligible individual or in any way advise or recommend to an eligible individual that he or she select MCP membership in a particular MCP. As provided in ORC Chapter 1751 and Section 3905.01, all non-licensed agents, including providers, are prohibited from advising or recommending to an eligible individual that he or she select MCP membership in a particular MCP as this would constitute the unlicensed practice of marketing.

g. MCP informational displays do not require the presence of a marketing representative if no marketing presentation will be made.

3. **Marketing Materials.** Marketing materials are those items produced in any medium, by or on behalf of the MCP, including gifts of nominal value (i.e., items worth no more than $15.00), which can reasonably be interpreted as intended to market to eligible individuals as defined in OAC 5160-26-01.

a. Marketing materials shall comply with the following requirements:

> i. Be available in a manner and format that may be easily understood.

> ii. Written materials developed to promote membership selection in the MCP shall be available in the prevalent non-English languages of eligible individuals in the service area and in alternative formats in an appropriate manner that takes into consideration the special needs of eligible individuals including but not limited to visually-impaired and LRP eligible individuals.

> iii. Oral interpretation and oral translation services shall be available for the review of marketing materials at no cost to eligible individuals.

> iv. Be distributed to the MCP's entire service area.

> v. The mailing and distribution of all MCP marketing materials shall be prior-approved by ODM and may contain no information or text on the outside of the mailing that identifies the addressee as a Medicaid recipient.

> vi. Not contain any assertion or statement (whether written or oral) that the MCP is endorsed by the Centers for Medicare and Medicaid Services (CMS), the Federal or state government or similar entity.

b. ODM or its designee may, at the MCP's request, mail MCP marketing materials to the eligible individuals. Postage and handling for each mailing will be charged to the requesting MCP. The MCP address shall not be used as the return address in mailings to eligible individuals processed by ODM.

S0215 - L9

Medicaid Managed Care
Appendix F
Marketing and Member Communications

    c. **Solicitation Brochure**. The MCP shall have a solicitation brochure available to eligible individuals which contains, at a minimum:

        i. Identification of the Medicaid recipients eligible for the MCP's coverage.

        ii. Information that the MCP's ID card replaces the member's monthly Medicaid card.

        iii. A statement that all medically-necessary Medicaid-covered services will be available to all members, including Healthchek services for those individuals under age 21.

        iv. A description of any additional services available to all members.

        v. Information that membership selection in a particular MCP is voluntary, that a decision to select MCP membership or to not select MCP membership in the MCP will not affect eligibility for Medicaid or other public assistance benefits, and that individuals may change MCPs under certain circumstances.

        vi. Information on how the individual can request or access additional MCP information or services, including clarification on how this information can be requested or accessed through:

            1. Sign language, oral interpretation and oral translation services at no cost to the eligible individual;

            2. Written information in the prevalent non-English languages of eligible individuals or members in the MCP's service area;

            3. Written information in alternative formats.

        vii. Clear identification of corporate or parent company identity when a trade name or DBA is used for the Medicaid product.

        viii. A statement that the brochure contains only a summary of the relevant information and more details, including a list of providers and any physician incentive plans the MCP operates will be provided upon request.

        ix. Information that the individual shall choose a PCP from the MCP's provider panel and that the PCP will coordinate the member's health care.

        x. Information that a member may change PCPs at least monthly.

        xi. A statement that all medically necessary health care services shall be obtained in or through the MCP's providers except emergency care, behavioral health services provided through facilities and any other services or provider types

S0215 – L10

Medicaid Managed Care
Appendix F
Marketing and Member Communications

designated by ODM.

xii. A description of how to access emergency services including information that access to emergency services is available within and outside the service area.

xiii. A description of the MCP's policies regarding access to providers outside the service area.

xiv. Information on member-initiated termination options in accordance with OAC rule 5160-26-02.1.

xv. Information on the procedures an eligible individual shall follow to select membership in an MCP including any applicable ODM selection requirements.

xvi. If applicable, information on any member co-payments the MCP has elected to implement in accordance with OAC rule 5160-26-12.

1. The MCP shall submit an annual marketing plan to ODM that includes all planned activities for promoting membership in or increasing awareness of the MCP. The marketing plan submission shall include an attestation by the MCP that the plan is accurate is not intended to mislead, confuse or defraud the eligible individuals or ODM.

2. **ODM Approval.** The MCP is responsible for ensuring all new and revised marketing materials (including materials used for marketing presentations) and member materials (including mailing and distribution) are approved by ODM prior to distribution to eligible individuals or members. The MCP shall include with each marketing submission an attestation that the material is accurate and is not intended to mislead, confuse or defraud the eligible individuals or ODM. In accordance with 42 CFR 438.104(c), ODM will consult with the Medical Care Advisory Committee in reviewing all MCP submitted marketing materials.

3. **Alleged Marketing Violations.** The MCP shall immediately notify ODM in writing of its discovery of an alleged or suspected marketing violation. ODM will forward information pertaining to alleged marketing violations to the Ohio Department of Insurance and the Medicaid Fraud Control Unit as appropriate.

4. Upon ODM's request, the MCP may be required to provide written notice to members of any significant change affecting contractual requirements, member services or access to providers.

5. **Member Materials.** Member materials are those items developed by or on behalf of the MCP to fulfill MCP program requirements or to communicate to all members or a group of members. Member

S0215 - L11

Medicaid Managed Care
Appendix F
Marketing and Member Communications

materials include member education, member appreciation and member incentive program information. Member health education materials produced by a source other than the MCP and which do not include any reference to the MCP are not considered to be member materials.

d. Member materials shall be:

   i. Available in written format and alternative formats in an appropriate manner that takes into consideration the special needs of the member including, but not limited to, visually-limited and LRP members.

   ii. Provided in a manner and format that may be easily understood;

   iii. Printed in the prevalent non-English languages of members in the service area upon request; and

   iv. Consistent with the practice guidelines specified in OAC rule 5160-26-05.1.

e. MCP member materials shall not include statements that are inaccurate, misleading, confusing, or otherwise misrepresentative, or which defraud eligible individuals or ODM.

4. **New Member Materials.** The MCP shall provide to each member or assistance group that selects or changes MCPs an MCP identification (ID) card, a new member letter, notice of advanced directives, provider directory postcard and post card providing the link to the member handbook, if sent in lieu of the full member handbook.

   a. The MCP ID card shall contain:

      i. The MCP's name as stated in its article of incorporation and any other trade or DBA name used;

      ii. The name of the member(s) enrolled in the MCP and each member's medical management information system billing number;

      iii. The name and telephone numbers of the PCPs assigned to the members;

      iv. Information on how to obtain the current eligibility status of the members;

      v. Coordinated Services Program (CSP) information as specified by ODM;

      vi. Pharmacy information; and

      vii. The MCP's emergency procedures including the toll-free call-in system phone numbers.

S0215 – L12

Medicaid Managed Care
Appendix F
Marketing and Member Communications

b. **New Member Letter**. The MCP shall use the model language specified by ODM for the new member letter and member handbooks. The MCP New Member Letter shall inform each member of the following:

   i. The new member materials issued by the MCP, what action to take if he or she did not receive those materials, and how to access the MCP's provider directory;

   ii. How to access MCP-provided transportation services;

   iii. How to change primary care providers;

   iv. The population groups not required to select MCP membership and what action to take if a member believes he or she meets this criteria and does not want to be an MCP member;

   v. The need and time frame for a member to contact the MCP if he or she has a health condition that the MCP should be aware of in order to most appropriately manage or transition the member's care; and

   vi. The need and how to access information on medications that require prior authorization.

c. **Member Handbook**. The MCP Member Handbook shall be clearly labeled as such and shall include:

   i. The rights of members including all rights found in OAC rule 5160-26-08.3 and any member responsibilities specified by the MCP. With the exception of any prior authorization (PA) requirements the MCP describes in the member handbook, the MCP cannot establish any member responsibility that would preclude the MCP's coverage of a Medicaid-covered service.

   ii. Information regarding services excluded from MCP coverage and the services and benefits available through the MCP and how to obtain them, including at a minimum:

      1. All services and benefits requiring PA or referral by the MCP or the member's PCP;

      2. Self-referral services, including Title X services, and women's routine and preventative health care services provided by a woman's health specialist as specified in OAC rule 5160-26-03;

      3. FQHC, RHC and certified nurse practitioner services specified in OAC rule 5160-26-03; and

S0215 – L13

Medicaid Managed Care
Appendix F
Marketing and Member Communications

    4. Any applicable pharmacy utilization management strategies prior-approved by ODM.

iii. Information regarding available emergency services, the procedures for accessing emergency services and directives as to the appropriate utilization, including:

    1. An explanation of the terms "emergency medical condition," "emergency services," and "post-stabilization services," as defined in OAC rule 5160-26-01;

    2. A statement that PA is not required for emergency services;

    3. An explanation of the availability of the 911 telephone system or its local equivalent;

    4. A statement that members have the right to use any hospital or other appropriate setting for emergency services; and

    5. An explanation of the post-stabilization care services requirements specified in OAC rule 5160-26-03.

iv. The procedure for members to express their recommendations for change to the MCP;

v. Identification of the categories of Medicaid recipients eligible for MCP membership;

vi. Information stating that the MCP's ID card replaces the member's monthly Medicaid card, how often the card is issued and how to use it;

vii. A statement that medically necessary health care services shall be obtained through the providers in the MCP's provider network with any exceptions that apply such as emergency care;

viii. Information related to the selection of a PCP from the MCP provider directory, how to change PCPs no less often than monthly, the MCP's procedures for processing PCP change requests after the initial month of MCP membership, and how the MCP will provide written confirmation to the member of any new PCP selection prior to or on the effective date of the change;

ix. A description of Healthchek services including who is eligible and how to obtain Healthchek services through the MCP;

x. Information on additional services available to members including care management;

S0215 – L14

Medicaid Managed Care
Appendix F
Marketing and Member Communications

    xi.   A description of the MCP's policies regarding access to providers outside the service area for non-emergency services and if applicable, access to providers within or outside the service area for non-emergency after hours services;

    xii.   Information on member initiated termination options in accordance with OAC rule 5160-26-02.1;

    xiii.   Information about MCP-initiated terminations;

    xiv.   An explanation of automatic MCP membership renewal in accordance with OAC rule 5160-26-02;

    xv.   The procedure for members to file an appeal, a grievance, or state hearing request as specified in OAC rule 5160-26-08.4, the MCP's mailing address and a copy of the optional form(s) that members may use to file an appeal or grievance with the MCP. Copies of the form(s) to file an appeal or grievance shall also be made available through the MCP's member services program;

    xvi.   The standard and expedited state hearing resolution time frames as outlined in 42 CFR 431.244;

    xvii.   The member handbook issuance date;

    xviii.   A statement that the MCP may not discriminate on the basis of race, color, religion, gender, gender identity, sexual orientation, age, disability, national origin, military status, ancestry, genetic information, health status, or need for health services in the receipt of health services;

    xix.   An explanation of subrogation and coordination of benefits;

    xx.   A clear identification of corporate or parent identity when a trade name or DBA is used for the Medicaid product;

    xxi.   Information on the procedures for members to access behavioral health services;

    xxii.   The MCP's policies related to the member's rights regarding advance directives, including a member's right to formulate, at the member's option, a description of applicable state law and a statement of any limitation regarding the implementation of advance directives as a matter of conscience;

    xxiii.   A statement that the MCP provides covered services to members through a provider agreement with ODM, and how members can contact ODM;

    xxiv.   The toll-free call-in system phone numbers;

S0215 – L15

Medicaid Managed Care
Appendix F
Marketing and Member Communications

xxv. A statement that additional information is available from the MCP upon request including, at a minimum, the structure and operation of the MCP and any physician incentive plans the MCP operates;

xxvi. Process for requesting or accessing additional MCP information or services including at a minimum:

1. Oral interpretation or translation services;

2. Written information in the prevalent non-English languages in the MCP's service areas; and

3. Written information in alternative formats.

xxvii. If applicable, detailed information on any member co-payments the MCP has elected to implement in accordance with OAC rule 5160-26-12;

xxviii. How to access the MCP's provider directory; and

xxix. The MCP shall provide access to provider panel information to members via the MCP's website and printed provider directories.

d. In addition to an MCP identification (ID) card, a new member letter, a member handbook, the MCP shall provide to each member or assistance group, as applicable, provider panel information, Notice of Nondiscrimination, and information on advance directives, as specified by ODM.

i. **Issuance of Member Materials.** The ID card shall be sent within seventy-two hours of receiving the 834C enrollment file, except during state cutoff when plans have the option to follow the 834 file loading process as stated in the 834 companion guide. The new member letter and request postcard shall be mailed within 5 days of the MCP receiving the 834C.

ii. The MCP may mail ODM prior-approved postcards to new members in lieu of mailing printed advance directives, directories, and member handbooks. At a minimum, the postcards shall advise members to call the MCP or return the postcards to request a printed advance directive, provider directory, and/or member handbook.

iii. If the MCP does not use an ODM prior-approved postcard, the MCP shall mail printed advance directives, provider directories, and member handbooks to all new members, within 5 days of receiving the 834C.

iv. If requested, a printed advance directive, provider directory, and member handbook shall be sent to a member within seven calendar days of the request.

S0215 - L16

Medicaid Managed Care
Appendix F
Marketing and Member Communications

    v.   The MCP shall designate two MCP staff members to receive a copy of the new member materials on a monthly basis in order to monitor the timely receipt of these materials. At least one of the staff members shall receive the materials at their home address.

    vi.  The MCP ID card shall contain pharmacy information, as prescribed by ODM.

5.  **Information Required for MCP Websites.**

    a.  **On-line Provider Directory.** The MCP shall have an internet-based provider directory or link to the Medicaid Consumer Hotline's online provider directory available in the same format as its ODM-approved provider directory, that allows members to electronically search for the MCP panel providers based on name, provider type and geographic proximity (as specified in Appendix H). MCP provider directories shall include all MCP-contracted providers (except as specified by ODM) as well as certain ODM non-contracted providers.

    b.  **On-line Member Website.** The MCP shall have a secure internet-based website which provides members the ability to submit questions, comments, grievances, and appeals, and receive a response. Members shall be given the option of a response by return e-mail or phone call. The MCP's responses to questions or comments shall be made within one business day of receipt. The MCP's responses to grievances and appeals shall adhere to the timeframes specified in OAC rule 5160-26-08.4. The member website shall be regularly updated to include the most current ODM-approved materials, although this website shall not be the only means for notifying members of new and/or revised MCP information (e.g., change in holiday closures, changes in additional benefits, and revisions to approved member materials). The MCP shall make a copy of its Authorized Representative request form available to members through its online member portal located on the MCP's website.

    c.  The MCP member website shall also include, at a minimum, the following information which shall be accessible to members and the general public without any log-in restriction:

        i.   MCP contact information, including the MCP's toll-free member services phone number, service hours, and closure dates;

        ii.  A listing of the counties the MCP serves unless the MCP serves the entire state in which case the MCP may indicate it services the entire state;

        iii. The ODM-approved MCP member handbook, recent newsletters and announcements;

        iv. The MCP's on-line provider directory as referenced this appendix;

        v.   Current version of the Member Handbook;

S0215 – L17

Medicaid Managed Care
Appendix F
Marketing and Member Communications

    vi.  A list of services requiring prior authorization (PA);

    vii.  The MCP's preferred drug list (PDL), including an explanation of the list and identification of any preferred drugs that require PA, the MCP's list of drugs that require PA, including an explanation of the list, identification of first line drugs for drugs that require PA for step therapy, how to initiate a PA, and the MCP's policy for coverage of generic versus brand name drugs.

    viii.  A 30 days advance notice of changes to the list of all services requiring prior authorization, as well as the MCP's PDL and list of drugs requiring prior authorization via their website. The MCP shall provide a hard copy of the notification of any PA changes upon request.

    ix.  The toll-free telephone number for the 24/7 medical advice call-in system specified in Appendix C;

    x.  Contact information to schedule non-emergency transportation assistance, including an explanation of the available services and to contact member services for transportation services complaints.

    xi.  The toll-free member services, 24/7 call-in systems and transportation scheduling telephone numbers shall be easily identified on either the MCP's website home page or a page that is a direct link from a contact button on the home page. ODM may require the MCP to include additional information on the member website as needed; and

    xii.  All Healthchek information as specified Appendix C.

6.  The MCP shall receive prior written approval from ODM before adding any information to its website that would require ODM prior approval in hard copy form (e.g., provider listings, member handbook information).The MCP shall provide members with a printed version of its Preferred Drug List (PDL) and Prior Authorization (PA) lists upon request.

**S0215 – L18**

Medicaid Managed Care
Appendix G
Coverage and Services

### APPENDIX G

### COVERAGE AND SERVICES

1. **Basic Benefit Package.** The MCP shall ensure members have access to all services outlined in OAC rule 5160-26-03, with limited exclusions, limitations and clarifications (below in this appendix), including emergency and post-stabilization services pursuant to 42 CFR 438.114. For information on Medicaid-covered services, the MCP shall refer to the Ohio Department of Medicaid (ODM) website.

   Services covered by the MCP benefit package shall include, but are not limited to:

   a. Inpatient hospital services;

   b. Outpatient hospital services;

   c. Rural health clinics (RHCs) and federally qualified health centers (FQHCs);

   d. Physician services whether furnished in the physician's office, the member's home, a hospital, or elsewhere;

   e. Laboratory and x-ray services;

   f. Screening, diagnosis, and treatment services to children under the age of 21 under Healthchek, Ohio's Early and Periodic Screening, Diagnosis, and Treatment (EPSDT) program. These services include all mandatory and optional medically necessary services (including treatment) and items listed in 42 U.S.C. 1396d(a) to correct or ameliorate defects and physical and mental illness and conditions discovered by a screening described in 42 U.S.C. 1396d(r). Such services and items, if approved through prior authorization, include those services and items listed at 42 U.S.C. 1396d(a) in excess of state Medicaid plan limits applicable to adults. An EPSDT screening is an examination and evaluation of the general physical and mental health, growth, development, and nutritional status of an individual under age 21. It includes the components set forth in 42 U.S.C. 1396d(r) and shall also be provided by plans to children under the age of 21;

   g. Family planning services and supplies;

   h. Home health and private duty nursing services;

   i. Podiatry;

   j. Chiropractic services;

   k. Physical therapy, occupational therapy, developmental therapy, and speech therapy;

S0215 – L19

Medicaid Managed Care
Appendix G
Coverage and Services

l.   Nurse-midwife, certified family nurse practitioner, and certified pediatric nurse practitioner services;

m.  Free-standing birth center services in free-standing birth centers as defined in OAC rule 5160-18-01;

n.   Prescribed drugs;

o.   Ambulance and ambulette services;

p.   Dental services;

q.   Durable medical equipment and medical supplies;

r.   Vision care services, including eyeglasses;

s.   Nursing facility stays as specified in OAC rule 5160-26-03 for ABD and MAGI members. For Adult Extension members, nursing facility stays are covered for the length of time medically necessary;

t.   Hospice care;

u.   Behavioral health services (see section 3.c. of this appendix);

v.   Immunizations (the MCP shall follow the coverage requirements provided by ODM for any newly approved vaccine under the Vaccines for Children (VFC) program);

w.  Preventive services covered by Ohio Medicaid in accordance with Section 4106 of the Affordable Care Act and 42 CFR 440.130(c);

x.   All U.S. Preventive Services Task Force (USPSTF) grade A and grade B preventive services and approved vaccines recommended by the Advisory Committee on Immunization Practices (ACIP) and their administration, without cost-sharing, as provided in Section 4106 of the Affordable Care Act. Additionally, the MCP shall cover without cost-sharing, services specified under Public Health Service Act Section 2713 in alignment with the Alternative Benefit Plan;

y.   Screening and counseling for obesity provided during an evaluation and management or preventive medicine visit, as described in OAC rule 5160-4-34;

z.   Respite services for Supplemental Security Income (SSI) members under the age of 21 with long-term care or behavioral health needs, as approved by CMS within the applicable 1915(b) waiver (see section 3.e. of this appendix); and

aa.  Telemedicine.

S0215 — L20

Medicaid Managed Care
Appendix G
Coverage and Services

2. **Exclusions.** The MCP is not required to pay for services not covered by the Medicaid program, except as specified in OAC rule 5160-26-03 or this Agreement. Information regarding non-covered services can be found on the ODM website. Services not covered by the Medicaid program include, but are not limited to:

   a. Services or supplies not medically necessary;

   b. Treatment of obesity unless medically necessary;

   c. Experimental services and procedures, including drugs and equipment, not in accordance with customary standards of practice;

   d. Abortions, except in the case of a reported rape, incest, or when medically necessary to save the life of the mother;

   e. Infertility services for males or females;

   f. Voluntary sterilization if under 21 years of age or legally incapable of consenting to the procedure;

   g. Reversal of voluntary sterilization procedures;

   h. Plastic or cosmetic surgery not medically necessary (These services could be deemed medically necessary if medical complications or conditions in addition to the physical imperfection are present);

   i. Sexual or marriage counseling;

   j. Biofeedback services;

   k. Services to find cause of death (autopsy) or services related to forensic studies;

   l. Paternity testing;

   m. Services determined by another third-party payor as not medically necessary;

   n. Drugs not covered by the Ohio Medicaid pharmacy program as specified in OAC rule 5160-9-03, including drugs for the treatment of obesity;

   o. Assisted suicide services, defined as services for the purpose of causing, or assisting to cause, the death of an individual. This does not pertain to withholding or withdrawing medical treatment, nutrition or hydration or to the provision of a service for the purpose of alleviating pain or discomfort, even if the use may increase the risk of death, so long as the service is not furnished for the specific purpose of causing death;

   p. Medical services if the service was caused by a provider-preventable condition as defined in 42 CFR 447.26. The prohibition on payment for provider-preventable

S0215 - L21

Medicaid Managed Care
Appendix G
Coverage and Services

conditions shall not result in a loss of access to care or services for Medicaid consumers; and

q. Non-emergency services or supplies received without members following the directions in their MCP member handbook, unless otherwise directed by ODM.

3. **Clarifications.**

a. **Member Cost-Sharing.** As specified in OAC rules 5160-26-05 and 5160-26-12, the MCP is permitted to impose the applicable member co-payment amount for dental services, vision services, non-emergency emergency department services, or prescribed drugs, the MCP shall notify ODM if they intend to impose a co-payment. ODM shall approve the notice to be sent to the MCP's members and the timing of when the co-payments will begin to be imposed. If ODM determines the MCP's decision to impose a particular co-payment on their members would constitute a significant change for those members, ODM may require the effective date of the co-payment to coincide with the "Open Enrollment" month.

Notwithstanding the preceding paragraph, the MCP shall provide an ODM-approved notice to all their members 90 days in advance of the date that the MCP will impose the co-payment. With the exception of member co-payments the MCP has elected to implement in accordance with OAC rules 5160-26-05 and 5160-26-12, the MCP's payment constitutes payment in full for any covered services and their subcontractors shall not charge members or ODM any additional co-payment, cost sharing, down-payment, or similar charge, refundable or otherwise.

b. **Abortion and Sterilization.** The use of federal funds to pay for abortion and sterilization services is prohibited unless the specific criteria found in federal law and OAC rules 5160-17-01 and 5160-21-02.2 are met. The MCP shall verify that all of the information on the applicable required forms (ODM 03197, ODM 03199, HHS-687 and HHS-687-1 (SPANISH VERSION)) is provided and that the service meets the required criteria before any such claim is paid.

Additionally, payment shall not be made for associated services such as anesthesia, laboratory tests, or hospital services if the abortion or sterilization itself does not qualify for payment. The MCP is responsible for educating their providers on the requirements; implementing internal procedures including systems edits to ensure claims are only paid once the MCP has determined if the applicable forms are completed and the required criteria are met, as confirmed by the appropriate certification or consent forms; and for maintaining documentation to justify any such claim payments. If the MCP has made the determination that the requirements associated with an abortion, sterilization, or hysterectomy were sufficiently met by the provider, then no additional information (i.e. operative notes, history and physical, ultrasound) is required from ancillary providers.

c. **Behavioral Health Services.**

S0215 – L22

Medicaid Managed Care
Appendix G
Coverage and Services

i. **Coordination of Services**. The MCP shall ensure that members have access to all medically-necessary behavioral health services covered by the FFS program and are responsible for coordinating those services with other medical and support services, including the publicly funded community behavioral health system. There are a number of Medicaid-covered mental health services available through Ohio Department of Mental Health and Addiction Services (OhioMHAS)-certified Community Mental Health Centers (CMHCs) and Medicaid-covered substance use disorder (SUD) services available through OhioMHAS-certified SUD treatment providers. The MCP shall notify members via the member handbook and provider directory of where and how to access behavioral health services, including the ability to self-refer to mental health services offered through OhioMHAS CMHCs as well as substance use treatment services offered through OhioMHAS-certified providers.

ii. The MCP shall provide Medicaid-covered behavioral health services for members who are unable to timely access services or are unwilling to access services through the publicly funded community behavioral health system as specified in section 3.c.iv of this appendix.

iii. In accordance with ORC section 5167.16, upon request and in coordination with the Help Me Grow program, the MCP shall arrange depression screening and cognitive behavioral health therapies for members enrolled in the Help Me Grow program and who are either pregnant or the birth mother of an infant or toddler under three years of age. Screening shall be provided in the home, and therapy services shall be provided in the home when requested by the member.

iv. **Financial Responsibility for Behavioral Health Services**. The MCP is financially responsible for the following behavioral health services:

1. Medicaid-covered prescribed drugs when prescribed by an MHA-certified or MHA-certified provider and obtained through an the MCP's panel pharmacy.

2. Medicaid-covered, provider-administered medications including:

   a. Injectable long-acting 2nd generation antipsychotic drugs, haloperidol, haloperidol decanoate, lorazepam, fluphenazine decanoate, and valium when administered by an ODMH-certified provider.

   b. Generic buprenorphine for induction and/or titration and vivitrol (injectable naltrexone) when administered by MHA-certified provider.

When administered as a medical benefit, the MCPs shall reimburse MHA CMHC or MHA-certified providers for Medicaid-covered, provider-administered medications listed above at the lesser of 100% of the

S0215 – L23

Medicaid Managed Care
Appendix G
Coverage and Services

provider's cost or 100% of the Ohio Medicaid program fee-for-service reimbursement rate.

3. Medicaid-covered services provided by an the MCP's panel laboratory when referred by an MHA CMHC or MHA-certified provider.

4. Inpatient psychiatric services in an Institution for Mental Disease (IMD), as defined in Section 1905(i) of the Social Security Act, as long as the member is under 21 years of age, or 65 years of age and older. For members aged 21 through 64, see limitations for services provided in IMDs below.

5. The following Medicaid-covered behavioral health services obtained through providers other than those who are MHA-certified CMHCs or MHA-certified providers when arranged/authorized by the MCP:

   a. **Mental Health**. The MCP is responsible for ensuring access to counseling and psychotherapy, physician/psychologist/ psychiatrist services, outpatient clinic services, general hospital outpatient psychiatric services, pre-hospitalization screening, diagnostic assessment (clinical evaluation), crisis intervention, psychiatric hospitalization in general hospitals (for all ages) and laboratory services. For Adult Extension members, the MCPs are is responsible for providing medically-necessary psychological services as described in Ohio's CMS-approved Alternative Benefit Package.

   b. **Substance Use**. The MCP is responsible for ensuring access to alcohol and other drug (AOD) urinalysis screening, assessment, counseling, physician/psychologist/psychiatrist AOD treatment services, outpatient clinic AOD treatment services, general hospital outpatient AOD treatment services, crisis intervention, inpatient detoxification services in a general hospital, and laboratory services.

v. **Limitations**.

   1. The MCP is not responsible for paying for behavioral health services provided through MHA-certified CMHCs and MHA-certified Medicaid providers;

   2. The MCP is not responsible for payment of partial hospitalization (mental health), outpatient detoxification, substance abuse intensive outpatient programs (IOP) or methadone maintenance; and

S0215 — L24

Medicaid Managed Care
Appendix G
Coverage and Services

   3. **Institutions for Mental Disease (IMDs).** In accordance with 42 CFR 438.6(e), the MCP may provide mental health services to members ages 21 through 64 for up to 15 days per calendar month while receiving inpatient treatment in an IMD as defined in Section 1905(i) of the Social Security Act. The MCP is not prohibited from contracting with an IMD to provide mental health services to members' ages 21 through 64, but Medicaid will not compensate the MCP for the provision of such services beyond 15 days per calendar month either through direct payment or considering any associated costs in Medicaid rate setting. MCP payments to the IMD are established in the plan's contractual agreement with the provider. The MCP is required to report quarterly on IMD stays that exceed 15 days per calendar month per ODM's specifications.

d. **Respite Services.** The MCP will provide access to and payment for respite services in accordance with OAC rule 5160-26-03. The MCP of may elect to cover additional respite services as a value added benefit in accordance with the terms of this agreement. The MCP will submit a quarterly report as designated by ODM.

e. **Organ Transplants.**

   i. The MCP shall ensure coverage for organ transplants and related services in accordance with OAC 5160-2-07.1. Coverage for all organ transplant services, except kidney transplants, is contingent upon review and recommendation by the "Ohio Solid Organ Transplant Consortium" based on criteria established by Ohio organ transplant surgeons and authorization from the ODM prior authorization unit. Reimbursement for bone marrow transplant and hematopoietic stem cell transplant services, as defined in OAC rule 3701:84-01, is contingent upon review and recommendation by the "Ohio Hematopoietic Stem Cell Transplant Consortium" based on criteria established by Ohio experts in the field of bone marrow transplant and authorization from the ODM prior authorization unit. While the MCP may require prior authorization for these transplant services, the approval criteria shall be limited to confirming the member has been recommended to and approved for a transplant by either consortium and authorized by ODM. In accordance with OAC rule 5160-2-03, all services related to covered organ donations are covered for the donor recipient when the member is Medicaid eligible.

   ii. **Prior Authorizations for Transplant Evaluations (Pre-Transplants).** The MCP is prohibited from requiring prior authorization that may create a barrier to accessing the "Ohio Solid Organ Transplant Consortium" or "Ohio Hematopoietic Stem Cell Transplant Consortium" for review and recommendation (e.g., a member shall be able to access pre-transplant services required for consortium review). The MCP may require providers to submit prior information for the purposes of assisting members with identifying available providers, initiating care management services, and addressing any compensation issues. However, when identifying available providers that could

S0215 – L25

Medicaid Managed Care
Appendix G
Coverage and Services

ultimately impact where the transplant is performed, the MCP shall not solely consider a provider's panel status but also consider the proximity to a member's residence, support system and the network of providers who have coordinated the member's care.

f. **Acupuncture.** Ohio Medicaid acupuncture coverage is limited to the pain management of migraine headaches and lower back pain.

g. **Gender Transition.** Pursuant to 45 CFR 92.207(b)(4), the MCP is prohibited from having or implementing a categorical coverage exclusion or limitation for all health services related to gender transition. However, Section 45 CFR 92.207(d) clarifies that this does not prevent the MCP from determining whether a particular health service is medically necessary or otherwise meets applicable coverage requirements in individual cases.

h. **Prescribed Drugs.**

   i. In providing the Medicaid pharmacy benefit to their members, the MCP shall cover:

      1. The same drugs covered by the FFS program, in accordance with OAC rules 5160-26-03 and 5160-9-03; and

      2. All Covered Outpatient Drugs, as defined in in Section 1927(k) of the Social Security Act, marketed by a drug manufacturer (or labeler) that participates in the Medicaid Drug Rebate Program within ten days of the drug's availability in the marketplace.

   ii. The MCP may limit prescribed drugs, subject to ODM review and approval. The MCP shall use the Limitations of Coverage and Drug Use Programs as set forth in 1927(d) and (g) of the Social Security Act, as well as other pharmacy benefit management strategies. Such strategies may include but are not limited to:

      1. A Preferred Drug list (PDL) which must be reviewed at least annually by the MCPs' Pharmacy and Therapeutics (P&T) Committee, meet the clinical needs of the MCPs' population, and include a range of drugs in each therapeutic class represented. If requested by ODM, MCPs must provide a satisfactory written explanation of the reasons for the designation of a drug in any category;

      2. Limits on quantity, age, clinical requirements and/or step therapy;

      3. Prior authorization programs that comply with the requirements of Section 1927(d)(5) of the Social Security Act as well as:

         a. ORC 5160.34(B)(6) through (B)(8) that specify the requirements to: honor prior authorization requests; permit a retrospective review of a claim; disclose any new prior authorizations; and list

S0215 – L26

Medicaid Managed Care
Appendix G
Coverage and Services

prior authorization requirements;

b. ORC 5164.7511 with respect to medication synchronization; and

c. ORC 5167.12(B) that prohibits the MCP from requiring prior authorization (PA) in the case of a drug to which all of the following apply:

  i. The drug is an antidepressant or antipsychotic;

  ii. The drug is administered or dispensed in a standard tablet or capsule form, except that in the case of an antipsychotic, the drug also may be administered or dispensed in a long-acting injectable form;

  iii. The drug is prescribed by any of the following:

    1. An MCP panel provider psychiatrist; or

    2. A psychiatrist practicing at a location on behalf of a CMHC; or

    3. A certified nurse practitioner or clinical nurse specialist who is certified in psychiatric mental health by a national certifying organization;

  iv. The drug is prescribed for a use indicated on the drug's labeling, as approved by the federal food and drug administration.

The MCP may require PA for antidepressant or antipsychotic drugs that do not meet the criteria outlined above. The MCP shall consider the prescribing provider's verification that the member is stable on the specific medication when making the PA decision.

The MCPs shall receive permission from ODM 90 days in advance of making a change to drug coverage that will add prior authorization requirements to a drug or drug class that will affect more than 1,000 plan members, or greater than 1% of the MCP's total ODM enrollment, whichever is less

iii. The MCP shall operate a drug utilization review program that complies with the requirements described in Section 1927(g) of the Social Security Act and 42 CFR Part 456 subpart K. As specified by ODM, the MCP shall submit information to fulfill the requirements of the annual report detailed in 42 CFR 456.712 of subpart K. The MCP shall also provide a detailed description of the program on an annual basis as required by 42 CFR 438.3(s)(5).

S0215 — L27

Medicaid Managed Care
Appendix G
Coverage and Services

    iv. The MCP may block all payments to pharmacies for drugs prescribed by a particular non-panel provider, if the MCP has done all of the following:

        1. Referred the prescriber to ODM Program Integrity for suspicion of fraud, waste, or abuse.

        2. Determined that the prescriber is not an employee of a Federally Qualified Health Center, Rural Health Clinic, Qualified Family Planning Provider, emergency department, or Ohio MHAS-certified Community Mental Health Center or Substance Use Disorder provider.

        3. Notified members who received prescriptions, within the previous 90 days, from that provider, that prescriptions from the prescriber will no longer be covered and ensured members have future access to a prescriber of the same specialty.

    v. The MCP shall, at a minimum, ensure same day coverage of the first dose of the long-acting injectable form of medications for substance use disorders, if the administering provider:

        1. Stocks the medication, or

        2. Has an agreement with a pharmacy to act as a prescription pick-up station, as described in OAC 4729-5-10.

4. **Information Sharing with Non-Panel Providers.** To assist members in accessing medically-necessary Medicaid covered services, the MCP is required to share specific information with certain non-panel providers. The information is to assist non-panel providers to recognize MCP membership, access information needed to provide services and if applicable successfully submit claims to the MCP.

    a. **ODM-Designated Providers.** The MCP shall share specific information with MHA-certified CMHCs, MHA-certified Medicaid providers, FQHCs/RHCs, qualified family planning providers (QFPPs), hospitals and if applicable, certified nurse midwives (CNMs), certified nurse practitioners (CNPs), and free-standing birth centers (FBCs) as defined in OAC rule 5160-18-01 within the MCP's service area and in bordering regions if appropriate based on member utilization information. The information shall be shared within the first month after the MCP has been awarded a Medicaid provider agreement for a specific region and annually thereafter.

    At a minimum, the information shall include the following:

        i. The information's purpose;

        ii. Claims submission information including the MCP's Medicaid provider number for each region (this information is only required to be provided to non-panel

S0215 – L28

Medicaid Managed Care
Appendix G
Coverage and Services

FQHCs/RHCs, QFPPs, CNMs, CNPs and hospitals);

iii. The MCP's prior authorization and referral procedures;

iv. A picture of the MCP's member ID card (front and back);

v. Contact numbers for obtaining information for eligibility verification, claims processing, referrals, PA, post-stabilization care services and if applicable information regarding the MCP's behavioral health administrator;

vi. A listing of the MCP's laboratories and radiology providers; and

vii. A listing of the MCP's contracting behavioral health providers and how to access services through them (this information is only required to be provided to non-panel OhioMHAS-certified CMHCs and OhioMHAS-certified Medicaid providers).

b. **MCP-authorized Providers.** The MCP authorizing the delivery of services from a non-panel provider shall ensure they have a mutually agreed upon compensation amount for the authorized service and notify the provider of the applicable provisions of OAC rule 5160-26-05. This notice is provided when the MCP authorizes a non-panel provider to furnish services on a one-time or infrequent basis to the MCP member and shall include required ODM-model language and information. This notice shall also be included with the transition of services form sent to providers as outlined in Appendix C.

c. Upon request, the MCP shall provide information to ODM to document the non-contracting providers identified by the MCP and the information provided to each provider. If the MCP requires referrals to specialists, they shall ensure information on referral approvals and denials is made available to ODM upon request.

5. **Mental Health Parity and Addiction Equity Act (MHPAEA) Requirements**. The MCP shall comply with MHPAEA requirements outlined in 42 CFR 438, Subpart K, with regard to services provided to managed care members. The requirements apply to the provision of all covered benefits to all populations included under the terms of this Agreement and include:

a. The MCP shall demonstrate to ODM that all covered services are being delivered in compliance with the MHPAEA regulation.

b. The MCP shall participate in ODM requested meetings, respond to ODM information requests, work with ODM to resolve compliance risks, and notify ODM of any changes to benefits or limitations that might impact compliance.

c. The MCP shall conduct an analysis each calendar year to determine compliance with MHPAEA and provide results of the analysis to ODM. If no changes have been made to the MCP's covered services, the MCP may attest to compliance with MHPAEA. The analysis or attestation will be due to ODM during the month of December, no later than December 31st.

S0215 – L29

Medicaid Managed Care
Appendix G
Coverage and Services

d.  The MCP shall work with ODM to ensure all members are provided access to a set of benefits that meets the MHPAEA requirements regardless of which behavioral health services are provided by the MCP.

S0215 – L30

Medicaid Managed Care
Appendix H
Provider Panel Specifications

## APPENDIX H

### PROVIDER PANEL SPECIFICATIONS

1. **Federal Access Standards.** The MCP shall provide or arrange for the delivery of all medically necessary, Medicaid-covered health services, and ensure compliance with the following federally defined provider panel access standards as required by 42 CFR 438.206:

    a. In establishing and maintaining their provider panel, the MCP shall consider the following:

        i. The anticipated Medicaid membership.

        ii. The expected utilization of services, taking into consideration the characteristics and health care needs of specific Medicaid populations represented in the MCP.

        iii. The number and types (in terms of training, experience, and specialization) of panel providers required to deliver the contracted Medicaid services.

        iv. The geographic location of panel providers and Medicaid members, considering distance, travel time, the means of transportation ordinarily used by Medicaid members, and whether the location provides physical access for Medicaid members with disabilities.

        v. The MCP shall adequately and timely cover services provided by an out-of-network provider if the MCP's contracted provider panel is unable to provide the services covered under this Agreement. The MCP shall cover the out-of-network services for as long as the MCP network is unable to provide the services. The MCP shall coordinate with the out-of-network provider with respect to payment and ensure the provider agrees with the applicable requirements.

    b. Contracting providers shall offer hours of operation no less than the hours of operation offered to commercial members or comparable to Medicaid FFS, if the provider serves only Medicaid members. The MCP shall ensure services are available 24 hours a day, 7 days a week, when medically necessary. The MCP shall establish mechanisms to ensure panel providers comply with timely access requirements, and shall take corrective action if there is failure to comply.

    c. In order to demonstrate adequate provider panel capacity and services, 42 CFR 438.206 and 438.207 stipulates that the MCP shall submit documentation to the Ohio Department of Medicaid (ODM), in a format specified by ODM, that demonstrates it offers an appropriate range of preventive, primary care, behavioral health and specialty services adequate for the anticipated number of members in the service area, while maintaining a provider panel sufficient in number, mix, and geographic distribution to meet the needs of the number of members in the service area. This documentation of assurance of adequate capacity and services shall be submitted to

S0215 – L31

Medicaid Managed Care
Appendix H
Provider Panel Specifications

ODM no less frequently than at the time the MCP enters into a contract with ODM; at any time there is a significant change (as defined by ODM) in the MCP's operations that would affect adequate capacity and services (including changes in services, benefits, geographic service or payments); and at any time there is enrollment of a new population in the MCP.

2. **General Provisions.** The ODM provider panel requirements are specified in the charts included with this appendix and shall be met prior to the MCP receiving a provider agreement with ODM. The MCP shall remain in compliance with these requirements for the duration of the provider agreement.

a. If the MCP is unable to provide the medically necessary, Medicaid-covered services through their contracted provider panel, the MCP shall ensure access to these services on an as needed basis. For example, if the MCP meets the orthopedist requirement but a member is unable to obtain a timely appointment from an orthopedist on the MCP's provider panel, the MCP will be required to secure an appointment from a panel orthopedist or arrange for an out-of-panel referral to an orthopedist.

b. If the MCP offers transportation to their members as an additional benefit and this transportation benefit only covers a limited number of trips, the required transportation listed above may not be counted toward this trip limit as specified in Appendix C.

c. In developing the provider panel requirements, ODM considered, on a county-by-county basis, the population size and utilization patterns of the Ohio Medicaid ABD, MAGI, and Adult Extension consumers, as well as the potential availability of the designated provider types. ODM has integrated existing utilization patterns into the provider network requirements to avoid disruption of care. Most provider panel requirements are county-specific but in certain circumstances, ODM requires providers to be located anywhere in the region.

d. ODM will recalculate the minimum provider panel specifications if ODM determines that significant changes have occurred in the availability of specific provider types and the number and composition of the eligible population. The Managed Care Provider Network (MCPN) is the tool that will be used for ODM to determine if the MCPs meet all the panel requirements identified within Appendix H; therefore, the plans shall enter all network providers as specified within the file specs.

e. On a monthly basis, ODM or its designee will provide the MCP with an electronic file containing the MCP's provider panel as reflected in the ODM Managed Care Provider Network (MCPN) database, or other designated system.

3. **Provider Subcontracting.** Unless otherwise specified in this appendix or OAC rule 5160-26-05, the MCP is required to enter into fully-executed subcontracts with their providers. These subcontracts shall include a baseline contractual agreement, as well as the appropriate ODM-approved Model Medicaid Addendum. The Model Medicaid Addendum incorporates all applicable OAC rule requirements specific to provider subcontracting and therefore cannot be

S0215 — L32

Medicaid Managed Care
Appendix H
Provider Panel Specifications

modified except to add personalizing information such as the MCP's name.

   a. As required by 42 CFR 438.608, all providers must be enrolled with ODM prior to contracting with an MCP. The MCP shall direct the provider to the ODM public portal to submit application for screening and enrollment prior to contracting. Beginning January 1, 2018, current MCP providers who are not contracted with ODM are allowed 120 days for completing the ODM process while still contracted with the MCP. If a provider applicant does not identify with a provider type that is available on the web application, they must complete a form specified by ODM and the MCP shall submit the form to ODM for screening and enrollment. The application can be found at: https://portal.ohmits.com/Public/Providers/Enrollment/tabId/44/Default.aspx.

   b. The MCP may not employ or contract with providers excluded from participation in federal health care programs under either Section 1128 or Section 1128A of the Social Security Act. Only those providers who meet the applicable criteria specified in this document, and as determined by ODM, will be counted toward meeting minimum panel requirements. The MCP shall credential/re- credential providers in accordance with OAC rule 5160-26-05. The MCP shall ensure the provider has met all applicable credentialing criteria before the provider can, be listed as a panel provider. At the direction of ODM, the MCP shall submit documentation verifying that all necessary contract documents have been appropriately completed.

   c. The MCPN is a centralized database system that maintains information on the status of all MCP-submitted providers. The MCP shall notify ODM of the addition and deletion of their contracting providers as specified in OAC rule 5160-26-05, and shall notify ODM within one business day, in instances where the MCP has identified that they are not in compliance with the provider panel requirements specified in this appendix. For provider deletions, the MCP shall complete and submit an electronic record terminating the provider from the MCPN or other designated system.

   d. The MCP shall use the Provider Master File to determine if a provider is fully enrolled or active. All providers, except single case agreements, must be in an active status on the Provider Master File before they can be listed by the MCP as network providers.

4. **Provider Panel Requirements.** The provider network criteria that shall be met by the MCP is as follows:

   a. **Primary Care Providers (PCPs).** PCP means an individual physician (M.D. or D.O.), certain physician group practice/clinic (Primary Care Clinics [PCCs]), physician assistants, or an advanced practice registered nurse (APRN) as defined in ORC 4723.43 or advanced practice nurse group practice within an acceptable specialty, contracting with the MCP to provide services as specified in OAC rule 5160-26-03.1. Acceptable specialty types for PCPs include family/general practice, internal medicine, and pediatrics. Acceptable PCCs include FQHCs, RHCs and the acceptable group practices/clinics specified by ODM. In order for the PCP to count toward minimum provider panel requirement:

      i. Each PCP shall agree to serve at least 50 Medicaid MCP members at each

Medicaid Managed Care
Appendix H
Provider Panel Specifications

practice site.

ii. As part of the MCP's subcontract with a PCP, the MCP shall ensure the total Medicaid member capacity is not greater than 2,000 for that individual PCP.

The PCP capacity for a county is the total amount of members that all of the PCPs in the MCP agree to serve in that county. ODM will determine the PCP capacity based on information submitted by the MCP through the MCPN. The PCP capacity shall exceed by at least 5% the total number of members enrolled in the MCP during the preceding month in the same county.

ODM will determine the MCP's compliance with the PCP capacity requirement each quarter using the ODM enrollment report for the previous month. For example, in April, ODM will review the MCP's countable PCP capacity using one of the April MCPN reports. The countable capacity will be compared to the finalized enrollment report for March.

ODM recognizes that some members needing specialized care will use specialty providers as PCPs. In these cases, the MCP will submit the specialist to the MCPN database as a PCP. However, the specialist serving as a PCP will not count toward minimum provider panel PCP requirements, even though they are coded as a PCP. Also, in some situations (e.g., continuity of care) a PCP may only want to serve a very small number of members for the MCP. These PCPs will, however, need to execute a subcontract with the MCP which includes the appropriate Model Medicaid Addendum.

In addition to the PCP capacity requirement, the MCP shall also contract with the specified number of pediatric PCPs for each region. These pediatric PCPs will have their stated capacity counted toward the PCP capacity requirement.

A pediatric PCP shall maintain a general pediatric practice (e.g., a pediatric neurologist would not meet this definition unless this physician also operated a practice as a general pediatrician) at a site(s) located within the county/region and be listed as a pediatrician with the Ohio State Medical Board. In addition, half of the required number of pediatric PCPs shall also be certified by the American Board of Pediatrics. The provider panel requirements for pediatricians are included in the practitioner charts in this appendix.

b. **Non-PCP Provider Network.** Although there are currently no capacity requirements of the non-PCP required provider types, the MCP is required to ensure adequate access is available to members for all required provider types. Additionally, for certain non-PCP required provider types, the MCP shall ensure these providers maintain a full-time practice at a site(s) located in the specified county/region (i.e., the ODM-specified county within the region or anywhere within the region if no particular county is specified). A full-time practice is defined as one where the provider is available to patients at their practice site(s) in the specified county/region for at least 25 hours a week. ODM will monitor access to services through a variety of data sources, including: consumer satisfaction surveys; member appeals/grievances/complaints and state hearing notifications/requests; clinical quality studies; encounter data volume;

S0215 – L34

Medicaid Managed Care
Appendix H
Provider Panel Specifications

provider complaints, and clinical performance measures.

c. **All Other Provider Network Requirements.** In addition to the PCP capacity requirements, the MCP is also required to maintain adequate access in the remainder of its provider network within the following categories: hospitals, dentists, vision care providers, OB/GYNs, allergists, general surgeons, otolaryngologists, orthopedists, FQHCs/RHCs and QFPPs. CNMs, CNPs, FQHCs/RHCs and QFPPs are federally-required provider types.

The MCP serving ABD members is required to maintain adequate capacity in addition to the remainder of its provider network within the following categories: cardiovascular, gastroenterology, nephrology, neurology, oncology, physical medicine, podiatry, psychiatry, and urology.

All Medicaid-contracting MCPs shall provide all medically-necessary Medicaid-covered services to their members and therefore their complete provider network will include many other additional specialists and provider types. The MCP shall ensure all non-PCP network providers follow community standards in the scheduling of routine appointments (i.e., the amount of time members shall wait from the time of their request to the first available time when the visit can occur).

i. **Hospitals.** The MCP shall contract with the number and type of hospitals specified by ODM for each county/region. In developing these hospital requirements, ODM considered, on a county-by-county basis, the population size and utilization patterns of the Ohio Medicaid ABD, MAGI, and Adult Extension consumers and integrated the existing utilization patterns into the hospital network requirements to avoid disruption of care. For this reason, ODM may require that the MCP contract with out-of-state hospitals (i.e. Kentucky, West Virginia, etc.).For each Ohio hospital, ODM utilizes the hospital's most current Annual Hospital Registration and Planning Report, as filed with the Ohio Department of Health (ODH), in verifying types of services that hospital provides. Although ODM has the authority, under certain situations, to obligate a non-contracting hospital to provide non-emergency hospital services to the MCP's members, the MCP shall still contract with the specified number and type of hospitals unless ODM approves a provider panel exception (see Section 5 of this appendix, Provider Panel Exceptions).

If the MCP-contracted hospital elects not to provide specific Medicaid-covered hospital services because of an objection on moral or religious grounds, the MCP shall ensure these hospital services are available to its members through another MCP-contracted hospital in the specified county/region.

ii. **OB/GYNs.** The MCP shall contract with at least the minimum number of OB/GYNs for each county/region, all of whom shall maintain a full-time obstetrical practice at a site(s) located in the specified county/region. Only MCP-contracting OB/GYNs with current hospital privileges at a hospital under contract with the MCP in the region can be submitted to the MCPN, or other system, count towards MCP minimum panel requirements, and be listed in the

S0215 – L35

Medicaid Managed Care
Appendix H
Provider Panel Specifications

MCPs' provider directory.

iii. **Certified Nurse Midwives (CNMs) and Certified Nurse Practitioners (CNPs).** The MCP shall ensure access to CNM and CNP services in the region if such provider types are present within the region. The MCP may contract directly with the CNM or CNP providers, or with a physician or other provider entity which is able to obligate the participation of a CNM or CNP. If the MCP does not contract for CNM or CNP services and such providers are present within the region, the MCP will be required to allow members to receive CNM or CNP services outside of the MCP's provider network.

Only CNMs with hospital delivery privileges at a hospital under contract with the MCP in the region can be submitted to the MCPN, or other system, count towards MCP minimum panel requirements, and be listed in the MCPs' provider directory. The MCP shall ensure a member's access to CNM and CNP services if such providers are practicing within the region.

iv. **Vision Care Providers.** The MCP shall contract with at least the minimum number of ophthalmologists/ optometrists for each specified county/region, all of whom shall maintain a full-time practice at a site(s) located in the specified county/region to count toward minimum panel requirements. All ODM-approved vision providers shall regularly perform routine eye exams.

The MCP will be expected to contract with an adequate number of ophthalmologists as part of their overall provider panel, but only ophthalmologists who regularly perform routine eye exams can be used to meet the vision care provider panel requirement. If optical dispensing is not sufficiently available in a region through the MCP's contracting ophthalmologists/optometrists, the MCP shall separately contract with an adequate number of optical dispensers located in the region.

v. **Dental Care Providers.** The MCP shall contract with at least the minimum number of dentists.

vi. **Other Specialty Types.** Allergists, pediatricians, general surgeons, otolaryngologists, orthopedists for the MAGI population and general surgeons, otolaryngologists, orthopedists, cardiologists, gastroenterologists, nephrologists, neurologists, oncologists, podiatrists, physiatrists, psychiatrists, and urologists for the ABD and Adult Extension populations. The MCP shall contract with at least the minimum number of ODM designated specialty provider types. In order to be counted toward meeting the provider panel requirements, these specialty providers shall maintain a full-time practice at a site(s) located within the specified county/region. Only contracting general surgeons, orthopedists, and otolaryngologists, cardiologists, gastroenterologists, nephrologists, neurologists, oncologists, physiatrists, and urologists with admitting privileges at a hospital under contract with the MCP in the region can be submitted to the MCPN, or other system, count towards MCP minimum panel requirements, and be listed in the MCP's provider

S0215 – L36

Medicaid Managed Care
Appendix H
Provider Panel Specifications

directory.

vii. **FQHCs/RHCs**. The MCP is required to ensure member access to any FQHCs/RHCs, regardless of contracting status. Contracting FQHC/RHC providers shall be submitted for ODM review via the MCPN process, or other designated process. Even if no FQHC/RHC is available within the region, the MCP shall have mechanisms in place to ensure coverage for FQHC/RHC services in the event that a member accesses these services outside of the region. The MCP shall also educate their staff and providers on the need to ensure member access to FQHC/RHC services.

In order to ensure any FQHC/RHC has the ability to submit a claim to ODM for the state's supplemental payment, the MCP shall offer FQHCs/RHCs reimbursement pursuant to the following:

1. The MCP shall provide expedited reimbursement on a service-specific basis in an amount no less than the payment made to other providers for the same or similar service.

2. If the MCP has no comparable service-specific rate structure, the MCP shall use the regular Medicaid FFS payment schedule for non-FQHC/RHC providers.

3. The MCP shall provide FQHCs/RHCs the MCP's Medicaid provider number(s) for each region to enable FQHC/RHC providers to bill for the ODM wraparound payment.

viii. **Qualified Family Planning Providers (QFPPs)**. All MCP members shall be permitted to self- refer for services and supplies allowed under Title X of the Public Health Services Act (Title X services) provided by a QFPP. A QFPP is defined as any public or not-for-profit health care provider that complies with Title X guidelines/standards, and receives either Title X funding or family planning funding from the ODH. The MCP shall reimburse all medically-necessary Medicaid-covered Title X services provided to eligible members by a QFPP provider (including on-site pharmacy and diagnostic services) on a patient self-referral basis, regardless of the provider's status as a panel or non-panel provider. A description of Title X services can be found on the ODH website. The MCP will be required to work with QFPPs in the region to develop mutually-agreeable HIPAA compliant policies and procedures to preserve patient/provider confidentiality, and convey pertinent information to the member's PCP and/or MCP.

ix. **Behavioral Health (BH) Providers**. The MCP shall ensure member access to all Medicaid-covered behavioral health services for members as specified in Appendix G. Although ODM is aware that certain outpatient substance abuse services may only be available through Medicaid providers certified by the Ohio Department of Mental Health and Addiction Services (OhioMHAS) in some areas, the MCP shall maintain an adequate number of contracted

S0215 – L37

Medicaid Managed Care
Appendix H
Provider Panel Specifications

mental health providers in the region to ensure access for members who are unable to timely access services or unwilling to access services through OhioMHAS certified community mental health centers (CMHCs). The MCP may contract with CMHCs and/or substance use disorder (SUD) treatment providers for medical services based on MCP business or operational needs intended to deliver respite, patient-centered medical home and care coordination. These contracts shall expressly prohibit payment for services for which the non-federal share of the cost is provided by a board of alcohol, drug addiction and mental health services or a state agency other than ODM, with the exception of respite services. Additionally, the MCP may contract with OhioMHAS certified CMHCs and SUD treatment providers for the provision of behavioral health services beginning July 1, 2018 in order to comply with the table within this appendix.

x. **Community Behavioral Health Center (CBHC) Laboratories.** When behavioral health services are carved-in to managed care, July 1, 2018, if the MCP is contracted with a CBHC that is an appropriately credentialed laboratory and meets Medicaid provider-eligibility requirements as a laboratory, the MCP is directed to accept the CBHC laboratory into their panel to allow for continuity of care. (CBHCs include both substance use disorder treatment providers and community mental health centers)

xi. **Pharmacies.** The MCP shall provide or arrange for the delivery of all medically necessary Medicaid-covered pharmacy services. When medically necessary, compounding service and same-day home delivery shall also be provided or arranged. The MCP's pharmacy network shall include the minimum required in Table 1 (below) unless any of the following apply:

1. No retail pharmacies are located in the county;

2. The MCP has offered the retail pharmacies in the county the opportunity to contract with the MCP at similar rates offered by the Medicaid fee-for-service program so it is anticipated that aggregate payment for dispensed drugs will not be less than the aggregate amount reimbursed by the Medicaid fee-for-service program; or

3. Available retail pharmacies in a county fail to meet the MCP's quality or program integrity standards.

Irrespective of the requirements and exceptions above, the MCP shall contract with at least one retail pharmacy in one of the adjoining counties.

**Table 1. Pharmacy Network Requirements.** Pharmacy requirement to be effective January 1, 2018.

| Adams | 2 | Fairfield | 14 | Licking | 11 | Portage | 12 |
|-------|---|-----------|----|---------|----|---------|----|
| Allen | 10 | Fayette | 3 | Logan | 5 | Preble | 2 |

S0215 – L38

Medicaid Managed Care
Appendix H
Provider Panel Specifications

| Ashland | 3 | Franklin | 98 | Lorain | 20 | Putnam | 3 |
|---|---|---|---|---|---|---|---|
| Ashtabula | 9 | Fulton | 4 | Lucas | 43 | Richland | 11 |
| Athens | 6 | Gallia | 2 | Madison | 2 | Ross | 6 |
| Auglaize | 3 | Geauga | 7 | Mahoning | 22 | Sandusky | 5 |
| Belmont | 8 | Greene | 12 | Marion | 6 | Scioto | 12 |
| Brown | 2 | Guernsey | 2 | Medina | 12 | Seneca | 4 |
| Butler | 26 | Hamilton | 69 | Meigs | 2 | Shelby | 3 |
| Carroll | 1 | Hancock | 5 | Mercer | 3 | Stark | 38 |
| Champaign | 3 | Hardin | 3 | Miami | 6 | Summit | 48 |
| Clark | 11 | Harrison | 2 | Monroe | 1 | Trumbull | 18 |
| Clermont | 15 | Henry | 1 | Montgomery | 50 | Tuscarawas | 8 |
| Clinton | 4 | Highland | 5 | Morgan | 0 | Union | 4 |
| Columbiana | 8 | Hocking | 2 | Morrow | 2 | VanWert | 1 |
| Coshocton | 2 | Holmes | 1 | Muskingum | 10 | Vinton | 0 |
| Crawford | 4 | Huron | 5 | Noble | 1 | Warren | 16 |
| Cuyahoga | 111 | Jackson | 3 | Ottawa | 4 | Washington | 5 |
| Darke | 3 | Jefferson | .8 | Paulding | 1 | Wayne | 7 |
| Defiance | 4 | Knox | 4 | Perry | 2 | Williams | 3 |
| Delaware | 11 | Lake | 17 | Pickaway | 3 | Wood | 10 |
| Erie | 6 | Lawrence | 5 | Pike | 3 | Wyandot | 2 |

5. **Pharmaceutical Drug Reporting and Pricing Requirements.**

    a. **Drug Rebates.** Section 1927 of the Social Security Act 42 U.S.C.A. 1396r-8 mandates that drug companies or labelers shall sign a Medicaid Drug Rebate Agreement with the federal government to provide federal drug rebates to the State in order to have their products covered by the Medicaid Program. Additionally, the Affordable Care Act (ACA) requires ODM to obtain federal drug rebates for drugs paid for by the MCPs. In order to ensure compliance with the provisions of the ACA, the MCP shall:

        i. Report the necessary encounter data to ODM for the invoicing of manufacturer rebates for all Covered Outpatient Drugs. This includes physician-administered drugs, drugs personally furnished by a physician, drugs provided in clinics and non-institutional settings, drugs dispensed by 340B covered entities, and drugs dispensed to MCP members with private or public pharmacy coverage and the MCP provided secondary coverage;

        ii. Work cooperatively with ODM and its designees, providing ODM with sufficient data and information to enable ODM to secure federal drug rebates for all utilization and administration of Covered Outpatient Drugs as described above. The MCP shall also assist ODM and its designees with the resolution of drug manufacturer disputes regarding claims for federal drug rebates for drugs dispensed or administered to MCP Members;

        iii. Establish Medicaid-specific BIN and PCN numbers for point-of-sale pharmacy

S0215 - L39

Medicaid Managed Care
Appendix H
Provider Panel Specifications

claims processing, to sure that the MCP's BIN and PCN numbers for Medicaid are not the same as for the MCP's commercial or Medicare part D business lines;

iv. Report all outpatient drug information, including National Drug Codes (NDCs) and accurate NDC units for all drug claim types, NCPDP, 837 Professional, 837 Institutional, etc. as designated by ODM. The MCPs may negotiate their own supplemental rebates for pharmaceutical products with drug companies.

v. Report all drugs billed to the MCP that were acquired through the 340B drug pricing program using standard modifiers so they can be properly excluded from federal drug rebates.

b. **Maximum Allowable Cost (MAC) Pricing**. The MCP shall update maximum allowable cost (MAC) and other pricing benchmarks on a schedule at least as consistent as is required by CMS for Medicare Part D plans found in 42 CFR 423.505(b)(21). The MCP's MAC will have the following characteristics:

i. The MCP's list of MAC reimbursement is updated a minimum of every 7 days;

ii. The MCP will provide, upon request from ODM or a retail community pharmacy in Ohio, at least one source where a non-340B retail community pharmacy in Ohio is able to purchase the drug at the MCP's MAC rate for that drug, or lower; and

iii. The MCP will provide a reasonable and direct process for Ohio's retail community pharmacies to communicate with the MCP and report the pharmacy's inability to purchase at the MCP's MAC price and receive instructions from the MCP as to where to purchase at the MAC price.

c. **MAC Transparency**. In accordance with ORC 3959.111, a pharmacy benefit manager (PBM) shall disclose to the MCP and/or ODM whether or not the PBM uses the same maximum allowable cost (MAC) list when billing an MCP as it does when reimbursing a pharmacy. If a PBM uses multiple MAC lists, the PBM shall disclose to the MCP and/or ODM any differences between the amount paid to a pharmacy and the amount charged to the plan sponsor. The disclosure required under this section shall be made within 10 calendar days of the PBM and a plan sponsor signing a contract, or within 10 calendar days of any applicable update to the MAC list(s).

6. **Provider Panel Exceptions**. Failure to contract with, and properly report to the MCPN, all MCP-contracted providers will result in sanctions as outlined in Appendix N. ODM will grant an exception to the issuance of a sanction only when an action taken by ODM has adversely impacted a plan's ability to meet the provider panel network standards.

7. **Provider Directories**. MCP provider directories shall include all MCP-contracted providers as well as certain non- contracted providers as specified by ODM. At the time of ODM's review, the information listed in the MCP's provider directory for all MCP-contracted providers shall exactly match the data currently on file in the ODM MCPN, or other designated process.

S0215 – L40

Medicaid Managed Care
Appendix H
Provider Panel Specifications

a. MCP provider directories shall utilize a format specified by ODM. Directories may be region- specific or include multiple regions, however, the providers within the directory shall be divided by region, county, and provider type, in that order. The directory shall also specify:

   i. Provider's name as well as any group affiliation

   ii. Provider's street address(es)

   iii. Provider's telephone number(s)

   iv. Provider's website URL, as appropriate

   v. Provider's specialty, when applicable

   vi. Indication of the provider's office/facility accessibility and accommodations (e.g. offices, exam room(s), and equipment), when applicable

   vii. Indication of whether the provider is accepting new members

   viii. Indication of the provider's linguistic capabilities, including the specific language(s) offered, including ASL, and whether they are offered by the provider or a skilled medical interpreter at the provider's office.

   ix. Provider's cultural competence training status, when available.

   x. How members may obtain directory information in alternate formats that takes into consideration the special needs of eligible individuals including but not limited to, visually-limited, LEP, and LRP eligible individuals.

b. **Printed Provider Directory**. Prior to executing a provider agreement with ODM, the MCP shall develop a printed provider directory that shall be prior-approved by ODM. Once approved, this directory content may be regularly updated with provider additions or deletions by the MCP without ODM prior-approval. Any revisions to the printed provider directory format must be approved by ODM before distribution.

c. **Internet Provider Directory**. The MCP is required to have an internet-based provider directory available in a format prior approved by ODM. Any revisions to the internet provider directory format must be approved by ODM before implementation. This internet directory shall allow members to electronically search for MCP panel providers based on name, provider type, and geographic proximity. If the MCP has one internet-based directory for multiple populations, each provider shall include a description of which population they serve.

d. **Provider Directory Updates**. In accordance with 42 CFR § 438.10 (h) (3), MCPs must update their printed directory at least monthly, and internet provider directories must

S0215 – L41

Medicaid Managed Care
Appendix H
Provider Panel Specifications

be updated no later than 30 calendar days after the MCP receives updated provider information.

8. **Managed care provider network performance measures.** ODM contracts with an External Quality Review Organization (EQRO), to conduct telephone surveys of providers' offices to validate information submitted in the MCPN files. These results will be used to evaluate MCP performance on a biannual basis. Sanctions for these measures are included in Appendix N of this agreement.

The following elements have a baseline that shall be met with the statewide results:

Measure 1 (M1) Rate of primary care provider (PCP) locations that were able to be reached

The data updated by the MCPs in ODM's system shall be accurate 70% of the time for the statistically valid statewide sample.

Measure 1 (M1) identifies the proportion of the PCP locations not reached during a biannual audit. The PCP was considered "not reached" if the provider is no longer practicing at the sampled location or the provider did not return phone calls after the EQRO made two attempts at different times during the survey. The measure is an inverse measure such that the higher the percentage of PCP locations not reached, the lower the level of performance.

$$\text{(M1) Percent of PCP Locations Not Reached} = \frac{\text{Number of PCP Locations Not Reached}}{\text{Total Number of PCP Locations}}$$

Number of PCP Locations
- Measure 2 (M2) Participating PCP locations still contracted with the MCP.
- For Measure 2, the baseline of 92% was established using the previous 2 cycles of data collection. The MCP shall ensure the contracting status of the statistically valid statewide sample is met 92% of the time.

The second measure (M2) reports the proportion of the PCP locations no longer contracted with the identified MCP at the time of the audit. This measure is also inverted such that a higher rate indicates lower performance.

$$\text{(M2)Percent of PCP Locations Not Contracted with MCP} = \frac{\text{Number of PCP Locations Not With MCP}}{\text{Number of PCP Locations Reached}}$$

ODM collected the first two years of performance measures and additional research to create a baseline for the two measures.

**Measure 1: PCP Locations Not Reached**
The data updated by the MCPs in ODM's system shall be accurate 70% of the time for the statistically valid statewide sample.

**Measure 2: PCP Locations Not Contracted With MCP**
For Measure 2, the baseline of 92% was established using the previous 2 years of collected data of members that were reached MCPs shall ensure the contracting status of the statistically valid statewide sample is met 92% of the time.

S0215 – L42

Medicaid Managed Care
Appendix H
Provider Panel Specifications

**Table 2. Network Capacity Minimum Standards.** Starting in July 2018, ODM will use the Health Service Delivery (HSD) CY 2017 Reference File to determine the time and distance standards that must be met. The county based standards will be eliminated for the provider types included in the table below.

| General Practice | Family Practice | Internal Medicine | Geriatrics |
|---|---|---|---|
| Primary Care – Physician Assistants | Primary Care – Nurse Practitioners | Primary Care | Allergy and Immunology |
| Cardiology | Chiropractor | Dermatology | Endocrinology |
| ENT/Otolaryngology | Gastroenterology | General Surgery | Gynecology, OB/GYN |
| Infectious Diseases | Nephrology | Neurology | Neurosurgery |
| Oncology – Medical, Surgical | Oncology – Radiation/Radiation Oncology | Ophthalmology | Orthopedic Surgery |
| Physiatrist, Rehabilitative Medicine | Plastic Surgery | Podiatry | Psychiatry |
| Pulmonology | Rheumatology | Urology | Vascular Surgery |
| Cardiothoracic Surgery | Acute Inpatient Hospital | Cardiac Surgery Program | Cardiac Catheterization Services |
| Critical Care Services | Outpatient Dialysis | Surgical Services | Skilled Nursing Facilities |
| Diagnostic Radiology | Mammography | Physical Therapy | Occupational Therapy |
| Speech Therapy | Inpatient Psychiatric Facility | Orthotics and Prosthetics | Outpatient Infusion Chemotherapy |

The above provider types along with the time and distance for each are listed on the HSD Reference file at https://www.cms.gov/Medicare/Medicare-Advantage/MedicareAdvantageApps/index.html .

S0215 – L43

Medicaid Managed Care
Appendix H
Provider Panel Specifications

Table 3. Provider Panel Specifications

| West Region | Adams | Allen | Auglaize | Brown | Butler | Champaign | Clark | Clermont | Clinton | Darke | Defiance | Fulton | Greene | Hamilton | Hancock | Hardin | Henry | Highland | Lucas |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total PCP Member Capacity | At least 5% more than previous month's member enrollment for each county | | | | | | | | | | | | | | | | | | |
| Minimum Contracted PCPs | 5.0 | 9.0 | 3.0 | 5.0 | 27.0 | 3.0 | 16.0 | 13.0 | 4.0 | 3.0 | 3.0 | 3.0 | 9.0 | 66.0 | 5.0 | 2.0 | 2.0 | 5.0 | 55.0 |
| *Any additional required capacity shall be located within the region. | | | | | | | | | | | | | | | | | | | |
| **Hospitals** | | | | | | | | | | | | | | | | | | | |
| General Hospital | | 1 | | | | | 1 | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | | 1 | |
| Hospital System | | | | | | | | | | | | | | 2 | | | | | 1 |
| Inpatient Psychiatric Hospital | | 1 | | | 1 | | | 1 | | 1 | 1 | 1 | | 3 | | | | 1 | 4 |
| *General hospitals shall provide obstetrical services if such a hospital is available in the county/region. | | | | | | | | | | | | | | | | | | | |
| **Practitioners** | | | | | | | | | | | | | | | | | | | |
| Allergists | | 1 | | | | | | | | | | | | 4 | | | | | 1 |
| Cardiovascular | | | 1 | | | | | | | | | | | 1 | | | | | 1 |
| Dentists | 1 | 5 | 1 | 1 | 13 | 1 | 6 | 5 | 1 | 1 | | 2 | 3 | 50 | 9 | 1 | 1 | 3 | 29 |
| Gastroenterology | | | | | | | | | | | | | | | | | | | 1 |
| General Surgeons | | 1 | | | 3 | | 3 | 2 | 2 | | | | 3 | 10 | | | | 2 | 2 |
| Nephrology | | | | | | | | | | | | | | | | | | | |
| Neurology | | | | | | | | | | | | | | | | | | | |
| OB/GYNs | | 3 | | 2 | 3 | | 3 | 1 | 1 | | | | 2 | 13 | 1 | | | | 1 |
| Oncology | | | | | | | | | | | | | | | | | | | 7 |
| Orthopedists | | 3 | | | 3 | | | | | | | | 2 | 7 | 2 | | | | 3 |
| Otolaryngologist | | 1 | | | 1 | | 1 | | | | | | | 4 | 1 | | | | 3 |
| Pediatricians | | 4 | | | 7 | | 2 | 2 | 1 | | 1 | | 3 | 39 | | | | | 23 |
| Physical Med Rehab | | | | | | | | | | | | | | | | | | | 1 |
| Podiatry | | | | | 1 | | | | | | | | | 2 | | | | | 2 |
| Psychiatry | | 1 | | | | | | | | | | | 1 | 3 | | | | | 3 |
| Urology | | | | | | | | | | | | | | | | | | | 1 |
| Vision | | 3 | 1 | | 4 | | 3 | 1 | 2 | 1 | 2 | | 3 | 14 | 1 | | | 2 | 9 |
| *All required providers and additional required providers shall be located within the region. | | | | | | | | | | | | | | | | | | | |

S0215 – L44

Medicaid Managed Care
Appendix H
Provider Panel Specifications

| West Region | Mercer | Miami | Montgomery | Ottawa | Paulding | Preble | Putnam | Sandusky | Seneca | Shelby | Van Wert | Warren | Williams | Wood | Wyandot | Additional Required In-Region Total | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total PCP Member Capacity | | | | | | | | | | | | | | | | | |
| Minimum Contracted PCPs | 2.0 | 6.0 | 51.0 | 3.0 | 2.0 | 3.0 | 2.0 | 5.0 | 5.0 | 3.0 | 2.0 | 6.0 | 4.0 | 5.0 | 2.0 | 36.0 | 375.0 |
| *Any additional required capacity shall be located within the region. | | | | | | | | | | | | | | | | | |
| Hospitals | | | | | | | | | | | | | | | | | |
| General Hospital | 1 | 1 | 1 | | | | | 1 | | 1 | 1 | | 1 | | 1 | 4 | 22 |
| Hospital System | | 1 | 1 | | | | | | | | | | | | | | 4 |
| Inpatient Psychiatric Hospital | | 1 | 1 | | | | | | | 1 | | 1 | | | | | |
| *General hospitals shall provide obstetrical services if such a hospital is available in the county/region. | | | | | | | | | | | | | | | | | |
| Practitioners | | | | | | | | | | | | | | | | | |
| Allergists | | | | | | | | | | | | | | | | | |
| Cardiovascular | | | | | | | | | | | | | | | | 10 | 18 |
| Dentists | | | 2 | | | | | | | | | | | | | 6 | 10 |
| Gastroenterology | 3 | 3 | 1 | 1 | | 4 | 1 | 3 | 2 | 1 | 3 | 3 | 1 | 2 | 1 | 11 | 161 |
| General Surgeons | | | | | | | | | | | | | | | | 4 | 5 |
| Nephrology | | 1 | 4 | | | | | | | | | 1 | | 1 | | 6 | 41 |
| Neurology | | | | | | | | | | | | | | | | 3 | 3 |
| OB/GYNs | | | | | | | | | | | | | | | | 5 | 6 |
| Oncology | 1 | 1 | 9 | | | | | 2 | 2 | 1 | | 2 | | 2 | 1 | 4 | 60 |
| Orthopedists | | | | | | | | | | | | | | | | 3 | 3 |
| Otolaryngologist | | 3 | 3 | | | | | 1 | | 1 | | 1 | | 1 | | 7 | 36 |
| Pediatricians | | 1 | 4 | | | | | | | | | | | | | 10 | 25 |
| Physical Med Rehab | | 1 | 22 | | | | | 1 | | | | | | 2 | | 31 | 140 |
| Podiatry | | | | | | | | | | | | | | | | 5 | 6 |
| Psychiatry | | | 2 | | | | | | | | | | 1 | 1 | | 5 | 13 |
| Urology | | | 2 | | | | | | | | | | | | | 7 | 17 |
| Vision | | | | | | | | | | | | | | | | 6 | 7 |
| *All required providers and additional required providers shall be located within the region. | | | | | | | | | | | | | | | | | |

Rev. 4/2018

S0215 – L45

Medicaid Managed Care
Appendix H
Provider Panel Specifications

| Northeast Region | Ashland | Ashtabula | Carroll | Columbiana | Cuyahoga | Erie | Geauga | Holmes | Huron | Lake | Lorain |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total PCP Member Capacity | At least 5% more than previous month's member enrollment for each county | | | | | | | | | | |
| Minimum Contracted PCPs | 4.0 | 12.0 | 3.0 | 12.0 | 148.0 | 6.0 | 2.0 | 2.0 | 6.0 | 11.0 | 25.0 |
| *Any additional required capacity shall be located within the region. | | | | | | | | | | | |
| Hospitals | | | | | | | | | | | |
| General Hospital | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Hospital System | | | | | 1 | | | | | | 1 |
| Inpatient Psychiatric Hospital | | | | | 9 | | 1 | | | 1 | |
| *General hospitals shall provide obstetrical services if such a hospital is available in the county/region. | | | | | | | | | | | |
| Practitioners | | | | | | | | | | | |
| Allergists | | | | | 2 | | | | | | 1 |
| Cardiovascular | | | | | 3 | | | | | | 1 |
| Dentists | 3 | 3 | | 3 | 102 | 2 | 1 | | 2 | 6 | 11 |
| Gastroenterology | | | | | 2 | | | | | | |
| General Surgeons | | | | 2 | 18 | 2 | | | 2 | 2 | 3 |
| Nephrology | | | | | 1 | | | | | | |
| Neurology | | | | | 2 | | | | | | |
| OB/GYNs | | 1 | | 2 | 24 | 2 | | | 1 | 1 | 3 |
| Oncology | | | | | 12 | | | | | | |
| Orthopedists | | | | | 3 | 1 | | | | 1 | 3 |
| Otolaryngologist | | | | | 3 | | | | | | 2 |
| Pediatricians | 1 | 1 | | 2 | 66 | 2 | | | | 3 | 8 |
| Physical Med Rehab | | | | | 2 | | | | | | |
| Podiatry | | | | | 4 | | | | | | 2 |
| Psychiatry | | | | | 5 | | | | | | 3 |
| Urology | | | | | 2 | | | | | | |
| Vision | | 3 | | | 32 | 2 | | | 2 | 6 | 11 |
| *All required providers and additional required providers shall be located within the region. | | | | | | | | | | | |

Rev. 4/2018

S0215 – L46

Medicaid Managed Care
Appendix H
Provider Panel Specifications

| Northeast Region | Mahoning | Medina | Portage | Richland | Stark | Summit | Trumbull | Tuscarawas | Wayne | Additional Required In-Region | Total Required |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total PCP Member Capacity | At least 5% more than previous month's member enrollment for each county | | | | | | | | | | |
| Minimum Contracted PCPs | 27.0 | 7.0 | 9.0 | 12.0 | 31.0 | 45.0 | 20.0 | 8.0 | 7.0 | 10.0 | 407.0 |
| *Any additional required capacity shall be located within the region. | | | | | | | | | | | |
| **Hospitals** | | | | | | | | | | | |
| General Hospital | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 21 |
| Hospital System | | | | | | 1 | | | | 1 | 3 |
| Inpatient Psychiatric Hospital | 1 | | | | 2 | 1 | 1 | 1 | | | |
| *General hospitals shall provide obstetrical services if such a hospital is available in the county/region. | | | | | | | | | | | |
| **Practitioners** | | | | | | | | | | | |
| Allergists | | | | | | 1 | | | | 4 | 9 |
| Cardiovascular | 1 | 4 | | | 1 | 1 | | | | 4 | 11 |
| Dentists | 14 | 2 | 3 | 7 | 17 | 23 | 11 | 4 | 3 | 3 | 205 |
| Gastroenterology | | | | | | | | | | 4 | 6 |
| General Surgeons | 4 | 2 | 1 | 3 | 4 | 6 | 2 | 1 | 2 | 5 | 59 |
| Nephrology | | | | | | | | | | 3 | 4 |
| Neurology | | | | | | | | | | 4 | 6 |
| OB/GYNs | 4 | 1 | | 1 | 7 | 12 | 3 | | 1 | 7 | 70 |
| Oncology | | | | | | | | | | 3 | 3 |
| Orthopedists | 3 | 1 | | 1 | 2 | 3 | 1 | | 1 | 11 | 40 |
| Otolaryngologist | 2 | | 2 | | 3 | 3 | | | | 7 | 20 |
| Pediatricians | 10 | 3 | 2 | 3 | 14 | 20 | 6 | 2 | 2 | 17 | 162 |
| Physical Med Rehab | | | | | | | | | | 4 | 6 |
| Podiatry | | | | | 1 | 2 | | | | 4 | 13 |
| Psychiatry | 3 | | | | 2 | 3 | 2 | | | 5 | 23 |
| Urology | | | | | | | | | | 5 | 7 |
| Vision | 5 | 4 | | 2 | 7 | 13 | 4 | | | 8 | 100 |
| *All required providers and additional required providers shall be located within the region. | | | | | | | | | | | |

S0215 – L47

Medicaid Managed Care
Appendix H
Provider Panel Specifications

| Central/Southeast Region | Athens | Belmont | Coshocton | Crawford | Delaware | Fairfield | Fayette | Franklin | Gallia | Guernsey | Harrison | Hocking | Jackson | Jefferson | Knox | Lawrence | Licking | Logan |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total PCP Member Capacity | | | | | | | | At least 5% more than previous month's member enrollment for each county | | | | | | | | | | |
| Minimum Contracted PCPs | 6.0 | 7.0 | 4.0 | 4.0 | 5.0 | 10.0 | 3.0 | 120.0 | 5.0 | 6.0 | 2.0 | 4.0 | 5.0 | 8.0 | 5.0 | 10.0 | 13.0 | 4.0 |
| *Any additional required capacity shall be located within the region. | | | | | | | | | | | | | | | | | | |
| **Hospitals** | | | | | | | | | | | | | | | | | | |
| General Hospital | 1 | 1 | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | | | | 1 | 1 | | 1 | 1 |
| Hospital System | | | | | | | | 2 | | | | | | | | | | |
| Inpatient Psychiatric Hospital | | 1 | | | | 1 | | 3 | 1 | | | 1 | | | | | 1 | |
| *General hospitals shall provide obstetrical services if such a hospital is available in the county/region. | | | | | | | | | | | | | | | | | | |
| **Practitioners** | | | | | | | | | | | | | | | | | | |
| Allergists | | | | | | | | 2 | | | | | | | | | | |
| Cardiovascular | | | | | | | | 2 | 1 | | | | | | | | | |
| Dentists | 3 | 4 | 9 | 1 | 3 | 4 | 1 | 95 | | 3 | | 1 | 1 | 3 | 3 | 3 | 4 | 1 |
| Gastroenterology | | | | | | | | 1 | | | | | | | | | | |
| General Surgeons | | 2 | | 1 | 2 | 3 | | 20 | 2 | 2 | | | | 2 | 1 | | 1 | 1 |
| Nephrology | | | | | | | | 1 | | | | | | | | | | |
| Neurology | | | | | | | | 1 | | | | | | | | | | |
| OB/GYNs | 2 | | | | 3 | 3 | | 18 | | 2 | | | | 2 | 1 | | 1 | |
| Oncology | | | | | | | | | | | | | | | | | | |
| Orthopedists | | | | | 2 | 2 | | 10 | 2 | | | | | | | | 2 | 1 |
| Otolaryngologist | | | | | 2 | | | 14 | 2 | 1 | | | | 1 | 1 | | 1 | 1 |
| Pediatricians | 1 | 1 | | | 4 | 3 | | 55 | 2 | 1 | | | | 1 | 1 | | 2 | 1 |
| Physical Med Rehab | | | | | | | | 1 | | | | | | | | | | |
| Podiatry | | 1 | | | 1 | | | 3 | | | | | | | | | | |
| Psychiatry | | 1 | | | | 1 | | 5 | | | | | | | | | | |
| Urology | | 1 | | | | | | | | | | | | | | | | |
| Vision | 3 | 4 | 1 | 2 | 3 | 3 | | 20 | 2 | 2 | | | 2 | 3 | 2 | 3 | 2 | 2 |
| *All required providers and additional required providers shall be located within the region. | | | | | | | | | | | | | | | | | | |

Rev. 4/2018

S0215 – L48

Medicaid Managed Care
Appendix H
Provider Panel Specifications

| Central/Southeast Region | Madison | Marion | Meigs | Monroe | Morgan | Morrow | Muskingum | Noble | Perry | Pickaway | Pike | Ross | Scioto | Union | Vinton | Washington | Additional Required: In-Region | Total Required |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total PCP Member Capacity | | | | | | | At least 5% more than previous month's member enrollment for each county | | | | | | | | | | | |
| Minimum Contracted PCPs | 3.0 | 7.0 | 4.0 | 1.0 | 2.0 | 3.0 | 12.0 | 2.0 | 5.0 | 5.0 | 5.0 | 10.0 | 13.0 | 3.0 | 1.0 | 6.0 | 14.0 | 317.0 |
| *Any additional required capacity shall be located within the region. | | | | | | | | | | | | | | | | | | |
| **Hospitals** | | | | | | | | | | | | | | | | | | |
| General Hospital | 1 | 1 | | | | | 1 | | | 1 | | 1 | 1 | 1 | | 1 | 6 | 27 |
| Hospital System | | | | | | | | | | | | | | 1 | | | | 2 |
| Inpatient psychiatric hospital | | 1 | | | | | 1 | | | | | 1 | 1 | 1 | | | | |
| *General hospitals shall provide obstetrical services if such a hospital is available in the county/region | | | | | | | | | | | | | | | | | | |
| **Practitioners** | | | | | | | | | | | | | | | | | | |
| Allergists | | | | | | | | | | | | | | | | | 3 | 5 |
| Cardiovascular | | | | | | | | | | | | | | | | | 4 | 7 |
| Dentists | 1 | 3 | | | | 1 | 4 | 1 | 1 | 1 | 1 | 4 | 2 | 1 | | 3 | 16 | 135 |
| Gastroenterology | | | | | | | | | | | | | | | | | 4 | 5 |
| General Surgeons | | 1 | | | | | 2 | | | 1 | | 2 | 2 | 1 | | 1 | 6 | 53 |
| Nephrology | | | | | | | | | | | | | | | | | 2 | 3 |
| Neurology | | | | | | | | | | | | | | | | | 2 | 3 |
| OB/GYNs | | 1 | | | | | 2 | | | | | 1 | 1 | | | 2 | 10 | 49 |
| Oncology | | | | | | | | | | | | | | | | | 2 | 2 |
| Orthopedists | | 2 | | | | | | | | | | 2 | | | | | 9 | 29 |
| Otolaryngologist | | 1 | | | | | | | | | | 1 | 1 | 1 | | | 3 | 30 |
| Pediatricians | 1 | 2 | | | | | 2 | | | 1 | | 2 | 2 | 1 | | 1 | 33 | 117 |
| Physical Med Rehab | | | | | | | | | | | | | | | | | 4 | 5 |
| Podiatry | | | | | | | 1 | | | | | | | | | | 5 | 11 |
| Psychiatry | | | | | | | 1 | | | | | | | | | | 6 | 14 |
| Urology | | | | | | | | | | | | | | | | | 6 | 6 |
| Vision | 2 | 2 | | | | | 4 | | | 1 | | 2 | 2 | 1 | | 2 | 11 | 79 |

*All required providers and additional required providers shall be located within the region.

S0215 – L49

Medicaid Managed Care
Appendix H
Provider Panel Specifications

Table 4. Nursing Facility Provider Panel

| Region | County | Nursing Facility Requirement |
|---|---|---|
| W | ADAMS | 1 |
| W | ALLEN | 2 |
| NE | ASHLAND | 1 |
| NE | ASHTABULA | 3 |
| CEN/SE | ATHENS | 1 |
| W | AUGLAIZE | 1 |
| CEN/SE | BELMONT | 2 |
| W | BROWN | 1 |
| W | BUTLER | 5 |
| W | CHAMPAIGN | 1 |
| W | CLARK | 3 |
| W | CLERMONT | 2 |
| W | CLINTON | 1 |
| NE | COLUMBIANA | 3 |
| CEN/SE | COSHOCTON | 1 |
| CEN/SE | CRAWFORD | 1 |
| NE | CUYAHOGA | 19 |
| W | DARKE | 1 |
| W | DEFIANCE | 1 |
| CEN/SE | DELAWARE | 1 |
| NE | ERIE | 2 |
| CEN/SE | FAIRFIELD | 2 |
| CEN/SE | FAYETTE | 1 |
| CEN/SE | FRANKLIN | 11 |
| W | FULTON | 1 |
| CEN/SE | GALLIA | 1 |

| Region | County | Nursing Facility Requirement |
|---|---|---|
| NE | GEAUGA | 1 |
| W | GREENE | 2 |
| CEN/SE | GUERNSEY | 1 |
| W | HAMILTON | 14 |
| W | HANCOCK | 1 |
| CEN/SE | HARRISON | 1 |
| W | HENRY | 1 |
| W | HIGHLAND | 1 |
| NE | HOLMES | 1 |
| NE | HURON | 1 |
| CEN/SE | JACKSON | 1 |
| CEN/SE | JEFFERSON | 2 |
| CEN/SE | KNOX | 2 |
| NE | LAKE | 2 |
| CEN/SE | LAWRENCE | 1 |
| CEN/SE | LICKING | 2 |
| CEN/SE | LOGAN | 1 |
| NE | LORAIN | 4 |
| W | LUCAS | 7 |
| NE | MAHONING | 5 |
| CEN/SE | MARION | 1 |
| NE | MEDINA | 2 |
| W | MERCER | 1 |
| W | MIAMI | 1 |
| W | MONTGOMERY | 8 |
| CEN/SE | MORROW | 1 |

| Region | County | Nursing Facility Requirement |
|---|---|---|
| CEN/SE | MUSKINGUM | 1 |
| W | OTTAWA | 1 |
| CEN/SE | PERRY | 1 |
| CEN/SE | PICKAWAY | 1 |
| CEN/SE | PIKE | 1 |
| NE | PORTAGE | 2 |
| W | PREBLE | 1 |
| W | PUTNAM | 1 |
| NE | RICHLAND | 2 |
| CEN/SE | ROSS | 1 |
| W | SANDUSKY | 2 |
| CEN/SE | SCIOTO | 2 |
| W | SENECA | 1 |
| W | SHELBY | 1 |
| NE | STARK | 7 |
| NE | SUMMIT | 9 |
| NE | TRUMBULL | 4 |
| NE | TUSCARAWAS | 2 |
| CEN/SE | UNION | 1 |
| W | VANWERT | 1 |
| W | WARREN | 3 |
| CEN/SE | WASHINGTON | 1 |
| NE | WAYNE | 2 |
| W | WILLIAMS | 1 |
| W | WOOD | 2 |

Rev. 4/2018

S0215 – L50

Medicaid Managed Care
Appendix H
Provider Panel Specifications

Table 5. Behavioral Health Provider Panel - MCP's will be held accountable to these standards effective July 1, 2018.

| Region | County | CMHCs | AOD | Region | County | CMHCs | AOD | Region | County | CMHCs | AOD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| W | ADAMS | 1 | 1 | W | GREENE | 3 | 1 | CEN/SE | NOBLE | - | 1 |
| W | ALLEN | 1 | 2 | CEN/SE | GUERNSEY | 5 | 1 | W | PAULDING | 1 | - |
| NE | ASHLAND | 3 | 1 | W | HAMILTON | 22 | 15 | CEN/SE | PERRY | - | 1 |
| NE | ASHTABULA | 1 | 3 | W | HANCOCK | - | 1 | CEN/SE | PICKAWAY | - | 1 |
| CEN/SE | ATHENS | 1 | 2 | CEN/SE | HARDIN | - | 1 | CEN/SE | PIKE | - | 1 |
| W | AUGLAIZE | - | - | W | HENRY | 1 | 1 | NE | PORTAGE | 5 | 3 |
| CEN/SE | BELMONT | 3 | 1 | W | HIGHLAND | 1 | 1 | W | PREBLE | - | 1 |
| W | BROWN | - | - | NE | HOCKING | - | 1 | W | PUTNAM | 1 | 1 |
| W | BUTLER | 7 | 4 | NE | HURON | - | - | NE | RICHLAND | 6 | 10 |
| W | CHAMPAIGN | - | - | CEN/SE | JACKSON | - | 1 | CEN/SE | ROSS | 2 | 3 |
| W | CLARK | 4 | 2 | CEN/SE | JEFFERSON | 1 | 1 | W | SANDUSKY | 1 | 1 |
| W | CLERMONT | 3 | 2 | CEN/SE | KNOX | - | 1 | CEN/SE | SCIOTO | 1 | 7 |
| W | CLINTON | - | - | NE | LAKE | 9 | 5 | W | SENECA | - | - |
| NE | COLUMBIANA | 2 | 1 | CEN/SE | LAWRENCE | 3 | 4 | W | SHELBY | 1 | 1 |
| CEN/SE | COSHOCTON | - | 1 | CEN/SE | LICKING | 4 | 1 | NE | STARK | 6 | 6 |
| CEN/SE | CRAWFORD | 1 | 1 | CEN/SE | LOGAN | 1 | 1 | NE | SUMMIT | 11 | 9 |
| NE | CUYAHOGA | 28 | 29 | NE | LORAIN | 2 | 4 | NE | TRUMBULL | 5 | 1 |
| W | DARKE | 1 | 1 | W | LUCAS | 12 | 11 | NE | TUSCARAWAS | 1 | 1 |
| W | DEFIANCE | 1 | 1 | CEN/SE | MADISON | 1 | - | CEN/SE | UNION | - | - |
| CEN/SE | DELAWARE | 1 | 1 | NE | MAHONING | 10 | 8 | W | VANWERT | 1 | 1 |
| NE | ERIE | 2 | 2 | CEN/SE | MARION | 1 | 1 | W | WARREN | 1 | 1 |
| CEN/SE | FAIRFIELD | 3 | 2 | NE | MEDINA | 3 | 3 | CEN/SE | WASHINGTON | 1 | 1 |
| CEN/SE | FAYETTE | - | - | W | MERCER | 1 | 1 | NE | WAYNE | 6 | 4 |
| CEN/SE | FRANKLIN | 23 | 19 | W | MIAMI | 1 | 1 | W | WILLIAMS | - | - |
| W | FULTON | 1 | - | W | MONTGOMERY | 12 | 10 | W | WOOD | 2 | 1 |
| CEN/SE | GALLIA | 1 | 5 | W | MORGAN | - | 1 | | | | |
| NE | GEAUGA | 3 | 3 | CEN/SE | MUSKINGUM | 2 | 1 | | | | |

S0215 – L51

Medicaid Managed Care
Appendix H
Provider Panel Specifications

**Table 6. Medicaid Community Behavioral Health Provider Panel (not provider types 84 or 95). The MCP will be held accountable to these standards effective July 1, 2018.**

| County | BH | County | BH | County | BH | County | BH |
|---|---|---|---|---|---|---|---|
| Allen | 22 | Fayette | 6 | Lorain | 47 | Richland | 11 |
| Ashland | 4 | Franklin | 75 | Lucas | 71 | Ross | 10 |
| Ashtabula | 16 | Gallia | 5 | Madison | 6 | Sandusky | 18 |
| Athens | 9 | Geauga | 15 | Mahoning | 38 | Scioto | 8 |
| Auglaize | 10 | Greene | 27 | Marion | 10 | Seneca | 14 |
| Belmont | 6 | Guernsey | 3 | Meigs | 6 | Shelby | 6 |
| Brown | 7 | Hamilton | 60 | Mercer | 5 | Stark | 40 |
| Butler | 40 | Hancock | 12 | Miami | 14 | Trumbull | 33 |
| Carroll | 4 | Hardin | 11 | Monroe | 2 | Tuscarawas | 8 |
| Champaign | 9 | Harrison | 4 | Montgomery | 48 | Union | 4 |
| Clark | 22 | Henry | 11 | Morgan | 3 | VanWert | 7 |
| Clinton | 11 | Highland | 6 | Morrow | 11 | Vinton | 5 |
| Columbiana | 20 | Hocking | 9 | Muskingum | 12 | Warren | 28 |
| Coshocton | 7 | Holmes | 4 | Noble | 0 | Washington | 3 |
| Crawford | 7 | Jackson | 4 | Ottawa | 14 | Wayne | 17 |
| Cuyahoga | 160 | Jefferson | 5 | Paulding | 4 | Williams | 15 |
| Darke | 4 | Knox | 10 | Perry | 6 | Wood | 35 |
| Defiance | 10 | Lake | 35 | Pike | 7 | Wyandot | 5 |
| Delaware | 17 | Lawrence | 6 | Portage | 28 | | |
| Erie | 12 | Licking | 20 | Preble | 6 | | |
| Fairfield | 19 | Logan | 8 | Putnam | 10 | | |

S0215 — L52

Medicaid Managed Care
Appendix I
Program Integrity

## APPENDIX I

### PROGRAM INTEGRITY

The MCP shall comply with all applicable state and federal program integrity requirements, including, but not limited to, those specified in Ohio Administrative Code (OAC) rule 5160-26-06, 42 CFR 455, 42 CFR 1002 and 42 CFR 438 Subpart H.

1. **Fraud and Abuse Program.** In addition to the specific requirements of OAC rule 5160-26-06, the MCP shall have a program that includes administrative and management arrangements or procedures to guard against fraud and abuse. The MCP's compliance program shall address the following:

   a. **Compliance Plan.** A mandatory compliance plan that includes designated staff responsible for administering the plan and clear goals, milestones or objectives, measurements, key dates for achieving identified outcomes, and an explanation of how the MCP will determine the effectiveness of the compliance plan.

   b. **Employee Education about False Claims Recovery.** The MCP shall comply with Section 6032 of the Deficit Reduction Act of 2005 regarding employee education and false claims recovery, specifically the MCP shall:

      i. Establish and make readily available to all employees, including the MCP's management, the following written policies regarding false claims recovery:

         1. Detailed information about the Federal False Claims Act and other state and federal laws related to the prevention and detection of fraud, waste and abuse, including administrative remedies for false claims and statements, as well as civil or criminal penalties;

         2. The MCP's policies and procedures for detecting and preventing fraud, waste and abuse; and

         3. The laws governing the rights of employees to be protected as whistleblowers. In addition, the MCP shall communicate the following whistleblower fraud and/or abuse reporting contacts to all employees, providers and subcontractors:

            a. Ohio Department of Medicaid (ODM) 1-614-466-0722 or at http://medicaid.ohio.gov/RESOURCES/HelpfulLinks/ReportingSuspectedMedicaidFraud.aspx;

            b. Medicaid Fraud Control Unit (MFCU) 1-800-642-2873 or at http://www.ohioattorneygeneral.gov/Individuals-and-Families/Victims/Submit-a-Tip/Report-Medicaid-Fraud; and

S0215 – L53

Medicaid Managed Care
Appendix I
Program Integrity

    c. The Ohio Auditor of State (AOS) 1-866-FRAUD-OH or by email at
       fraudohio@ohioauditor.gov

  ii. Include the required written policies regarding false claims recovery in any
     employee handbook;

  iii. In accordance with 42 CFR 438.608, establish written policies for any MCP
     contractors and agents that provide detailed information about the Federal
     False Claims Act and other state and federal laws related to the prevention and
     detection of fraud, waste and abuse, including administrative remedies for false
     claims and statements, as well as civil or criminal penalties; the laws governing
     the rights of employees to be protected as whistleblowers; and the MCP's
     policies and procedures for detecting and preventing fraud, waste and abuse.
     The MCP shall make such information readily available to their subcontractors;
     and

  iv. Disseminating the required written policies to all contractors and agents who
     shall abide by those written policies.

c. **Monitoring for Fraud and Abuse**. The MCP shall specifically address the MCP's
  strategies for prevention, detection, investigation and reporting in at least the following
  areas:

    i. **Credible allegations of fraud**. The MCP shall monitor activities on an ongoing
      basis to prevent and detect activities involving suspected fraud, embezzlement,
      and theft (e.g., by staff, providers, contractors) and report findings promptly to
      ODM as specified in this Appendix.

    ii. **Underutilization of services**. In order to ensure all Medicaid-covered services
      are provided as required, monitoring of the following areas shall occur:

      1. The MCP shall annually review their prior authorization (PA) procedures
        to determine if they unreasonably limit a member's access to Medicaid-
        covered services;

      2. The MCP shall annually review their appeals process for providers
        following the MCP's denial of a prior authorization request for a
        determination as to whether the appeals process unreasonably limits a
        member's access to Medicaid-covered services;

      3. The MCP shall monitor, on an ongoing basis, service denials and
        utilization in order to identify member services which may be
        underutilized; and

      4. If any underutilized services or limits to a member's access to Medicaid-
        covered services are identified, the MCP shall immediately investigate
        and, if indicated, correct the problem(s).

S0215 - L54

Medicaid Managed Care
Appendix I
Program Integrity

      iii. **Claims submission and billing.** On an ongoing basis, the MCP shall identify and correct claims submission and billing activities which are potentially fraudulent including, at a minimum, double-billing and improper coding, such as upcoding and unbundling, to the satisfaction of ODM.

2. **Special Investigative Unit (SIU).** At a minimum, the MCP shall utilize a single in-state MCP lead investigator to conduct fraud, waste and abuse investigations, prepare investigatory reports, implement the Compliance Plan to guard against fraud, waste and abuse, monitor aberrant providers and refer potential fraud, waste and abuse to ODM.

    a. The lead investigator shall be a full-time employee in the State of Ohio. He or she shall be dedicated solely to ODM program integrity work and meet the following qualifications:

      i. A minimum of two years in healthcare field working in fraud, waste and abuse investigations and audits,

      ii. A Bachelor's degree, or an Associate's degree with an additional two years working in health care fraud, waste and abuse investigations and audits. ODM. will accept experience and certifications commensurate with the aforementioned educational requirements. ODM will evaluate the experience and certifications in lieu of the educational requirements; and

      iii. Ability to understand and analyze health care claims and coding

    b. The in-state lead investigator shall participate in SIU coordination with ODM Program Integrity in areas such as fraud referrals, audits and investigations, overpayments, provider terminations, among other activities, as well as attend any required meetings as prescribed by ODM.

    c. The MCP shall meet fraud and abuse performance targets based upon per capita metrics as prescribed by ODM in the following areas:

      i. Referrals accepted by the Medicaid Fraud Control Unit (MFCU) of the Ohio Attorney General's Office, and

      ii. Recoveries of overpayments related to fraud and abuse.

3. **Reporting MCP monitoring of fraud and abuse activities.** Pursuant to OAC rule 5160-26-06, the MCP shall report annually to ODM a summary of the MCP's monitoring of credible allegations of fraud and abuse, underutilization of member services, limits to Medicaid-covered services and suspicious claims submission and billing. The MCP's report shall also identify any proposed changes to the MCP's compliance plan for the coming year.

    a. **Reporting suspected fraud and abuse.** The MCP are required to promptly report all instances of suspected provider fraud and abuse to ODM and member fraud and abuse

**S0215 – L55**

Medicaid Managed Care
Appendix I
Program Integrity

to ODM's Bureau of Program Integrity, copying the appropriate county department of job and family services. If the MCP fails to properly report a case of suspected fraud or abuse before the suspected fraud or abuse is identified by the State of Ohio, its designees, the United States or private parties acting on behalf of the United States, any portion of the fraud or abuse recovered by the State of Ohio or designees shall be retained by the State of Ohio or its designees.

    i. **Credible allegation of provider fraud**. The MCP shall promptly refer suspected cases of provider fraud in the ODM specified form to ODM for investigation and determination of whether a credible allegation of fraud exists. If a credible allegation of fraud exists, at the direction of ODM, the MCP shall immediately suspend all payments to the provider and shall suspend the provider in accordance with Ohio Rev. Code 5164.36. At the request of ODM staff, ODM's designee, the Ohio Attorney General's Office, or federal agencies, the MCP shall produce copies of all MCP fraud, waste and abuse investigatory files and data (including, but not limited to records of recipient and provider interviews) in thirty business days unless otherwise agreed upon by ODM.

    ii. **Credible allegation of member fraud**. All suspected enrollee fraud and abuse shall be immediately reported to Bureau of Program Integrity (BPI) at Program_Integrity_County_Referral@medicaid.ohio.gov and copy the appropriate county department of job and family services (CDJFS).

b. **Referrals and Attestations**. The MCP shall submit fraud, waste and abuse referrals to ODM using the ODM Referral form. Each referral submitted to ODM will be distributed to all MCPs. Upon receipt of a fraud, waste and abuse referral from ODM, the MCP shall respond by submitting the attestation form specified by ODM within 90 days.

c. **Monitoring for prohibited affiliations**. The MCP's policies and procedures for ensuring that, pursuant to 42 CFR 438.610, the MCP will not knowingly have a relationship or prohibited affiliation with individuals debarred by Federal Agencies, as specified in Article XII of the Agreement.

d. **Provider indictment**. If an indictment is issued, charges a non-institutional Medicaid provider or its owner, officer, authorized agent, associate, manager, or employee with committing an offence specified in ORC 5164.37(E), and ODM suspends this Agreement held by the non-institutional Medicaid provider, at the direction of ODM, the MCP shall immediately suspend the provider and terminate Medicaid payments to the provider for Medicaid services rendered in accordance with ORC 5164.37(D).

e. The MCP shall disclose any change in ownership and control information and this information shall be furnished to ODM within 35 days in accordance with 42 CFR 455:104 and 5160-1-17.3.

f. In accordance with 42 CFR 455.105, the MCP shall submit within 35 days of the date requested by ODM or the U.S. Department of Health and Human Services full and complete information about:

Medicaid Managed Care
Appendix I
Program Integrity

    i.  The ownership of any subcontractor with whom the MCP has had business transactions totaling more than $25, 000 during the 12-month period ending on the date of the request.

    ii.  Any significant business transactions between the MCP and any wholly owned supplier, or between the provider and any subcontractor, during the 5-year period ending on the date of the request.

g.  The MCP shall disclose the following information on persons convicted of crimes in accordance with 42 CFR 455.106 who have:

    i.  Ownership or control interest in the provider, or is an agent or managing employee of the provider; and

    ii.  Been convicted of a criminal offense related to that person's involvement in any program under Medicare, Medicaid, or the Title XX services program since the inception of those programs.

This information shall also be disclosed at any time upon written request by the Medicaid agency. The Medicaid agency may refuse to enter into or may terminate this Agreement if it determines that the provider did not fully and accurately make any disclosure referenced in this section.

h.  The MCP shall notify ODM when the MCP denies credentialing to providers for program integrity reasons.

i.  The MCP shall notify ODM when a provider panel application is denied or a panel provider agreement is terminated for program integrity reasons. The MCP shall provide the reason for the denial or termination.

j.  The MCP shall provide to ODM the inventory of all open program integrity related audits and investigations related to fraud, waste and abuse activities for identifying and collecting potential overpayments, utilization review and provider compliance. The inventory shall include, but is not limited to, audits and investigations performed, overpayments identified, overpayments recovered and other program integrity actions taken; such as, corrective action plans, provider education, financial sanctions and sanctions against a provider, during the previous contracting period and for each ongoing quarter.

    i.  The MCP may not take action to recoup improperly paid funds or withhold funds potentially due to a provider when the issues, services or claims upon which the recoupment or withhold is based on the following:

        1.  The improperly paid funds were recovered by ODM, the State of Ohio, the federal government or their designees, or

S0215 - L57

Medicaid Managed Care
Appendix I
Program Integrity

2. The improperly paid funds are currently being investigated by the State of Ohio, are the subject of pending federal or state litigation or investigation, or are being audited by ODM, the Ohio Auditor of State, CMS, OIG, or their agents.

ii. The MCP shall notify ODM when it proposes to recoup or withhold.

iii. Improperly paid funds already paid or potentially due to a provider and obtain ODM approval to recoup or withhold, prior to taking such action.

k. Non-federally qualified MCPs shall report to ODM a description of certain transactions with parties of interest as outlined in Section 1903(m)(4)(A) of SSA [42 U.S.C. 1396b].

4. **Data Certification.** Pursuant to 42 CFR 438.604 and 42 CFR 438.606, the MCP is required to provide certification as to the accuracy, completeness and truthfulness of data and documents submitted to ODM which may affect MCP payment.

a. **MCP Submissions.** The MCP shall submit the appropriate ODM-developed certification concurrently with the submission of the following data or documents:

i. Encounter Data as specified in Appendix L;

ii. Prompt Pay Reports as specified in Appendix J;

iii. Cost Reports as specified in Appendix J;

iv. Care Management Data as specified in Appendix L

v. HEDIS IDSS Data/FAR [as specified in Appendix L; and

vi. CAHPS Data as specified in Appendix L.

b. **Source of Certification.** The above MCP data submissions shall be certified by one of the following:

i. The MCP's Chief Executive Officer;

ii. The MCP's Chief Financial Officer; or

iii. An individual who has delegated authority to sign for, and who reports directly to, the MCP's Chief Executive Officer or Chief Financial Officer. When the authorization is delegated to another MCP employee, the CEO or CFO remains responsible.

c. The MCP shall provide certification as to the accuracy, completeness, and truthfulness of additional submissions.

S0215 - L58

Medicaid Managed Care
Appendix I
Program Integrity

5. **Explanation of Benefits (EOB) Mailings.** Pursuant to 42 CFR 455.20, the MCP shall have a method for verifying with enrollees whether services billed by providers were received; therefore, the MCP is required to conduct a mailing of EOBs to a 95% confidence level (plus or minus 5% margin of error) random sample of the MCP's enrollees once a year. As an option, the MCP may meet this requirement by using a strategy targeting services or areas of concern as long as the number of mailed EOBs is not less than the number generated by the random sample described above. If the MCP opts to use a targeted mailing, they shall submit the proposed strategy in writing to ODM, and receive written prior approval from ODM. The EOB mailing shall only include those members that have received health care services within the last six months, comply with all state and federal regulations regarding release of personal health information, outline the recent medical services identified as having been provided to the enrollee and request that the enrollee report any discrepancies to the MCP. The MCP shall inform their Contract Administrator of the date of the EOB mailing and provide results of the mailing 60 to 90 days after the mailing (i.e., number mailed, number of enrollees reporting discrepancies).

6. **Breaches of Protected Health Information.** The MCP shall report the number of breaches of protected health information (PHI) and specify how many breaches were reported to HHS as required by 45 CFR Part 164.408 (b) and (c). This report shall be submitted annually as indicated on the "MCP Calendar of Required Submissions."

7. **Cooperation with State and Federal Authorities.** The MCP shall provide all data and information requested by ODM, the Ohio Attorney General, law enforcement, etc. in the manner, format and time frame requested. The MCP shall cooperate fully with State and Federal Authorities and:

   a. The MCP shall cooperate fully in any investigation or prosecution by any duly authorized government agency, whether administrative, civil or criminal including providing, upon request, information, access to records, and access to interview MCP subcontractors, employees and consultants in any manner related to the investigation.

   b. The MCP, subcontractors and the MCPs' providers shall, upon request, make available to ODM BPI, ODM OMC and AGO MFCU/OIG any and all administrative, financial and medical records relating to the delivery of items or services for which ODM monies are expended. Such records will be made available at no cost to the requesting entity.

S0215 - L59

Medicaid Managed Care
Appendix J
Financial Performance

## APPENDIX J

### FINANCIAL PERFORMANCE

1. **Submission of Financial Statements and Reports.** The MCP shall submit the following financial reports to the Ohio Department of Medicaid (ODM) as outlined in Ohio Administrative Code (OAC) rule 5160-26-09: The National Association of Insurance Commissioners (NAIC) quarterly and annual Health Statements (hereafter referred to as the "Financial Statements"). The Financial Statements shall include all required Health Statement filings, schedules and exhibits as stated in the NAIC Annual Health Statement Instructions including, but not limited to, the following sections: Assets, Liabilities, Capital and Surplus Account, Cash Flow, Analysis of Operations by Lines of Business, Five-Year Historical Data, and the Exhibit of Premiums, Enrollment and Utilization and the Modified Supplemental Health Care Exhibit. The Financial Statements shall be submitted to ODM even if the Ohio Department of Insurance (ODI) does not require the MCP to submit these statements to ODI. An electronic copy of the reports in the NAIC-approved format shall be provided to ODM;

   a. Annual financial statements for those entities who have an ownership interest totaling five percent or more in the MCP or an indirect interest of five percent or more, or a combination of direct and indirect interest equal to five percent or more in the MCP;

   b. Annual audited Financial Statements prepared by a licensed independent external auditor as submitted to the ODI, as outlined in OAC rule 5160-26-09(B);

   c. Quarterly and Annual Medicaid MCP ODM Cost Reports for all covered populations specified in Appendix B of this Agreement and the auditor's certification of the cost report, as outlined in OAC rule 5160-26-09(B);

      i. The annual and quarterly cost reports shall adhere to the Agreement, and be submitted in accordance with the cost report instructions and within established timeframes.

      ii. Annual and quarterly cost reports shall be revised in accordance with the actuaries' observation log and/or ODM instructions.

      iii. All non-mandatory observations identified in the actuary observation log shall be appropriately addressed and responses submitted within established timeframes by ODM.

   d. Annual physician incentive plan disclosure statements and disclosure of and changes to the MCP's physician incentive plans, as outlined in OAC rule 5160-26-09(B);

   e. Reinsurance agreements, as outlined in OAC rule 5160-26-09(C);

   f. Prompt Pay Reports, in accordance with OAC rule 5160-26-09(B). An electronic copy of the reports in the ODM-specified format shall be provided to ODM;

**S0215 - L60**

Medicaid Managed Care
Appendix J
Financial Performance

g. Notification of requests for information and copies of information released pursuant to a tort action (i.e., third party recovery), as outlined in OAC rule 5160-26-09.1;

h. Financial, utilization, and statistical reports, when ODM requests such reports, based on a concern regarding the MCP's quality of care, delivery of services, fiscal operations or solvency, in accordance with OAC rule 5160-26-06(D);

i. The MCP shall submit ODM-specified reports for the calculation of items 2.b, 2.c and 2.d below in electronic formats.

j. Penalty for noncompliance. Noncompliance with submission of the above items will result in penalties, as outlined in Appendix N of this Agreement.

2. **Financial Performance Measures and Standards.** This Appendix establishes specific expectations concerning the financial performance of the MCP. In the interest of administrative simplicity and non-duplication of areas of ODI authority, ODM's emphasis is on the assurance of access to and quality of care. ODM will focus only on a limited number of indicators and related standards to monitor MCP financial performance. The five indicators and standards for this Agreement period are identified below. The source for each indicator will be the NAIC Quarterly and Annual Financial Statements and Modified Supplemental Health Care Exhibit. The measurement period that will be used to determine compliance will be the annual Financial Statement and Modified Supplemental Health Care Exhibit.

a. **Indicator**: Current Ratio. Refer to the ODM Methods for Financial Performance Measures for the definition and calculations for the Current Ratio.

**Standard**: The Current Ratio shall not fall below 1.00 as determined from the annual Financial Statement submitted to ODI and ODM.

b. **Indicator**: Medical Loss Ratio. Refer to the ODM Methods for Financial Performance Measures for the definition and calculations for the Medical Loss Ratio indicator.

**Standard**: Minimum Medical Loss Ratio shall not fall below 85%, as determined from the annual Modified Supplemental Health Care Exhibit of the annual Financial Statement submitted to ODM.

c. **Indicator**: Administrative Expense Ratio. Refer to the ODM Methods for Financial Performance Measures for the definition and calculations for the Administration Expense Ratio indicator.

**Standard**: Administrative Expense Ratio shall not exceed 15%, as determined from the annual Financial Statement submitted to ODI and ODM.

d. **Indicator**: Overall Expense Ratio. Refer to the ODM Methods for Financial Performance Measures for the definition and calculations for the Overall Expense Ratio indicator.

S0215 – L61

Medicaid Managed Care
Appendix J
Financial Performance

> **Standard**: Overall Expense Ratio shall not exceed 100% as determined from the annual Financial Statement submitted to ODI and ODM.

> e. **Indicator**: Defensive Interval. Refer to the ODM Methods for Financial Performance Measures for the definition and calculations for the Defensive Interval indicator.

> **Standard**: The Defensive Interval shall not fall below 30 days as determined from the annual Financial Statement submitted to ODI and ODM.

**Penalty for noncompliance**. Noncompliance with any of the above standards will result in penalties, as outlined in Appendix N of this Agreement.

Long-term investments that can be liquidated without significant penalty within 24 hours, which the MCP includes in cash and short-term investments in the financial performance measures, shall be disclosed in footnotes on the NAIC Reports. Descriptions and amounts shall also be disclosed. Please note that "significant penalty" for this purpose is any penalty greater than 20%. The MCP shall enter the amortized cost of the investment, the market value of the investment, and the amount of the penalty.

3. **Reinsurance Requirements.** Pursuant to the provisions of OAC rule 5160-26-09(C), the MCP shall carry reinsurance coverage from a licensed commercial carrier to protect against inpatient-related medical expenses incurred by Medicaid members.

   The annual deductible or retention amount for such insurance shall be specified in the reinsurance agreement and shall not exceed $100,000.00, unless ODM has provided the MCP with prior approval in writing for a higher deductible amount or alternate reinsurance arrangement. Except for transplant services, and as provided below, this reinsurance shall cover, at a minimum, 80% of inpatient costs incurred by one member in one year, in excess of $100,000.00 unless ODM has provided the MCP with prior approval in writing for a higher deductible amount or alternate reinsurance arrangement.

   For transplant services, the reinsurance shall cover, at a minimum, 50% of inpatient transplant related costs incurred by one member in one year, in excess of $100,000.00 unless ODM has provided the MCP with prior approval in writing for a higher deductible amount or alternate reinsurance arrangement.

   The MCP may request a higher deductible amount and/or that the reinsurance cover less than 80% of inpatient costs in excess of the deductible amount, only after the MCP has one year of enrollment in Ohio. If the MCP does not have more than 75,000 members in Ohio, but does have more than 75,000 members between Ohio and other states, ODM may consider alternate reinsurance arrangements. However, depending on the corporate structures of the Medicaid MCP, other forms of security may be required in addition to reinsurance. These other security tools may include parental guarantees, letters of credit, or performance bonds. In determining whether or not the request will be approved, ODM may consider any or all of the following:

   a. Whether the MCP has sufficient reserves available to pay unexpected claims;

S0215 – L62

Medicaid Managed Care
Appendix J
Financial Performance

    b. The MCP's history in complying with financial indicators 2.a., 2.b., 2.c. 2.d and 2.e, as specified in this Appendix;

    c. The number of members covered by the MCP;

    d. How long the MCP has been covering Medicaid or other members on a full risk·basis;

    e. Risk based capital ratio greater than 2.5 or higher calculated from the last annual·ODI financial statement;

    f. Scatter diagram or bar graph from the last calendar year that shows the number of reinsurance claims that exceeded the current reinsurance deductible graph/chart showing the claims history for reinsurance above the previously approved deductible from the last calendar year.

Penalty for noncompliance: Noncompliance with submission of the above items will result in penalties, as outlined in Appendix N of the Agreement.

4. **Prompt Pay Requirements.** In accordance with 42 CFR 447.46, the MCP shall pay 90% of all submitted clean claims within 30 days of the date of receipt and 99% of such claims within 90 days of the date of receipt, unless the MCP and its contracted provider(s) have established an alternative payment schedule mutually agreed upon and described in their contract. Effective for claims received on or after July 1, 2017, the claim types listed below will be separately measured against the 30 and 90 day prompt pay standards:

    a. **Clean nursing facility claims.**

        i. The MCP shall pay 90% of all clean nursing facility claims within 30 days of the date of receipt.

        ii. 99% of such claims within 90 days of the date of receipt.

    b. **Clean pharmacy claims.**

        i. The MCP shall pay 90% of all clean pharmacy claims within 30 days of the date of receipt.

        ii. 99% of such claims within 90 days of the date of receipt.

    c. **All other clean claim types** (excluding clean nursing facility and pharmacy claims).

        i. The MCP shall pay 90% of all other clean claim types (excluding clean nursing facility and pharmacy claims) within 30 days of the date of receipt.

        ii. 99% of such claims within 90 days of the date of receipt.

S0215 - L63

Medicaid Managed Care
Appendix J
Financial Performance

The prompt pay requirement applies to the processing of both electronic and paper claims for contracting and non-contracting providers by the MCP and delegated claims processing entities.

The date of receipt is the date the MCP receives the claim, as indicated by its date stamp on the claim. The date of payment is the date of the check or date of electronic payment transmission. A claim means a bill from a provider for health care services assigned a unique identifier. A claim does not include an encounter form.

A "claim" can include any of the following: (1) a bill for services; (2) a line item of services; or (3) all services for one recipient within a bill. A "clean claim" is a claim that can be processed without obtaining additional information from the provider of a service or from a third party.

Clean claims do not include payments made to a provider of service or a third party where the timing of the payment is not directly related to submission of a completed claim by the provider of service or third party (e.g., capitation). A clean claim also does not include a claim from a provider who is under investigation for fraud or abuse, or a claim under review for medical necessity.

Penalty for noncompliance: Noncompliance with submission of the above items will result in penalties, as outlined in Appendix N of the Agreement.

5. **Physician Incentive Plan Disclosure Requirements.** The MCP shall comply with the physician incentive plan requirements stipulated in 42 CFR 438.3(i). If the MCP operates a physician incentive plan, no specific payment can be made directly or indirectly under this physician incentive plan to a physician or physician group as an inducement to reduce or limit medically necessary services furnished to an individual.

If the physician incentive plan places a physician or physician group at substantial financial risk [as determined under paragraph (d) of 42 CFR 422.208] for services that the physician or physician group does not furnish itself, the MCP shall ensure all physicians and physician groups at substantial financial risk have either aggregate or per-patient stop-loss protection in accordance with paragraph (f) of 42 CFR 422.208, and conduct periodic surveys in accordance with paragraph (h) of 42 CFR 422.208.

In accordance with 42 CFR 417.479 and 42 CFR 422.210, the MCP shall maintain copies of the following required documentation and submit to ODM upon request:

a. A description of the types of physician incentive arrangements the MCP has in place which indicates whether they involve a withhold, bonus, capitation, or other arrangement. If a physician incentive arrangement involves a withhold or bonus, the percent of the withhold or bonus shall be specified.

b. A description of information/data feedback to a physician/group on their: 1) adherence to evidence-based practice guidelines; and 2) positive and/or negative care variances from standard clinical pathways that may impact outcomes or costs. The feedback information may be used by the MCP for activities such as physician performance

S0215 - L64

Medicaid Managed Care
Appendix J
Financial Performance

improvement projects that include incentive programs or the development of quality improvement initiatives.

c. A description of the panel size for each physician incentive plan. If patients are pooled, then the pooling method used to determine if substantial financial risk exists shall also be specified.

d. If more than 25% of the total potential payment of a physician/group is at risk for referral services, the MCP shall maintain a copy of the results of the required patient satisfaction survey and documentation verifying that the physician or physician group has adequate stop-loss protection, including the type of coverage (e.g., per member per year, aggregate), the threshold amounts, and any coinsurance required for amounts over the threshold.

e. Upon request by a member or a potential member and no later than 14 calendar days after the request, the MCP shall provide the following information to the member:

   i. Whether the MCP uses a physician incentive plan that affects the use of referral services;

   ii. The type of incentive arrangement;

   iii. Whether stop-loss protection is provided; and

   iv. A summary of the survey results if the MCP was required to conduct a survey.

The information provided by the MCP shall adequately address the member's request.

6. **Notification of Regulatory Action.** If the MCP is notified by the ODI of proposed or implemented regulatory action, they shall report such notification and the nature of the action to ODM no later than one business day after receipt from ODI. ODM may request, and the MCP shall provide, any additional information as necessary to ensure continued satisfaction of program requirements. The MCP may request that information related to such actions be considered proprietary in accordance with established ODM procedures. Failure to comply with this provision will result in an immediate enrollment freeze.

S0215 - L65

Medicaid Managed Care
Appendix K
Quality Care

**APPENDIX K**

**QUALITY CARE**

This appendix establishes program requirements and expectations related to MCP responsibilities for developing and implementing a population health management program; assuring health, safety, and welfare for members; partnering with Comprehensive Primary Care (CPC) practices to improve population health; coordinating with care management entities; developing and implementing utilization management programs; developing and implementing a Quality Assessment and Performance Improvement (QAPI) program; and participating in external quality review activities. These program requirements support the priorities and goals set forth in the Ohio Medicaid Quality Strategy.

1. **Population Health Management.** The Ohio Department of Medicaid (ODM) seeks to improve the health of the Ohio Medicaid population by identifying and monitoring individual patients within specified groups. A well-designed population health management program is driven by clinical, financial, and operational data from internal departments and larger delivery systems providing actionable data that can be used to improve quality of care, patient experience, health equity and cost of care.

   The following section outlines the population health management requirements the MCP shall address as part of its model of care. The MCP shall develop a model of care that broadly defines the way services will be delivered to meet population needs. The MCP shall address the following components as part of its model of care:

   a. **Description of the Population(s) and Specialized Services**. A comprehensive description of the MCP's population and the specialized services and resources tailored to the population are key to the model of care. This section of the model of care shall address the following components:

      i. **Risk stratification levels**. The MCP shall develop a risk stratification level framework for the purpose of targeting interventions and allocating resources based on the member's needs. Using a risk stratification framework comprised of five levels (i.e., from lowest to highest: monitoring, low, medium, high and intensive), the MCP will determine the appropriate risk stratification level based on assessed needs.

      The MCP shall identify the factors that will be considered when determining a member's risk stratification level. At a minimum, the MCP shall consider the following current and historical factors: acuity of chronic conditions, substance use and/or mental health disorders, maternal risk (e.g., prior preterm birth), inpatient or emergency department utilization, social determinants of health and/or safety risk factors. The MCP shall develop criteria and thresholds for each level that will be used to determine assignment to the risk stratification level. Criteria and thresholds established by the MCP are subject to ODM approval.

S0215 - L66

Medicaid Managed Care
Appendix K
Quality Care

For all new members, the MCP shall use a health risk assessment for the purpose of risk stratification and to identify potential needs for care management. The MCP shall administer the ODM-approved standardized pediatric and adult needs assessment tool within 90 days of enrollment and communicate information as required by ODM (e.g., CPC practices, ODM). In 2018, the MCP shall collaborate with ODM on the development of a new health risk assessment tool that shall be implemented by January 1, 2019.

The MCP shall evaluate a member's stratification level when there is a significant change in the member's need(s), progress in meeting care plan goals, etc. The MCP shall describe the trigger(s) for changing the member's stratification level.

The MCP shall assign each member to a risk stratification level for each month of enrollment with the MCP. For members newly enrolled with the MCP, an initial risk stratification level shall be assigned within the first month of the member's enrollment.

ii. **Population stream**. ODM established five population streams—women of reproductive age, behavioral health, chronic conditions, healthy children and healthy adults—that will be used to organize work around population health. The MCP shall develop a strategy that assigns each member to a single population stream in accordance with ODM's population stream and corresponding hierarchy and in alignment with ODM's Quality Strategy (i.e., tracking to specific population health outcomes). The MCP shall have a process to identify and track the population stream assigned to each member.

The MCP shall provide a description for each population stream that shall include the incidence and prevalence of medical and behavioral health conditions and issues that might impact health status such as age, gender, race, ethnicity, geography, language, or other socio economic barriers that might affect the effective provision of health care services, as well as living or caregiver arrangements that might pose challenges for certain members.

iii. **Specialized services and resources**. The MCP shall include a description of specialized services and other resources (e.g., health and wellness programs, 24/7 nurse advice line, care management, etc.) for each population stream tailored to risk level and communities.

ODM may provide structured guidance for priority population streams that the MCP should integrate into the model of care (e.g., Ohio Department of Medicaid's Guidance for Managed Care Plans for the Provision of Enhanced Maternal Care Services).

At a minimum, the MCP shall integrate the following into its model of care:

S0215 – L67

Medicaid Managed Care
Appendix K
Quality Care

1. **Care Management**. The MCP shall ensure members are able to access care management services when needed. There shall be a clear delineation of roles and responsibilities between the MCP and other entities (CPC practice, PCMH, community partners, etc.) responsible for, or are contributing, to care management in order to ensure no duplication of, or gaps in, services. If no other accountable entity has been identified for the member, then the MCP is responsible for providing the full scope of care management services to the member.

   The MCP's approach to care management shall emulate the features of a high-performing care management system: person and family centeredness; timely, proactive planned communication and action; the promotion self-care and independence; emphasis on cross continuum and system collaboration (e.g., behavioral health); and the comprehensive consideration of physical, behavioral and social determinants of health. The MCP shall consider the Case Management Society of America's *Standards of Practice for Case Management,* 2016 when designing and implementing its care management program.

   The following components shall be addressed in the care management section of the model of care:

   a. **Assessment**. The MCP shall have a clear description of the process for conducting or arranging for assessments appropriate for their members' unique circumstances and needs (e.g., physical, behavioral, social, and safety) that includes the following:

      i. Methods utilized to complete assessments, including any variances by risk level.

      ii. Timeline to complete assessments, including any variances by risk level.

      iii. Identification of the trigger(s) for completion of a comprehensive assessment, a disease-specific assessment or a re-assessment when there is a change to the member's health status or needs, a significant change event, a change in diagnosis, or as requested by member or his/her provider.

      iv. How the assessment will be used to develop and update the care plan and confirm the risk stratification level for each member.

      v. How data from the member's primary care provider will be used to prevent duplication of assessment efforts

S0215 – L68

Medicaid Managed Care
Appendix K
Quality Care

and to assist with identification of priorities for the member.

    vi. How members who cannot be reached or who refuse assessments will be handled by the MCP, including multiple contacts if initial contacts are unsuccessful.

    vii. How assessment data will be stored and made available to members of the multi-disciplinary care team in order to coordinate care.

    viii. How assessment data will be shared with the member's other payor, as applicable, in order to prevent duplication of efforts.

b. **Individualized Care Plans**. The MCP shall have a person centered care planning process that includes the following components:

    i. How an individualized care plan will be developed and updated based on the most recent assessment along with timelines for the initial development and updates.

    ii. Inclusion of prioritized measureable goals, interventions, and outcomes.

    iii. Development of goals with, and agreement by, the member.

    iv. Alignment of care plan goals with the priority issues identified by the primary care provider so the MCP can support the provider-patient relationship.

    v. Validation that services recommended were received by the member and a provision that if services were not received there is necessary action taken to address and close gaps in care.

    vi. Updates to the care that occur at least every 12 months or when the member's needs change significantly.

    vii. Retention of the ICP and making it available to members of the multi-disciplinary team.

c. **Care Management Staffing**. The MCP staffing model shall address the following components:

S0215 – L69

Medicaid Managed Care
Appendix K
Quality Care

i. How the MCP identifies and determines who will be the accountable point of contact (e.g., care manager);

ii. How the MCP determines the composition of the multi-disciplinary team, as needed, when the member's physical, psychosocial, and/or behavioral conditions would benefit from a range of disciplines with different but complementary skills, knowledge and experience working together to deliver a comprehensive, integrated approach to care management;

iii. The delineation of roles and responsibilities of the team members (with particular emphasis on non-duplication of activities performed by PCPs, PCMHs, etc.);

iv. How the MCP exchanges member information within and across the team;

v. How the MCP will ensure staff who are completing care management functions are operating within their professional scope of practice, are appropriate for the member's health care needs, and follow the state's licensure/credentialing requirements.

vi. A staff training model that includes the onboarding of new employees and ongoing training for current employees on the MCP's model of care, cultural competency, person centered care planning, motivational interviewing, grievance reporting process/procedure, availability of community resources in the care manager's respective geographic areas, care management strategies for disease specific processes, abuse/neglect/exploitation reporting requirements, and HIPAA;

vii. How the MCP will strive for a single point of care management for each member in order to reduce duplication and gaps in services.

viii. That the MCP will attest that care managers and MCP employed/delegated members of the care management team are not related by blood or marriage to the member or any paid caregiver, financially responsible for the member, or empowered to make financial or health related decisions on behalf of a member.

S0215 — L70

Medicaid Managed Care
Appendix K
Quality Care

ix. A methodology for assigning consistent and appropriate caseloads for care managers that ensures health, welfare and safety for members. The caseload assignment methodology shall consider the following factors: population; acuity status mix; care manager qualifications, years of experience, and responsibilities; provision of support staff; location of care manager (community, MCP office, provider office);geographic proximity of care manager to members (if community based); and access to and capabilities of technology/IT systems.

d. **Contact Schedule.** The MCP shall establish a contact schedule with the member based on his or her needs and facilitates ongoing communication with the member. When a gap in care and/or a need for follow-up is identified, the MCP shall take action (e.g., close the gap in care, arrange transportation, referral to disease management, referral to behavioral health, etc.) and update the care plan, as appropriate.

e. **Special Populations.** The MCP shall assess special populations identified by ODM (e.g., children with special health care needs who are not affiliated with an accountable care management entity, children in custody, justice involved, etc. ) to determine if there is a need for care management.

f. **Care Management Status Indicators.** A care management status will be assigned to each member who is care managed by the MCP regardless of stratification level: outreach and coordination, engaged, and inactive. A member shall only be assigned to one care management status and they are defined as follows:

i. **Outreach and coordination.** This indicator is used when the MCP performs one or more of the following activities for a member: conducts outreach; educates the member; makes referrals for physical, behavioral, or social services; or provides service coordination (defined as a planned, active interaction between the MCP and any provider involved with the member).

ii. **Engaged.** A member is classified as engaged after the MCP completes an assessment and develops an individualized care plan. Ongoing, the engaged status can be used when the MCP is able to meet the frequency requirements for the member's contact

S0215 – L71

Medicaid Managed Care
Appendix K
Quality Care

              schedule.

        iii. **Inactive**. A member is regarded as inactive if the MCP has assigned a population stream and risk level but is unable to engage the member in care management and/or is not performing outreach and coordination activities for the member.

    g. **Care Management Information Technology System**. The MCP shall have a care management system that captures, at a minimum, the results of the assessment and the care plan content, including goals, interventions, outcomes and completion dates. Members of the care management team who use the care management system shall also have access to, and meaningfully use, relevant data about the member (claims, prior authorization data) in order to coordinate and communicate care needs across providers and delivery systems. The MCP shall use information technology systems and processes to integrate the following data elements: enrollment data, care management data, claims, member services, 24/7 nurse advice line, prior authorization data, etc. in order to maximize internal MCP communications (e.g., the Utilization Management reviewer is able to see the care management risk level and the name of a care manager for a member) about a specific member. The MCP's system shall also have capability to make care management data available to the member, the PCP and specialists.

    h. **Care Management Program Effectiveness.** ODM will evaluate the effectiveness of the MCP's care management program by administering a provider and consumer satisfaction survey, conducting targeted administrative performance reviews, and/or calculating results for efficiency or fragmentation of care measures. ODM will develop methods and standards for these activities in Calendar Year (CY) 2018 with anticipated implementation in CY 2019.

2. **Care Transitions**. The MCP shall effectively and comprehensively manage transitions of care between both physical and behavioral health settings in order to prevent unplanned or unnecessary readmissions, emergency department visits, and/or adverse outcomes. The MCP shall have a process to conduct the following:

    a. Identify members who require assistance transitioning between settings;

S0215 – L72

Medicaid Managed Care
Appendix K
Quality Care

b. Develop a method for evaluating risk of readmission in order to determine the intensity of follow up required for the member after the date of discharge;

c. Designate MCP staff who will communicate with the discharging facility and inform the facility of the MCP's designated contacts;

d. Ensure timely notification and receipt of admission dates, discharge dates and clinical information is communicated between MCP departments, care settings and with the primary care provider, as appropriate;

e. Participate in discharge planning activity with the facility including making arrangements for safe discharge placement and facilitating clinical hand-offs between the discharging facility and the MCP;

f. Obtain a copy of the discharge/transition plan;

g. Arrange for services specified in the discharge/transition plan; and

h. Conduct timely follow up with the member and the member's primary provider to ensure post discharge services have been provided.

When the MCP is contacted by an inpatient facility with a request to participate in discharge planning, the MCP shall cooperate as outlined above to ensure a safe discharge placement and services are arranged for the member.

3. **Enhanced Maternal Care.** The MCP shall integrate ODM's *Guidance for Managed Care Plans for the Provision of Enhanced Maternal Care Services* into its model of care.

b. **Data Submission.** The MCP shall submit four electronic files as follows:

i. **Population stream.** The MCP shall submit to ODM a file that contains a population stream for all specified members. The assigned population stream shall align with ODM's five population streams: women of reproductive age, behavioral health, chronic condition, healthy children, and healthy adults. Requirements for this file submission are specified in Medicaid Managed Care: Population Stream Data Submission Specifications.

ii. **Risk stratification level.** The MCP shall submit a file to ODM that contains a risk stratification level for all specified members. The assigned risk stratification level will be intensive, high, medium, low or monitoring. Requirements for this file

S0215 – L73

Medicaid Managed Care
Appendix K
Quality Care

> submission are specified in Medicaid Managed Care: Risk Stratification Data Submission Specifications.

> iii. **Care management status**. The MCP shall submit a file to ODM that contains a care management status for all specified members. The three care management status indicators are outreach and coordination, engaged, inactive. Requirements for this file submission are specified in Medicaid Managed Care: Care Management Status Submission Specifications.

> iv. **Health risk assessment**. Beginning on or after January 1, 2019, the MCP shall submit a file to ODM that contains health risk assessment results for all specified members. Requirements for this file submission are specified in Medicaid Managed Care: Health Risk Assessment Submission Specifications.

> Submissions to ODM will occur quarterly and in accordance with the specifications referenced in 1.b.i-iv.

> ODM, or its designee, may validate the accuracy of the information contained in the four electronic files with the MCP's records for the member.

c. **Program Submission and Evaluation**. The MCP shall have an ODM-approved Model of Care. The MCP shall assess and enhance specialized programming for each group identified by the MCP's population health management strategy using continuous quality improvement principles.

2. **Member Safeguards**. The MCP shall develop and implement safeguards, systems, and processes that detect, prevent, and mitigate harm and/or risk factors that could impact an individual's health, welfare, and safety. When the MCP identifies or becomes aware of risk factors, it shall put in place services and supports to mitigate and address the identified issues as expeditiously as the situation warrants.

When the member poses or continues to pose a risk to his or her health, safety, and welfare, the MCP may develop and implement an acknowledgement of responsibility plan between the MCP, the member and/or the legal guardian, as applicable, identifying the risks and setting forth interventions recommended by the MCP to remedy risks to the individual's health, safety and welfare. The MCP's process for development and implementation of an acknowledgement of responsibility plan shall be in accordance with ODM's specifications, as described in ODM's "Acknowledgement of Responsibility Guidance" document. The MCP shall also document the member's acknowledgement of responsibility, refusal to sign the acknowledgement of responsibility, and/or lack of adherence to the agreed upon actions or interventions in the clinical record.

ODM or its designee will conduct administrative reviews, in-home checks, and/or other oversight activities to ensure an individual's health, welfare, and safety. The penalties for non-compliance that places a member at risk for a negative health outcome or jeopardizes the health, safety and welfare of the member are located in Appendix N.

S0215 – L74

Medicaid Managed Care
Appendix K
Quality Care

3. **Partnering with State Innovation Model (SIM) Comprehensive Primary Care (CPC) Practices to Improve Population Health.** MCP members who are attributed to a CPC Practice shall receive all of their care management, including coordination of behavioral, physical, and social needs, from the CPC practice. Ideally, the CPC practice shall be the member's primary care management entity. In the event the CPC practice communicates to the MCP that it is not the lead care management entity for an attributed member, the MCP may choose to care manage the member.

The MCP plays a key role in supporting the CPC practice's with achieving optimal population-level health outcomes. The MCP shall establish a relationship with each CPC practice and identify the level of support to be provided by the MCP based on the CPC practice's infrastructure, capabilities, and preferences for MCP assistance (e.g., addressing social determinants of health, risk stratification, etc.). At a minimum, the MCP shall support each of the CPC activities and the overall initiative:

| For each of the following CPC activities, | the MCP shall do the following during the start-up and ongoing phases of the initiative: |
|---|---|
| Same day appointments | Identify and document how the CPC practice offers same day appointments (e.g., extended weekday hours, weekend hours, etc.) in order to ensure accurate information and appropriate guidance is provided by member facing departments to attributed members. |
| 24/7 access to care | Identify and document if the CPC practice offers 24/7 access to care in order to ensure accurate information and appropriate guidance is provided by member facing departments to attributed members. |
| Risk Stratification | Generate and provide a list of risk-stratified members attributed to each CPC practice on a regular basis and whenever there is a change in risk status.

Review the risk stratified list with the CPC practice and provide additional data for high priority patients in order to assist the CPC with ongoing care management responsibilities.

Timely notify the CPC practice of significant change events (IP hospitalizations, ED visits, etc.) that could impact the assigned risk stratification level.

Update the MCP's care management system to reflect changes to the risk stratification level initiated and communicated by the CPC practice. |
| Outreach to key patients | Provide information about MCP-administered specialized services and resources as part of the MCP's model of care for which a CPC practice can refer and link members to with assistance by the MCP. |

S0215 - L75

Medicaid Managed Care
Appendix K
Quality Care

| For each of the following CPC activities, | the MCP shall do the following during the start-up and ongoing phases of the initiative: |
|---|---|
|  | Assist with identification of preventive or chronic services that members have not received in order to identify gaps in care.<br><br>Assist in coordinating services as needed (e.g., schedule appointments, arrange transportation, facilitate referrals and linkages to MCP health and wellness programs, etc) in order to assist with improving health outcomes.<br><br>Share timely, meaningful, actionable data with the CPC practice that can facilitate population health activities. |
| Team based care management | Work with each CPC practice to delineate roles and responsibilities for high priority patients to ensure there are no gaps in or duplication of services.<br><br>Designate points of contact for each CPC practice to clearly identify who will participate in CPC-led patient care team meetings and who will assist the CPC with effectively and efficiently navigating MCP processes (e.g., facilitating prior authorizations).<br><br>Participate in CPC-led patient care team meetings, when requested.<br><br>Respond timely to requests from the CPC for action and follow up by the MCP (e.g., arranging transportation, performing outreach to a patient).<br><br>Receive and integrate critical CPC data elements (e.g., social determinants of health identified by the CPC) into the MCP's care management system and use the information when interacting with members.<br><br>Share timely, meaningful, actionable data with the CPC that can facilitate effective team based care management activities (e.g., resolution of CPC requests for MCP follow up). |
| Follow up after hospital discharge | Notify the CPC of ED visits or IP admissions for high priority patients.<br><br>Participate in discharge planning activities with the CPC and inpatient facility in order to support a safe discharge placement and to prevent unplanned or unnecessary readmissions, ED visits, and/or adverse outcomes.<br><br>Support the post discharge services as specified in the discharge/transition plan. |

S0215 – L76

Medicaid Managed Care
Appendix K
Quality Care

| For each of the following CPC activities, | the MCP shall do the following during the start-up and ongoing phases of the initiative: |
|---|---|
| | Facilitate clinical hand offs, upon request from the CPC, between the discharging facility and other providers (e.g., home health, community behavioral health agencies). <br><br> Share timely, meaningful, and actionable data with the CPC that can facilitate effective care transitions. |
| Tracking of follow up tests and specialist referrals | When requested assist with bi-directional communication between the CPC and specialists, pharmacies, labs and imaging facilities, as needed, in order to facilitate timely exchange of information. <br><br> Share timely, meaningful, and actionable data with the CPC that can facilitate tracking and follow up of tests and referrals (e.g., when patients self-refer). |
| Patient Experience | Facilitate a warm hand off between the MCP care manager and the CPC when care management responsibility transitions from the MCP to the CPC. <br><br> Provide quantitative or qualitative data with the CPC that can improve the patient experience (e.g., results from the MCP's member advisory groups, member satisfaction surveys, grievances and complaints, member preferences, etc.). <br><br> Participate in the CPC's improvement opportunities, as requested, aimed at improving overall patient experience and reducing disparities in patient experience. |

The MCP shall perform the following administrative activities in support of the CPC initiative:

a. Perform ongoing identification of members who could receive care management from a CPC. Contact identified members and educate them about the benefits of CPC, assist members with selection of a CPC, and facilitate referrals to the CPC.

b. Submit the CPC member attribution files as specified by ODM to meet data quality assurance standards described in the CPC Attribution File Submission Specifications and Standards Methodology. Generate and provide a list of attributed members for each CPC.

c. Track members who are attributed to each CPC.

d. Reimburse CPCs the agreed upon 'per member per month' (PMPM) payment for attributed members and any shared savings for meeting model requirements in accordance with requirements set forth by ODM. The MCP shall send the PMPM

S0215 – L77

Medicaid Managed Care
Appendix K
Quality Care

payment to CPC practices within ten calendar days of receipt from ODM.

e. Reconcile payment data for each CPC.

f. Amend contracts, as necessary, with CPCs to reflect the reimbursement of the PMPM payment and the shared savings payment.

g. Provide technical support, as needed, to the CPC to assist with its understanding and use of data files provided by the MCP.

h. Receive and integrate data provided by the CPC and implement throughout the MCP's systems and operations;

i. Integrate results from CPC metrics into the MCP's overall quality improvement program.

j. Use regional and community population health priorities to develop a clear improvement strategy in partnership with CPCs.

k. Ensure provider- and member-facing departments (provider services, member services or 24/7 nurse advice lines, utilization management) are able to identify when a member is attributed to a CPC and use related information (e.g., the attributed CPC, expanded access offered by the CPC, explanation of why a member was attributed to a CPC, etc.) when interacting with members and providers.

4. **Partnering with Behavioral Health Care Providers to Improve Population Health.** The MCP shall actively participate, as directed by ODM, in ODM's efforts to design a Behavioral Health Care Coordination Model that will be implemented on or after July 1, 2018.

5. **Coordination and collaboration with Care Management Entities.**

a. Collaboration and coordination with:

i. **Certified Medicaid Health Home Providers.** Medicaid Health Home services will be discontinued effective June 30, 2018. Until this date, the MCP shall continue to support the Medicaid Health Homes by:

1. Delineating responsibilities between the Health Home and the MCP in order to avoid duplication or gaps in services.

2. Maintaining a single point of contact for the Health Home.

3. Transmission of requested data, information and reports in a timely manner.

4. Responding to requests for assistance or support in a timely manner.

S0215 - L78

Medicaid Managed Care
Appendix K
Quality Care

Prior to the discontinuation of Health Home services, the MCP shall collaborate with the Health Home to transition the member to other Medicaid service options that will be available as well as transfer the care management responsibility to the MCP, as applicable.

Through June 30, 2018, the MCP may continue to include a member who is receiving health home services in the intensive level as long as the MCP collaborates with the Health Home on a quarterly basis on care management activities. When the care management responsibility transitions back to the MCP, the MCP shall assure it is compliant with care management requirements in this appendix.

ii. **Case management agencies/entities for the Medicaid FFS waivers**. The MCP shall coordinate and collaborate with agencies that provide case management services to managed care members who receive services from any of the following Medicaid waiver programs: Ohio Home Care waiver, PASSPORT waiver, Assisted Living waiver, and DODD-administered waivers. The MCP shall support waiver case management agencies per the following:

1. Delineating responsibilities between the case management agency and the MCP in order to avoid duplication or gaps in services.

2. Maintaining a single point of contact for the case management agency.

3. Transmission of requested data, information and reports in a timely manner.

4. Responding to requests for assistance or support in a timely manner.

b. Pursuant to 438.208(b), for all members, the MCP shall coordinate services received from any other payor, with the services received in FFS Medicaid, and with services received from community and social support providers.

6. **Utilization Management Programs**. The MCP shall implement clearly defined structures and processes to maximize the effectiveness of the care provided to members pursuant to OAC rule 5160-26-03.1.

Pursuant to the criteria in ORC 5160.34(C), the MCP is prohibited from retroactively denying a prior authorization (PA) request as a utilization management strategy. In addition, the MCP shall permit the retrospective review of a claim submitted for a service where PA was required, but not obtained, pursuant to the criteria in ORC 5160.34(B)(9). Also ORC 5160.34 requires the MCPs establish a streamlined provider appeal process relating to adverse PA determinations.

a. **Drug Utilization Management**. Pursuant to ORC Section 5167.12, the MCP may implement strategies for the management of drug utilization. ODM may request details of drug utilization management programs, such as prior authorization, step therapy, partial fills, specialty pharmacy, pill-splitting, etc. and require changes to such programs,

S0215 - L79

Medicaid Managed Care
Appendix K
Quality Care

if they cause barriers to care. The MCP may, subject to ODM prior-approval, require PA of certain drug classes and place limitations on the type of provider and locations where certain drugs may be administered; however, the MCP cannot require PA for drugs used to prevent preterm birth nor can they require PA for the location of administration. The MCP shall establish their PA system so that it does not unnecessarily impede member access to medically-necessary Medicaid-covered services as follows:

i. As outlined in Appendix C, the MCP shall adhere to specific PA limitations to assist with the transition of new members from FFS Medicaid.

ii. As outlined in ORC 5167.12 and Appendix G, the MCP shall allow members to receive without PA certain antidepressant and antipsychotic drugs and to take into consideration if the member is stabilized on a specific antidepressant or antipsychotic drug when PA is permitted.

iii. The MCP shall comply with the provisions of 1927(d)(5) of the Social Security Act, 42 USC 1396r-8(d)(5), 42 CFR 438.3(s)(6), and OAC rule 5160-26-03.1 regarding the timeframes for prior authorization of covered outpatient drugs.

iv. The MCP shall develop and submit for prior approval, a coordinated services program (CSP) as defined in OAC rule 5160-20-01 to address the utilization or pattern of receiving medications at a frequency or in an amount that exceeds medical necessity. The MCP shall, at a minimum, issue a notice of enrollment in CSP to members whose pattern of utilization, of controlled substances, exceeds medical necessity and follow all provisions of OAC rule 5160-20-01 for initial and continued enrollment. The MCP shall offer to provide care management services to any member who is enrolled in the CSP. Exceeding medical necessity may include:

1. Receiving prescriptions for 12 or more controlled substances in 90 days; or

2. Receiving controlled substance prescriptions from 4 or more pharmacies in 90 days; or

3. Receiving controlled substance prescriptions from 4 or more prescribers in 90 days; or

4. Receiving medical services for diagnoses including substance abuse, or poisoning, or that indicates a pattern of using services to obtain controlled substances not medically necessary or are a result of substances being used in a way not medically necessary.

v. The MCP shall develop prospective and retrospective drug utilization review programs designed to promote the appropriate clinical prescribing of covered drugs as outlined in Appendix G.

## S0215 – L80

Medicaid Managed Care
Appendix K
Quality Care

    b. The MCP shall develop medication management programs to be submitted and approved annually as directed by ODM. Medication management is a process that promotes safe and effective use of medications, including prescription and over the counter drugs, vitamins, and herbal supplements. The plan shall detail the medication management triggering events, activity that occurs after a triggering event, how each medication management interaction is documented so each member of the care team can access the information, and how an action plan will be initiated and monitored.

    c. **Behavioral Health Expedited Prior Authorization.** With implementation of Behavioral Health Redesign, certain behavioral health services, assertive community treatment (ACT), intensive home based treatment (IHBT) and substance use disorder (SUD) residential treatment (beginning with the third stay in a calendar year), shall be prior authorized as expeditiously as the member's health condition requires but no later than two business days after receipt of the request in accordance with OAC rule 5160-26-03.1.

7. **Transition of Care from the Ohio Department of Rehabilitation and Correction's Facilities to the Community for Critical Risk Individuals.** The MCP is responsible for facilitating and managing transitions of care for pending members who are designated as critical risk (refer to ODM's Methodology for Identification of Critical Risk Individuals) and are being discharged from Ohio Department of Rehabilitation and Correction's (ODRC's) facilities..

    a. Upon receiving notification from ODM and/or ODRC about pending members who will be released from the ODRC facility and will be enrolled with the MCP, the MCP shall identify which pending members meet the critical risk criteria. For pending members confirmed as meeting the critical risk criteria, the MCP will receive clinical information from ODRC and other entities. The MCP may request additional information for these pending members from the ODRC facility using the process prescribed by ODM. The MCP will notify ODRC if the requested records are not received within the timeframes established by ODRC & ODM.

    b. The MCP shall develop a transition plan using the approved ODM form with information provided by ODRC and other programs/entities (e.g., Ohio Department of Mental Health and Addiction Services' Community Linkages program). The MCP shall facilitate input to the transition plan by entities specified by ODM. The MCP will conduct an interactive session (e.g., videoconference) to review the completed transition plan with each pending member who meets the critical risk criteria. The MCP will request the interactive session and submit a copy of the transition plan to the ODRC facility according to the methods and timeframes prescribed by ODM. The MCP shall make reasonable effort to conduct this interactive session at least 14 calendar days prior to the pending member's scheduled release date from the ODRC facility. The MCP shall review the transition plan with the pending member during the interactive session and identify/confirm necessary changes that will be made to the transition plan. The MCP shall update the transition plan, as appropriate, and submit the final transition plan to ODRC/Operations Support Center and the ODRC facility as prescribed by ODM.

S0215 – L81

Medicaid Managed Care
Appendix K
Quality Care

    c. After the pending member is released from the ODRC facility, the MCP shall contact the member as expeditiously as the member's condition warrants but not later than five (5) calendar days from the date of release to assist the member with accessing care according to the transition plan, including identifying and removing barriers to care, and addressing additional needs expressed by the member. If the MCP is unable to contact the member within the first five calendar days (by making three different attempts over the 5 days), the MCP shall send a letter to the member no later than seven calendar days from the release date. The letter shall include contact information for member services and the care management department the member can use to request assistance with accessing services or community supports. The MCP shall document all outreach attempts and contacts with the member.

    d. The MCP shall assess the member's need for care management using processes established in this appendix.

8. **Quality Improvement (QI) Program.** ODM defines quality improvement as a deliberate and defined, science-informed approach that is responsive to member needs and incorporates reliable methods for improving population health. Following this definition, the MCP shall make continuous and ongoing efforts to achieve measurable improvements in efficiency, effectiveness, performance, accountability, outcomes and other indicators of quality in services or processes that achieve equity and improve population health. Often these efforts require manual, rapid cycle, iterative work to determine effective strategies that may need to be "hard-wired" into plan processes.

As required by 42 CFR 438.330, the MCP shall establish and implement an ongoing comprehensive QAPI program for the services it delivers to its members. Updates to the MCP's QI program shall be submitted to ODM annually within the QAPI template and shall include the following elements:

    a. **QI Program Structure.** The MCP's quality improvement efforts should be integrated throughout the organization so that: (1) staff at all levels of the organization are fully equipped to improving health outcomes, (2) the results of QI efforts are transparently communicated internally and externally, and (3) staff across the organization are empowered to seek out the root cause of problems and test improvement strategies.

The MCP shall establish appropriate administrative oversight arrangements and accountability for the QAPI program. This includes: assignment of a senior QI leadership team responsible for the QI program (e.g., Quality Improvement Director, Medical Director, etc.); provision for ongoing transparent communication and coordination between the QI leadership team, the CEO and relevant functional areas of the organization; assurance that the Medical Director is involved in all clinically-related projects; and a commitment to providing staff at all levels of the organization with the appropriate education, experience, training, and authority to test and implement improvements that promote population health.

    b. **Senior QI leadership team.** The MCP's senior-level leadership team shall provide direction and routine oversight of improvement initiatives. The lead for this team shall

## S0215 — L82

report directly to the organization's CEO. The team shall manage the organization's QI portfolio and shall be responsible for promoting a culture of QI throughout the organization with improved health outcomes for the Medicaid population as the primary goal. The MCP shall indicate commitment to improved outcomes and encourage improvement at all levels through activities that may include the following: clearly linking the MCP's quality improvement strategy to the organization's mission and vision, integrating the voices of members and providers into quality improvement activities, developing quality capacity among MCP staff, dedicating resources and tools to quality initiatives, consistently and frequently using data and analytics strategically to identify improvement opportunities and learn from improvement initiatives to maximize successes, and transparently sharing quality improvement opportunities and the results of quality improvement initiatives throughout the organization and with ODM.

The MCP shall submit the structure of the senior level QI leadership team structure for approval by ODM by June 30, 2018 using the QAPI template. Thereafter, changes to this structure shall be submitted, as needed, as part of the annual QAPI submission. Information submitted should include:

   i. Position role and responsibility on the QI leadership team;

   ii. Quality improvement training and experience;

   iii. The role of each team member in the quality improvement process;

   iv. Framework for frequently and transparently sharing information and data throughout the organization to inform improvement activities (e.g. dashboards; newsletters; staff meetings);

   v. Dedicated analytic and project management support;

   vi. Methods for identifying and assigning needed quality improvement resources;

   vii. Methods for building and sustaining quality improvement culture and capacity throughout the organization;

By January 1, 2019, each MCP shall have established an ODM-approved, senior leadership QI structure that is responsible for ensuring on-going, rapid-cycle improvement of the quality of care and services and championing improvement efforts through high-impact leadership activities.[1]

c. **QI Initiative Staffing.** In an organization with an exemplary QI culture, quality improvement is fully embedded in the way the organization does business, across all levels, departments and programs, allowing staff to continue to seek out the root cause

---

[1] Swensen S, Pugh M, McMullan C, Kabcenell A. *High-Impact Leadership: Improve Care, Improve the Health of Populations, and Reduce Costs.* IHI White Paper. Cambridge, Massachusetts: Institute for Healthcare Improvement; 2013.

S0215 - L83

Medicaid Managed Care
Appendix K
Quality Care

of problems, establish measurable objectives and quantify progress towards goals even when leadership changes.

As MCPs strive to develop an organization-wide QI culture, dedicated staff shall be devoted to fulfilling a set of clearly defined QI functions and responsibilities that are proportionate to, and adequate for, the planned number and types of QI initiatives. The dedication of resources should allow the plan to determine effectiveness of initiatives through quality improvement science-based methods prior to plan-wide implementation, as well as allowing for long-term maintenance and spread of effective efforts.

i. Quality improvement teams shall be composed of MCP staff dedicated to the Ohio line of business and empowered to promote improved MCP operations that represent the following areas of expertise:

1. Continuous quality improvement,

2. Analytics,

3. Subject matter expertise in clinical and/or nonclinical improvement topic(s) being addressed through improvement efforts,

4. Health equity,

5. Member- and provider-perspectives; and

6. Familiarity with MCP policies and processes related to the topic.

At least one member of the team shall have decision-making authority for testing changes to plan processes and at least one member of the team shall be designated as a direct contact for physician or member partners.

Decision-making authority allows the team to undertake small tests of change by the individuals who are actively involved in the day-to-day work of the programmatic area or who have developed a thorough understanding of the work. Direct contacts for physician or member partners in the QI effort help assure that the voice of the customer is integrated into improvement efforts.

ii. Required QI responsibilities include:

1. Frequent and ongoing data analysis and monitoring using methods such as statistical process control to differentiate common and special cause variation in order to identify successes and opportunities for improvement;

**S0215 – L84**

Medicaid Managed Care
Appendix K
Quality Care

2.  Frequent communication with the senior leadership team regarding improvement data, opportunities and progress;

3.  Cross-organization collaboration to further quality goals;

4.  Analyzing data to identify disparities in services and/or care and tailoring interventions to specific populations when needed; and

5.  Active incorporation of member and provider perspectives into improvement activities.

By June 30, 2018, the MCP shall submit a plan for approval using the QAPI template regarding how these staffing requirements will be continually and consistently met. By January 1, 2019, this Ohio Medicaid dedicated quality improvement support structure should be fully operational.

d.  **Capacity Building.** The MCP shall build internal quality capacity at all levels of the organization through investment in staff training in effective quality improvement and through the application of effective quality improvement principles.

At a minimum, MCP Medical Directors, Quality Improvement Directors, analytic support staff, and at least one MCP staff person assigned to each improvement team shall complete coursework in the application of rapid cycle quality improvement tools and methods from an ODM-approved entity.[2]

Coursework does not substitute for the certification required in Appendix C.

Using the QAPI template, by June 30, 2018, the MCP shall provide ODM with its plan, with timelines, for spreading the use of these improvement concepts to all staff within the organization. By January 1, 2019, the MCP shall be in the process of implementing the ODM approved plan.

i.  **QI Coursework Content.** Content shall include, but not be limited to, topics such as:

1.  The Model for Improvement[3] developed by the Associates in Process Improvement and popularized by the Institute for Healthcare Improvement (IHI)

---

[2] Examples of approved entities offering coaching and/or training in these areas include: the Institute for Healthcare Improvement, the Intermountain Healthcare Leadership Institute, the Cincinnati Children's Hospital Anderson Center for Health System Excellence, the American Society for Quality's Learning Institute, the Deming Institute, and the National Association for Healthcare Quality.

[3] Langley GL, Nolan KM, Nolan TW, Norman CL, Provost LP. The Improvement Guide: A Practical Approach to Enhancing Organizational Performance (2nd edition). San Francisco: Jossey-Bass Publishers; 2009.

S0215 – L85

Medicaid Managed Care
Appendix K
Quality Care

2. Edward W. Deming's System of Profound Knowledge

3. Listening to and incorporating the Voice of the Customer (VOC)

4. Process mapping/flow charting

5. SMART Aim development and the use of key driver diagrams[1] for building testable hypotheses

6. Methods for barrier identification and intervention selection (e.g., root cause analyses, Pareto charts, failure mode and effects analysis, the 5 whys technique, etc.)

7. Selection and use of process, outcome and balancing measures

8. Testing change through the use of PDS(C)A cycles[4]

9. The use of statistical process control, such as the Shewart control chart[5]

10. Tools for spread and sustainability planning

ii. **Coursework completion.** Training curricula for staff outlined in this appendix shall be submitted to ODM for approval prior to enrollment. Evidence of coursework completion shall be submitted within 1 month of completion.

iii. **Coursework Exemptions.** Staff will be exempt from this requirement, if one of the following is completed within the two years prior to this contract's effective date: 1) an accredited/certified education course in quality improvement science or 2) satisfactory completion of NCQA, CPHQ or ASQ CQIA certification. Medical Directors with a substantial role in improvement projects or who are accountable for the QAPI program, as well as Quality Improvement Directors who are hired after July 1, 2016, shall complete the course work within six (6) months of their start date unless they have evidence of course completion within the two years prior to their effective start date.

iv. **ODM funded QI training efforts.** MCP staff at all levels of the organization shall be required to participate in all ODM-funded QI training.

e. **Quality Improvement Strategy.** The MCP shall submit a clearly delineated, outcomes-driven strategy for improvement (e.g., work plan) as part of its annual QAPI submission. The strategy shall measure, analyze, and track performance indicators that reflect the ODM Quality Strategy population health focus, including: population streams (e.g., women of reproductive age, chronic conditions, and behavioral health), value based purchasing strategies (e.g., comprehensive primary care, episode-based payments), and

---

[4] Deming WE. The New Economics for Industry, Government, and Education. Cambridge, MA: The MIT Press; 2000
[5] Revelle JB. Quality Essentials: A Reference Guide from A to Z, ASQ Quality Press, 2004.

S0215 – L86

Medicaid Managed Care
Appendix K
Quality Care

health equity focus. The MCP's quality improvement strategy shall, at minimum, describe:

    i. The MCP leadership team, including leadership positions and how each role supports and champions the MCP's quality improvement strategy and related initiatives and projects;

    ii. How the MCP strategy aligns with the ODM quality strategy, including how the MCP will collaborate with other MCPs on ODM directed population health efforts;

    iii. The MCP's quality improvement initiatives, including:

        1. How the initiative supports the MCP and ODM quality strategies;

        2. Criteria considered when choosing and prioritizing the MCP's improvement projects and initiatives by population stream;

        3. The process for identifying the root causes of prioritized improvement initiatives;

        4. The theory of change for each improvement project (i.e., cause and effect diagrams, key driver diagrams);

        5. The process for incorporating the voice of the customer (e.g., member, provider) into continual efforts to identify areas for improvement, design and prioritize interventions, and improve services and population health;

        6. The roles and responsibilities of staff assigned to the project and resources allocation to support the improvement effort;

        7. Baseline, measures and measure frequency), target goals and the timeline for their achievement;

        8. How newly identified areas for improvement from data analysis and customer input, as well as from the previous year's evaluation are reflected in the quality strategy; and

        9. The development and implementation of mechanisms for sustaining and spreading improvement in health outcomes, enrollee satisfaction, and other targets of improvement efforts.

    f. **Improvement Projects.** Improvement projects are sponsored by MCP leadership as described in 7.b. and are assigned appropriate staffing resources as described in 7.c. above. In addition to operationalizing the MCP's improvement strategy, improvement projects build confidence among internal and external customers regarding the MCP's

**S0215 – L87**

Medicaid Managed Care
Appendix K
Quality Care

commitment to population health and focus on continuous improvement of services and outcomes.

Improvement projects use rapid-cycle continuous quality improvement methods to identify and address root cause, prioritize and test interventions, monitor intervention results, and sustain and scale up interventions found through testing to improve health outcomes, quality of life and satisfaction of providers and consumers.

Through the use of rapid cycle continuous quality improvement science techniques used in improvement projects, the MCP is expected to quickly learn the effectiveness of interventions on a small scale prior to investing significant time or resources in "hard-wiring" the change or in MCP-wide implementation. The "all-teach, all-learn" approach to quality improvement values input from staff at all levels of the organization, encourages transparency, and views problems as opportunities to improve population health. Ongoing analysis and data feedback is used to guide improvement efforts and shall be shared frequently within improvement teams, QI leadership, and ODM.

The MCP shall integrate results from performance and quality improvement projects into its overall quality assessment and improvement program.

Results of improvement efforts shall be transparently shared across MCPs and with ODM to inform population health planning statewide.

i. **Performance Improvement Projects**. In accordance with federal requirements, the MCP shall conduct clinical and non-clinical performance improvement projects (PIPs) using rapid cycle quality improvement science techniques. The MCP shall adhere to ODM-specified reporting, submission and frequency guidelines during the life of the PIP, establish and implement mechanisms for sustaining successful interventions, and maintaining improvement gains, Upon request, the MCP shall provide longitudinal data demonstrating sustained improvement over the course of the project and during the sustainability phase following final validation of the PIP by ODM's external quality review organization (EQRO). The MCP shall initiate and complete PIPs in topics selected by ODM. All PIPs designed and implemented by the MCP shall be approved by ODM.

The EQRO will assist the MCP with the development and implementation of at least one PIP by providing technical assistance, and will annually validate the PIPs in accordance with the Center's for Medicare and Medicaid Services' protocols.

ii. **Quality Improvement Projects**. Quality Improvement Projects (QIPs) use rapid cycle quality improvement science principles and may be required by the state or initiated by the MCP. Like PIPs, the QIPs can focus on clinical or non-clinical areas, are intended to achieve significant and sustained improvement over time, and have favorable effects on health outcomes, quality of life and

# S0215 – L88

Medicaid Managed Care
Appendix K
Quality Care

provider/consumer satisfaction. Although QIPs are not validated by the EQRO, the MCP shall adhere to ODM-specified reporting and submission requirements.

The MCP shall actively participate in performance and quality improvement initiatives facilitated by ODM, the EQRO, or both. This includes improvement projects focused on each population stream, MCP support of CPC practices, and efforts with other state agencies, collaborative or community based organizations impacting MCP membership. MCP participation shall also be required in ODM-directed population health efforts that require collaboration between all MCPs and may include standardization of program processes across plans.

g. **Program Communication.** Each MCP shall have a clearly defined communication strategy for quality improvement activities. This includes:

   i. Mechanisms for data receipt and exchange, analyzing and interpreting data, and transparently and proactively involving stakeholders and partners in applying data to improvement efforts;

   ii. A description, including lines and methods of communication, of the internal mechanisms used to frequently, transparently, and proactively communicate improvement status updates and results across the organization and to executive leadership;

   iii. Mechanisms for proactive, regular communication with ODM and/or EQRO staff regarding improvement opportunities and priorities, intervention successes, lessons learned and future activities; and

   iv. Responding promptly and transparently to data and information requests by ODM or the EQRO.

h. **Clinical Practice Guidelines.** The MCP's QAPI shall describe how the MCP will ensure that the clinical practice guidelines are valid and represent reliable clinical evidence or a consensus of healthcare professionals in a particular field. MCPs shall follow the guidance in the QAPI submission template when describing this aspect of the program.

i. **Assessment of Health Care Service Utilization.** The MCP shall have mechanisms in place to detect under- and over-utilization of health care services. The MCP shall follow the guidance in the QAPI submission template when specifying the mechanisms used to monitor utilization in the submission of the QAPI program to ODM. The MCP shall ensure the utilization analysis documented in the QAPI is linked to ensuring population health outcomes, and is incorporated into the quality strategy.

Pursuant to the program integrity provisions outlined in Appendix I, the MCP shall monitor for the potential under-utilization of services by its members in order to ensure all Medicaid-covered services are being provided, as required. If any underutilized services are identified, the MCP shall immediately investigate the underutilization in

**S0215 – L89**

Medicaid Managed Care
Appendix K
Quality Care

order to determine root cause, take corrective action and monitor data over time to ensure the problem which resulted in such service underutilization has been corrected.

In addition, the MCP shall conduct an ongoing review of service denials and shall monitor utilization on an ongoing basis in order to identify services which may be underutilized.

j.  **Assessment of the Quality and Appropriateness of Care for Members with Special Health Care Needs and Enrollees Receiving Long-term Services and Supports**. The MCP shall have mechanisms in place to assess the quality and appropriateness of care furnished to members with special health care needs. The MCP shall follow the guidance in the QAPI submission template when describing and evaluating these aspects of the program.

k.  **Addressing Health Disparities**. The MCP shall participate in, and support, ODM's efforts to eliminate health disparities in Ohio. According to the U.S. Department of Health and Human Services' Office of Minority Health, a health disparity is "a particular type of health difference closely linked with social or economic disadvantage." Health disparities adversely affect groups of people who have systematically experienced greater social and/or economic obstacles to health based on characteristics historically linked to discrimination or exclusion (e.g., race or ethnic group; religion; socioeconomic status; gender; age; mental health; cognitive, sensory or physical disability; sexual orientation; or geographic location). In support of ODM's effort to achieve health equity, the MCP shall collect and meaningfully use race, ethnicity and language data to identify and reduce disparities in health care access, services and outcomes.

Support of ODM's health equity efforts includes having MCP health equity representatives actively involved in improvement initiatives, determining the root cause of inequities, developing targeted interventions and measures, and collecting and analyzing data to track progress in disparity reduction efforts. These efforts move beyond agenda setting, and instead focus on the work needed for change to occur, and place greater responsibility for improvement on all parties participating in improvement efforts.

l.  **Submission of Performance Measurement Data**. The MCP shall submit data as required by ODM that enables ODM to calculate standard measures as defined in Appendices L and M. The MCP shall also submit self-reported, audited Healthcare Effectiveness Data and Information Set (HEDIS) data (see ODM Methodology for MCP Self-Reported, HEDIS-Audited Data) for performance measures set forth in Appendix M. A separate, duplicative submission of performance measurement data is not required as part of the annual QAPI submission.

m.  **QAPI Program Impact and Effectiveness**. The MCP shall evaluate the impact and effectiveness of each effort within the QAPI program, including efforts to reduce health disparities. The MCP shall update the QAPI program based on the findings of the self-evaluation and submit both the evaluation results and updates annually to ODM for

## S0215 – L90

Medicaid Managed Care
Appendix K
Quality Care

review and approval following the template provided in the QAPI guidance document. Evaluation should, at a minimum, include:

    i. The outcomes and trended results of each performance improvement project, including documentation of successful and unsuccessful interventions;

    ii. The results of any efforts to support community integration for enrollees using long-term services and supports; and

    iii. How these results will be incorporated into the MCP's quality strategy.

9. **External Quality Review.** ODM will select an external quality review organization (EQRO) to provide for an annual, external, and independent review of the quality, outcomes, timeliness of and access to services provided by the MCP. The MCP shall participate in annual external quality review which will include but not be limited to the following activities:

    a. Administrative compliance assessment as required by 42 CFR 438.358 and as specified by ODM.

        i. Non duplication exemption – As allowed by 42 CFR 438.360 and 438.362, an MCP with accreditation from a national organization approved by the Centers for Medicare and Medicaid services may request to be exempted from certain portions of the administrative compliance assessment. ODM will inform the MCP when a non-duplication exemption may be requested.

        ii. The EQRO may conduct focused reviews of MCP performance in the following domains which include, but are not limited to:

            1. Availability of services

            2. Assurance of adequate capacity and services

            3. Coordination and continuity of care

            4. Coverage and authorization of services

            5. Credentialing and re-credentialing of services

            6. Sub contractual relationships and delegation

            7. Enrollee information and enrollee rights

            8. Confidentiality of health information

            9. Enrollment and disenrollment

S0215 - L91

Medicaid Managed Care
Appendix K
Quality Care

        10. Grievance process

        11. Practice guidelines

        12. Quality assessment and performance improvement program

        13. Health information systems

        14. Fraud and abuse

    b.  Encounter data studies.

    c.  Validation of performance measurement data.

    d.  Review of information systems.

    e.  Validation of performance improvement projects.

    f.  Member satisfaction and/or quality of life surveys.

The MCP shall submit data and information, including member medical records, at no cost to, and as requested by, ODM or its designee for the annual external quality review.

The penalties for non-compliance with external quality review activities are listed in Appendix N, Compliance Assessment System.

S0215 – L92

Medicaid Managed Care
Appendix L
Data Quality

## APPENDIX L

## DATA QUALITY

A high level of performance on the data quality standards and requirements established in this appendix is crucial in order for the Ohio Department of Medicaid (ODM) to determine the value of the Medicaid Managed Health Care Program and to evaluate Medicaid consumers' access to and quality of services. Data collected from the MCP is used in key performance assessments such as the external quality review, clinical performance measures, utilization review, care coordination and care management, and in determining incentives. The data will also be used in conjunction with the cost reports in setting the premium payment rates. Data sets collected from the MCP with data quality standards and/or submission requirements include: encounter data; Healthcare Effectiveness Data and Information Set (HEDIS) data; care management data; appeals and grievances data; utilization management data; Consumer Assessment of Healthcare Providers and Systems (CAHPS) data, third party liability data, and primary care provider data.

The measures in this Appendix are calculated per MCP using statewide results that include all regions in which the MCP has membership. Unless otherwise specified, each measure is calculated for the MCP's overall Ohio Medicaid population (i.e., ABD, MAGI, and Adult Extension members).

ODM reserves the right to revise the measures and measurement periods established in this appendix (and their corresponding compliance periods), as needed, due to unforeseen circumstances. Unless otherwise noted, the most recent report or study finalized prior to the end of the contract period will be used in determining the MCP's performance level for that contract period.

1. **Encounter Data.** For detailed descriptions of the encounter data quality measures below, see *ODM Methods for the MAGI, ABD, and Adult Extension Encounter Data Quality Measures.*

    The MCP's encounter data submissions will be assessed for completeness and accuracy. The MCP is responsible for collecting information from providers and reporting the data to ODM in accordance with program requirements established in Appendix C. Failure to do so jeopardizes the MCP's ability to demonstrate compliance with other performance standards.

    a. **Encounter Data Completeness.**

        i. **Encounter Data Volume.** This measure is calculated separately for ABD adults, ABD children, MAGI members (adults and children combined), and Adult Extension members.

            1. **Measure.** The volume measure for each population and service category, as listed in Table 2 of this appendix, is the rate of utilization (e.g., discharges, visits) per 1,000 member months (MM).

            2. **Measurement Period.** The measurement periods for each population for the State Fiscal Year (SFY) 2016 and SFY 2017 contract periods are listed in Table 1 below.

S0215 – L93

Medicaid Managed Care
Appendix L
Data Quality

3. **Data Quality Standards.** The data quality standards, per population and service category, are listed in Table 2 below. This measure is calculated separately for each population. For each population, the MCP shall meet or exceed the standard for every service category, in all quarters of the measurement period.

Note: the MCP will be held accountable to the data quality standards for this measure beginning with the 'Qtr 1 thru Qtr 4: 2014, 2015; Qtr 1, 2016' measurement period for the Adult Extension population as bolded in Table 1 below.

See Appendix N, Compliance Assessment System, for the penalties for noncompliance with the standards for this measure.

**Table 1. Measurement Periods for the SFY 2016 and SFY 2017 Contract Periods.**

| MAGI Quarterly Measurement Periods | ABD Adult Quarterly Measurement Periods | ABD Child Quarterly Measurement Periods | Adult Extension Members Quarterly Measurement Periods | Data Source: Estimated Encounter Data File Update | Quarterly Report Estimated Issue Date | Contract Period |
|---|---|---|---|---|---|---|
| Qtr 2 thru Qtr 4: 2012, Qtr 1 thru Qtr 4: 2013, 2014, Qtr 1 2015 | Qtr 2 thru Qtr 4: 2012, Qtr 1 thru Qtr 4: 2013, 2014, Qtr 1 2015 | Qtr 3, Qtr 4: 2013, Qtr 1 thru Qtr 4: 2014, Qtr 1 2015 | Qtr 1 thru Qtr 4: 2014, Qtr 1 2015 | July 2015 | August 2015 | SFY 2016 |
| Qtr 3, Qtr 4: 2012, Qtr 1 thru Qtr 4: 2013, 2014, Qtr 1, Qtr 2: 2015 | Qtr 3, Qtr 4: 2012, Qtr 1 thru Qtr 4: 2013, 2014, Qtr 1, Qtr 2: 2015 | Qtr 3, Qtr 4: 2013, Qtr 1 thru Qtr 4: 2014, Qtr 1, Qtr 2: 2015 | Qtr 1 thru Qtr 4: 2014, Qtr 1, Qtr 2: 2015 | October 2015 | November 2015 | |
| Qtr 4: 2012, Qtr 1 thru Qtr 4: 2013, 2014, Qtr 1 thru Qtr 3: 2015 | Qtr 4: 2012, Qtr 1 thru Qtr 4: 2013, 2014, Qtr 1 thru Qtr 3: 2015 | Qtr 3, Qtr 4: 2013, Qtr 1 thru Qtr 4: 2014, Qtr 1, thru Qtr 3: 2015 | Qtr 1 thru Qtr 4: 2014, Qtr 1 thru Qtr 3: 2015 | January 2016 | February 2016 | |
| Qtr 1 thru Qtr 4: 2013, 2014, 2015 | Qtr 1 thru Qtr 4: 2013, 2014, 2015 | Qtr 3, Qtr 4: 2013, Qtr 1 thru Qtr 4: 2014, 2015 | Qtr 1 thru Qtr 4: 2014, 2015 | May 2016 | June 2016 | |
| Qtr 2 thru Qtr 4: 2013, Qtr 1 thru Qtr 4: 2014, 2015, Qtr 1 2016 | Qtr 2 thru Qtr 4: 2013, Qtr 1 thru Qtr 4: 2014, 2015, Qtr 1 2016 | Qtr 3, Qtr 4: 2014, Qtr 1 thru Qtr 4: 2015, Qtr 1 2016 | Qtr 1 thru Qtr 4: 2014, 2015; Qtr 1 2016 | August 2016 | September 2016 | SFY 2017 |
| Qtr 3, Qtr 4: 2013, Qtr 1 thru Qtr 4: 2014, 2015, Qtr 1, Qtr 2: 2016 | Qtr 3, Qtr 4: 2013, Qtr 1 thru Qtr 4: 2014, 2015, Qtr 1, Qtr 2: 2016 | Qtr 3, Qtr 4: 2014, Qtr 1 thru Qtr 4: 2015, Qtr 1, Qtr 2: 2016 | Qtr 1 thru Qtr 4: 2014, 2015; Qtr 1, Qtr 2: 2016 | November 2016 | December 2016 | |

## S0215 – L94

Medicaid Managed Care
Appendix L
Data Quality

| | | | | | | |
|---|---|---|---|---|---|---|
| Qtr 4: 2013, Qtr 1 thru Qtr 4: 2014, 2015, Qtr 1 thru Qtr 3: 2016 | Qtr 4: 2013, Qtr 1 thru Qtr 4: 2014, 2015, Qtr 1 thru Qtr 3: 2016 | Qtr 3, Qtr 4: 2014, Qtr 1 thru Qtr 4: 2015, Qtr 1, thru Qtr 3: 2016 | Qtr 1 thru Qtr 4: 2014, 2015; Qtr 1 thru Qtr 3: 2016 | February 2017 | March 2017 | |
| Qtr 1 thru Qtr 4: 2014, 2015, 2016 | Qtr 1 thru Qtr 4: 2014, 2015, 2016 | Qtr 3, Qtr 4: 2014, Qtr 1 thru Qtr 4: | Qtr 1 thru Qtr 4: 2014, 2015, 2016 | May 2017 | June 2017 | |
| Qtr 2 thru Qtr 4: 2014, Qtr 1 thru Qtr 4: 2015, 2016, Qtr 1 2017 | Qtr 2 thru Qtr 4: 2014, Qtr 1 thru Qtr 4: 2015, 2016, Qtr 1 2017 | Qtr 3, Qtr 4: 2014, Qtr 1 thru Qtr 4: 2015, 2016 Qtr 1 2017 | Qtr 1 thru Qtr 4: 2015, 2016; Qtr 1 2017 | August 2017 | September 2017 | SFY 2018 |
| Qtr 3, Qtr 4: 2014, Qtr 1 thru Qtr 4: 2015, 2016, Qtr 1, Qtr 2: 2017 | Qtr 3, Qtr 4: 2014, Qtr 1 thru Qtr 4: 2015, 2016, Qtr 1, Qtr 2: 2017 | Qtr 3, Qtr 4: 2014, Qtr 1 thru Qtr 4: 2015, 2016 Qtr 1, Qtr 2: 2017 | Qtr 1 thru Qtr 4: 2015, 2016; Qtr 1, Qtr 2: 2017 | November 2017 | December 2017 | |
| Qtr 4: 2014, Qtr 1 thru Qtr 4: 2015, 2016, Qtr 1 thru Qtr 3: 2017 | Qtr 4: 2014, Qtr 1 thru Qtr 4: 2015, 2016, Qtr 1 thru Qtr 3: 2017 | Qtr 3, Qtr 4: 2015, Qtr 1 thru Qtr 4: 2016, Qtr 1, thru Qtr 3: 2017 | Qtr 1 thru Qtr 4: 2015, 2016; Qtr 1 thru Qtr 3: 2017 | February 2018 | March 2018 | SFY 2018 |
| Qtr 1 thru Qtr 4: 2015, 2016, 2017 | Qtr 1 thru Qtr 4: 2015, 2016, 2017 | Qtr 3, Qtr 4: 2015, Qtr 1 thru Qtr 4: 2016, 2017 | Qtr 1 thru Qtr 4: 2015, 2016, 2017 | May 2018 | June 2018 | |

Note: Qtr 1 = January to March; Qtr 2 = April to June; Qtr 3 = July to September; Qtr 4 = October to December

### Table 2. Data Quality Standards.

| Category | Measure per 1,000/MM | MAGI Standards | ABD Adult Standards | ABD Child Standards | Adult Extension Standards | Description |
|---|---|---|---|---|---|---|
| Inpatient Hospital | Discharges | 4.2 | 17.8 | 4.2 | 7.5 | General/acute care, excluding newborns and mental health and chemical dependency services |
| Emergency Department | Visits | 65.5 | 126.0 | 60.8 | 90.1 | Includes physician and hospital emergency department encounters |
| Dental | Visits | 45.2 | 30.9 | 35.5 | 42.3 | Non-institutional and hospital dental visits |
| Vision | | 14.9 | 21.3 | 15.3 | 17.3 | Non-institutional and hospital outpatient optometry and ophthalmology visits |

**S0215 - L95**

Medicaid Managed Care
Appendix L
Data Quality

| Primary and Specialist Care | | 224.4 | 451.6 | 196.3 | 285.6 | Physician/practitioner and hospital outpatient visits |
|---|---|---|---|---|---|---|
| Behavioral Health | Service | 35.9 | 74.9 | 120.2 | 62.4 | Inpatient and outpatient behavioral encounters |
| DME | Service | 10.1 | 116.4 | 54.8 | 27.5 | Durable Medical Equipment |
| Pharmacy | Prescriptions | 600.3 | 3717.3 | 834.9 | 1511.8 | Prescribed drugs |

ii. **Incomplete Rendering Provider Data.** This measure is calculated to ensure the MCP is reporting individual-level rendering provider information to ODM so that Ohio Medicaid complies with federal reporting requirements.

1. **Measure.** The percentage of rendering providers reported on encounters without individual-level Medicaid and/or Reporting provider numbers as identified in MITS.

2. **Measurement Period.** The measurement periods for the SFY 2016 and SFY 2017 contract periods are listed in Table 3 below. The MCP shall meet or exceed the standard in all quarters of the measurement period.

3. **Data Quality Standard.** (effective SFY 2017) Less than or equal to 4.0%.

See Appendix N, Compliance Assessment System, for the penalties for noncompliance with the standard for this measure.

**Table 3. Measurement Periods for the SFY 2016 and SFY 2017 Contract Periods.**

| Quarterly Measurement Periods | Data Source: Estimated Encounter Data File Update | Quarterly Report Estimated Issue Date | Contract Period |
|---|---|---|---|
| Qtr 1 thru Qtr 4: 2014; Qtr 1: 2015 | July 2015 | August 2015 | SFY 2016 |
| Qtr 1 thru Qtr 4: 2014; Qtr 1, Qtr 2: 2015 | October 2015 | November 2015 | |
| Qtr 1 thru Qtr 4: 2014; Qtr 1 thru Qtr 3: 2015 | January 2016 | February 2016 | |
| Qtr 1 thru Qtr 4: 2014; Qtr 1 thru Qtr 4: 2015 | April 2016 | May 2016 | |
| Qtr 1 thru Qtr 4: 2015; Qtr 1: 2016 | July 2016 | August 2016 | SFY 2017 |
| Qtr 1 thru Qtr 4: 2015; Qtr 1, Qtr 2: 2016 | October 2016 | November 2016 | |
| Qtr 1 thru Qtr 4: 2015; Qtr 1 thru Qtr 3: 2016 | January 2017 | February 2017 | |
| Qtr 1 thru Qtr 4: 2015; Qtr 1 thru Qtr 4: 2016 | April 2017 | May 2017 | |

**S0215 – L96**

Medicaid Managed Care
Appendix L
Data Quality

| Qtr 1 thru Qtr 4: 2016; Qtr 1: 2017 | July 2017 | August 2017 | |
|---|---|---|---|
| Qtr 1 thru Qtr 4: 2016; Qtr 1, Qtr 2: 2017 | October 2017 | November 2017 | SFY 2018 |
| Qtr 1 thru Qtr 4: 2016; Qtr 1 thru Qtr 3: 2017 | January 2018 | February 2018 | |
| Qtr 1 thru Qtr 4: 2016; Qtr 1 thru Qtr 4: 2017 | April 2018 | May 2018 | |

Note: Qtr 1 = January-March; Qtr 2 = April-June; Qtr 3 = July-September; Qtr 4 = October-December

iii. **NPI Provider Number Usage Without Medicaid/Reporting Provider Numbers.** This measure is calculated to ensure providers reported on encounters can be associated with Medicaid and/or Reporting providers in MITS.

1. **Measure.** The percentage of institutional (837 I), professional (837 P), and dental (837 D) EDI transactions with an NPI provider number in the billing provider EDI data field that do not have a NPI and Medicaid or Reporting Provider Number in MITS.

2. **Measurement Period.** The measurement periods for the SFY 2016 and SFY 2017 contract periods are listed in Table 3 above. The MCP shall meet or exceed the standard in all quarters of the measurement period.

3. **Data Quality Standard.** (effective SFY 2017) Less than or equal to 6.0%.

See Appendix N, Compliance Assessment System, for the penalties for noncompliance with the standard for this measure.

iv. **NPI Provider Number for Ordering, Referring and Prescribing Providers.** This measure is calculated per MCP and includes all Ohio [MCP/MCOP] members receiving services from the MCP. The NPI Provider Number Usage for Ordering, Referring and Prescribing Providers measure is calculated to ensure these providers reported on encounters can be verified by ODM in compliance with 42 CFR § 438.602 and 42 CFR § 455.410.

1. **Measure.** The percentage of EDI transactions with qualifying billing provider types and specialties with an NPI provider number in the ordering/referring/prescribing provider EDI data field that do not have a Medicaid or Reporting Provider Number in MITS. Please refer to table 1 in the "NPI Provider Number for Ordering, Referring and Prescribing Providers" section of the ODM Encounter Data Quality Measures document for the qualifying billing provider type and specialties.

2. **Measurement Period.** The report periods for CY 2014 through CY 2017 contract periods are listed in Table 3 above. Results for CY18 will be informational. Results for SFY or CY 18 will be used to set a baseline for

S0215 — L97

Medicaid Managed Care
Appendix L
Data Quality

CY or SFY 2019. This measure will be used for informational purposes only until SFY 19. Beginning in SFY19, this measure will be used to determine compliance.

3. 'Data Quality Standard. To be determined.

See Appendix N, Compliance Assessment System, for the penalties for noncompliance with the standard for this measure.

v. **Rejected Encounters.** Encounters submitted to ODM that are incomplete or inaccurate are rejected and reported back to the MCPs on the exception report. If the MCP does not resubmit rejected encounters, ODM's encounter data set will be incomplete.

1. **Measure 1** (only applies to MCPs that have had Medicaid membership for more than one year). See Appendix N, Compliance Assessment System, for the penalties for noncompliance with the standard for this measure.

    a. **Measure 1.** The percentage of encounters submitted to ODM that are rejected.

    b. **Measurement Period.** For the SFY 2018 contract period, performance will be evaluated using the following measurement periods: July – September 2017; October – December 2017; January – March 2018; and April – June 2018.

    c. **Data Quality Standard for Measure 1.** The data quality standard for measure 1 is a maximum encounter data rejection rate for each file type in the ODM-specified medium per format as follows:

    | | |
    |---|---|
    | 837 Dental: | 23% |
    | 837 Institutional: | 22% |
    | 837 Professional: | 34% |
    | NCPDP: | 19% |

    Results from September 2011 through September 2012 were used as a baseline to set a data quality standard for this measure.

2. **Measure 2** (only applies to MCPs that have had Medicaid membership for one year or less). See Appendix N, Compliance Assessment System, for the penalty for noncompliance with the standard for this measure.

## S0215 – L98

Medicaid Managed Care
Appendix L
Data Quality

    a.  **Measure 2.** The percentage of encounters submitted to ODM that are rejected.

    b.  **Measurement Period.** The measurement period for Measure 2 is monthly. Results are calculated and performance is monitored monthly. The first reporting month begins with the third month of enrollment. This measure will not be calculated for SFY 2018.

    c.  **Data Quality Standard for Measure 2.** The data quality standard for measure 2 is a maximum encounter data rejection rate for each file type in the ODM-specified medium per format as follows:

        i.  Third through sixth month with membership: Not Applicable SFY 2018.

        ii.  Seventh through twelfth month with membership: Not Applicable SFY 2018.

vi.  **Acceptance Rate.** This measure only applies to MCPs that have had Medicaid membership for one year or less.

    1.  **Measure.** The rate of encounters that are submitted to ODM and accepted (i.e. accepted encounters per 1,000 member months).

    2.  **Measurement Period.** The measurement period for this measure is monthly. Results are calculated and performance is monitored monthly. The first reporting month begins with the third month of enrollment. This measure will not be calculated for SFY 2017.

    3.  **Data Quality Standard.** The data quality standard is a monthly minimum accepted rate of encounters for each file type in the ODM-specified medium per format as follows:

        a.  Third through sixth month with membership: Not Applicable for SFY 2017.

        b.  Seventh through twelfth month of membership: Not Applicable for SFY 2017.

See Appendix N, Compliance Assessment System, for the penalty for noncompliance with the standards for this measure.

b.  **Encounter Data Accuracy Studies.** As with data completeness, the MCP is responsible for assuring the collection and submission of accurate data to ODM. Failure to do so

## S0215 - L99

Medicaid Managed Care
Appendix L
Data Quality

jeopardizes the MCPs' performance, credibility and, if not corrected, will be assumed to indicate a failure in actual performance.

i. **Measure 1** *(This measure is calculated for MAGI and Adult Extension members only).* The focus of this accuracy study will be on delivery encounters. Its primary purpose will be to verify that the MCP submits encounter data accurately and to ensure only one payment is made per delivery. The rate of appropriate payments will be determined by comparing a sample of delivery payments to the medical record.

*Measurement Period*: In order to provide timely feedback on the accuracy rate of encounters, the measurement period will be the most recent from when the measure is initiated. This measure is conducted annually.

Medical records retrieval from the provider and submittal to ODM or its designee is an integral component of the validation process. ODM has optimized the sampling to minimize the number of records required. This methodology requires a high record submittal rate. To aid the MCP in achieving a high submittal rate, ODM will give at least an 8 week period to retrieve and submit medical records as a part of the validation process. A record submittal rate will be calculated as a percentage of all records requested for the study.

*Data Quality Standard 1 for Measure 1*: For results that are finalized during the contract year, the accuracy rate for encounters generating delivery payments is 100%.

*Data Quality Standard 2 for Measure 1*: A minimum record submittal rate of 85%.

See Appendix N, Compliance Assessment System, for the penalty for noncompliance with the standards for this measure.

ii. **Measure 2.** This accuracy study will compare the accuracy and completeness of payment data stored in the MCPs' claims systems during the study period to payment data submitted to and accepted by ODM. Two levels of analysis will be conducted: one to evaluate encounter data completeness for which two rates will be calculated and one to evaluate payment data accuracy. Encounter data completeness and payment accuracy will be determined by aggregating data across claim types i.e., dental, institutional (inpatient, outpatient, and other), professional, and pharmacy. Encounter data completeness for all claim types will be evaluated at the detail level. Payment data accuracy for each claim type will be evaluated based on how encounters are processed—i.e., either paid at the detail level or at the header level. As such, evaluation of payment data accuracy will be as follows:

## S0215 – M1

Medicaid Managed Care
Appendix L
Data Quality

- Dental and professional payment comparisons will be at the detail level,

- Inpatient-institutional payment comparisons will be at the header level, while outpatient-institutional and other-institutional payment comparisons will be at the detail level.

- Pharmacy payment comparisons will be at the header level.

**Encounter Data Completeness (Level 1)**

- **Omission Encounter Rate**: The percentage of encounters in the MCP's fully adjudicated claims file not present in the ODM encounter data files.

- **Surplus Encounter Rate**: The percentage of encounters in the ODM encounter data files not present in the MCP's fully adjudicated claims files.

**Payment Data Accuracy (Level 2):**

- **Payment Error Rate**: The percentage of matched encounters between the ODM encounter data files and the MCP's fully adjudicated claims files where a payment amount discrepancy was identified.

*Measurement Period*: In order to provide timely feedback on the omission rate of encounters, the measurement period will be the most recent from when the study is initiated. This study is conducted annually.

**Data Quality Standard for Measure 2** (For SFY 2018):

- **For Level 1**: An omission encounter rate and a surplus encounter rate of no more than 10% at the line-level records.

- **For Level 2**: A payment error rate of no more than 4% for each claim type based on how encounters are processed—i.e., either paid at the detail level or at the header level.

c. **Encounter Data Submission.** Information concerning the proper submission of electronic data interchange (EDI) encounter transactions may be obtained from the Ohio Department of Medicaid (ODM) website. The website contains Encounter Data Companion Guides for the Managed Care 837 dental, professional and institutional transactions and the NCPDP D.0 pharmacy transactions. Additional Companion Guides for transactions that should be used in conjunction with encounters include the U277 Unsolicited Claim/Encounter Status Notifications, the 824 Application Advice and the TA1 Transmission Acknowledgement are also available on the website. The Encounter Data Companion Guides shall be used in conjunction with the X12 Implementation Guides for EDI transactions.

# S0215 – M2

Medicaid Managed Care
Appendix L
Data Quality

Information concerning Managed Care encounter data measures may be obtained from the Ohio Department of Medicaid's Methodology for Covered Families & Children (CFC), Aged, Blind, or Disabled (ABD), and Adult Extension (Group VIII) Encounter Data Quality Measures document also located on the ODM website. This document gives additional guidance on the methodologies used to create the measures in Appendix L of this Agreement. This document also provides the Encounter Data Minimum Number of Encounters required by each plan, the Encounter Data Submission Schedule and the Encounter Data Certification Letter guidelines.

For specific encounter data submission guidelines related to Delivery Kick Payments (DKP), please refer to the Modified Adjusted Gross Income (MAGI) and MAGI Adult Extension Delivery Payment Reporting Procedures and Specifications for ODM Managed Care Plans document located on the ODM website.

   i.  **Encounter Data Submission Procedure.** The MCP shall submit encounter data files to ODM per the specified schedule and within the allotted amount established in the Ohio Department of Medicaid's Methodology for Covered Families & Children (CFC), Aged, Blind, or Disabled (ABD), and Adult Extension (Group VIII) Encounter Data Quality Measures document.

       The MCP shall submit a letter of certification, using the form required by ODM, with each encounter data file in the ODM-specified medium per format.

       The letter of certification shall be signed by the MCP's Chief Executive Officer (CEO), Chief Financial Officer (CFO), or an individual who has delegated authority to sign for, and who reports directly to, the MCP's CEO or CFO.

       See Appendix N, Compliance Assessment System, for the penalties for noncompliance with these data submission requirements.

   ii.  **Timeliness of Encounter Data Submission.** ODM requires MCP-paid encounters be submitted no later than 35 calendar days after the end of the month in which they were paid. Beginning in March 2015 for encounters paid in January 2015, the MCP shall report encounter data submission lag time on a monthly basis to ODM. Results may be subject to an audit by ODM and/or its designee.

       MCP-paid pharmacy encounters shall be submitted no later than 15 calendar days after the date the MCP's PBM adjudicates the claim. Effective with the September 2018 measurement period of SFY 2019, ODM will evaluate the timeliness of MCP paid pharmacy encounters.

       Effective with the September 2017 measurement period of SFY 2017, ODM will evaluate the timeliness of MCP paid encounters.

       *Measure:* The percentage of the MCP's total monthly paid encounters that are submitted to ODM and accepted within 35 calendar days of the month in which they were paid, (e.g., encounters paid by the MCP in January 2015 that are

**S0215 - M3**

Medicaid Managed Care
Appendix L
Data Quality

submitted to ODM and accepted on or before March 7th 2015, divided by the total number of encounters paid by the MCP in January 2015).

*Measurement Periods*: For SFY 2018: July 2017, August 2017, September 2017, October 2017, November 2017, December 2017, January 2018, February 2018, March 2018, April 2017, May 2018, and June 2018. The MCP will be held accountable to the data quality standard for this measure beginning with the July 2017 measurement period of SFY 2018.

*Data Quality Standard:* The data quality standard is greater than or equal to 90%.

Results from January 2015 through June 2015 were used as a baseline to set the data quality standard for this measure.

The penalty for noncompliance with the standard(s) for this measure will be listed in Appendix N, Compliance Assessment System.

iii. **Encounter Submissions Per Encounter Schedule.**

*Measure:* The percent of encounters listed on the Ohio Department of Medicaid's Methodology for Covered Families & Children (CFC), Aged, Blind, or Disabled (ABD), and Adult Extension (Group VIII) Encounter Data Quality Measures document as the minimum amount for that month that were submitted to ODM and accepted.

*Measurement Periods*: For SFY 2018: July 2017, August 2017, September 2017, October 2017, November 2017, December 2017, January 2018, February 2018, March 2018, April 2018, May 2018, and June 2018.

*Data Quality Standard*: The data quality standard is greater than or equal to 100%.

See Appendix N, Compliance Assessment System, for the penalties for noncompliance with this data submission requirement.

2. **MCP Self-reported, Audited HEDIS Data.**

a. **Annual Submission of HEDIS IDSS Data.** The MCP is required to collect, report, and submit to ODM self-reported, audited HEDIS data (see *ODM Specifications for the Submission of MCP Self-Reported, Audited HEDIS Results*) for the full set of HEDIS measures reported by the MCP to NCQA for Ohio Medicaid members. This shall include all HEDIS measures listed in Appendix M. The self-reported, audited HEDIS data are due to ODM no later than five business days after the NCQA due date.

See Appendix N, Compliance Assessment System, for the penalties for noncompliance with this data submission requirement.

**S0215 – M4**

Medicaid Managed Care
Appendix L
Data Quality

      b. **Annual Submission of Final HEDIS Audit Report (FAR).** The MCP is required to submit to ODM their FAR that contains the audited results for the full set of HEDIS measures reported by the MCP to NCQA for Ohio Medicaid members. This shall include all HEDIS measures listed in Appendix M. The FAR is due to ODM no later than five business days after the NCQA due date (see *ODM Specifications for the Submission of MCP Self-Reported, Audited HEDIS Results*).

      See Appendix N, *Compliance Assessment System*, for the penalties for noncompliance with this data submission requirement.

      Note: ODM will review the MCP's FAR in order to determine if any data collection or reporting issues were identified. In addition, ODM will evaluate any issues that resulted in the assignment of an audit result of "Not Report" (i.e., NR) for any measure. ODM reserves the right to pursue corrective action based on this review (see Appendix N).

      c. **Data Certification Requirements for HEDIS IDSS Data and Final HEDIS Audit Report.** In accordance with 42 CFR 438.600, the MCP shall submit a signed data certification letter to ODM attesting to the accuracy and completeness of its audited HEDIS IDSS data submitted to ODM. The MCP shall also submit to ODM a signed data certification letter attesting to the accuracy and completeness of its final HEDIS audit report (FAR) submitted to ODM.

      Each data certification letter is due to ODM on the same day the respective HEDIS IDSS data/FAR is to be submitted. For complete instructions on submitting the data certification letters, see *ODM Specifications for the Submission of MCP Self-Reported, Audited HEDIS Results*.

      See Appendix N, *Compliance Assessment System*, for the penalties for noncompliance with these data submission requirements.

      d. **Annual Submission of Member Level Detail Records for Specified HEDIS Measures.** The MCP is required to submit member level detail records for specific HEDIS measures, in accordance with *ODM Specifications for the Submission of MCP Self-Reported, Audited HEDIS Results.* The required member level detail will be used to meet CMS reporting requirements for the Core Set of Children's Health Care Quality Measures for Medicaid and CHIP (Child Core Set).

      See Appendix N, Compliance Assessment System, for the penalties for noncompliance with these data submission requirements.

3. **Care Management Data.** ODM designed a Care Management System (CAMS) in order to monitor MCP compliance with program requirements specified in Appendix K.1.d. The MCP's care management data submission will be assessed for completeness and accuracy. The MCP is responsible for submitting a care management file every month. Failure to do so jeopardizes the MCP's ability to demonstrate compliance with care management requirements. The MCP shall also submit a letter of certification, using the form required by ODM, with each CAMS data

## S0215 — M5

Medicaid Managed Care
Appendix L
Data Quality

submission file. The specifications for submitting the care management file and instructions for submitting the data certification letter are provided in *the ODM Care Management Excel File and Submission Specifications.*

**Timely Submission of Care Management Files.** The MCP shall submit Care Management files on a monthly basis according to the specifications established in the *ODM Care Management Excel File and Submission Specifications.*

See Appendix N, Compliance Assessment System, for the penalty for noncompliance with this requirement.

4. **Appeals and Grievances Data.** Pursuant to OAC rule 5160-26-08.4, the MCP is required to submit appeal and grievance activity to ODM as directed. ODM requires appeal and grievance activity to be submitted at least monthly in an electronic data file format pursuant to the *ODM Appeal File and Submission Specifications* and *ODM Grievance File and Submission Specifications.*

The appeal data file and the grievance data file shall include all appeal and grievance activity, respectively, for the previous month, and shall be submitted by the ODM-specified due date. These data files shall be submitted in the ODM-specified format and with the ODM-specified filename in order to be successfully processed.

If the MCP fails to submit their monthly electronic data files to ODM by the specified due date or who fail to resubmit, by no later than the end of that month, a file which meets the data quality requirements, they will be subject to penalty as stipulated under Appendix N of this Agreement.

5. **Utilization Management Data.** Pursuant to OAC rule 5160-26-03.1, the MCP is required to submit information on prior authorization requests as directed by ODM. ODM requires information on prior authorization requests to be submitted at least bi-weekly in electronic data file formats pursuant to the *ODM Utilization Management Tracking Database: Prior Authorization File and Submission Specifications* document.

6. **CAHPS Data.**

   a. **Annual CAHPS Survey Administration and Data Submission.** The MCP is required to contract with an NCQA Certified HEDIS Survey Vendor to administer an annual CAHPS survey to the MCP's Ohio Medicaid members, per the survey administration requirements outlined in the *ODM CAHPS Survey Administration and Data Submission Specifications.* The survey data shall be submitted to NCQA, The CAHPS Database, and ODM's designee per the data submission requirements and by the due dates established in the *ODM CAHPS Survey Administration and Data Submission Specifications.*

   See Appendix N, Compliance Assessment System, for the penalties for noncompliance with this requirement.

   b. **CAHPS Data Certification Requirements.** The MCP is required to annually submit to ODM three CAHPS data certification letters, one that attests to the MCP's adherence to

**S0215 - M6**

Medicaid Managed Care
Appendix L
Data Quality

ODM's requirements for the CAHPS survey administration and data submission to
NCQA, a second that attests to the MCP's adherence to ODM's requirements for the
CAHPS data submission to The CAHPS Database, and a third that attests to the MCP's
adherence to ODM's requirements for the CAHPS data submission to ODM's designee. .
The MCP's CAHPS data certification letters shall be submitted per the instructions and
by the due dates provided in the *ODM CAHPS Survey Administration and Data
Submission Specifications.*

See Appendix N, Compliance Assessment System, for the penalties for noncompliance
with these data submission requirements.

7. **Third Party Liability Data Submissions.** No later than the 20th of each month, the MCP shall
either (1) provide ODM with a Third Party Liability (TPL) data file that includes all
TPL information for members effective the first day of that month or (2) reconcile the ODM
monthly TPL file with their data and provide ODM with a data file that contains any
discrepancies, additions, and deletions. The MCP shall submit this information electronically to
ODM pursuant to the *ODM Third Party Liability File and Submission Specifications.*

8. **Primary Care Provider (PCP) Data.** ODM requires assignment of primary care providers (PCPs) to
members as specified in OAC rule 5160-26-03.1. The MCP is responsible for submitting a PCP
data file every quarter. The MCP's PCP data file submission will be assessed for completeness
and accuracy. The MCP shall also submit a letter of certification, using the form required by
ODM, with each PCP data file submission. The specifications for submitting the PCP data file and
instructions for submitting the data certification letter are provided in *the ODM Primary Care
Provider Data File and Submission Specifications.*

**Timely Submission of PCP Data Files.** The MCP shall submit a PCP data file, and corresponding
certification letter, on a quarterly basis according to the specifications established in the *ODM
Primary Care Provider Data File and Submission Specifications.*

See Appendix N, Compliance Assessment System, for the penalties for noncompliance with
these requirements.

9. **Medicaid Managed Care Quarterly Enrollment Files.** Accurate MCP enrollment records are a
critical component of determining accurate rates for measures where recipient enrollment is
used as the basis for calculating rates. In order to ensure the most accurate and complete
enrollment records possible for the MCP, ODM is creating Quarterly Enrollment files to be sent
to the MCP for the purpose of enrollment verification Details regarding specifications for these
enrollment files can be found in *ODM's Medicaid Managed Care Plan Quarterly Enrollment Data
File Specifications.*

Effective July 2016, the MCP may voluntary submit to ODM on a quarterly basis addition and
deletion files for member enrollment spans. These file submissions shall be accompanied by a
data certification letter, using the form required by ODM. Specifications for submitting the
addition and deletion files, and instructions for submitting the associated data certification
letter, are provided in ODM's *Medicaid Managed Care Plan Addition and Deletion Enrollment
Data File Specifications.*

**S0215 – M7**

Medicaid Managed Care
Appendix L
Data Quality

As this file submission is voluntary, no penalty will be assessed for failure to submit the required data certification letter, however, ODM will not utilize any MCP files submitted under this section not accompanied by the associated data certification letter.

10. **Submission of Provider Preventable Conditions Data**. Pursuant to 42 CFR 438.3(g), the MCP shall identify the occurrence of all provider preventable conditions (PPCs). The MCP shall report identified PPCs, regardless of the provider's intention to bill for that event, to ODM in a manner specified by ODM.

## S0215 – M8

Medicaid Managed Care
Appendix M
Quality Measures and Standards

**APPENDIX M**

**QUALITY MEASURES AND STANDARDS**

The Ohio Department of Medicaid (ODM) has established Quality Measures and Standards to evaluate MCP performance in key program areas (i.e., access, clinical quality, consumer satisfaction). The selected measures align with specific priorities, goals, and/or focus areas of the ODM Quality Strategy. Most measures have one or more Minimum Performance Standards. Specific measures and standards are used to determine MCP performance incentives. Measures with a minimum performance standard are used to determine MCP noncompliance sanctions. A limited number of measures are informational/reporting only and have no associated standards, incentives, or sanctions. All of the measures utilized for performance evaluation are derived from national measurement sets (e.g., HEDIS, AHRQ), widely used for evaluation of Medicaid and/or managed care industry data. Performance measures and standards are subject to change based on the revision or update of applicable national measures, methods, benchmarks, or other factors as deemed relevant.

The establishment of Quality Measures and Standards in this Appendix is not intended to limit the assessment of other indicators of performance for quality improvement activities. Performance on multiple measures will be assessed and reported to the MCPs and others, including Medicaid consumers.

1. **Quality Measures.** For State Fiscal Year (SFY) 2017 and SFY 2018, specific measures are designated for use in the Pay-for-Performance (P4P) Incentive System (see Appendix O, *Pay-for-Performance (P4P)*). For these measures, performance exceeding the Minimum Performance Standard may result in the receipt of financial incentives for participating MCPs. For the remaining measures that include a Minimum Performance Standard, failure to meet a standard will result in the assessment of a noncompliance penalty (see Appendix N).

   For SFY 2019, specific measures are designated for use in the Quality Based Assignment and Quality Withhold Incentive Systems (see Appendix O). For these measures, results will be used in determining the award of incentives for participating MCPs. For the measures that include a Minimum Performance Standard, failure to meet a standard will result in the assessment of a noncompliance penalty (see Appendix N).

   The MCP is evaluated on each measure using statewide results that include all regions in which the MCP has membership. Performance results will be used to assess the quality of care provided by the MCP to the managed care population, and may be used for federal reporting and ODM public reporting purposes (e.g., MCP report cards). Results for each measure are calculated per MCP and include all of the MCP's Ohio Medicaid members who meet the criteria specified by the methodology for the given measure. MCP performance is assessed using ODM calculated performance measurement data for the CHIPRA, AHRQ, and AMA/PCPI measures; NCQA calculated summary rates for the HEDIS/CAHPS survey measures; and MCP self-reported, audited HEDIS data for the NCQA HEDIS measures listed in Table 1 below. The ODM methodology for the CHIPRA, AHRQ, and AMA/PCPI measures in Table 1 is posted, upon publication, to the *Medicaid Managed Care Program* page of the ODM website. The HEDIS measures and HEDIS/CAHPS survey measures in Table 1 are calculated in accordance with

S0215 – M9

Medicaid Managed Care
Appendix M
Quality Measures and Standards

*NCQA's Volume 2: Technical Specifications* and *NCQA's Volume 3: Specifications for Survey Measures*, respectively. The previous calendar year is the standard measurement year for HEDIS data.

**Measures, Measurement Sets, Standards, and Measurement Years.** The measures, accompanying Minimum Performance Standards, and measurement years for the SFY 2017, SFY 2018, and SFY 2019 contract periods are listed in Table 1 below. The measurement set associated with each measure is also provided. The measures used in the Pay for Performance (P4P) Incentive System are denoted with an asterisk (*) in the respective Minimum Performance Standard columns and the standard is bolded. The measures used in the Quality Based Assignment and Quality Withhold Incentive Systems each year are denoted with a QBA or QW in the respective Minimum Performance Standard columns. No standard will be established or compliance assessed for measures designated 'reporting only' for the corresponding year. Minimum performance standards will be established for the subsequent SFY for Reporting Only measures denoted with a double asterisk (Reporting Only **).

Table 1. SFY 2017, SFY 2018 and SFY 2019 Performance Measures, Measurements Sets, Standards, and Measurement Years.

| Measure | Measurement Set | SFY 2017 Minimum Perf. Std. | SFY 2017 Measurement Year | SFY 2018 Minimum Perf. Std. | SFY 2018 Measurement Year | SFY 2019 Minimum Perf. Std. | SFY 2019 Measurement Year |
|---|---|---|---|---|---|---|---|
| **Quality Strategy Population Stream: Healthy Children** | | | | | | | |
| Well-Child Visits in the First 15 Months of Life – Six or More Well-Child Visits | NCQA/HEDIS | ≥ 51.8% | CY 2016 | ≥ 53.5% | CY 2017 | QW | CY 2018 |
| Well-Child Visits in the Third, Fourth, Fifth and Sixth Years of Life | NCQA/HEDIS | ≥ 65.5% | CY 2016 | ≥ 64.7% | CY 2017 | QW | CY 2018 |
| Adolescent Well-Care Visits | NCQA/HEDIS | ≥ 41.8%* | CY 2016 | ≥ 40.9%* | CY.2017 | QW | CY 2018 |
| Weight Assessment and Counseling for Nutrition and Physical Activity for Children/Adolescents: BMI Percentile Documentation | NCQA/HEDIS | Reporting Only | CY 2016 | Reporting Only | CY 2017 | ≥ 40.24% | CY 2018 |
| Children and Adolescents' Access to Primary Care Practitioners - 12-24 Months, 25 Months - 6 Years, 7-11 Years, and 12-19 Years | NCQA/HEDIS | 12-24 mos. ≥ 94.2% / 25 Mos. - 6 Yrs. ≥ 85.4% / 7-11 Yrs. ≥ 88.9% | CY 2016 | 12-24 Mos. ≥ 93.1% / 25 Mos. - 6 Yrs. ≥ 84.8% / 7-11 Yrs. ≥ 87.9% | CY 2017 | 12-24 Mos. ≥ 93.27% / 25 Mos. - 6 Yrs. ≥ 84.94% / 7-11 Yrs. ≥ 87.58% | CY 2018 |

**S0215 – M10**

Medicaid Managed Care
Appendix M
Quality Measures and Standards

| | | 12-19 Yrs. ≥ 87.3% | | 12-19 Yrs. ≥ 85.8% | | 12-19 Yrs. ≥ 85.65% | |
|---|---|---|---|---|---|---|---|
| Appropriate Treatment for Children With Upper Respiratory Infection | NCQA/HEDIS | ≥ 84.2%* | CY 2016 | Eliminated Effective SFY 2018 | Eliminated Effective SFY 2018 | Eliminated Effective SFY 2018 | Eliminated Effective SFY 2018 |
| Appropriate Testing for Children With Pharyngitis | NCQA/HEDIS | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Reporting Only** | CY 2018 |
| General Child Rating of Health Plan (CAHPS Health Plan Survey) | NCQA/HEDIS/ CAHPS | ≥2.51 | CY 2016 (Survey conducted in CY 2017) | ≥ 2.51 | CY 2017 (Survey conducted in CY 2018) | ≥ 2.51 | CY 2018 (Survey conducted in CY 2019) |
| General Child - Customer Service Composite (CAHPS Health Plan Survey) | NCQA/ HEDIS/ CAHPS | Not Applicable | Not Applicable | ≥ 2.50 | CY 2017 (Survey conducted in CY 2018) | ≥ 2.50 | CY 2018 (Survey conducted in CY 2019) |
| Annual Dental Visits, Total Rate | NCQA/HEDIS | Reporting Only | CY 2016 | Reporting Only | CY 2017 | Reporting Only | CY 2018 |
| Childhood Immunization Status (Combo 2) | NCQA/HEDIS | Reporting Only | CY 2016 | Reporting Only | CY 2017 | Reporting Only | CY 2018 |
| Childhood Immunization Status (Combo 3) | NCQA/HEDIS | Reporting Only | CY 2016 | Reporting Only | CY 2017 | Reporting Only | CY 2018 |
| Childhood Immunization Status (Combo 10) | NCQA/HEDIS | Reporting Only | CY 2016 | Reporting Only | CY 2017 | Reporting Only | CY 2018 |
| Immunizations for Adolescents (Combo 1) | NCQA/HEDIS | Reporting Only | CY 2016 | Reporting Only | CY 2017 | Reporting Only | CY 2018 |
| Weight Assessment and Counseling for Nutrition and Physical Activity for Children/Adolescents: Counseling for Nutrition, Counseling for Physical Activity | NCQA/HEDIS | Reporting Only | CY 2016 | Reporting Only | CY 2017 | Reporting Only | CY 2018 |
| Quality Strategy Population Stream: Women of Reproductive Age | | | | | | | |
| Frequency of Ongoing Prenatal Care – ≥ 81 Percent of Expected Visits | NCQA/HEDIS | ≥ 46.7% | CY 2016 | Eliminated Effective SFY 2018 | Eliminated Effective SFY 2018 | Eliminated Effective SFY 2018 | Eliminated Effective SFY 2018 |
| | NCQA/HEDIS | ≥ 77.4%* | CY 2016 | ≥ 74.2%* | CY 2017 | QBA | CY 2018 |

# S0215 – M11

Medicaid Managed Care
Appendix M
Quality Measures and Standards

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Prenatal and Postpartum Care - Timeliness of Prenatal Care | | | | | | ≥ 64.48 | |
| Prenatal and Postpartum Care - Postpartum Care | NCQA/HEDIS | ≥ 55.5%* | CY 2016 | ≥ 55.5%* | CY 2017 | QBA ≥ 45.76 | CY 2018 |
| Percent of Live Births Weighing Less Than 2,500 Grams | CHIPRA | ≤ 10.3% | CY 2016 | ≤ 10.3% | CY 2017 | QBA ≤ TBD | CY 2018 |
| Human Papillomavirus Vaccine for Female Adolescents | NCQA/HEDIS | Not Applicable | CY 2016 | Not Applicable | CY 2017 | Not Applicable | CY 2018 |
| Immunization for Adolescents (HPV) | NCQA/HEDIS | Reporting Only | CY 2016 | Reporting Only | CY 2017 | Reporting Only | CY 2018 |
| Chlamydia Screening in Women, Total | NCQA/HEDIS | Reporting Only | CY 2016 | Reporting Only | CY 2017 | Reporting Only | CY 2018 |
| **Quality Strategy Population Stream: Behavioral Health** | | | | | | | |
| Initiation and Engagement of Alcohol and Other Drug Dependence Treatment – Initiation of AOD Treatment Total, Engagement of AOD Treatment Total | NCQA/HEDIS | Not Applicable | Not Applicable | Reporting Only | CY 2017 | Initiation Total QW / Engage-ment Total Reporting Only** | CY 2018 |
| Follow-Up After Hospitalization for Mental Illness | NCQA/HEDIS | 7-Day Follow-up ≥ 32.0%* / 30-Day Follow-up Not Applicable | CY 2016 | 7-Day Follow-up ≥ 34.2%* / 30-Day Follow-up Reporting Only | CY 2017 | 7-Day Follow-up QW / 30-Day Follow-up Reporting Only ** | CY 2018 |
| Use of First-Line Psychosocial Care for Children and Adolescents on Antipsychotics, Total | NCQA/HEDIS | ≥ 60.2% | CY 2016 | ≥ 48.8% | CY 2017 | ≥ 53.81% | CY 2018 |
| Use of Multiple Concurrent Antipsychotics in Children and Adolescents, Total | NCQA/HEDIS | Reporting Only | CY 2016 | ≤ 3.1% | CY 2017 | QW | CY 2018 |
| Metabolic Monitoring for Children and Adolescents on Antipsychotics, Total | NCQA/HEDIS | Reporting Only | CY 2016 | Eliminated Effective SFY 2018 | Eliminated Effective SFY 2018 | Eliminated Effective SFY 2018 | Eliminated Effective SFY 2018 |
| Antidepressant Medication Management – | NCQA/HEDIS | Reporting Only | CY 2016 | Reporting Only | CY 2017 | Acute Phase ≥ 42.17% | CY 2018 |

# S0215 – M12

Medicaid Managed Care
Appendix M
Quality Measures and Standards

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Effective Acute Phase Treatment, Effective Continuation Phase Treatment | | | | | | Continu-ation Phase Reporting Only** | |
| Follow-Up Care for Children Prescribed ADHD Medication | NCQA/HEDIS | Reporting Only | CY 2016 | Reporting Only | CY 2017 | Reporting Only | CY 2018 |
| Mental Health Utilization | NCQA/HEDIS | Reporting Only | CY 2016 | Reporting Only | CY 2017 | Reporting Only | CY 2018 |
| Follow-Up After Emergency Department Visit for Mental Illness | NCQA/HEDIS | Not Applicable | CY 2016 | Not Applicable | CY 2017 | 7-Day Follow-up Reporting Only / 30-Day Follow-up Reporting Only | CY 2018 |
| Follow-Up After Emergency Department Visit for Alcohol and Other Drug Dependence, Total | NCQA/HEDIS | Not Applicable | CY 2016 | Not Applicable | CY 2017 | 7-Day Follow-up Reporting Only / 30-Day Follow-up Reporting Only | CY 2018 |
| Use of Opioids at High Dosage | NCQA/HEDIS | Not Applicable | CY 2016 | Not Applicable | CY 2017 | Reporting Only | CY 2018 |
| Use of Opioids From Multiple Providers-Multiple Providers, Multiple Pharmacies, Multiple Prescribers and Multiple Pharmacies | NCQA/HEDIS | Not Applicable | CY 2016 | Not Applicable | CY 2017 | Reporting Only | CY 2018 |
| Quality Strategy Population Stream: Chronic Conditions | | | | | | | |
| Comprehensive Diabetes Care – HbA1c Poor Control (>9.0%) | NCQA/HEDIS | Not Applicable | Not Applicable | ≤ 52.3% | CY 2017 | QW | CY 2018 |
| Comprehensive Diabetes Care – HbA1c Testing | NCQA/HEDIS | Not Applicable | Not Applicable | Reporting Only | CY 2017 | QW | CY 2018 |
| Comprehensive Diabetes Care - Eye Exam (Retinal) Performed | NCQA/HEDIS | ≥ 47.1% | CY 2016 | ≥ 44.5% | CY 2017 | QW | CY 2018 |
| Comprehensive Diabetes Care - Blood Pressure Control (<140/90 mm Hg) | NCQA/HEDIS | ≥56.5% | CY 2016 | ≥ 52.3% | CY 2017 | QW | CY 2018 |
| Comprehensive Diabetes Care – HbA1c Control (<8.0%) | NCQA/HEDIS | ≥40.0%* | CY 2016 | Reporting Only | CY 2017 | Reporting Only | CY 2018 |

# S0215 – M13

Medicaid Managed Care
Appendix M
Quality Measures and Standards

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Comprehensive Diabetes Care: Medical Attention for Nephropathy | NCQA/HEDIS | Reporting Only | CY 2016 | Reporting Only | CY 2017 | Reporting Only | CY 2018 |
| Statin Therapy for Patients With Diabetes, Received Statin Therapy | NCQA/HEDIS | Reporting Only | CY 2016 | ≥ 55.7% | CY 2017 | ≥ 57.73% | CY 2018 |
| PQI 16: Lower-Extremity Amputation, Patients w/ Diabetes | AHRQ | ≤2.4 | CY 2016 | ≤ 2.4 | CY 2017 | ≤ 2.4 | CY 2018 |
| Controlling High Blood Pressure | NCQA/HEDIS | ≥49.9%* | CY 2016 | ≥ 46.9%* | CY 2017 | QW | CY 2018 |
| Statin Therapy for Patients With Cardiovascular Disease, Received Statin Therapy, Total | NCQA/HEDIS | Reporting Only | CY 2016 | ≥ 76.3% | CY 2017 | QW | CY 2018 |
| Annual Monitoring for Patients on Persistent Medication, Total | NCQA/HEDIS | Not Applicable | CY 2016 | Not Applicable | CY 2017 | Reporting Only | CY 2018 |
| PQI 8: Heart Failure Admission Rate | AHRQ | Reporting Only | CY 2016 | Eliminated Effective SFY 2018 | Eliminated Effective SFY 2018 | Eliminated Effective SFY 2018 | Eliminated Effective SFY 2018 |
| PQI 13: Angina without Procedure Admission Rate | AHRQ | Reporting Only | CY 2016 | Eliminated Effective SFY 2018 | Eliminated Effective SFY 2018 | Eliminated Effective SFY 2018 | Eliminated Effective SFY 2018 |
| Medication Management for People With Asthma – Medication Compliance 50%, Total Rate; Medication Compliance 75 %, Total Rate | NCQA/HEDIS | 50% Total Rate Not Applicable / 75% Total Rate ≥ 23.7% | CY 2016 | 50% Total Rate Reporting Only / 75% Total Rate ≥ 25.1% | CY 2017 | 50% Total Rate Reporting Only / 75% Total Rate ≥ 19.97% | CY 2018 |
| PDI 14: Asthma Admission Rate (ages 2 - 17) | AHRQ | Reporting Only | CY 2016 | Eliminated Effective SFY 2018 | Eliminated Effective SFY 2018 | Eliminated Effective SFY 2018 | Eliminated Effective SFY 2018 |
| Pharmacotherapy Management of COPD Exacerbation | NCQA/HEDIS | Reporting Only | CY 2016 | Reporting Only | CY 2017 | Dispensed Systemic Corticoste-roid Within 14 days: Reporting Only** Dispensed a Systemic Bronchodi-lator within 30 days: Reporting Only | CY 2018 |

**S0215 – M14**

Medicaid Managed Care
Appendix M
Quality Measures and Standards

| Quality Strategy Population Stream: **Healthy Adults** | | | | | | | |
|---|---|---|---|---|---|---|---|
| Cervical Cancer Screening | NCQA/HEDIS | Reporting Only | CY 2016 | Reporting Only | CY 2017 | **QBA** ≥ 38.36 | CY 2018 |
| Breast Cancer Screening | NCQA/HEDIS | Reporting Only | CY 2016 | Reporting Only | CY 2017 | **QBA** ≥ 43.68 | CY 2018 |
| Adult BMI Assessment | NCQA/HEDIS | Not Applicable | Not Applicable | Reporting Only | CY 2017 | ≥ 28.79 | CY 2018 |
| Adults' Access to Preventive/Ambulatory Health Services – Total | NCQA/HEDIS | ≥79.6% | CY 2016 | ≥ 77.2% | CY 2017 | ≥76.17% | CY 2018 |
| Tobacco Use: Screening and Cessation | AMA-PCPI | Not Applicable | Not Applicable | Reporting Only | CY 2017 | Reporting Only** | CY 2018 |
| Adult Rating of Health Plan (CAHPS Health Plan Survey) | NCQA/HEDIS/ CAHPS | ≥2.3 | CY 2016 (Survey conducted in CY 2017) | ≥ 2.37 | CY 2017 (Survey conducted in CY 2018 | ≥ 2.35 | CY 2018 (Survey conducted in CY 2019 |
| Adult - Customer Service Composite (CAHPS Health Plan Survey) | NCQA/ HEDIS/ CAHPS | Not Applicable | Not Applicable | ≥ 2.48 | CY 2017 (Survey conducted in CY 2018) | ≥ 2.48 | CY 2018 (Survey conducted in CY 2019) |
| Ambulatory Care- Emergency Department (ED) Visits | NCQA/HEDIS | Reporting Only | CY 2016 | Reporting Only | CY 2017 | Reporting Only | CY 2018 |

*This Minimum Performance Standard and associated measure are used in the Pay for Performance (P4P) Incentive System for the respective year listed in Table 1 above, and as outlined in Appendix O. No penalty will be assessed for noncompliance with this Minimum Performance Standard and measure for the corresponding year.

Note: no standard will be established or compliance assessed for the measures designated 'reporting only' or 'QW' in the Minimum Performance Standard column for the corresponding year.

** = Minimum Performance Standard will be established for the subsequent state fiscal year

TBD= Minimum Performance Standard: to be determined

QBA = Quality-Based Auto-Assignment measure

QW = Quality Withhold measure

2. **Additional Operational Considerations.**

   a. **Measures and Measurement Years.** ODM reserves the right to revise the measures and measurement years established in this Appendix (and any corresponding compliance periods), as needed, due to unforeseen circumstances. Unless otherwise noted, the most recent report or study finalized prior to the end of the contract period will be used in determining the MCP's performance level for that contract period.

   b. **Performance Standards – Compliance Determination.** In the event the MCP's performance cannot be evaluated for a performance measure and measurement year established in Table 1 of this appendix, ODM in its sole discretion will deem the MCP to have met or to have not met the standard(s) for that particular measure and

**S0215 – M15**

Medicaid Managed Care
Appendix M
Quality Measures and Standards

measurement year depending on the circumstances involved (e.g., if a HEDIS measure was assigned an audit result of "Not Report" on the MCP's Final Audit Report and the "Not Report" designation was determined to be the result of a material bias caused by the MCP, ODM would deem the MCP to have not met the standard(s) for that measure and measurement year).

c. **Performance Standards – Retrospective Adjustment.** ODM will implement the use of a uniform methodology, as needed, for the retrospective adjustment of any Minimum Performance Standard listed in Table 1. of this Appendix, except for the CAHPS measure standards. This methodology will be implemented at ODM's sole discretion when all three of the following criteria are met.

   i. The methodology for the standard's associated measure is revised. Note, for HEDIS measures, ODM will not adjust performance measure standards retrospectively due to procedural changes such as revisions to medical record hybrid review timelines.

   ii. For the year the methodology is revised, the performance results for all Ohio Medicaid MCPs all increase or all decrease when compared to the standard setting year (e.g., for the SFY 2013 provider agreement, the standard setting year is HEDIS 2011). Note, this excludes MCPs without results for both years.

   iii. For the year the methodology is revised, the performance results for three or more Ohio Medicaid MCPs each change by at least three percentage points (e.g., increase from 56.0% to 59.0%) when compared to the standard setting year.

For a comprehensive description of the standard adjustment methodology, see *ODM Methods for the Retrospective Adjustment of Quality and P4P Measure Standards.*

**S0215 – M16**

Medicaid Managed Care
Appendix N
Compliance Assessment System

**APPENDIX N**

**COMPLIANCE ASSESSMENT SYSTEM**

1. **General Provisions of the Compliance Assessment System.**

   a. The Compliance Assessment System (CAS) sets forth sanctions that may be assessed by the Ohio Department of Medicaid (ODM) against the MCP if the MCP is found to have violated this Agreement, or any other applicable law, rule, or regulation. It does not in any way limit ODM from requiring Corrective Action Plans (CAPs) and program improvements, or from imposing any of the sanctions specified in 42 CFR 438.706 and OAC rule 5160-26-10 or any other additional compliance actions, including the proposed termination, amendment, or nonrenewal of this Agreement. Any actions undertaken by ODM under this Appendix are not exclusive to any other compliance action it may impose or available to ODM under applicable law or regulations. Pursuant to 42 CFR 438.704, any civil monetary penalties imposed by ODM shall not exceed mandated maximum figures.

   b. As set forth in OAC rule 5160-26-10, regardless of whether ODM imposes a sanction, the MCP is required to initiate corrective action for any MCP program violation or deficiency as soon as the violation or deficiency is identified by the MCP or ODM. The MCP is required to report to ODM when it becomes aware of any violation that could impair a member's ability to obtain correct information regarding services, impair member rights, affect the ability of the MCP to deliver covered services, or affect the member's ability to access covered services.

   c. If ODM determines the MCP has violated any of the requirements of sections 1903(m) or 1932 of the Social Security Act not specifically identified within this Agreement, ODM may (1) require the MCP to permit any of its members to disenroll from the MCP without cause, or (2) suspend any further new member enrollments to the MCP, or both.

   d. Program violations that reflect noncompliance from the previous compliance term will be subject to remedial action under CAS at the time that ODM first becomes aware of this noncompliance.

   e. ODM retains the right to use its discretion to determine and apply the most appropriate compliance action based on the severity of the noncompliance, a pattern of repeated noncompliance, and number of beneficiaries affected. In instances where the MCP is able to document, to the satisfaction of ODM, that the violation and precipitating circumstances were beyond its control and could not have reasonably been foreseen (e.g., a construction crew severs a phone line, a lightning strike disables a computer system, etc.), ODM may, in its discretion, utilize alternative methods (i.e., a remediation plan) in lieu of the imposition of sanctions/remedial actions as defined in Section 2 of this appendix.

      A Remediation Plan is a structured activity or process implemented by the MCP to

**S0215 – M17**

Medicaid Managed Care
Appendix N
Compliance Assessment System

improve identified deficiencies related to compliance with applicable rules, regulations or contractual requirements. All remediation plans shall be submitted in the manner specified by ODM. Failure to comply with, or meet the requirements of a remediation plan may result in the imposition of progressive sanctions/remedial actions outlined in Section 2.

f. ODM will issue all notices of noncompliance in writing to the identified MCP contact.

2. **Types of Sanctions/Remedial Actions.** ODM may impose sanctions/remedial actions, including, but not limited to, the items listed below.

a. **Corrective Action Plans (CAPs).** A CAP is a structured activity, process or quality improvement initiative implemented by the MCP to improve identified operational and clinical quality deficiencies. All CAPs shall be submitted in the manner specified by ODM.

The MCP may be required to develop CAPs for any instance of noncompliance with applicable rules, regulations or contractual requirements; CAPs are not limited to actions taken in this appendix. All CAPs requiring ongoing activity on the part of the MCP to ensure its compliance with a program requirement will remain in effect until the MCP has provided sufficient evidence that it has fulfilled the requirements of the CAP to the satisfaction of ODM. All CAPs requiring implementation of quality improvement initiatives will remain in effect for at least twelve months from the date of implementation.

Where ODM has determined the specific action which shall be implemented by the MCP or if the MCP has failed to submit a CAP, ODM may require the MCP to comply with an ODM-developed or "directed" CAP.

Where a sanction is assessed for a violation in which the MCP has previously been assessed a CAP the MCP may be assessed escalating sanctions under this Agreement.

b. **Financial Sanctions**

i. **Financial Sanctions Assessed Due to Accumulated Points.** Points will accumulate over a rolling 12-month schedule. Points more than 12 months old will expire.

No points will be assigned for a violation if the MCP is able to document that the precipitating circumstances were completely beyond its control and could not have been foreseen (e.g., a construction crew severs a phone line, a lightning strike disables a computer system, etc.).

In cases where an MCP-contracted healthcare provider is found to have violated a program requirement (e.g., failing to provide adequate contract termination notice, marketing to potential members, inappropriate member billing, etc.), ODM may assess points unless to the satisfaction of ODM: (1) the MCP can document that it provided sufficient notification or education to providers of

S0215 – M18

Medicaid Managed Care
Appendix N
Compliance Assessment System

applicable program requirements and prohibited activities; and (2) the MCP took immediate and appropriate action to correct the problem and to ensure it will not reoccur. ODM will review repeated incidents and determine whether the MCP has a systemic problem. If ODM determines that a systemic problem exists, further sanctions or remedial actions may be assessed against the MCP.

1. **5 Points.** ODM may in its discretion assess five (5) points for any instance of noncompliance with applicable rules, regulations or contractual requirements. Instances of noncompliance can include, but are not limited to those that (1) impair a member's or potential enrollee's ability to obtain accurate information regarding MCP services, (2) violate a care management process, (3) impair a member's or potential enrollee's ability to obtain correct information regarding services or (4) infringe on the rights of a member or potential enrollee. Examples of five (5) point violations include, but are not limited to the following:

    - Failure to provide accurate provider panel information.
    - Failure to provide member materials to new members in a timely manner.
    - Failure to comply with appeal, grievance, or state hearing requirements, including the failure to notify a member of his or her right to a state hearing when the MCP proposes to deny, reduce, suspend or terminate a Medicaid-covered service.
    - Failure to staff a 24-hour call-in system with appropriate trained medical personnel.
    - Failure to meet the monthly call-center requirements for either the member services or the 24-hour call-in system lines.
    - Provision of false, inaccurate or materially misleading information to ODM, health care providers, the MCP's members, or any eligible individuals.
    - Use of unapproved marketing or member materials.
    - Failure to appropriately notify ODM, or members, of provider panel terminations.
    - Failure to update website provider directories as required.
    - Failure to comply with an open remediation plan or CAP or a CAP closed in the last twelve (12) months.
    - Failure to actively participate in quality improvement projects or performance improvement projects facilitated by ODM and/or the EQRO.
    - Failure to meet provider network performance standards.
    - A violation of a care management process specified in Appendix K of the Agreement that does not meet the standards for a 10 point violation. Examples include but are not limited to the following:

**S0215 – M19**

Medicaid Managed Care
Appendix N
Compliance Assessment System

- Failure to ensure staff performing care management functions are operating within their professional scope of practice, are appropriately responding to a member's care management needs, or are complying with the state's licensure/credentialing requirements;
- Failure to adequately assess an individual's needs including the evaluation of mandatory assessment domains;
- Failure to update an assessment upon a change in health status, needs or significant health care event;
- Failure to develop or update a care plan that appropriately addresses assessed needs of a member;
- Failure to monitor the care plan;
- Failure to complete a care gap analysis that identifies gaps between recommended care and care received by a member;
- Failure to update the care plan in a timely manner when gaps in care or change in need are identified;
- Failure to coordinate care for a member across providers, specialists, and team members, as appropriate;
- Failure to adhere to a documented communication plan, including the contact schedule for in-person visits and telephone calls; or
- Failure to make reasonable attempts to obtain a discharge/transition plan from an inpatient facility; conduct timely follow up with the member and provider, as appropriate; or arrange for services specified in the discharge/transition plan.

2. **10 Points.** ODM may in its discretion assess ten (10) points for any instance of noncompliance with applicable rules, regulations or contractual requirements that could, as determined by ODM: (1) affect the ability of the MCP to deliver, or a member to access, covered services; (2) place a member at risk for a negative health outcome; or (3) jeopardize the safety and welfare of a member. Examples include, but are not limited to, the following:

- Discrimination among members on the basis of their health status or need for health care services (this includes any practice that would reasonably be expected to encourage termination or discourage selection by individuals whose medical condition indicates probable need for substantial future medical services).
- Failure to assist a member in accessing needed services in a timely manner after receiving a request from the member.
- Failure to provide medically-necessary Medicaid covered

**S0215 – M20**

Medicaid Managed Care
Appendix N
Compliance Assessment System

services to members.

- Failure to participate in transition of care activities or discharge planning activities.
- Failure to process prior authorization requests within the prescribed time frames.
- Repeated failure to comply with an open remediation plan or CAP or a CAP closed in the last twelve (12) months.
- The imposition of premiums or charges on members in excess of the premiums or charges permitted under the Medicaid program.
- Misrepresentation or falsification of information that the MCP furnishes to ODM.
- Misrepresentation or falsification of information that the MCP furnishes to a member, potential member, or health care provider.
- Failure to comply with the requirements for physician incentive plans, as set forth in 42 CFR 422.208 and 422.210.
- Violation of a care management process as specified in Appendix K.

3. **Progressive Sanctions Based on Accumulated Points.** Progressive sanctions will be based on the number of points accumulated at the time of the most recent incident. A CAP or other sanction may be imposed in addition to the financial sanctions listed below. The designated financial sanction amount will be assessed when the number of accumulated points falls within the ranges specified below:

| | |
|---|---|
| 0 -15 Points | CAP + No financial sanction |
| 16-25 Points | CAP + $5,000 financial sanction |
| 26-50 Points | CAP + $10,000 financial sanction |
| 51-70 Points | CAP + $20,000 financial sanction |
| 71-100 Points | CAP + $30,000 financial sanction |
| 100+ Points | Proposed Agreement Termination |

ii. **Specific Pre-Determined Sanctions**

1. **Adequate network-minimum provider panel requirements.** Any deficiencies in the MCP's provider network specified in Appendix H of this Agreement or by ODM, may result in the assessment of a $1,000 nonrefundable financial sanction for each category (practitioners, PCP

**S0215 – M21**

Medicaid Managed Care
Appendix N
Compliance Assessment System

capacity, hospitals), for each county. Compliance will be assessed at least quarterly.

ODM may assess additional sanctions (e.g., CAPs, points, financial sanctions) if (1) the MCP violates any other provider panel requirements or (2) the MCP's member has experienced problems accessing necessary services due to lack of an adequate provider panel.

2. **Network Performance Baseline Measure.** ODM may assess a $50,000 nonrefundable financial sanction for each baseline measure not met on the bi-annual Network Performance surveys.

3. **Late Submissions.** All submissions, data and documentation submitted by the MCP shall be received by ODM within the specified deadline and shall represent the MCP in an honest and forthright manner. If the MCP fails to provide ODM with any required submission, data or documentation, ODM may assess a nonrefundable financial sanction of $100 per calendar day, unless the MCP requests and is granted an extension by ODM. Assessments for late submissions will be done monthly.

   If the MCP is unable to meet a program deadline or data/documentation submission deadline, the MCP shall submit a written request to its Contract Administrator for an extension of the deadline, as soon as possible, but no later than 3 PM, EST, on the date of the deadline in question. Requests for extensions should only be submitted where unforeseeable circumstances have made it impossible for the MCP to meet a deadline stipulated by ODM. All such requests will be evaluated upon this standard. ODM may assess compliance against the MCP for late submission unless ODM has granted written approval for a deadline extension request.

4. **Noncompliance with Claims Adjudication Requirements.** If ODM finds the MCP is unable to (1) electronically accept and adjudicate claims to final status, or (2) notify providers of the status of their submitted claims, ODM may assess the MCP with a financial sanction of $20,000 per calendar day for the period of noncompliance. Additionally, the MCP may be assessed 5 points per incident of noncompliance.

   If ODM has identified specific instances where the MCP has failed to take the necessary steps to comply with the requirements specified in Appendix C of the Agreement by (1) failing to notify non-contracting providers of procedures for claims submissions when requested or (2) failing to notify contracting and non-contracting providers of the status of their submitted claims, the MCP may be assessed 5 points per incident of noncompliance.

**S0215 – M22**

Medicaid Managed Care
Appendix N
Compliance Assessment System

5. **Noncompliance with Financial Performance Measures or the Submission of Financial Statements.** If the MCP fails to meet any standard for 2.a., 2.b., 2.c., or 2.d of Appendix J, ODM may require the MCP to complete a CAP and specify the date by which compliance shall be demonstrated. Failure by the MCP to meet the standard or otherwise comply with the CAP by the specified date may result in a new enrollment freeze unless ODM determines that the deficiency does not potentially jeopardize access to or quality of care or affect the MCP's ability to meet administrative requirements (e.g., prompt pay requirements). Justifiable reasons for noncompliance may include one-time events (e.g., MCP investment in information system products).

If Financial Statements are not submitted to the Ohio Department of Insurance (ODI) by the due date, the MCP continues to be obligated to submit the report to ODM by ODI's originally specified due date unless the MCP requests and is granted an extension by ODM.

If the MCP fails to submit complete quarterly and annual Financial Statements on a timely basis, ODM will deem this a failure to meet the standards and may impose the noncompliance sanctions listed above for indicators 2.a., 2.b., 2.c., and 2.d, including a new enrollment freeze. The new enrollment freeze will take effect on the first of the month following the month ODM has determined that the MCP was non-compliant for failing to submit financial reports timely.

6. **Noncompliance with Medical Loss Ratio (MLR) Requirements.**

   a. **Establishment of MLR for ABD, CFC and AFK Members.** ODM shall perform an MLR calculation as defined in the ODM Methods for Financial Performance Measures for the periods stated below.

      i. ODM shall perform MLR calculations for the incurred periods of January 1, 2017 through December 31, 2017, ("first period"), and January 1, 2018 through December 31, 2018, ("second period").

      ii. For each period, ODM or its designee will initiate the MLR calculation 6 months after the end of each period.

      iii. The MCP shall provide and certify any data used in the calculation of the MLR in accordance with 42 CFR 438.600 et al. Data submitted to ODM is subject to review or audit by ODM or its designee.

S0215 - M23

Medicaid Managed Care
Appendix N
Compliance Assessment System

    b. **Establishment of MLR for Adult Extension Members.** ODM shall perform an MLR calculation as defined in the ODM Methods for Financial Performance Measures for the periods stated below.

        iv. ODM shall perform MLR calculations for the incurred periods of January 1, 2016 through December 31, 2016, ("first period"), and January 1, 2017 through December 31, 2017, ("second period").

        v. For each period, ODM or its designee will initiate the MLR calculation 6 months after the end of each period.

        vi. The MCP shall provide and certify any data used in the calculation of the MLR in accordance with 42 CFR 438.600 et al. Data submitted to ODM is subject to review or audit by ODM or its designee.

    c. **MLR Rebate for Adult Extension Members.** The MCP shall be required to expend at minimum 85 percent of Net Capitation Payments for the Extension population on Allowed Medical Expenses. If the MCP does not meet the minimum 85 percent MLR threshold, then the MCP shall return to the State the difference between 85 percent of total Net Capitation Payments to the MCP and actual Allowed Medical Expenses incurred. After completion of the MLR calculation, if it is determined that the MLR of the MCP is less than 85 percent, then ODM will notify the MCP of the capitation payments to be `returned to the State.

        i. The MCP shall remit to the State the full amount due no later than 90 calendar days after the date ODM delivers notice to the MCP of that amount.

        ii. It is explicitly noted that this MLR contract provision may result in payment by the MCP to ODM.

        iii. In the event of a change in capitation rate for the Extension population, for each period provided in this Provision, a MLR calculation in accordance with the requirements of this Provision shall be re-determined by ODM. Subsequent to this re-determination, adjustments to payments in accordance with this Provision may result in changes in payment by the MCP to ODM.

## S0215 — M24

Medicaid Managed Care
Appendix N
Compliance Assessment System

      d. Beginning January 1, 2018 through December 31, 2018, the MLR calculations will combine ABD, CFC, AFK and the Adult Extension members into a single MLR calculation.

7. **Noncompliance with Reinsurance Requirements.** If ODM determines that (1) the MCP has failed to maintain reinsurance coverage as specified in Appendix J, (2) the MCP's deductible exceeds $100,000 without approval from ODM, or (3) the MCP's reinsurance for non-transplant services covers less than 80% of inpatient costs in excess of the deductible incurred by one member for one year without approval from ODM, then ODM may require the MCP to pay a financial sanction to ODM. The amount of the sanction will be the lesser of (1) 10% of the difference between the estimated amount of what the MCP would have paid in premiums for the reinsurance policy if it had been in compliance and what the MCP actually paid while it was out of compliance or (2) $50,000.

    If ODM determines the MCP's reinsurance for transplant services covers less than 50% of inpatient costs incurred by one member for one year, ODM may subject the MCP to a CAP.

8. **Noncompliance with Prompt Payment.** ODM may impose progressive sanctions on the MCP that does not comply with the prompt pay requirements as specified in Appendix J of this Agreement. For claims received January 1, 2017 through June 30, 2017, sanctions will be based on the ODM Ohio Medical Assistance Provider Agreement in effect January 1, 2017. For claims received July 1, 2017 going forward:

      a. The first instance of noncompliance during a rolling 12-month period for each claim type listed in Appendix J: ODM may assess a refundable financial sanction equal to .04% of the amount calculated in accordance with this appendix on each claim type and timeframe separately. The refundable financial sanction amount will be returned to the MCP if ODM determines the MCP is in full compliance with the prompt pay standards within the five consecutive reporting periods following the report period for which the refundable financial sanction was issued.

      b. The second instance of noncompliance during a rolling 12-month period for each claim type listed in Appendix J: ODM may assess a nonrefundable financial sanction equal to .08% of the amount calculated in accordance with this appendix on each claim type and timeframe separately.

      c. Subsequent violations during a rolling 12-month period may result in an enrollment freeze of not less than three (3) months duration or until the MCP has come back into compliance.

**S0215 – M25**

Medicaid Managed Care
Appendix N
Compliance Assessment System

9. **Noncompliance with Clinical Laboratory Improvement Amendments (CLIA).** If the MCP fails to comply with CLIA requirements as specified by ODM, then ODM may impose a nonrefundable financial sanction in the amount of a $1,000 for each documented violation.

10. **Noncompliance with Abortion and Sterilization Hysterectomy Requirements.** If the MCP fails to comply with abortion and sterilization requirements as specified by ODM, then ODM may impose a nonrefundable financial sanction in the amount of $2,000 for each documented violation. Additionally, the MCP shall take all appropriate action to correct each violation documented by ODM.

11. **Refusal to Comply with Program Requirements.** If ODM has instructed the MCP that it shall comply with a specific program requirement and the MCP refuses, such refusal constitutes documentation that the MCP is no longer operating in the best interests of the MCP's members or the state of Ohio, and ODM may move to terminate or non-renew this Agreement.

12. **Data Quality Submission Requirements and Measures (as specified in Appendix L).** ODM reserves the right to withhold an assessment of noncompliance under this appendix due to unforeseeable circumstances.

    a. **Data Quality Submission Requirements.**

        i. **Annual Submission of MCP Self-Reported, Audited HEDIS Data.** Performance is monitored annually. If the MCP fails to submit its self-reported, audited HEDIS data to ODM as specified in Appendix L, the MCP will be considered non-compliant with the standards for the self-reported, audited HEDIS performance measures in Appendix M for the corresponding contract period per this appendix. In addition, ODM may impose a non-refundable $300,000 financial sanction if the MCP's HEDIS data submission does not contain any measure(s) designated as 'reporting only' and/or 'informational only' in Appendix M for the corresponding contact period. Furthermore, the MCP may be disqualified from participation in the P4P incentive system in Appendix O for the corresponding contract period.

        ii. **Annual Submission of Final HEDIS Audit Report (FAR).** Performance is monitored annually. If the MCP fails to submit it's FAR to ODM as specified in Appendix L, the MCP will be considered non-compliant with the standards for the self-reported, audited HEDIS

S0215 – M26

Medicaid Managed Care
Appendix N
Compliance Assessment System

performance measures in Appendix M for the corresponding contract period per this appendix. In addition, the MCP may be disqualified from participation in the P4P incentive system in Appendix O for the corresponding contract period.

ODM will review the MCP's FAR in order to determine if any data collection or reporting issues were identified. In addition, ODM will evaluate any issues that resulted in the assignment of an audit result of "Not Report" (i.e., NR) for any measure. The MCP may be required to submit to ODM requested documentation to account for an NR audit designation. Based on its review of the MCP's FAR and any NR audit designations assigned, ODM reserves the right to pursue corrective action (such as requiring the MCP to implement a corrective action plan to resolve data collection and/or reporting issues).

iii. **Data Certification Requirements for HEDIS IDSS Data and HEDIS Audit Report.** Performance is monitored annually. If the MCP fails to submit a required data certification letter to ODM within the required time frame, ODM may impose a nonrefundable financial sanction of $100 per calendar day, unless the MCP requests and is granted an extension by ODM.

iv. **Annual Submission of Member Level Detail Records for Specified HEDIS Measures.** Performance is monitored annually. If the MCP fails to submit the required HEDIS measure member level detail records to ODM within the required time frame, ODM may impose a nonrefundable financial sanction of $100 per calendar day, unless the MCP requests and is granted an extension by ODM.

v. **Annual CAHPS Survey Administration and Data Submission.** Performance is monitored annually. If the MCP fails to administer a CAHPS survey and submit the survey data to NCQA, the CAHPS Database, and ODM's designee, as specified in Appendix L, ODM may impose a non-refundable $300,000 financial sanction. In addition, the MCP will be considered non-compliant with the standards for the CAHPS performance measure in Appendix M for the corresponding contract period, per this appendix.

**S0215 – M27**

Medicaid Managed Care
Appendix N
Compliance Assessment System

      vi. **CAHPS Data Certification Requirements.** Performance is monitored annually. If the MCP fails to submit a required CAHPS data certification letter to ODM within the required time frame, ODM may impose a nonrefundable financial sanction of $100 per calendar day, unless the MCP requests and is granted an extension by ODM.

b. **Data Quality Measures.** The MCP shall submit to ODM, by the specified deadline and according to ODM's specifications, all required data files and requested documentation needed to calculate each measure listed under this section. If the MCP fails to comply with this requirement for any measure listed under this section, then the MCP will be considered noncompliant with the standard(s) for that measure.

Unless otherwise specified, sanctions for noncompliance are assessed per MCP and measure for the MCP's overall Ohio Medicaid population (i.e., ABD, MAGI, and Adult Extension members).

      i. **Encounter Data Volume.** Performance is monitored once every quarter for the entire measurement period for each of the following populations: ABD adults, ABD children, MAGI members, and Adult Extension members. Sanctions for non-compliance will be assessed separately, by population. For each population, if the standard is not met for every service category in all quarters of the measurement period, the MCP will be determined to be noncompliant for the measurement period.

ODM will issue a CAP for all instances of noncompliance with this measure that are not consecutive. ODM will issue a series of progressive sanctions for consecutive instances of noncompliance. The first time the MCP is determined to be noncompliant with the standard for this measure, ODM will issue a CAP. If the MCP is determined to be noncompliant with the standard in a second, consecutive quarter, ODM will impose a financial sanction of two percent of the amount calculated in accordance with this appendix. (Financial sanctions will not be levied in subsequent, consecutive quarters the MCP is determined to be noncompliant.) If the MCP is determined to be noncompliant with the standard in a third, consecutive quarter, ODM will impose a new member enrollment freeze. A financial

# S0215 — M28

Medicaid Managed Care
Appendix N
Compliance Assessment System

sanction issued under this section will be returned to the MCP if ODM determines the MCP is in full compliance with this program requirement within the five consecutive report periods following the report period for which the financial sanction was issued. A new member enrollment freeze issued under this section will be lifted after ODM determines the MCP is in full compliance with this program requirement.

ii. **Rejected Encounters.** Performance is monitored once every quarter for Measure 1 and once every month for Measure 2. Compliance determination with the standard applies only to the measurement period under consideration and does not include performance in previous measurement periods. Files in the ODM-specified medium per format that are totally rejected will not be considered in the determination of noncompliance. If the standard is not met for every file type, the MCP may be determined to be noncompliant for the measurement period.

Effective SFY 2016, ODM may issue a CAP for all instances of noncompliance with this measure that are not consecutive. ODM may issue a series of progressive sanctions for consecutive instances of noncompliance. The first time the MCP is determined to be noncompliant with the standard for this measure, ODM may issue a CAP. If the MCP is determined to be noncompliant with the standard in a second, consecutive measurement period, ODM may impose a financial sanction of two percent of the amount calculated in accordance with this appendix. If the MCP is determined to be noncompliant with the standard in a third, consecutive measurement period, ODM may impose a new member enrollment freeze. Special consideration may be made for MCPs with less than 1,000 members.

A financial sanction issued under this section will be returned to the MCP if ODM determines the MCP is in full compliance with this program requirement within the five consecutive report periods following the report period for which the financial sanction was issued. A new member enrollment freeze issued under this section will be lifted after ODM determines the MCP is in full compliance with this program requirement.

S0215 – M29

Medicaid Managed Care
Appendix N
Compliance Assessment System

iii. **Acceptance Rate.** Performance is monitored once every month. Compliance determination with the standard applies only to the month under consideration and does not include performance in previous months. If the standard is not met for every file type, the MCP may be determined to be noncompliant for the measurement period.

ODM may issue a CAP for all instances of noncompliance with this measure that are not consecutive. ODM may issue a series of progressive sanctions for consecutive instances of noncompliance. The first time the MCP is determined to be noncompliant with the standard for this measure, ODM may issue a CAP. If the MCP is determined to be noncompliant with the standard in a second, consecutive measurement period, ODM may impose a financial sanction of two percent of the amount calculated in accordance with this appendix. If the MCP is determined to be noncompliant with the standard in a third, consecutive measurement period, ODM may impose a new member enrollment freeze. Special consideration may be made for MCPs with less than 1,000 members.

A financial sanction issued under this section will be returned to the MCP if ODM determines the MCP is in full compliance with this program requirement within the five consecutive report periods following the report period for which the financial sanction was issued. A new member enrollment freeze issued under this section will be lifted after ODM determines the MCP is in full compliance with this program requirement.

iv. **Encounter Data Accuracy Study - Payment Accuracy Measure.** The first time the MCP is determined to be noncompliant with the standard for either level 1 or level 2 for this measure, the MCP shall implement a CAP which identifies interventions and a timeline for resolving data quality issues related to payments. Additional reports to ODM addressing targeted areas of deficiencies and progress implementing data quality improvement activities may be required. Upon all subsequent measurements of performance, if the MCP is again determined to be noncompliant with the standard for either level 1 or level 2 for this measure, ODM may impose a financial sanction of one percent of

S0215 — M30

Medicaid Managed Care
Appendix N
Compliance Assessment System

the amount calculated in accordance with this appendix. A financial sanction issued under this section will be returned to the MCP if ODM determines the MCP is in full compliance with this program requirement within the five consecutive report periods following the report period for which the financial sanction was issued.

v.  **Encounter Data Accuracy Study - Delivery Payment Measure.** Compliance with this measure will only be assessed for the MAGI population and Adult Extension members (combined). The MCP shall participate in a detailed review of delivery payments made for deliveries during the measurement period. The required accuracy rate for encounters generating delivery payments is 100%; therefore, any duplicate delivery payments or delivery payments not validated shall be returned to ODM. For all encounter data accuracy studies completed during the contract period, if the MCP does not meet the minimum record submittal rate of 85%, ODM may impose a non-refundable $10,000 financial sanction. However, no financial sanctions will be imposed if the MCP is in its first contract year of Medicaid program participation.

vi.  **Incomplete Rendering Provider Data.** Performance is monitored once every quarter for all measurement periods. If the standard is not met in all quarters of the measurement period, the MCP will be noncompliant for the measurement period.

Effective SFY 2016, ODM may issue a CAP for all instances of noncompliance with this measure that are NOT consecutive. ODM may issue a series of progressive sanctions for consecutive instances of noncompliance. The first time the MCP is determined to be noncompliant with the standard for this measure, ODM may issue a CAP. If the MCP is determined to be noncompliant with the standard in a second, consecutive quarter, ODM may impose a financial sanction of two percent of the amount calculated in accordance with this appendix. If the MCP is determined to be noncompliant with the standard in a third, consecutive quarter, ODM may impose a new member enrollment freeze.

S0215 – M31

Medicaid Managed Care
Appendix N
Compliance Assessment System

A financial sanction issued under this section will be returned to the MCP if ODM determines the MCP is in full compliance with this program requirement within the five consecutive report periods following the report period for which the financial sanction was issued. A new member enrollment freeze issued under this section will be lifted after ODM determines the MCP is in full compliance with this program requirement.

vii. **NPI Provider Number Usage without Medicaid/Reporting Provider Numbers. Performance** is monitored once every quarter for all measurement periods. If the standard is not met in all quarters of the measurement period, the MCP may be determined to be noncompliant for the measurement period.

Effective SFY 2016, ODM may issue a CAP for all instances of noncompliance with this measure that are NOT consecutive. ODM may issue a series of progressive sanctions for consecutive instances of noncompliance. The first time the MCP is determined to be noncompliant with the standard for this measure, ODM may issue a CAP. If the MCP is determined to be noncompliant with the standard in a second, consecutive quarter, ODM may impose a financial sanction of two percent of the amount calculated in accordance with this appendix. If the MCP is determined to be noncompliant with the standard in a third, consecutive quarter, ODM may impose a new member enrollment freeze.

A financial sanction issued under this section will be returned to the MCP if ODM determines the MCP is in full compliance with this program requirement within the five consecutive report periods following the report period for which the financial sanction was issued. A new member enrollment freeze issued under this section will be lifted after ODM determines the MCP is in full compliance with this program requirement.

viii. **Encounter Submissions per The Ohio Department of Medicaid's Methodology for Covered Families & Children (CFC), Aged, Blind, or Disabled (ABD), and Adult Extension (Group VIII) Encounter Data Quality Measures document.** Performance is monitored once every month. If the standard is not met for the

S0215 - M32

Medicaid Managed Care
Appendix N
Compliance Assessment System

measurement period, the MCP will be noncompliant for the measurement period.

Effective January 2015, ODM will issue a series of progressive sanctions for all instances of noncompliance. The first time the MCP is determined to be noncompliant with the standard for this measure, ODM may impose a financial sanction of one percent of the amount calculated in accordance with this appendix. If the MCP is determined to be noncompliant with the standard in any subsequent month, consecutive or non-consecutive, ODM will impose a financial sanction of two percent of the amount calculated in accordance with this appendix.

A financial sanction issued under this section will be returned to the MCP if ODM determines the MCP is in full compliance with this program requirement within the five consecutive report periods following the report period for which the financial sanction was issued.

ix. **Timeliness of Encounter Data Submission.** Performance is monitored once every month. If the standard is not met for the measurement period, the MCP will be noncompliant for the measurement period.

Effective July 2016, ODM will issue a series of progressive sanctions for all instances of noncompliance. The first time the MCP is determined to be noncompliant with the standard for this measure, ODM may impose a financial sanction of one percent of the amount calculated in accordance with this appendix. If the MCP is determined to be noncompliant with the standard in any subsequent month, consecutive or non-consecutive, ODM will impose a financial sanction of two percent of the amount calculated in accordance with this appendix.

A financial sanction issued under this section will be returned to the MCP if ODM determines the MCP is in full compliance anytime within the five consecutive report periods following the report period for which the financial sanction was issued.

13. **Quality Measures (as specified in Appendix M).** This section sets forth sanctions for those quality measure standards in Appendix M subject to corrective action.

S0215 - M33

Medicaid Managed Care
Appendix N
Compliance Assessment System

ODM reserves the right to withhold an assessment of noncompliance under this section due to unforeseeable circumstances.

For each measure in Table 1 of Appendix M, one or more rates are calculated. Each rate has an associated Minimum Performance Standard. When the MCP fails to meet a Minimum Performance Standard listed in Appendix M, for a measure for which noncompliance sanctions are applicable, the MCP may be assessed a sanction for noncompliance with the standard. ODM has established uniform noncompliance sanctions for these standards.

A series of progressive sanctions may be issued for consecutive instances of noncompliance with the standard established for a given rate. For example, four rates, corresponding to the HEDIS age breakouts, are calculated for the *Children and Adolescents' Access to Primary Care Practitioners* measure. The MCP failing to meet the standard established for the '12-24 Months' rate in three consecutive measurement periods would be subject to progressive sanctions. However, the MCP failing to meet the standard established for the '7-11 Years' rate in one measurement period and the '12-19 Years' rate in the next would not be subject to progressive sanctions, as these only apply to the standard established for the same rate.

For the standard established for each rate listed in Table 1 of Appendix M, for measures for which noncompliance sanctions are applicable, the MCP may be assessed sanctions for instances of noncompliance as follows:

a. **First instance, or subsequent but nonconsecutive instance, of noncompliance.** ODM may impose a financial sanction in the amount of one quarter of one percent of the MCP's average monthly net premium and delivery payment amount for the twelve months prior to the month in which the compliance action is issued to the MCP. If the MCP is determined to be in full compliance with this program requirement within the following five consecutive report periods, the financial sanction will be returned.

b. **Second consecutive instance of noncompliance.** ODM may impose a financial sanction in the amount of one quarter of one percent of the MCP's average monthly net premium and delivery payment amount for the twelve months prior to the month in which the compliance action is issued to the MCP. The financial sanction is non-refundable.

c. **Third consecutive, and any additional consecutive, instance of noncompliance.** ODM may impose a financial sanction in the

S0215 – M34

Medicaid Managed Care
Appendix N
Compliance Assessment System

amount of one half of one percent of the MCP's average monthly net premium and delivery payment amount for the twelve months prior to the month in which the compliance action is issued to the MCP. The financial sanction is non-refundable.

In addition, if ODM determines the MCP is noncompliant with greater than 50% of the quality standards listed in Appendix M, for which noncompliance sanctions are applicable, for two consecutive contract years, ODM will have the option to terminate the MCP's Agreement.

14. **Quality Care (as specified in Appendix K).** ODM reserves the right to withhold an assessment of noncompliance under this section due to unforeseeable circumstances.

   a. **Administrative Compliance Assessment.** Compliance with administrative standards is performed by the external quality review organization, as specified by ODM. For each documented instance of noncompliance with an administrative standard, the MCP may be required to submit a CAP as specified by ODM to remedy the identified deficiency.

   b. **Member Safeguards.** In addition to points that may be assessed pursuant to this appendix, ODM may assess a non-refundable financial sanction of $50,000 (per case) for any instance of noncompliance that places a member at risk for a negative health outcome or jeopardizes the health, safety and welfare of the member. This financial sanction may be imposed for any instance where plan action or inaction has come to ODM's attention and in accordance with ODM's Health, Safety, Welfare Improvement Process for Medicaid Managed Care Consumers, ODM has determined, the MCP to be noncompliant with a specific program requirement, contractual requirement, rule and/or regulation.

   c. **Maintenance of National Committee for Quality Assurance Health Plan Accreditation.** For the standard established in Appendix C, ODM may assess the following sanctions for non-compliance as follows: ·

   **If the MCP receives a Provisional accreditation status -** the MCP will be required to complete a resurvey within 12 months of the accreditation decision. If the resurvey results in a Provisional or Denied status, ODM will consider this a material breach of this Agreement may terminate the provider agreement with the managed care plan.

**S0215 – M35**

Medicaid Managed Care
Appendix N
Compliance Assessment System

> If the MCP receives a Denied accreditation status - then ODM considers this a material breach of the provider agreement and may terminate the provider agreement with the MCP.

15. **Noncompliance with Provision of Transportation Services.** If the MCP fails to comply with the transportation requirements specified in Appendix C.19 of this Agreement, or if the MCP fails to transport a member to a pre-scheduled appointment on time, which results in a missed appointment, when providing Medicaid-covered transportation services and when members shall travel more than 30 miles to receive services, ODM may impose a nonrefundable financial sanction in the amount of $1,000 for each violation. ODM may assess additional sanctions (e.g., CAPs, points, financial sanctions) as provided for in this appendix for any violation of the requirements to provide Medicaid-covered transportation services.

16. **Non-compliance with Behavioral Health Carve-in Testing Standards.** For the testing standards established in Appendix C of this Agreement, ODM may impose a financial sanction in the amount of $15,000 for each instance of noncompliance.

iii. **Financial Sanctions.** Refundable or nonrefundable financial sanctions may be assessed separately or in combination with other sanctions or remedial actions. The total financial sanctions assessed in any one month will not exceed 15% of one month's payments from ODM to the MCP. Unless otherwise stated, all financial sanctions are nonrefundable.

1. Refundable and nonrefundable financial sanctions/assurances shall be paid by the MCP to ODM within thirty (30) calendar days of invoice date by the MCP, or as otherwise directed by ODM in writing. In addition, per ORC Section 131.02, payments owed to the State not received within forty-five (45) calendar days will be certified to the Attorney General's (AG's) office. The AG's Office will assess the appropriate collection fee for MCP payments certified to the AG's Office.

2. For financial sanctions calculated in accordance with this section, ODM will use the MCP's average monthly net premium and delivery payment amount for the twelve months prior to the month in which the compliance action is issued to the MCP.

3. Unless otherwise specified, any monies collected through the imposition of a refundable financial sanction will be returned to the MCP (minus any applicable collection fees owed to the AG's Office if the MCP has been delinquent in submitting payment) after it has demonstrated full compliance with the particular program requirement, as determined by ODM.

**S0215 − M36**

Medicaid Managed Care
Appendix N
Compliance Assessment System

4.   The MCP is required to submit a written request for refund to ODM at the time it believes is appropriate before a refund of monies will be considered.

5.   Refundable financial sanctions issued under sections of this appendix will be returned to the MCP in the event ODM replaces or eliminates the sanction's applicable measure(s) from the Agreement for the measurement period immediately following the measurement period for which the sanction was assessed.

iv.   **New Enrollment Freezes.** Notwithstanding any other sanction or point assessment that ODM may impose on the MCP under this Agreement, ODM may prohibit the MCP from receiving new enrollment through consumer initiated selection or the assignment process if any of the following occur: (1) the MCP has accumulated a total of 51 or more points during a rolling 12-month period; (2) the MCP has failed to fully implement a plan of correction within the designated time frame; (3) circumstances exist that potentially jeopardize the MCP's members' access to care, as solely determined by ODM; or (4) the MCP is found to have a pattern of repeated or ongoing noncompliance, as solely determined by ODM. Examples of circumstances that ODM may consider as jeopardizing member access to care include, but are not limited to, the following:

1.   The MCP has been found by ODM to be noncompliant with the prompt payment or the non-contracting provider payment requirements;

2.   The MCP has been found by ODM to be noncompliant with the provider panel requirements specified in Appendix H of the Agreement;

3.   The MCP has refused to comply with a program requirement after ODM has directed the MCP to comply with the specific program requirement;

4.   The MCP has received notice of proposed or implemented adverse action by the ODI; or

5.   The MCP has failed to provide adequate provider or administrative capacity.

Payments provided for under the Agreement will be denied for new enrollees, when and for so long as, payments for those enrollees are denied by CMS in accordance with the requirements in 42 CFR 438.726.

New Member Enrollment freezes issued under this appendix may be lifted in the event ODM replaces or eliminates the sanction's applicable measure(s) from the Agreement for the measurement period immediately following the measurement period for which the sanction was assessed.

S0215 – M37

Medicaid Managed Care
Appendix N
Compliance Assessment System

Unless otherwise specified, new enrollment freezes issued under this appendix may be lifted after the MCP is determined to be in full compliance with the applicable program requirement, and the violations or deficiencies are resolved to the satisfaction of ODM.

v. **Reduction of Assignments.** ODM has discretion over how member auto-assignments are made. ODM may reduce the number of assignments the MCP receives to ensure program stability within a region, or upon a determination that the MCP lacks sufficient capacity to meet the needs of the increased ·enrollment volume. ODM may determine the MCP has demonstrated a lack of sufficient capacity under circumstances that include, but are not limited to the following:

1. The MCP has failed to maintain an adequate provider network;

2. The MCP has failed to provide new member materials by the member's effective date;

3. The MCP has failed to meet the minimum call center requirements;

4. The MCP has failed to meet the minimum performance standards for members with·special health care needs; or

5. The MCP has failed to provide.complete and accurate data files regarding appeals or grievances, primary care providers, or its Care Management System (CAMS) files.

vi. **Death or Injury to Member.** ODM may immediately terminate or suspend this Agreement if the·MCP's failure to perform, or properly perform, any of the requirements in this Agreement results in the death of or serious injury to, the MCP's member, as determined by ODM.

3. **Request for Reconsiderations.** Unless otherwise specified below, the MCP may seek reconsideration of any sanction or remedial action imposed by ODM including points, financial sanctions, and member enrollment freezes. The MCP may seek reconsideration of CAPs only when a CAP is required for the first violation in a series of progressive compliance actions.

a. The MCP may not seek reconsideration of:

i. An action by ODM that results in changes to the auto-assignment of members; or

ii. The imposition of directed CAPs, as defined in this appendix.

b. The MCP shall submit a request for reconsideration on the form required by ODM, in accordance with the following procedure:

**S0215 – M38**

Medicaid Managed Care
Appendix N
Compliance Assessment System

i.   The MCP shall submit a request for reconsideration either by email to the designated Contract Administrator (CA), or by overnight mail to ODM's Office of Managed Care (OMC). The request for reconsideration shall be received by ODM no later than the tenth business day after the date that the MCP receives notice of the imposition of the remedial action by ODM. If ODM imposes an enrollment freeze based on access to care concerns, the enrollment freeze will be imposed concurrent with initiating notification to the MCP.

ii.  A request for reconsideration shall explain in detail why the specified sanction should not be imposed. At a minimum, the reconsideration request shall include: a statement of the proposed action being contested; the basis for requesting reconsideration; and any supporting documentation. In considering the MCP's request for reconsideration, ODM will review only the written material submitted by the MCP.

iii. ODM will take reasonable steps to make a final decision, or request additional information, within ten business days after receiving the request for reconsideration. If ODM requires additional time, the MCP will be notified in writing.

iv.  If ODM approves a reconsideration request, in whole, the associated sanctions or remedial actions will be rescinded. The MCP will not be required to submit a CAP.

v.   If ODM approves, in part, the MCP's reconsideration request the sanction, remedial action and/ or remedial actions may be rescinded or reduced, at the discretion of ODM. The MCP may still be required to submit a CAP if ODM, in its discretion, believes that a CAP is still warranted under the circumstances.

vi.  If ODM denies a reconsideration request, any CAP, sanction, or remedial action, and/or points outlined in the original notice of noncompliance will be assessed.

**S0215 – M39**

Medicaid Managed Care
Appendix O
P4P and Quality Withhold

**APPENDIX O**

**PAY-FOR-PERFORMANCE (P4P) and QUALITY WITHOLD**

The Ohio Department of Medicaid (ODM) established a Pay for Performance (P4P) Incentive System and a Quality Withhold Program to provide financial rewards and quality payments to MCPs that achieve specific levels of performance in program priority areas. Standardized clinical quality measures derived from a national measurement set (i.e., HEDIS) are used to determine incentive payments. The P4P Incentive System will be phased out after State Fiscal Year (SFY) 2018 (measurement year 2017) and replaced with the Quality Withhold Program in SFY 2019 (measurement year 2018).

1. **P4P Incentive System.** The SFY 2018 P4P determination will evaluate MCP clinical quality. For SFY 2018, one P4P Incentive System determination will be made per MCP. Results for each P4P measure will be calculated per MCP, statewide, and include all regions in which the MCP has membership as specified in this Appendix. For the Clinical Performance P4P determinations, the MCP will be required to develop and implement improvement initiatives in areas of low performance as specified in this Appendix.

   a. **SFY 2018 Determination.** For SFY 2018, ODM will make one P4P Incentive System determination per MCP, as outlined below.

      Clinical Performance P4P Incentive System Determination:

      i. **Frequency.** MCP performance is assessed annually (i.e., ODM will issue one assessment and payment, if applicable, per MCP for SFY 2018).

      ii. **Measures.** Performance is assessed on six measures, as listed in Table 1 below.

      iii. **Report Period.** The measurement year for the six clinical quality measures is CY 2017.

      iv. **Standards.** A set of ten performance levels, with corresponding standards, is established for each of the six measures, as provided in Table 1 below.

      v. **Potential Payout.** The potential payout for this determination is an amount equal to 1.25% of the net premium and delivery payments made to the MCP between January 1, 2017 and December 31, 2017, pursuant to the applicable Medicaid Managed Care Provider Agreements.

      vi. **Calculation.** ODM calculates the MCP's potential payout (i.e., 1.25%) and divides this equally among the six measures. The MCP is then awarded a percentage (0-100) of the potential payout allotted to each measure. This determination is made on a measure by measure basis, using the MCP's performance measure result in comparison to the ten performance levels, and corresponding standards, established for each measure. If the MCP fails to meet the standard for level one, they are awarded 0% for the measure.

S0215 – M40

Medicaid Managed Care
Appendix O
P4P and Quality Withhold

**Table 1. SFY 2018 P4P Clinical Performance Measures and Standards.**

| P4P Perf. Level | Percent of Potential Payout Awarded | Follow-Up After Hospitalization for Mental Illness (7 Days) | Prenatal and Postpartum Care: Timeliness of Prenatal Care | Prenatal and Postpartum Care: Postpartum Care | Controlling High Blood Pressure (Patients with Hyper-tension) | Adolescent Well-Care Visits | Comprehensive Diabetes Care: HbA1c Poor Control (> 9.0%) |
|---|---|---|---|---|---|---|---|
| | | SFY 2018 P4P Clinical Performance Measures and Standards | | | | | |
| | | Standards that Determine % of Potential Payout Awarded, by Measure | | | | | |
| 10 | 100% | 55.3% | 87.6% | 67.5% | 64.0% | 57.7% | 36.9% |
| 9 | 87% | 53.1% | 86.5% | 66.2% | 62.1% | 55.8% | 38.3% |
| 8 | 74% | 50.8% | 85.4% | 64.9% | 60.3% | 54.0% | 39.6% |
| 7 | 61% | 48.6% | 84.4% | 63.6% | 58.5% | 52.1% | 41.0% |
| 6 | 50% | 46.3% | 83.3% | 62.3% | 56.6% | 50.3% | 42.4% |
| 5 | 39% | 44.1% | 82.3% | 61.0% | 54.8% | 48.4% | 43.8% |
| 4 | 28% | 42.1% | 80.6% | 59.9% | 53.2% | 46.9% | 45.5% |
| 3 | 19% | 40.1% | 79.0% | 58.8% | 51.6% | 45.4% | 47.2% |
| 2 | 11% | 38.2% | 77.4% | 57.7% | 50.0% | 43.9% | 48.9% |
| 1 | 4% | 36.2% | 75.8% | 56.6% | 48.5% | 42.4% | 50.6% |
| | 0% | ≤ 36.1% | ≤75.7% | ≤56.5% | ≤48.4% | ≤42.3% | ≥50.7% |
| MPS | | 34.2% | 74.2% | 55.5% | 46.9% | 40.9% | 52.3% |

MPS = Minimum Performance Standard (*established in Appendix M, and provided above for reference*)

Note: MCP performance is assessed using MCP self-reported, audited HEDIS data calculated in accordance with *NCQA HEDIS 2018, Volume 2: Technical Specifications.*

b. **SFY 2018 Quality Improvement.** The clinical measures used in the P4P Incentive System evaluate healthcare delivery to clinical populations of high priority to Ohio Medicaid. The MCP is expected to maintain a focus on continuous quality improvement in their provision of care and services to these populations. To monitor MCP quality improvement, ODM will require the MCP to develop and implement one Quality Improvement Project (QIP), as outlined in paragraph 7.e.b) of Appendix K, for each MCP SFY 2018 P4P clinical measure result that does not meet the corresponding standard listed below. The MCP shall adhere to ODM-specified reporting and submission guidelines in completing the QIP.

| | |
|---|---|
| Follow-Up After Hospitalization for Mental Illness (7 Days) | ≥ 16.9% |
| Prenatal and Postpartum Care: Timeliness of Prenatal Care | ≥ 63.6% |
| Prenatal and Postpartum Care: Postpartum Care | ≥ 43.6% |
| Controlling High Blood Pressure (Patients with Hypertension) | ≥ 33.8% |
| Adolescent Well-Care Visits | ≥ 26.8% |
| Comprehensive Diabetes Care: HbA1c Poor Control (> 9.0%) | ≤ 68.2% |

2. **Quality Withhold Program.** Starting with capitation and delivery payments made in April 2018, ODM will withhold 2.0% for use in the Quality Withhold Program. ODM will use Quality Indices to calculate the amount of the withhold payout. Quality Indices will be comprised of multiple performance measures related to the index topic. Quality Indices measure the effectiveness of the MCP's population health management strategy and quality improvement programs to

S0215 – M41

Medicaid Managed Care
Appendix O
P4P and Quality Withhold

impact population health outcomes. Determination of the Quality Withhold payout is specified in this appendix. A bonus pool for high performing MCPs will be established annually based on unreturned quality withhold dollars as specified in this appendix

a. **SFY 2019 Quality Withhold Payout Determination.** The Department will use the MCPs' self-reported audited HEDIS data submission for the purpose of evaluating performance related to the Quality Withhold Program.

   i. **Frequency.** MCP performance will be assessed annually (i.e., ODM will issue one assessment and payment, if applicable, per MCP for SFY 2019).

   ii. **Quality Indices & Measures.** Performance will be assessed on four equally weighted Quality Indices. The Quality Indices used in the Quality Withhold program for SFY 2019 (measurement year 2018) are: (1) Chronic Condition: Cardiovascular Disease; (2) Chronic Condition: Diabetes; (3) Behavioral Health; and (4) Healthy Children. Each index is composed of multiple quality measures which are assigned different weights. The index measures and weights are described in *ODM's Quality Indices and Scoring Methodology*.

   iii. **Report Period.** The measurement year for the measures used in the Quality Indices is CY 2018.

   iv. **Index Score.** Indices will be scored according to *ODM's Quality Indices and Scoring Methodology*. A separate Index Score will be calculated or each Index.

   v. **Potential Payout:** The potential payout for this determination is equal to the amount withheld during CY 2018, i.e., ODM will withhold 2.0% of the capitation and delivery payments from April, 2018 through December, 2018.

   vi. **Calculation.** ODM calculates the MCP's maximum potential payout and divides this equally among the Quality Indices used in the Quality Withhold Program. The MCP is then awarded a percentage (0-100) of the potential payout allotted to each Quality Index. This determination is made on an index-by-index basis, using the MCP's Index Score for each Quality Index in comparison to Table 2 below.

**Table 2. SFY 2019 Quality Withhold Payout Table.**

| SFY 2019 Quality Withhold Program Payout Table | |
|---|---|
| Index Score | Percent of Potential Payout Awarded |
| >=50.0 | 100% |
| 45.0 – 49.9 | 91.6% |
| 40.0 – 44.9 | 83.3% |
| 35.0 – 39.9 | 75.0% |
| 30.0 – 34.9 | 62.5% |
| 25.0 – 29.9 | 50.0% |
| < 25.0 | 0% |

# S0215 – M42

Medicaid Managed Care
Appendix O
P4P and Quality Withhold

vii. **SFY 2019 Bonus Pool Determination.** The SFY 2019 Bonus Pool will be funded by the unreturned SFY 2019 Quality Withhold Program dollars. If $0 are unreturned, then there will be no bonus pool. Unclaimed Bonus Pool dollars will not carry over to the next year. In order to qualify for a share of the bonus pool, MCPs must achieve the following:

1. An average Index Score of 75.0 points or greater across all indices included in the SFY 2019 Quality Withhold Program; and

2. At least 90.0% of CPC practices with MCP members attributed during the measurement year must remain in good standing on applicable quality and efficiency metrics. In order to remain in good standing, CPC practices must pass at least 50% of applicable quality metrics and at least 50% of applicable efficiency metrics. This determination will be made by ODM.

The Bonus Pool will be divided in proportion to each qualified MCP's net MMC premium and delivery payments made for the measurement year.

b. **SFY 2020 Quality Withhold Payout Determination.** The Department will use the MCPs' self-reported audited HEDIS data submission for the purpose of evaluating performance related to the Quality Withhold Program.

i. **Frequency.** MCP performance will be assessed annually (i.e., ODM will issue one assessment and payment, if applicable, per MCP for SFY 2020).

ii. **Quality Indices & Measures.** Performance will be assessed on four equally weighted Quality Indices. The Quality Indices used in the Quality Withhold program for SFY 2020 (measurement year 2019) are: (1) Chronic Condition: Cardiovascular Disease; (2) Chronic Condition: Diabetes; (3) Behavioral Health; and (4) Healthy Children. Each index is composed of multiple quality measures which are assigned different weights. The index measures and weights are described in *ODM's Quality Indices and Scoring Methodology*.

iii. **Report Period.** The measurement year for the measures used in the Quality Indices is CY 2019.

iv. **Index Score.** Indices will be scored according to *ODM's Quality Indices and Scoring Methodology.* A separate Index Score will be calculated for each Index.

v. **Potential Payout.** The potential payout for this determination is equal to the amount withheld during CY 2019, i.e., ODM will withhold 2.0% of the capitation and delivery payments from January, 2019 through December, 2019.

vi. **Calculation.** ODM calculates the MCP's maximum potential payout and divides this equally among the Quality Indices used in the Quality Withhold Program. The MCP is then awarded a percentage (0-100) of the potential payout allotted

**S0215 — M43**

Medicaid Managed Care
Appendix O
P4P and Quality Withhold

to each Quality Index. This determination is made on an index-by-index basis, using the MCP's Index Score for each Quality Index in comparison to Table 3 below.

**Table 3. SFY 2020 Quality Withhold Payout Table**

| SFY 2020 Quality Withhold Program Payout Table | |
| --- | --- |
| Index Score | Percent of Potential Payout Awarded |
| >= 75 | 100% |
| 70.0 – 74.9 | 95.0% |
| 65.0 – 69.9 | 91.0% |
| 60.0 – 64.9 | 87.5% |
| 55.0 – 59.9 | 84.5% |
| 50.0 – 54.9 | 81.8% |
| 45.0 – 49.9 | 79.3% |
| 40.0 – 44.9 | 77.0% |
| 35.0 – 39.9 | 75.0% |
| 30.0 – 34.9 | 50.0% |
| 25.0 – 29.9 | 25.0% |
| < 25.0 | 0% |

    vii. **SFY 2020 Bonus Pool Determination**. The SFY 2020 Bonus Pool will be funded by the unreturned SFY 2020 Quality Withhold Program dollars. If $0 are unreturned, then there will be no bonus pool. Unclaimed Bonus Pool dollars will not carry over to the next year. In order to qualify for a share of the bonus pool, MCPs must achieve the following:

        1. An average Index Score of 75.0 points or greater across all indices included in the SFY 2020 Quality Withhold Program; and

        2. At least 90.0% of CPC practices with MCP members attributed during the measurement year must remain in good standing on applicable quality and efficiency metrics. In order to remain in good standing, CPC practices must pass at least 50% of applicable quality metrics and at least 50% of applicable efficiency metrics. This determination will be made by ODM.

    The Bonus Pool will be divided in proportion to each qualified MCP's net MMC premium and delivery payments made for the measurement year.

  c. **SFY 2021 Quality Withhold Payout Determination**. The Department will use the MCPs' self-reported audited HEDIS data submission for the purpose of evaluating performance related to the Quality Withhold Program.

    i. **Frequency**. MCP performance will be assessed annually (i.e., ODM will issue one assessment and payment, if applicable, per MCP for SFY 2021).

S0215 - M44

Medicaid Managed Care
Appendix O
P4P and Quality Withhold

ii. **Quality Indices & Measures.** Performance will be assessed on four equally weighted Quality Indices. The Quality Indices used in the Quality Withhold program for SFY 2021 (measurement year 2020) are: (1) Chronic Condition: Cardiovascular Disease; (2) Chronic Condition: Diabetes; (3) Behavioral Health; and (4) Healthy Children. Each index is composed of multiple quality measures which are assigned different weights. The index measures and weights are described in *ODM's Quality Indices and Scoring Methodology*.

iii. **Report Period.** The measurement year for the measures used in the Quality Indices is CY 2020.

iv. **Index Score.** Indices will be scored according to *ODM's Quality Indices and Scoring Methodology*. A separate Index Score will be calculated for each Index.

v. **Potential Payout.** The potential payout for this determination is equal to the amount withheld during CY 2020, i.e., ODM will withhold 2.0% of the capitation and delivery payments from January, 2020 through December, 2020.

vi. **Calculation.** ODM calculates the MCP's maximum potential payout and divides this equally among the Quality Indices used in the Quality Withhold Program. The MCP is then awarded a percentage (0-100) of the potential payout allotted to each Quality Index. This determination is made on an index-by-index basis, using the MCP's Index Score for each Quality Index in comparison to Table 4 below.

Table 4. SFY 2021 Quality Withhold Payout Table

| SFY 2021 Quality Withhold Program Payout Table | |
|---|---|
| Index Score | Percent of Potential Payout Awarded |
| >= 75 | 100% |
| 70.0 – 74.9 | 95.0% |
| 65.0 – 69.9 | 91.0% |
| 60.0 – 64.9 | 87.5% |
| 55.0 – 59.9 | 84.5% |
| 50.0 – 54.9 | 81.8% |
| 45.0 – 49.9 | 79.3% |
| 40.0 – 44.9 | 77.0% |
| 35.0 – 39.9 | 75.0% |
| 30.0 – 34.9 | 0% |
| 25.0 – 29.9 | 0% |
| <25 | 0% |

vii. **SFY 2021 Bonus Pool Determination.** The SFY 2021 Bonus Pool will be funded by the unreturned SFY 2021 Quality Withhold Program dollars. If $0 are unreturned, then there will be no bonus pool. Unclaimed Bonus Pool dollars will not carry over to the next year. In order to qualify for a share of the bonus pool, MCPs must achieve the following:

**S0215 – M45**

Medicaid Managed Care
Appendix O
P4P and Quality Withhold

1: An average Index Score of 75.0 points or greater across all indices included in the SFY 2021 Quality Withhold Program; and

2. At least 90.0% of CPC practices with MCP members attributed during the measurement year must remain in good standing on applicable quality and efficiency metrics. In order to remain in good standing, CPC practices must pass at least 50% of applicable quality metrics and at least 50% of applicable efficiency metrics. This determination will be made by ODM.

The Bonus Pool will be divided in proportion to each qualified MCP's net MMC premium and delivery payments made for the measurement year.

3. **Additional Operational Considerations.**

   a. **Timing of P4P Incentive System and Quality Withhold Program Determinations.** ODM will issue results for each P4P Incentive System and Quality Withhold Program determination to participating MCPs within six months of the end of each established report period. Given that unforeseen circumstances may impact the timing of this determination, ODM reserves the right to revise the time frame in which the P4P Incentive System or Quality Withhold program determination is issued (i.e., the determination may be made more than six months after the end of the contract period).

   b. **Agreement Termination, Nonrenewal, or Denial.** Upon termination, nonrenewal, or denial of the MCP Agreement, the incentive or withhold amount will be retained or awarded by ODM, in accordance with Appendix P, *MCP Termination/Non-renewal*, of this Agreement.

   c. **P4P or Quality Withhold Measures, Requirements, and Measurement Years.** ODM reserves the right to revise P4P or Quality Withhold measures, requirements, and measurement years, as needed, due to unforeseen circumstances. Unless otherwise noted, the most recent report or study finalized prior to the end of the contract period will be used in determining the MCP's overall performance level for that contract period.

   d. **P4P Potential Payout Amounts – Status Determination.** In the event the MCP's performance cannot be evaluated on a particular P4P measure, ODM in its sole discretion will award or retain 100% of the incentive or withhold amount (potential payout) allocated to that particular measure or index. This determination will be based on the circumstances involved (e.g., for SFY 2016, if a HEDIS measure was assigned an audit result of "Not Report" on the MCP's Final Audit Report and the "Not Report" designation was determined to be the result of a material bias caused by the MCP, ODM will retain 100% of the incentive or withhold amount [potential payout] allocated to that measure).

   e. **P4P Performance Standards – Retrospective Adjustment.** ODM uses a uniform methodology, as needed, for the retrospective adjustment of any P4P Incentive or

## S0215 – M46

Medicaid Managed Care
Appendix O
P4P and Quality Withhold

Quality Withhold Standard. This methodology will be implemented at ⊙DM's sole discretion when all three of the following criteria below are met.

    i.  The methodology for the standard's associated measure is revised. Note: for HEDIS measures, ODM will not adjust performance measure standards retrospectively due to procedural changes such as revisions to medical record hybrid review timelines.

    ii.  For the year the methodology is revised, the performance results for all Ohio Medicaid MCPs all increase or all decrease when compared to·the standard setting year (e.g., for the SFY 2013 Provider Agreement, the standard setting year is HEDIS 2011). Note: this excludes MCPs without results for both years.

    iii.  For the year the methodology is revised, the performance results for three or more Ohio Medicaid MCPs each change by at least three.percentage .points (e.g., increase from 56.0% to 59.0%) when compared to the standard setting year.

For a comprehensive description of the standard adjustment methodology, see *ODM Methods for the Retrospective Adjustment of Quality, P4P, and Quality Withhold Measure Standards*

S0215 - M47

Medicaid Managed Care
Appendix P
Plan Terminations/Nonrenewals

## APPENDIX P

### PLAN TERMINATIONS/NONRENEWALS

1. **MCP-Initiated Terminations/Nonrenewals**. If the MCP provides notice of the termination/nonrenewal of this Agreement to ODM, pursuant to Article VIII of the agreement, the MCP will be required to comply with the following:

   a. **Fulfill Existing Duties and Obligations**. The MCP agrees to fulfill all duties and obligations as required under Chapter 5160-26 of the Administrative Code and any provider agreements related to the provision of services for the Medicaid population during periods of time when the MCP was under contract with ODM. Such duties and obligations include, but are not limited to, the submission by the MCP of any previously reported appeals and grievances·data which were unresolved for the Medicaid population after the termination/nonrenewal date, resolution of provider and consumer complaints for the Medicaid population served by the MCP for the MCP provider agreement time periods, and provision of data to support audits related to the Medicaid population served by the MCP for the MCP's provider agreement time periods.

   b. **Refundable Monetary Assurance**. The MCP will be required to submit a refundable monetary assurance. This monetary assurance will be held by ODM until such time that the MCP has submitted all outstanding monies owed, data files, and reports, including, but not limited to, grievance, appeal, encounter and cost report data related to time periods through the final date of service under this Agreement. The monetary assurance shall be in an amount of either $50,000 or 5 % of the capitation amount paid by ODM in the month the termination/nonrenewal notice is issued, whichever is greater.

   The MCP shall remit the monetary assurance in the specified amounts via separate electronic fund transfers (EFT) payable to Treasurer of State, State of Ohio (ODM). The MCP shall contact their Contract Administrator to verify the correct amounts required for the monetary assurance and obtain an invoice number prior to submitting the monetary assurance. Information from the invoices shall be included with each EFT to ensure monies are deposited in the appropriate ODM Fund account. In addition, the MCP shall send copies of the EFT bank confirmations and copies of the invoices to their Contract Administrator.

   If the monetary assurance is not received as specified above, ODM will withhold the MCP's next month's capitation payment until such time that ODM receives documentation that the monetary assurance is received by the Treasurer of State. If within one year of the date of issuance of the invoice, the MCP does not submit all outstanding monies owed and required submissions, including, but not limited to, grievance, appeal, encounter and cost report data related to time periods through the final date of service under this Agreement, the monetary assurance will not be refunded to the MCP.

   c. **Bonus Amount**. The bonus amount in the managed care program performance payment fund will be retained by ODM.

**S0215 — M48**

Medicaid Managed Care
Appendix P
Plan Terminations/Nonrenewals

> d. **Final Accounting of Amounts Outstanding**. The MCP shall submit to ODM a final accounting list of any outstanding monies owed by ODM no later than six (6) months after the termination/nonrenewal date. Failure by the MCP to submit a list of outstanding items will be deemed a forfeiture of any additional compensation due to the MCP. ODM payment will be limited to only those amounts properly owed by ODM.
>
> e. **Financial sanctions**. All previously collected refundable financial sanctions shall be retained by ODM.
>
> f. **Data Files**. In order to assist members with continuity of care, the MCP shall create data files to be shared with each newly·enrolling MCP. The data files will be provided in a consistent format specified by ODM and may include information on the following: care management, prior authorizations, inpatient facility stays, PCP assignments, and pregnant members. The timeline for providing these files will be at the discretion of ODM. The terminating MCP will be responsible for ensuring the accuracy and data quality of the files.
>
> g. **Notification**.
>
>> i. **Provider Notification**. The MCP shall notify contracted providers at least 55 days prior to the effective date of termination. The provider notification shall be approved by ODM prior to distribution.
>>
>> ii. **Member Notification**. Unless otherwise notified by ODM, the MCP shall notify their members regarding this Agreement termination at least 45 days in advance of the effective date of termination. The member notification shall be approved by ODM prior to distribution.
>>
>> iii. **Prior Authorization Re-Direction Notification**. The MCP shall create two notices to assist members and providers with prior authorization requests received and/or approved during the last month of membership. The first notice is for prior authorization requests for services to be provided after the effective date of termination; this notice will direct members and providers to contact the enrolling MCP. The second notice is for prior authorization requests for services to be provided before and after the effective date of termination. The MCP shall utilize ODM model language to create the notices and receive approval by ODM prior to distribution. The notices will be mailed to the provider and copied to the member for all requests received during the last month of MCP membership.

2. **ODM-initiated Terminations for Cause under OAC 5160-26-10.**

> a. If ODM initiates the proposed termination, nonrenewal or amendment of this Agreement pursuant to OAC rule 5160-26-10 by issuing a proposed adjudication order pursuant to O.R.C. 5164.38, and the MCP submits a valid appeal of that proposed action

**S0215 – M49**

Medicaid Managed Care
Appendix P
Plan Terminations/Nonrenewals

pursuant to O.R.C. Chapter 119, this Agreement will be extended through the issuance of an adjudication order in the MCP's appeal under ORC Chapter 119.

During this time, the MCP will continue to accrue points and be assessed penalties for each subsequent compliance assessment occurrence/violation under Appendix N of this Agreement. If the MCP exceeds 69 points, each subsequent point accrual will result in a $15,000 nonrefundable financial sanction.

Pursuant to OAC rule 5160-26-10, if ODM has proposed the termination, nonrenewal, denial or amendment of this Agreement, ODM may notify the MCP's members of this proposed action and inform the members of their right to immediately terminate their membership with that MCP without cause. If ODM has proposed the termination, nonrenewal, denial or amendment this Agreement, and access to medically-necessary covered services is jeopardized, ODM may propose to terminate the membership of all of the MCP's members. The appeal process for reconsideration of the proposed termination of members is as follows:

i. All notifications of such a proposed MCP membership termination will be made by ODM via certified or overnight mail to the identified MCP Contact.

ii. The MCP will be notified by ODM of such a proposed MCP membership termination, and will have three business days from the date of receipt to request reconsideration.

iii. All reconsideration requests shall be submitted by either facsimile transmission or overnight mail to the Director, Ohio Department of Medicaid, and received by 3PM Eastern Time on the third business day following receipt of the ODM notification of termination. The address and fax number to be used in making these requests will be specified in the ODM notification of termination document.

iv. The MCP will be responsible for verifying timely receipt of all reconsideration requests. All requests shall explain in detail why the proposed MCP membership termination is not justified. The MCP's justification for reconsideration will be limited to a review of the written material submitted by the MCP.

v. A final decision or request for additional information will be made by the Director within three business days of receipt of the request for reconsideration. Should the Director require additional time in rendering the final reconsideration decision, the MCP will be notified of such in writing.

vi. The proposed MCP membership termination will not occur while an appeal is under review and pending the Director's decision. If the Director denies the appeal, the MCP membership termination will proceed at the first possible effective date. The date may be retroactive if the ODM determines that it would be in the best interest of the members.

**S0215 – M50**

Medicaid Managed Care
Appendix P
Plan Terminations/Nonrenewals

b. **Fulfill Existing Duties and Obligations**. The MCP agrees to fulfill all duties and obligations as required under Chapter 5160-26 of the Administrative Code and any provider agreements related to the provision of services for the Medicaid population during periods of time when the MCP was under contract with ODM. Such duties and obligations include, but are not limited to, the submission by the MCP of any previously reported appeals and grievances data which were unresolved for the Medicaid population after the termination/nonrenewal date, resolution of provider and consumer complaints for the Medicaid population served by the MCP for the MCP provider agreement time periods, and provision of data to support audits related to the Medicaid population served by the MCP for the MCP's provider agreement time periods.

c. **Refundable Monetary Assurance**. The MCP will be required to submit a refundable monetary assurance. This monetary assurance will be held by ODM until such time that the MCP has submitted all outstanding monies owed, data files, and reports, including, but not limited to, grievance, appeal, encounter and cost report data related to time periods through the final date of service under the MCP's provider agreement. The monetary assurance shall be in an amount of either $50,000 or 5 % of the capitation amount paid by ODM in the month the termination/nonrenewal notice is issued, whichever is greater.

The MCP shall remit the monetary assurance in the specified amounts via separate electronic fund transfers (EFT) payable to Treasurer of State, State of Ohio (ODM). The MCP shall contact their Contract Administrator to verify the correct amounts required for the monetary assurance and obtain an invoice number prior to submitting the monetary assurance. Information from the invoices shall be included with each EFT to ensure monies are deposited in the appropriate ODM Fund account. In addition, the MCP shall send copies of the EFT bank confirmations and copies of the invoices to their Contract Administrator.

If the monetary assurance is not received as specified above, ODM will withhold the MCP's next month's capitation payment until such time that ODM receives documentation that the monetary assurance is received by the Treasurer of State. If within one year of the date of issuance of the invoice, the MCP does not submit all outstanding monies owed and required submissions, including, but not limited to, grievance, appeal, encounter and cost report data related to time periods through the final date of service under the MCP's provider agreement, the monetary assurance will not be refunded to the MCP.

d. **Bonus Amount**. The bonus amount in the managed care program performance payment fund will be retained by ODM.

e. **Financial sanctions**. All previously collected refundable financial sanctions shall be retained by ODM.

f. **Final Accounting of Amounts Outstanding**. The MCP shall submit to ODM a final accounting list of any outstanding monies owed by ODM no later than six (6) months after the termination/nonrenewal date. Failure by the MCP to submit a list of

**S0215 – M51**

Medicaid Managed Care
Appendix P
Plan Terminations/Nonrenewals

outstanding items will be deemed a forfeiture of any additional compensation due to the MCP. ODM payment will be limited to only those amounts properly owed by ODM.

g. **Data Files**. In order to assist members with continuity of care, the MCP shall create data files to be shared with each newly enrolling MCP. The data files will be provided in a consistent format specified by ODM and may include information on the following: care management, prior authorizations, inpatient facility stays, PCP assignments, and pregnant members. The timeline for providing these files will be at the discretion of ODM. The terminating MCP will be responsible for ensuring the accuracy and data quality of the files.

h. **Notification**.

i. **Provider Notification**. The MCP shall notify contracted providers at least 55 days prior to the effective date of termination. The provider notification shall be approved by ODM prior to distribution.

ii. **Prior Authorization Re-Direction Notification**. The MCP shall create two notices to assist members and providers with prior authorization requests received and/or approved during the last month of membership. The first notice is for prior authorization requests for services to be provided after the effective date of termination; this notice will direct members and providers to contact the enrolling MCP. The second notice is for prior authorization requests for services to be provided before and after the effective date of termination. The MCP shall utilize ODM model language to create the notices and receive approval by ODM prior to distribution. The notices will be mailed to the provider and copied to the member for all requests received during the last month of MCP membership.

3. **Termination due to Non-selection through ODM Procurement Processes**. Should this Agreement end or not be extended in the event the MCP is not awarded a provider agreement as a result of an ODM procurement and the MCP selection process, the MCP has no right to appeal the selection process under ORC Chapter 119 pursuant to ORC 5164.38 and will be required to comply with the following:

a. **Fulfill Existing Duties and Obligations**. The MCP agrees to fulfill all duties and obligations as required under Chapter 5160-26 of the Administrative Code and any provider agreements related to the provision of services for the Medicaid population during periods of time when the MCP was under contract with ODM. Such duties and obligations include, but are not limited to, the submission by the MCP of any previously reported appeals and grievances data which were unresolved for the Medicaid population after the termination/nonrenewal date, resolution of provider and consumer complaints for the Medicaid population served by the MCP for the MCP provider agreement time periods, and provision of data to support audits related to the Medicaid population served by the MCP for the MCP's provider agreement time periods.

**S0215 – M52**

Medicaid Managed Care
Appendix P
Plan Terminations/Nonrenewals

b. **Refundable Monetary Assurance**. The MCP will be required to submit a refundable monetary assurance. This monetary assurance will be held by ODM until such time that the MCP has submitted all outstanding monies owed, data files, and reports, including, but not limited to, grievance, appeal, encounter and cost report data related to time periods through the final date of service under the MCP's provider agreement. The monetary assurance shall be in an amount of either $50,000 or 5 % of the capitation amount paid by ODM in the month the termination/nonrenewal notice is issued, whichever is greater.

The MCP shall remit the monetary assurance in the specified amounts via separate electronic fund transfers (EFT) payable to Treasurer of State, State of Ohio (ODM). The MCP shall contact their Contract Administrator to verify the correct amounts required for the monetary assurance and obtain an invoice number prior to submitting the monetary assurance. Information from the invoices shall be included with each EFT to ensure monies are deposited in the appropriate ODM Fund account. In addition, the MCP shall send copies of the EFT bank confirmations and copies of the invoices to their Contract Administrator.

If the monetary assurance is not received as specified above, ODM will withhold the MCP's next month's capitation payment until such time that ODM receives documentation that the monetary assurance is received by the Treasurer of State. If within one year of the date of issuance of the invoice, the MCP does not submit all outstanding monies owed and required submissions, including, but not limited to, grievance, appeal, encounter and cost report data related to time periods through the final date of service under the MCP's provider agreement, the monetary assurance will not be refunded to the MCP.

c. **Bonus Amount**. The bonus amount in the managed care program performance payment fund will be awarded by ODM in accordance with the pay-for-performance system set forth in Appendix O for the current provider agreement year.

d. **Financial sanctions**. All previously collected refundable financial sanctions shall be returned to the MCP.

e. **Final Accounting of Amounts Outstanding**. The MCP shall submit to ODM a final accounting list of any outstanding monies owed by ODM no later than six (6) months after the termination/nonrenewal date. Failure by the MCP to submit a list of outstanding items will be deemed a forfeiture of any additional compensation due to the MCP. ODM payment will be limited to only those amounts properly owed by ODM.

f. **Data Files**. In order to assist members with continuity of care, the MCP shall create data files to be shared with each newly enrolling MCP. The data files will be provided in a consistent format specified by ODM and may include information on the following: care management, prior authorizations, inpatient facility stays, PCP assignments, and pregnant members. The timeline for providing these files will be at the discretion of ODM. The terminating MCP will be responsible for ensuring the accuracy and data quality of the files.

**S0215 – M53**

Medicaid Managed Care
Appendix P
Plan Terminations/Nonrenewals

g. **Notification.**

i. **Provider Notification.** The MCP shall notify contracted providers at least 55 days prior to the effective date of termination. The provider notification shall be approved by ODM prior to distribution.

ii. **Prior Authorization Re-Direction Notification.** The MCP shall create two notices to assist members and providers with prior authorization requests received and/or approved during the last month of membership. The first notice is for prior authorization requests for services to be provided after the effective date of termination; this notice will direct members and providers to contact the enrolling MCP. The second notice is for prior authorization requests for services to be provided before and after the effective date of termination. The MCP shall utilize ODM model language to create the notices and receive approval by ODM prior to distribution. The notices will be mailed to the provider and copied to the member for all requests received during the last month of MCP membership.

4. **Termination or Modification of this Agreement due to Lack of Funding.** Should this Agreement terminate or be modified due to a lack of available funding as set forth in the Baseline of this Agreement, the MCP has no right to appeal the selection process under ORC Chapter 119 pursuant to ORC 5164.38 and will be required to comply with the following:

a. **Fulfill Existing Duties and Obligations.** The MCP agrees to fulfill all duties and obligations as required under Chapter 5160-26 of the Administrative Code and any provider agreements related to the provision of services for the Medicaid population(s) during periods of time when the MCP was under contract with ODM. Such duties and obligations include, but are not limited to, the submission by the MCP of any previously reported appeals and grievances data which were unresolved for the Medicaid populations, resolution of provider and consumer complaints for the Medicaid population served by the MCP for the MCP provider agreement time periods, and provision of data to support audits related to the Medicaid population served by the MCP for the MCP's provider agreement time periods.

b. **Refundable Monetary Assurance.** The MCP will be required to submit a refundable monetary assurance should the Agreement terminate. This monetary assurance will be held by ODM until such time that the MCP has submitted all outstanding monies owed, data files, and reports, including, but not limited to, grievance, appeal, encounter and cost report data related to time periods through the final date of service under the MCP's provider agreement. The monetary assurance shall be in an amount of either $50,000 or 5 % of the capitation amount paid by ODM in the month the termination notice is issued, whichever is greater.

The MCP shall remit the monetary assurance in the specified amounts via separate electronic fund transfers (EFT) payable to Treasurer of State, State of Ohio (ODM). The MCP shall contact their Contract Administrator to verify the correct amounts required

S0215 - M54

Medicaid Managed Care
Appendix P
Plan Terminations/Nonrenewals

for the monetary assurance and obtain an invoice number prior to submitting the monetary assurance. Information from the invoices shall be included with each EFT to ensure monies are deposited in the appropriate ODM Fund account. In addition, the MCP shall send copies of the EFT bank confirmations and copies of the invoices to their Contract Administrator.

If the monetary assurance is not received as specified above, ODM will withhold the MCP's next month's capitation payment until such time that ODM receives documentation that the monetary assurance is received by the Treasurer of State. If within one year of the date of issuance of the invoice, the MCP does not submit all outstanding monies owed and required submissions, including, but not limited to, grievance, appeal, financial sanctions or sanctions, encounter and cost report data related to time periods through the final date of service under the MCP's provider agreement, the monetary assurance will not be refunded to the MCP.

c. **Bonus Amount**. The bonus amount in the managed care program performance payment fund will be awarded by ODM in accordance with the pay-for-performance system set forth in Appendix O for the current provider agreement year.

d. **Financial sanctions**. Previously collected refundable financial sanctions directly and solely related to the termination or modification of this Agreement shall be returned to the MCP.

e. **Final Accounting of Amounts Outstanding**. The MCP shall submit to ODM a final accounting list of any outstanding monies owed by ODM no later than six (6) months after a termination/nonrenewal date of this Agreement. Failure by the MCP to submit a list of outstanding items will be deemed a forfeiture of any additional compensation due to the MCP. ODM payment will be limited to only those amounts properly owed by ODM.

f. **Data Files**. In order to assist members with continuity of care, the MCP shall create data files if requested by ODM. The data files will be provided in a consistent format specified by ODM and may include information on the following: care management, prior authorizations, inpatient facility stays, PCP assignments, and pregnant members. The timeline for providing these files will be at the discretion of ODM. The MCP will be responsible for ensuring the accuracy and data quality of the files.

g. **Provider Notification**. The MCP shall notify contracted providers within 30 days of notice from ODM of the effective date of termination or modification of this Agreement. The provider notification shall be approved by ODM prior to distribution.

S0215 – M55

Medicaid Managed Care
Appendix Q
Payment Reform

## APPENDIX Q

**PAYMENT REFORM**

On January 9, 2013, Governor John Kasich's Advisory Council on Health Care Payment Reform adopted the Catalyst for Payment Reform (CPR) principles as part of a comprehensive strategy to prioritize and coordinate multi-payer health care payment innovation activities in Ohio. The Ohio Department of Medicaid (ODM) is committed to reforming the health care delivery system by designing and implementing systems of payment that signal powerful expectations for improved health care delivery.

1. **Payment Innovation and Reform.** Improving the delivery of health care, including its quality, efficiency, safety, patient-centeredness, coordination, and outcomes, requires significant changes in existing payment structures and methodologies as well as the environment in which payments are made. The following innovations have been adopted by Ohio Medicaid:

    a. Payment reforms should promote health by rewarding the delivery of quality, cost effective and affordable care that is patient-centered and reduces disparities;

    b. Health care payments should encourage and reward patient-centered care that coordinates services across the spectrum of providers and care setting while tailoring health care service to the individuals patient's needs;

    c. Payment policies should encourage alignment between public and private sectors to promote improvement, innovations and meeting national health priorities, and to maximize the impact of payment decisions of one sector on the other;

    d. Decisions about payment should be made through independent processes guided by what serves the patient and helps society as a whole, and payment decisions shall balance the perspectives of consumers, purchasers, payers, physicians and other health care providers;

    e. Payment policies should foster ways to reduce expenditure on administrative processes (e.g., claims payment and adjudications); and

    f. Reforms to payment should balance the need for urgency against the need to have realistic goals and timelines that take into account the need to change complex systems and geographic and other variations.

2. **ODM's Expectations.** ODM expects the MCP to support and advance initiatives to develop a health care market where payment is increasingly designed to improve and reflect the effectiveness and efficiency with which providers deliver care. In addition, ODM supports the development of MCP members engaged in managing their health, selecting their providers, and maintaining sensitivity to the cost and quality of services they seek. The MCP shall use its best efforts to ensure these commitments and initiatives apply to the benefits offered and services delivered under this provider agreement. The MCP shall achieve progress in the following areas:

**S0215 – M56**

Medicaid Managed Care
Appendix Q
Payment Reform

    a. **Value-Oriented Payment**. The MCP shall design and implement payment methodologies with its network providers designed either to cut waste or reflect value. For the purposes of this Agreement, payments that cut waste are those that by their design reduce unnecessary payment and unnecessary care (e.g. elective cesarean deliveries). Value is defined as the level of the quality of care for the amount of money paid to the provider. Payments designed to reflect value are those tied to provider performance so that they may rise or fall in a predetermined fashion commensurate with different levels of performance assessed against standard measures.

    b. **Market Competition and Consumerism**. The MCP shall design contracting methodologies and payment options and administer the benefit package to members in a manner that enhances competition among providers and reduces unwarranted price and quality variation. To stimulate provider competition further, the MCP shall establish programs to engage members to make informed choices and to select evidence-based, cost-effective care.

    c. **Transparency**. The MCP shall participate in ODM initiatives to design and implement member-accessible comparisons of provider information including quality, cost, and patient experience among providers in the MCP's network. The MCP shall contribute to the program design, provide data as specified by ODM, and publish results in accordance with standards established by the Department.

3. **Obligations of the MCPs.** The MCP shall implement payment strategies that tie payment to value or reduce waste. In doing so, the MCP shall provide ODM with its strategy to make 50% of aggregate net payments to providers value-oriented by 2020. In addition, the MCP shall submit a quarterly progress report as specified by ODM that addresses progress towards meeting these obligations. Implementation strategies include the following:

    a. Pay providers differentially according to performance (and reinforce with benefit design);

    b. Design approaches to payment that reduce waste while not diminishing quality, including reducing unwarranted payment variation;

    c. Design payments to encourage adherence to clinical guidelines. At a minimum, the MCP shall address policies to discourage elective deliveries before 39 weeks; and

    d. Develop payment strategies to reduce unwarranted price variation, such as reference or value pricing (e.g., analysis of price variation among network providers by procedure and service types, pilot value pricing programs, encouragement of member value-based pricing information , center of excellence pricing, and rebalance payment between primary and specialty care). Prior to implementation, the MCP shall inform ODM of service specific fee schedule changes that may adversely impact 50 or more network providers.

4. **State Sponsored Value Based Initiatives.** Ohio is committed to pursuing payment models that increase access to patient-centered medical homes and support episode-based payments for an

## S0215 – M57

Medicaid Managed Care
Appendix Q
Payment Reform

acute medical event. The purpose of both models is to achieve better health, better care, and cost savings. Participation of the MCP is critical to the success of both models. The MCP shall implement value-based initiatives in accordance with the following rules:

    a.  Episode Based Payments, Ohio Administrative Code 5160-1-70; and

    b.  Patient Centered Medical Homes Ohio Administrative Code 5160-1-71 and 5160-1-72.